# 13-1183

## 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘
### for the
## 𝕾𝖊𝖈𝖔𝖓𝖉 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

Andrew Adams,

Appellant,

-v.-

Festival Fun Parks, LLC

Defendant – Appellee.

On Appeal from the United States District Court
for the District of Connecticut

## JOINT APPENDEX

Attorney for the Plaintiff:
Sabatini and Associates, LLC
One Market Square
Newington, CT  06111
860-667-0839

- and -

Attorney for the Defendant:
Fisher & Phillips, LLP
201 King of Prussia Road, Suite 650
Radnor, PA  19087

# **INDEX**

Docket Entries……………………………………………………………..JA1

Plaintiff's Amended Complaint,
 Filed October16, 2011, Entry # 16…………………………………..JA8

Defendant's Answer to Amended Complaint with Affirmative Defenses,
 Filed November 1, 2011, Entry # 19…………………………………JA25

Defendant's Motion to Preclude Testimony of Cynthia K. Niedbala,
 Filed March 15, 2012, Entry #29……………………………….…JA47

Defendant's Motion for Summary Judgment, Including
Memorandum in Support, Statement of Material facts
 Filed March 15, 2012, Entry # 30……………………………...…JA107

Defendant's Corrected Exhibits to Memorandum of Law,
 Filed April 27, 2012, Entry # 35………………………….….…...…JA143

Plaintiff's Objection to Defendant's Motion for Summary Judgment, Including
Memorandum in Support, Affidavit, Exhibits, Statement of Martial facts
 Filed May 4, 2012, Entry # 36………………………….…….…...……JA203

Defendant's Reply to Response to Motion for Summary Judgment,
Including Exhibits
 Filed June 1, 2012, Entry # 40…………………………………………JA399

Order of the Honorable Janet C. Hall,
 Filed March 12, 2013, Entry # 47…………………..………………JA425

Judgment,
 Filed March 12, 2013, Entry # 48…………………………..…...JA454

Notice of Appeal,
 Filed April 1, 2012, Entry # 50……………………….….….………JA455

i

# U.S. District Court
# United States District Court for the District of Connecticut (New Haven)
## CIVIL DOCKET FOR CASE #: 3:11-cv-00427-JCH

Adams v. Festival Fun Parks, LLC
Assigned to: Judge Janet C. Hall
Demand: $500,000
Cause: 42:12101 Americans with Disabilities Act

Date Filed: 03/18/2011
Date Terminated: 03/12/2013
Jury Demand: Plaintiff
Nature of Suit: 445 Civil Rights:
Americans with Disabilities -
Employment
Jurisdiction: Federal Question

**Plaintiff**

**Andrew Adams**                    represented by **Cindy A Miller**
Rose Kallor LLP
750 Main Street, Suite 606
Hartford, CT 06103
860-748-4660
Fax: 860-241-1547
Email: cmiller@rosekallor.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James V. Sabatini**
Sabatini & Associates
One Market Square
Newington, CT 06111
860-667-0839
Fax: 860-667-0867
Email: sa@sabatinilaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Festival Fun Parks, LLC**          represented by **James P. McLaughlin**
*doing business as*                  Fisher & Phillips, LLP - PA
Lake Compounce Theme Park            Radnor Financial Center, Suite 650
201 King of Prussia Road
Radnor, PA 19087
610-230-2138
Fax: 610-230-2151
Email: jmclaughlin@laborlawyers.com
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Risa B. Boerner**
Fisher & Phillips, LLP - PA
Radnor Financial Center, Suite 650
201 King of Prussia Road
Radnor, PA 19087
610-230-2132
Fax: 610-230-2151
Email: rboerner@laborlawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/18/2011 | 1 | COMPLAINT against Festival Fun Parks, LLC, filed by Andrew Adams. (Montgomery, A.) (Additional attachment(s) added on 3/18/2011: # 1 Civil Cover Sheet) (Montgomery, A.). (Entered: 03/18/2011) |
| 03/18/2011 | | Filing fee received from Sabatini and Associates LLC: $ 350.00, receipt number CTXH00000760 (Montgomery, A.) (Entered: 03/18/2011) |
| 03/18/2011 | 2 | Order on Pretrial Deadlines: Motions to Dismiss due on 6/18/2011. Amended Pleadings due by 5/17/2011 Discovery due by 9/17/2011 Dispositive Motions due by 10/17/2011. Signed by Clerk on 3/18/2011. (Montgomery, A.) (Entered: 03/18/2011) |
| 03/18/2011 | 3 | ELECTRONIC FILING ORDER - PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER. Signed by Judge Janet C. Hall on 3/18/2011. (Montgomery, A.) (Entered: 03/18/2011) |
| 03/18/2011 | 4 | STANDING PROTECTIVE ORDER. Signed by Judge Janet C. Hall on 3/18/2011. (Montgomery, A.) (Entered: 03/18/2011) |
| 03/18/2011 | 5 | NOTICE TO COUNSEL: Counsel initiating or removing this action is responsible for serving all parties with attached documents and copies of 4 Protective Order, 2 Order on Pretrial Deadlines, 3 Electronic Filing Order, 1 Complaint filed by Andrew Adams. Signed by Clerk on 3/18/2011. (Montgomery, A.) (Entered: 03/18/2011) |
| 04/14/2011 | 6 | WAIVER OF SERVICE Returned Executed as to Festival Fun Parks, LLC waiver sent on 4/11/2011, answer due 6/10/2011 filed by Andrew Adams. (Sabatini, James) (Entered: 04/14/2011) |
| 05/16/2011 | 7 | ANSWER to 1 Complaint with Affirmative Defenses by Festival Fun Parks, LLC.(Boerner, Risa) (Entered: 05/16/2011) |
| 06/06/2011 | | Set Deadlines/Hearings: Rule 26 Meeting Report due by 6/29/2011 (DeRubeis, B.) (Entered: 06/06/2011) |
| 06/29/2011 | 8 | |

Case: 13-1183    Document: 51    Page: 5    08/19/2013    1020229    458

| | | |
|---|---|---|
| | | Joint REPORT of Rule 26(f) Planning Meeting by Andrew Adams, Festival Fun Parks, LLC (Sabatini, James) Modified on 6/30/2011 (Payton, R.). (Entered: 06/29/2011) |
| 06/30/2011 | 9 | Docket Entry Correction re 8 Report of Rule 26(f) Planning Meeting Modified to add Plaintiff and Defendant as filers to Docket Entry (Payton, R.) (Entered: 06/30/2011) |
| 07/05/2011 | 10 | SCHEDULING ORDER re: 8 Joint REPORT of Rule 26(f) Planning Meeting. Discovery due by 2/1/2012 Dispositive Motions due by 3/15/2012 Status Report due by 10/3/2011 Trial Brief due by 3/15/2012. Signed by Judge Janet C. Hall on 7/5/2011. (Simpson, T.) (Entered: 07/05/2011) |
| 09/06/2011 | 11 | MOTION for Extension of Time until 10/11/2011 to Respond to First Set of Interrogatories and Requests for Production by Andrew Adams. (Sabatini, James) (Entered: 09/06/2011) |
| 09/06/2011 | 12 | First MOTION to Amend/Correct 1 Complaint by Andrew Adams.Responses due by 9/27/2011 (Sabatini, James) (Entered: 09/06/2011) |
| 09/06/2011 | 13 | AMENDED COMPLAINT against Festival Fun Parks, LLC, filed by Andrew Adams.(Sabatini, James) (Entered: 09/06/2011) |
| 09/07/2011 | 14 | ORDER granting 11 MOTION for Extension of Time until 10/11/2011 to Respond to First Set of Interrogatories and Requests for Production by Andrew Adams. SO ORDERED by Judge Janet C. Hall on 9/7/2011. (DeRubeis, B.) (Entered: 09/07/2011) |
| 10/04/2011 | 15 | ORDER granting 12 First MOTION to Amend/Correct 1 Complaint by Andrew Adams. Plaintiff is directed to file his amended complaint. SO ORDERED by Judge Janet C. Hall on 10/4/2011. (DeRubeis, B.) (Entered: 10/04/2011) |
| 10/06/2011 | 16 | AMENDED COMPLAINT against Festival Fun Parks, LLC, filed by Andrew Adams.(Sabatini, James) (Entered: 10/06/2011) |
| 10/12/2011 | 17 | MOTION for Extension of Time until 11/11/2011 to respond to defendant's First Set of Interrogatories and Requests for Production by Andrew Adams. (Sabatini, James) (Entered: 10/12/2011) |
| 10/13/2011 | 18 | ORDER granting 17 MOTION for Extension of Time until 11/11/2011 to respond to defendant's First Set of Interrogatories and Requests for Production by Andrew Adams. SO ORDERED by Judge Janet C. Hall on 10/13/2011. (DeRubeis, B.) (Entered: 10/13/2011) |
| 11/01/2011 | 19 | ANSWER to 16 Amended Complaint with Affirmative Defenses. by Festival Fun Parks, LLC.(Boerner, Risa) (Entered: 11/01/2011) |
| 11/11/2011 | 20 | Final MOTION for Extension of Time until 11-25-2011 Answer or Object to Interrogatories and Requests for Production by Andrew Adams. (Sabatini, James) (Entered: 11/11/2011) |
| 11/14/2011 | 21 | ORDER granting 20 Final MOTION for Extension of Time until 11-25-2011 Answer or Object to Interrogatories and Requests for Production by Andrew Adams. SO ORDERED by Judge Janet C. Hall on 11/14/2011. (DeRubeis, B.) (Entered: 11/14/2011) |

| | | |
|---|---|---|
| 12/12/2011 | 22 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Telephonic Status Conference set for 12/15/2011 10:00 AM in Chambers Room 417, 915 Lafayette Blvd., Bridgeport, CT before Judge Janet C. Hall. Counsel are requested to participate in this conference, via telephone. This conference call is to be arranged between counsel. Once all parties are on the line, please telephone chambers at (203) 579-5554. (DeRubeis, B.) (Entered: 12/12/2011) |
| 12/15/2011 | 23 | Minute Entry for proceedings held before Judge Janet C. Hall: Status Conference held on 12/15/2011. Parties already resolved issue. 5 minutes(Court Reporter T. Fidanza.) (Vaughan, K.) (Entered: 12/15/2011) |
| 02/21/2012 | 24 | MOTION for Attorney(s) James P. McLaughlin to be Admitted Pro Hac Vice (paid $25 PHV fee; receipt number 0205-2409065) by Festival Fun Parks, LLC. (Boerner, Risa) (Entered: 02/21/2012) |
| 02/22/2012 | 25 | ORDER denying without prejudice to renew for failure to comply with Local Rule 83.1 24 MOTION for Attorney(s) James P. McLaughlin to be Admitted Pro Hac Vice. SO ORDERED by Judge Janet C. Hall on 2/22/2012. (DeRubeis, B.) (Entered: 02/22/2012) |
| 03/01/2012 | 26 | MOTION for Attorney(s) James P. McLaughlin to be Admitted Pro Hac Vice (paid $25 PHV fee; receipt number 0205-2420152) by Festival Fun Parks, LLC. (Boerner, Risa) (Entered: 03/01/2012) |
| 03/02/2012 | 27 | ORDER granting 26 Motion for Attorney James P. McLaughlin to Appear Pro Hac Vice. Signed by Clerk on 3/2/2012. (Oliver, T.) (Entered: 03/02/2012) |
| 03/12/2012 | 28 | CERTIFICATE OF GOOD STANDING re 26 MOTION for Attorney(s) James P. McLaughlin to be Admitted Pro Hac Vice (paid $25 PHV fee; receipt number 0205-2420152) by Festival Fun Parks, LLC. (Boerner, Risa) (Entered: 03/12/2012) |
| 03/15/2012 | 29 | MOTION to Preclude The Testimony of Cynthia K. Niedbala by Festival Fun Parks, LLC.Responses due by 4/5/2012 (Attachments: # 1 Memorandum in Support, # 2 Exhibit Exhibits A-D)(Boerner, Risa) (Entered: 03/15/2012) |
| 03/15/2012 | 30 | MOTION for Summary Judgment by Festival Fun Parks, LLC.Responses due by 4/5/2012 (Attachments: # 1 Memorandum in Support, # 2 Exhibit Exhibits A-D, # 3 Statement of Material Facts)(Boerner, Risa) (Entered: 03/15/2012) |
| 03/20/2012 | 31 | MOTION for Extension of Time to File Response/Reply as to 30 MOTION for Summary Judgment until 5/5/2012 by Andrew Adams. (Sabatini, James) (Entered: 03/20/2012) |
| 03/20/2012 | 32 | MOTION for Extension of Time to File Response/Reply as to 29 MOTION to Preclude The Testimony of Cynthia K. Niedbala until 5/5/2012 by Andrew Adams. (Sabatini, James) (Entered: 03/20/2012) |
| 03/21/2012 | 33 | ORDER granting 31 Motion for Extension of Time to File Response/Reply re: 30 MOTION for Summary Judgment ; granting 32 Motion for Extension of Time to File Response/Reply re 29 MOTION to Preclude The Testimony of |

| | | |
|---|---|---|
| | | Cynthia K. Niedbala. Responses due by 5/5/2012. This will be the only extension. SO ORDERED by Judge Janet C. Hall on 3/21/2012. (DeRubeis, B.) (Entered: 03/21/2012) |
| 04/26/2012 | 34 | EXHIBIT *A-D (corrected) to Memorandum of Law in Support* by Festival Fun Parks, LLC re 30 MOTION for Summary Judgment. (Boerner, Risa) (Additional attachment(s) added on 4/27/2012: # 1 REPLACEMENT PDF) (Oliver, T.). (Entered: 04/26/2012) |
| 04/27/2012 | 35 | Docket Entry Correction re 34 Exhibit MODIFIED TO ADD REPLACEMENT PDF DOCUMENT; ORIGINAL WAS UNSIGNED & MISSING CERTIFICATE OF SERVICE (Oliver, T.) (Entered: 04/27/2012) |
| 05/04/2012 | 36 | OBJECTION *to Defendant's 30 Motion for Summary Judgment* filed by Andrew Adams. (Attachments: # 1 Memorandum in Support, # 2 Statement of Material Facts, # 3 Affidavit Affidavit of James V. Sabatini, Esq., # 4 Exhibit Exhibits 1-8)(Sabatini, James) Modified on 5/7/2012 TO LINK TO DOC #30 (Oliver, T.). (Entered: 05/04/2012) |
| 05/09/2012 | 37 | MOTION for Extension of Time to File Response/Reply as to 30 MOTION for Summary Judgment until June 1, 2012 by Festival Fun Parks, LLC. (McLaughlin, James) (Entered: 05/09/2012) |
| 05/11/2012 | 38 | ORDER granting 37 Motion for Extension of Time to File Response/Reply re 30 MOTION for Summary Judgment. Reply due by 6/1/2012. SO ORDERED by Judge Janet C. Hall on 5/11/2012. (DeRubeis, B.) (Entered: 05/11/2012) |
| 05/22/2012 | 39 | ORDER granting absent objection 29 MOTION to Preclude The Testimony of Cynthia K. Niedbala by Festival Fun Parks, LLC. SO ORDERED by Judge Janet C. Hall on 5/21/2012. (DeRubeis, B.) (Entered: 05/22/2012) |
| 06/01/2012 | 40 | REPLY to Response to 30 MOTION for Summary Judgment filed by Festival Fun Parks, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (McLaughlin, James) (Entered: 06/01/2012) |
| 09/12/2012 | 41 | NOTICE TO COUNSEL/PRO SE LITIGANTS: COUNSEL AND PRO SE LITIGANTS ARE HEREBY ADVISED THAT EFFECTIVE SEPTEMBER 19, 2012, ALL COURT PROCEEDINGS BEFORE JUDGE JANET C. HALL PREVIOUSLY SCHEDULED IN BRIDGEPORT CONNECTICUT, **WILL BE HELD IN COURTROOM 1, 141 CHURCH STREET, NEW HAVEN, CONNECTICUT.** PARTIES REQUESTED TO PARTICIPATE IN TELEPHONIC CONFERENCES ON OR AFTER SEPTEMBER 19, 2012, SHOULD TELEPHONE CHAMBERS AT **(203) 773-2427.** THIS IS THE ONLY NOTICE PARTIES WILL RECEIVE. Signed by Clerk on 9/12/12. (Pesta, J.) (Entered: 09/12/2012) |
| 02/19/2013 | 42 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Oral Argument set for 3/14/2013 03:00 PM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall as to 30 MOTION for Summary Judgment. (DeRubeis, B.) (Entered: 02/19/2013) |
| | | |

| 02/25/2013 | 43 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 3/14/2013*. Oral Argument has been changed to 3/5/2013 11:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall as to <u>30</u> MOTION for Summary Judgment.(DeRubeis, B.) (Entered: 02/25/2013) |
| 02/26/2013 | 44 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 3/5/2013*. Oral argument has been changed to 3/8/2013 at 03:00 PM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall as to <u>30</u> MOTION for Summary Judgment. (Mar, Stephen) (Entered: 02/26/2013) |
| 02/28/2013 | <u>45</u> | NOTICE of Appearance by Cindy A Miller on behalf of Andrew Adams (Miller, Cindy) (Entered: 02/28/2013) |
| 03/08/2013 | <u>46</u> | Minute Entry. Proceedings held before Judge Janet C. Hall: Motion Hearing held on 3/8/2013; taking under advisement <u>30</u> Motion for Summary Judgment; Total Time: 1 hours(Court Reporter Terri Fidanza.) (Lewis, D) (Entered: 03/11/2013) |
| 03/12/2013 | <u>47</u> | RULING granting <u>30</u> Motion for Summary Judgment. Summary judgment is entered in favor of Festival Fun Parks on all Counts.. Signed by Judge Janet C. Hall on 3/12/2013. (Lewis, D) (Entered: 03/12/2013) |
| 03/12/2013 | <u>48</u> | JUDGMENT entered in favor of Festival Fun Parks, LLC against Andrew Adams.<br><br>For Appeal Forms please go to the following website:<br>http://www.ctd.uscourts.gov/forms.html<br>Signed by Clerk on 3/12/2013.(Lewis, D) (Entered: 03/12/2013) |
| 03/12/2013 | | JUDICIAL PROCEEDINGS SURVEY: The following link to the confidential survey requires you to log into CM/ECF for SECURITY purposes. Once in CM/ECF you will be prompted for the case number. Although you are receiving this survey through CM/ECF, it is hosted on an independent website called SurveyMonkey. Once in SurveyMonkey, the survey is located in a secure account. The survey is not docketed and it is not sent directly to the judge. To ensure anonymity, completed surveys are held up to 90 days before they are sent to the judge for review. We hope you will take this opportunity to participate, please click on this link:<br><br>https://ecf.ctd.uscourts.gov/cgi-bin/Dispatch.pl?survey<br>(Lewis, D) (Entered: 03/12/2013) |
| 03/19/2013 | <u>49</u> | NOTICE OF APPEAL to Federal Circuit by Andrew Adams. Filing fee $ 455, receipt number 0205-2814512. (Sabatini, James) (Entered: 03/19/2013) |
| 04/01/2013 | <u>50</u> | NOTICE OF APPEAL as to <u>48</u> Judgment by Andrew Adams. Filing fee $ 455, receipt number 0205-2826835. (Miller, Cindy) (Entered: 04/01/2013) |
| 04/02/2013 | <u>51</u> | |

| | | |
|---|---|---|
| | | BILL OF COSTS by Festival Fun Parks, LLC. (Attachments: # 1 Exhibit A to Bill of Costs, # 2 Exhibit A-1 to Bill of Costs, # 3 Exhibit A-2 to Bill of Costs) (McLaughlin, James) (Entered: 04/02/2013) |
| 04/02/2013 | 52 | ORDER denying 51 Bill of Costs filed by Festival Fun Parks, LLC without prejudice as prematurely filed. A bill of costs is filed only after the judgment becomes final due to the expiration of the appeal period or after the issuance of a mandate by the Court of Appeals. D. Conn. L. Civ. R. 54(a)1. In this case, an appeal is pending any request for costs is premature.<br>Signed by Clerk on 4/2/2013.(Thomas, D.) (Entered: 04/02/2013) |
| 04/02/2013 | | Clerk's Disbursement of Funds - Refund in the amount of $455.00 paid to card holder James Sabatini for overpayment of Notice of Appeal filing fee originally received on 3/12/13 rec.no. 0205-2814512. (Smart, E) (Entered: 04/03/2013) |
| 05/19/2013 | 53 | TRANSCRIPT of Proceedings: Type of Hearing: Oral Argument. Held on March 8,2013 before Judge Janet C. Hall. Court Reporter: Terri Fidanza. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/9/2013. Redacted Transcript Deadline set for 6/19/2013. Release of Transcript Restriction set for 8/17/2013. (Fidanza, T.) (Entered: 05/19/2013) |
| 05/23/2013 | 54 | Index to Record on Appeal by Andrew Adams re 50 Notice of Appeal, 36 Objection, 48 Judgment, 47 Order on Motion for Summary Judgment, 16 Amended Complaint, 34 Exhibit, 40 Reply to Response to Motion, 30 MOTION for Summary Judgment, 53 Transcript,,,, 19 Answer to Amended Complaint. For docket entries without a hyperlink, contact the court to arrange for the document(s) to be made available to you. (Miller, Cindy) (Entered: 05/23/2013) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/15/2013 10:55:38 | | |
| PACER Login: | sa1410 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 3:11-cv-00427-JCH |
| Billable Pages: | 5 | Cost: | 0.50 |

### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ANDREW ADAMS,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No.: 3:11 cv 00427 (JCH)** |
| | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **FESTIVAL FUN PARKS, LLC, d/b/a** | : | |
| **LAKE COMPOUNCE THEME PARK,** | : | |
| | : | |
| **Defendant.** | : | **October 6, 2011** |

**Jury Trial Demanded**

### FIRST AMENDED COMPLAINT

Plaintiff, Andrew Adams, by and through his attorneys, Sabatini and Associates, LLC, complaining of the defendant, respectfully alleges:

### PARTIES

1. Plaintiff Andrew Adams is a Connecticut citizen residing in the City of Bristol.

2. Defendant, Festival Fun Parks, LLC d/b/a Lake Compounce Theme Park. is a limited liability company organized and existing under the laws of the State of Delaware. Defendant's principal place of business is 4590 Macarthur Blvd., Newport Beach, California.

3. At all times material, plaintiff is an employee within the meaning of the Americans With Disabilities Act of 1990 (ADA), Title VII and the Connecticut Fair Employment Practices Act 46a-60(a)(1) *et seq*.

4. At all times material, defendant is an employer within the meaning of the ADA, Title VII and the Connecticut Fair Employment Practices Act 46a-60(a)(1) *et seq*.

## JURISDICTION AND VENUE

5.  The Court has jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343 and this action is brought pursuant to: the American With Disabilities Act of 1990, cited as 42 U.S.C. §12101 and Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991.

6.  This Court has personal jurisdiction over the Parties and venue is proper under 28 U.S.C. §1391(b) in that a substantial part of the events or omissions giving rise to the claim occurred in the State of Connecticut.

## GENERAL ALLEGATIONS

7.  Plaintiff is suffers from mental retardation.

8.  Plaintiff is male.

9.  At all times material, Defendant employs fifteen (15) or more individuals.

10.  In May 2008, defendant hired the plaintiff as a full time employee with the job title of Maintenance Helper.

11.  Plaintiff worked at defendant's Lake Compounce Theme Park located in Bristol, Connecticut.

12.  Plaintiff was subjected to sexual harassment by his co-employees including Justin Walters.

13.  Defendant, by and through its employees, called the plaintiff stupid.

14.  Defendant, by and through its employees, told the plaintiff that he did not know what he was doing.

15.  Defendant, by and through its employees, wrote the word "sucks" next to plaintiff's name located on plaintiff's blow torch.

16. Defendant, by and through its employees, threw and smashed an apple on plaintiff's truck.

17. Defendant, by and through its employee, Walters, told the plaintiff that being on his knees was his best position and that he liked being on his knees because he liked guys so much.

18. Walters would repeatedly make the above-referenced comment when plaintiff was required to get on his knees to perform his job duties.

19. Defendant, by and through its employees Walters, told the plaintiff that he "had" plaintiff's mother last night and that she was good.

20. Plaintiff complained to his immediate supervisor, John Fitch, about the harassment.

21. Fitch told the plaintiff that he would have to deal with it if he wanted to work in the department.

22. Fitch failed to end the harassment.

23. Upon information and belief, Fitch failed to make any effort to end the harassment.

24. Plaintiff spoke to Fitch's supervisor, Mario Abela about the harassment by Walters and was told to give Walters a chance and that he was not so bad.

25. Plaintiff spoke to defendant's general manager, Jerry Brick, and asked if he could find a new position to work because of the problems he was having.

26. Plaintiff asked if he could work in the painting department.

27. Defendant told the plaintiff that there were no open positions in the painting department.

28.  On October 31, 2009, defendant terminated plaintiff's employment.

29.  At all times material, defendant was aware of plaintiff's mental disability.

30.  Defendant sexually harassed the plaintiff and harassed the plaintiff on the basis of his disability.

31.  At all times material, plaintiff's disability does not prevent him from performing the essential functions of his job with or without a reasonable accommodation.

32.  Any excuse to be given by the defendant regarding plaintiff's termination would be a pretext for the termination.

33.  Plaintiff filed charges on the following date: February 22, 2010 with the Equal Employment Opportunity Commission (EEOC).

34.  Plaintiff's receipt of the right to sue letter is pending.

35.  Plaintiff filed charges on the following date: February 22, 2010, with the Commission on Human Rights and Opportunities (CHRO).

36.  Plaintiff received a release of jurisdiction (copy attached as Exhibit 1) on the following date: December 29, 2010.

### FIRST COUNT
### (Disability Discrimination In Violation Of The ADA)

1.  Plaintiff repeats the allegations in paragraphs 1 through 41 above as if fully incorporated herein.

37.  Defendant's actions violate the Americans With Disabilities Act of 1990 as amended, which prohibits discrimination on the basis of disability.

38.  Defendant, by and through its agents and/or employees, violated the Americans With Disabilities Act, in one or more of the following ways:

(a)    In that defendant interfered with plaintiff's privilege of employment on the basis of plaintiff's disability;

(b)    In that defendant discriminated against the plaintiff in such a way that it adversely affected his status as an employee including termination;

(c)    In that defendant terminated plaintiff's employment; and

(d)    In that defendant treated the plaintiff adversely different from similarly situated non-disabled employees;

39. As a direct and proximate result of defendant's unequal treatment and discrimination, plaintiff has been deprived of his employment and equal employment opportunities because of her disability.

40. As a further direct and proximate result of defendant's discrimination of the plaintiff, plaintiff has been deprived of income, wages, and benefits.

41. As a further result of defendant's termination and discrimination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment, emotional distress, and harm to professional reputation.

42. Plaintiff has suffered and will continue to suffer injuries and losses as a result of defendant's wrongful and discriminatory acts.

43. Defendant's conduct towards the plaintiff was arbitrary and discriminatory all in violation of the ADA. The defendant exhibited ill will, malice, improper motive and indifference to the plaintiff's civil rights by terminating his employment on the basis of his disability.

**SECOND COUNT**
**(Disability Discrimination in Violation of C.G.S. §46a-60(a)(1))**

1. Plaintiff repeats the allegations in paragraphs 1 through 43 above as if fully incorporated herein.

44. Defendant, by and through its agents, servants, and/or employees, violated the Connecticut Fair Employment Practices Act C.G.S. §46a-60a *et seq.* in one or more of the following ways.

     a.     In that defendant interfered with plaintiff's privilege of employment on the basis of plaintiff's disability;

     b.     In that defendant limited and classified the plaintiff by his disability in such a way that deprived him of opportunities and recognition given to other similarly situated coworkers;

     c.     In that defendant discriminated against the plaintiff in such a way that adversely affected his status as an employee;

     d.     In that defendant treated the plaintiff adversely different from similarly situated non-disabled employees;

     e.     In that defendant terminated plaintiff's employment on account of his disability; and

     f.     In that defendant intentionally discriminated against the plaintiff;

45. As a direct and proximate result of defendant's unequal treatment and discrimination, plaintiff has been deprived of his employment and equal employment opportunities because of his disability.

46. As a further direct and proximate result of defendant's discrimination of the plaintiff, plaintiff has been deprived of income, wages, and benefits.

47.  As a further result of defendant's termination and discrimination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment, emotional distress, and harm to professional reputation.

48.  Plaintiff has suffered and will continue to suffer injuries and losses as a result of defendant's wrongful and discriminatory acts.

49.  Defendant's conduct towards the plaintiff was arbitrary and discriminatory all in violation of the C.G.S. Section 46a-60(a)(1).  The defendant exhibited ill will, malice, improper motive and indifference to the plaintiff's civil rights by terminating him employment on the basis of his disability.

## THIRD COUNT
### (Gender Discrimination in Violation of C.G.S. §46a-60(a)(1))

1.  Plaintiff repeats the foregoing allegations as if the same were repeated herein.

50.  Defendant's actions violated Connecticut Fair Employment Practices Act, C.G.S. §46a-60(a)(1) as amended, which prohibit discrimination on the basis of gender in one or more of the following ways:

(a)    In that defendant terminated plaintiff's employment because of his gender;

(b)    In that defendant interfered with plaintiff's privilege of employment on the basis of plaintiff's gender;

(c)    In that defendant limited and classified the plaintiff by his gender in such a way that deprived herein of opportunities and recognition given to other similarly situated coworkers;

(d)    In that defendant discriminated against the plaintiff in such a way that adversely affected his status as an employee;

(e)     In that defendant treated the plaintiff adversely different from similarly situated non-male employees; and

(f)     In that defendant discriminated against the plaintiff because the plaintiff did not act more masculine thus did not fit a stereotype of his gender.

51.  As a direct and proximate result of defendant's discrimination and wrongful termination, plaintiff has been deprived of his employment and equal employment opportunities because of his gender.

52.  As a further direct and proximate result of defendant's discrimination of the plaintiff, plaintiff has been deprived of income, wages and benefits.

53.  As a further result of defendant's termination and discrimination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment and emotional distress.

54.  Plaintiff has suffered and will continue to suffer injuries as a result of defendant's wrongful and discriminatory acts.

55.  Defendant's termination and unequal treatment of the plaintiff was arbitrary, unreasonably discriminatory and retaliatory all in violation of Connecticut's Fair Employment Practices Act. The defendant exhibited ill will, malice, improper motive, and indifference to the plaintiff's civil rights by terminating him on the basis of his gender.

## FOURTH COUNT
### (Gender Discrimination in Violation of Title VII)

1.  Plaintiff repeats the foregoing allegations as if the same were repeated herein.

56. Defendant's actions violated Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991 in one or more of the following ways.

(a)     In that defendant terminated plaintiff's employment because of his gender;

JA 15

(b)    In that defendant interfered with plaintiff's privilege of employment on the basis of plaintiff's gender;

(c)    In that defendant limited and classified the plaintiff by his gender in such a way that deprived herein of opportunities and recognition given to other similarly situated coworkers;

(d)    In that defendant discriminated against the plaintiff in such a way that adversely affected his status as an employee;

(e)    In that defendant treated the plaintiff adversely different from similarly situated non-male employees; and

(f)    In that defendant discriminated against the plaintiff because the plaintiff did not act more masculine thus did not fit a stereotype of his gender.

57. As a direct and proximate result of defendant's discrimination and wrongful termination, plaintiff has been deprived of his employment and equal employment opportunities because of his gender.

58. As a further direct and proximate result of defendant's discrimination of the plaintiff, plaintiff has been deprived of income, wages and benefits.

59. As a further result of defendant's termination and discrimination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment and emotional distress.

60. Plaintiff has suffered and will continue to suffer injuries as a result of defendant's wrongful and discriminatory acts.

61. Defendant's termination and unequal treatment of the plaintiff was arbitrary, and unreasonably discriminatory all in violation of Title VII. The defendant exhibited ill will, malice, improper motive, and indifference to the plaintiff's civil rights by

terminating him on the basis of his gender.

## FIFTH COUNT
**(Hostile Work Environment Sexual Harassment In Violation of Title VII)**

1. Plaintiff repeats the foregoing allegations as if the same were repeated herein.

62. Plaintiff was repeatedly subjected to sexual harassment by his co-worker. The harassment was repetitious and continuous.

63. The harassment was unwelcome.

64. The harassment was based upon his gender and was sexual in nature.

65. Plaintiff subjectively, reasonably and objectively perceived his work environment to be hostile.

66. Defendant knew or should have known that the plaintiff was being sexually harassed and unreasonably failed to stop the sexual harassment.

67. As a direct and proximate result of the hostile work environment sexual harassment, plaintiff suffered damages.

## SIXTH COUNT
**(Hostile Work Environment Sexual Harassment In Violation of C.G.S. §46a-60(a)(1)))**

1. Plaintiff repeats the foregoing allegations as if the same were repeated herein.

68. Plaintiff was repeatedly subjected to sexual harassment by his co-worker. The harassment was repetitious and continuous.

69. The harassment was unwelcome.

70. The harassment was based upon his gender and was sexual in nature.

71. Plaintiff subjectively, reasonably and objectively perceived his work environment to be hostile.

72. Defendant knew or should have known that the plaintiff was being sexually

harassed and unreasonably failed to stop the sexual harassment.

73. As a direct and proximate result of the hostile work environment sexual harassment, plaintiff suffered damages.

## SEVENTH COUNT
**(Retaliation In Violation of Connecticut Fair Employment Practices Act C.G.S. §46a-60(a)(4))**

1. Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein.

74. Defendant, by and through its agents, servants, and/or employees, violated the Connecticut Fair Employment Practices Act C.G.S. §46a-609(a)(4) *et seq.* in one or more of the following ways.

a.      In that defendant retaliated against the plaintiff in response to his complaint that he was being sexually harassed;

b.      In that defendant retaliated against the plaintiff for his protesting of discriminatory conduct and treatment directed towards him on the basis of his disability.

75. As a result of defendant's violation of Connecticut Fair Employment Practices Act C.G.S. §46a-60(a)(4), plaintiff suffered damages including: loss of employment, loss of income and wages and benefits, and harm to his professional reputation.

76. As a further result of defendant's retaliatory termination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment, and emotional distress.

77. Plaintiff has suffered and will continue to suffer injuries as a result of defendant's wrongful and retaliatory acts.

78. Defendant's retaliatory conducted toward the plaintiff was arbitrary,

unreasonably discriminatory and retaliatory all in violation of Connecticut Fair Employment Practices Act C.G.S. §46a-609(a)(4) *et seq*. The defendant exhibited ill will, malice, improper motive, and indifference to the plaintiff's civil rights by retaliating against him.

## EIGHTH COUNT
### (Retaliation In Violation of Title VII)

1. Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein.

79. Defendant, by and through its agents, servants, and/or employees, violated Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991. in one or more of the following ways.

a.    In that defendant retaliated against the plaintiff in response to his complaint that he was being sexually harassed;

b.    In that defendant retaliated against the plaintiff for his protesting of discriminatory conduct and treatment directed towards him on the basis of his disability.

80. As a result of defendant's violation of Title VII, plaintiff suffered damages including: loss of employment, loss of income and wages and benefits, and harm to his professional reputation.

81. As a further result of defendant's retaliatory termination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment, and emotional distress.

82. Plaintiff has suffered and will continue to suffer injuries as a result of defendant's wrongful and retaliatory acts.

83. Defendant's retaliatory conducted toward the plaintiff was arbitrary, unreasonably discriminatory and retaliatory all in violation of Title VII. The defendant

exhibited ill will, malice, improper motive, and indifference to the plaintiff's civil rights by retaliating against him.

## **DEMAND FOR RELIEF**

WHEREFORE, plaintiff prays for appropriate compensatory damages including: compensatory damages; damages for back pay, front pay, bonuses, personal days, lost pension benefits, emotional distress; consequential damages; punitive damages; reasonable attorneys' fees; costs; interest; job reinstatement; prejudgment interest; for an injunction requiring the removal of any and all adverse information contained in plaintiff's personnel file; for a trial by jury; and for all other just and proper relief.

DATE:    October 6, 2011

/s/ James Sabatini
James V. Sabatini, Esq.
Fed. No.: CT 19899
SABATINI AND ASSOCIATES, LLC
1 Market Square
Newington, CT 06111
Tel. No.: (860) 667-0839
Fax No.: (860) 667-0867
Email: jsabatini@sabatinilaw.com

ATTORNEY FOR PLAINTIFF

## ELECTRONIC CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2011 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


        /s/ James V. Sabatini
        James V. Sabatini

**EXHIBIT 1**

## STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

**Andrew Adams**
COMPLAINANT

vs.                                                                          **DATE: December 29, 2010**

**Palace Entertainment d/b/a Lake Compounce Theme Park**
RESPONDENT

CHRO Case No. 1030252

## RELEASE OF JURISDICTION

Pursuant to the request for a release of jurisdiction, the Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint in accordance with CONN. GEN. STAT. § 46a-101. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred or in which the Respondent transacts business. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

**A copy of any civil action brought pursuant to this release must be served on the Commission at 25 Sigourney Street, Hartford, CT 06106 at the same time all other parties are served. THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION    BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

In granting this release, the Commission expressly finds in accordance with CONN. GEN. STAT. §§ 46a-100 and 46a-101(b) that all conditions precedent to the issuance of the release have been met. The complaint was timely filed under CONN. GEN. STAT. § 46a-82 and the complaint has been pending for a period of not less than 210 days. The complaint is not currently scheduled for public hearing nor is there reason to believe that the complaint will be resolved within a period of 30 days from the date the Commission received the request.

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

With the granting of this release of jurisdiction, the Commission administratively dismisses this complaint in accordance with CONN. GEN. STAT. § 46a-101(d) without cost or penalty to any party.

Very truly yours,

Robert J. Brothers, Jr.
Executive Director

cc: Complainant's counsel James V. Sabatini by e-mail to: jsabatini@sabatinilaw.com
Respondent's Attorney: Christopher H. Mills by e-mail to: cmills@laborlawyers.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

ANDREW ADAMS,                            )
                                         )
            Plaintiff,                   )
                                         )        Case No. 3:11-cv-00427 (JCH)
vs.                                      )
                                         )
FESTIVAL FUN PARKS, LLC,                 )
d/b/a LAKE COMPOUNCE                     )        May 16, 2011
                                         )
            Defendant.                   )
                                         )

## ANSWER OF DEFENDANT FESTIVAL FUN PARKS, LLC
## TO PLAINTIFF'S COMPLAINT

Defendant Festival Fun Parks LLC, ("Festival Fun Parks" or "Defendant") responds as follows to the Complaint of Plaintiff Andrew Adams ("Plaintiff"):

## PARTIES

1.      Defendant is without sufficient knowledge to admit or deny the allegations contained in this paragraph and, therefore, denies these allegations.

2.      Admitted.

3.      Plaintiff's alleged status as an employee under the Americans with Disabilities Act of 1990 ("ADA"), Title VII, and the Connecticut Fair Employment Practices Act, C.G.A. § 46a-60(a)(1) et. seq. are conclusions of law to which no response is required.  To the extent these allegations are deemed to be factual, they are denied.

4.      Defendant's alleged status as an employer under the ADA, Title VII, and the Connecticut Fair Employment Practices Act, C.G.A. § 46a-60(a)(1) et. seq. are conclusions of

**Error! Unknown document property name.**

law to which no response is required.  To the extent these allegations are deemed to be factual, they are denied.

## JURISDICTION AND VENUE

5.      Defendant admits that this Court has jurisdiction over the claims asserted in Plaintiff's Complaint but denies that Plaintiff has properly pled any cause of action or is entitled to any relief pursuant to any law.

6.      Defendant admits that venue is proper in this Court but denies that Plaintiff has properly pled any cause of action or is entitled to any relief pursuant to any law.

## GENERAL ALLEGATIONS

7.      Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and therefore denies the same.

8.      Admitted.

9.      Admitted.

10.     Admitted.

11.     Admitted.

12.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

13.     Denied.

14.     Denied.

15.     Denied.

16.     Denied.

17.     Denied.

2

Error! Unknown document property name.

18.    Denied.

19.    Denied.

20.    Denied.

21.    Defendant admits that John Fitch counseled Plaintiff that it was important that he maintain a positive working relationship with his co-workers.  Defendant denies the remaining allegations set forth in this paragraph of the Complaint.

22.    Denied.

23.    Denied.

24.    Denied.

25.    Defendant admits that Plaintiff discussed with Jerry Brick the possibility of exploring a different position.  Defendant denies the remaining allegations set forth in this paragraph of the Complaint.

26.    Admitted.

27.    Defendant admits that it advised Plaintiff that because he did not have sufficient painting experience, he was not qualified to work in the paint department.  Defendant denies the remaining allegations set forth in this paragraph of the Complaint.

28.    Denied.

29.    Denied.

30.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

3

31.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

32.     Denied.

33.     Defendant is without sufficient knowledge to admit or deny the allegations contained in this paragraph and, therefore, denies these allegations.

34.     Defendant is without sufficient knowledge to admit or deny the allegations contained in this paragraph and, therefore, denies these allegations.

35.     Defendant is without sufficient knowledge to admit or deny the allegations contained in this paragraph and, therefore, denies these allegations.

36.     Exhibit "A" to the Complaint is a document in writing that speaks for itself, and plaintiff's characterization of that document is denied.   Defendant is without sufficient knowledge to admit or deny the remaining allegations contained in this paragraph and, therefore, denies these allegations.

## **FIRST COUNT**

1(a).[1]   Defendant hereby repeats and re-alleges its responses to paragraphs 1 through 36 of the Complaint as if fully set forth herein.

37.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

---

[1]     Plaintiff's Complaint numbers the first paragraph of each "count" as "1."  For ease of reference, Defendant re-numbers these paragraphs as 1(a) through 1(h).

4

Error! Unknown document property name.

38.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

     a.  The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

     b.  The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

     c.  The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

     d.  The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

39.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

40.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

Error! Unknown document property name.

41.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

42.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

43.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

## SECOND COUNT

1(b).    Defendant hereby repeats and re-alleges its responses to paragraphs 1 through 43 of the Complaint as if fully set forth herein.

44.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

    a.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

    b.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

6

Error! Unknown document property name.

    c.   The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

    d.   The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

    e.   The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

    f.   The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

45.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

46.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

47.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

**Error! Unknown document property name.**

48.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

49.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

## THIRD COUNT

1(c).     Defendant hereby repeats and re-alleges its responses to paragraphs 1 through 49 of the Complaint as if fully set forth herein.

50.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

   a.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

   b.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

   c.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

Error! Unknown document property name.

  d. The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required. To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

  e. The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required. To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

  f. The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required. To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

  51. The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required. To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

  52. The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required. To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

  53. The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required. To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

  54. The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required. To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

9

Error! Unknown document property name.

55.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

## FOURTH COUNT

1(d).    Defendant hereby repeats and re-alleges its responses to paragraphs 1 through 55 of the Complaint as if fully set forth herein.

56.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

      a.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

      b.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

      c.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

      d.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

Error! Unknown document property name.

JA 34

    e.   The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required. To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

    f.   The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required. To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

57.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required. To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

58.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required. To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

59.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required. To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

60.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required. To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

61.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required. To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

## **FIFTH COUNT**

Error! Unknown document property name.

1(e).    Defendant hereby repeats and re-alleges its responses to paragraphs 1 through 61 of the Complaint as if fully set forth herein.

62.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

63.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

64.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

65.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

66.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

67.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

## SIXTH COUNT

1(f).    Defendant hereby repeats and re-alleges its responses to paragraphs 1 through 67 of the Complaint as if fully set forth herein.

**Error! Unknown document property name.**

68.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

69.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

70.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

71.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

72.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

73.     The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

## SEVENTH COUNT

1(g).    Defendant hereby repeats and re-alleges its responses to paragraphs 1 through 73 of the Complaint as if fully set forth herein.

Error! Unknown document property name.

JA 37

74.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.   To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

    a.   The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.   To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

    b.   The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.   To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

75.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.   To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

76.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.   To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

77.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.   To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

78.    The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.   To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

**EIGHTH COUNT**

14

Error! Unknown document property name.

1(h).        Defendant hereby repeats and re-alleges its responses to paragraphs 1 through 78 of the Complaint as if fully set forth herein.

79.        The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

    a.  The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

    b.  The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

80.  The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

81.  The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

82.  The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

83.  The allegations in this paragraph of Plaintiff's Complaint constitute conclusions of law to which no response is required.  To the extent that any aspects of this paragraph of Plaintiff's Complaint are deemed factual, they are denied.

**Error! Unknown document property name.**

16

## ANSWER TO "DEMAND FOR RELIEF"

Defendant denies that Plaintiff is entitled to any relief prayed for in the "Demand for Relief" of the Complaint or that any relief is appropriate in this case.

## GENERAL DENIAL

Any allegation in the Complaint not heretofore specifically admitted or denied is hereby denied.

## AFFIRMATIVE DEFENSES

## FIRST DEFENSE

Defendant's employment action or inaction was based upon lawful reasons not in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act, and the Connecticut Fair Employment Practices Act, or any other federal, state, or local law.

## SECOND DEFENSE

Plaintiff is barred from alleging in this action all matters under Title VII, the Americans with Disabilities Act, or the Connecticut Fair Employment Practices Act which were not the subject of: (1) a timely charge of discrimination filed with the EEOC and/or CHRO which named Defendant, or (2) a right to sue notice issued by the EEOC and/or the CHRO.

## THIRD DEFENSE

Defendant is not liable under Title VII, the Americans with Disabilities Act, or the Connecticut Fair Employment Practices Act because its employment action or inaction was based upon legitimate business reasons and/or because it would have taken the same employment action or inaction related to Plaintiff even in the absence of the alleged impermissible motivating factor.

17

Error! Unknown document property name.

## FOURTH DEFENSE

Plaintiff's claims for discrimination under Title VII and the Connecticut Fair Employment Practices Act are barred because Plaintiff cannot allege a prima facie case of discrimination.

## FIFTH DEFENSE

Plaintiff unreasonably failed to take advantage of preventative or corrective opportunities provided by Defendant or to avoid harm otherwise.

## SIXTH DEFENSE

Plaintiff did not suffer any damages for which he is entitled to relief.

## SEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because his own acts or omissions caused or contributed to any alleged loss or injury.

## EIGHTH DEFENSE

Any injury for which Plaintiff may be seeking relief was caused, in whole or in part, by the conduct of others for whom Defendant is not liable.

## NINTH DEFENSE

To the extent Plaintiff claims back pay damages and/or damages relating to lost pay or pay increases, bonuses, benefits, training, promotion, pension or seniority, any such damages awarded must be reduced by Plaintiff's actual earning and/or the amount Plaintiff could have earned with reasonable diligence.

18

**Error! Unknown document property name.**

### TENTH DEFENSE

In the event Plaintiff is determined to be entitled to back pay, front pay, and/or damages relating to lost pay or pay increases, bonuses, benefits, training, promotion, pension or seniority, Plaintiff failed to mitigate his damages.

### ELEVENTH DEFENSE

Plaintiff may not recover back pay and/or damages relating to lost pay or pay increases, bonuses, benefits, training, promotion, pension or seniority, for any periods of time during which Plaintiff did not, and/or was unable to, work.

### TWELFTH DEFENSE

Defendant's alleged action or inaction was not taken with malice or with reckless indifference to the protected rights of Plaintiff so as to entitle Plaintiff to punitive damages under Title VII, the Connecticut Fair Employment Practices Act, or the Americans with Disabilities Act.

### THIRTEENTH DEFENSE

Plaintiff's claim for punitive damage against Defendant is barred because any alleged discriminatory employment decision of managing agents were contrary to Defendant's good faith efforts to comply with Title VII the Connecticut Fair Employment Practices Act, and the Americans with Disabilities Act.

### FOURTEENTH DEFENSE

Plaintiff cannot recover punitive damages and, therefore, any such claim should be dismissed.

**Error! Unknown document property name.**

JA 43

### FIFTEENTH DEFENSE

Plaintiff is not entitled to punitive damages as Defendant, at all times relevant to this suit, acted in good faith with regard to Plaintiff and had reasonable ground for believing that its actions did not violate any law.

### SIXTEENTH DEFENSE

Subject to reasonable opportunity for investigation and discovery, Plaintiff's claims are limited or barred by the doctrines of unclean hands, laches, estoppel, waiver, release and/or other equitable defenses.

### SEVENTEENTH DEFENSE

Plaintiff's Complaint, in whole or part, fails to state a claim upon which relief can be granted.

### EIGHTEENTH DEFENSE

Plaintiff's claims are barred, in whole or part, by all applicable statutes of limitation governing the claims advanced by Plaintiff.

### NINETEENTH DEFENSE

Plaintiff is not entitled to equitable relief insofar as he has an adequate remedy at law.

### TWENTIETH DEFENSE

Plaintiff is not disabled.

### TWENTY-FIRST DEFENSE

Defendant's actions were based on requirements that are job-related and consistent with business necessity.

**Error! Unknown document property name.**

JA 44

### TWENTY-SECOND DEFENSE

Defendant did not take a tangible adverse employment action against Plaintiff.

### TWENTY-THIRD DEFENSE

Plaintiff unreasonably failed to take advantage of preventative and/or corrective opportunities or procedures provided by or afforded by Defendant.

### TWENTY-FORTH DEFENSE

Defendant reserves the right to assert any additional defenses that further investigation and discovery may reveal to be applicable.

**WHEREFORE**, Defendant prays that this Court enter judgment in its favor and against Plaintiff and award defendant its reasonable attorneys' fees and costs, and award such other relief as may be just and proper in this case.


Date:  November 2, 2011                          Respectfully submitted,


                                                 FISHER & PHILLIPS LLP


                                                 _/s/Risa B. Boerner_____
                                                 Risa B. Boerner, Esquire
                                                 Fisher & Phillips LLP
                                                 Radnor Financial Center
                                                 201 King of Prussia Road, Suite 650
                                                 Radnor, Pennsylvania  19087
                                                 (610) 230-2132
                                                 (610) 230-2151 (FAX)
                                                 rboerner@laborlawyers.com

                                                 *Counsel for Defendant Festival Fun*
                                                 *Parks LLC*

Error! Unknown document property name.

CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2011, a copy of the foregoing Answer and Affirmative Defenses to Plaintiff's Complaint was filed electronically and served by mail to anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ *Risa B. Boerner*
Risa B. Boerner

Error! Unknown document property name.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ANDREW ADAMS, | : |
| Plaintiff, | : |
| | : |
| v. | :    CASE NO.: 3:11-cv-00427-JCH |
| | : |
| FESTIVAL FUN PARKS, LLC, | : |
| D/B/A LAKE COMPOUNCE, | : |
| | : |
| Defendant. | : |

## MOTION OF DEFENDANT FESTIVAL FUN PARKS, LLC TO PRECLUDE THE TESTIMONY OF CYNTHIA K. NIEDBALA, M.D.

Pursuant to Federal Rule of Civil Procedure 37(b), Defendant Festival Fun Parks, LLC d/b/a Lake Compounce ("Festival Fun Parks") hereby submits this Motion to Preclude the Testimony of Cynthia K. Niedbala, M.D., and in support of the Motion, avers as follows:

1.     On June 29, 2011, Festival Fun Parks and Plaintiff Andrew Adams ("Plaintiff" or "Adams") filed a Rule 26(f) Report of the Parties Planning Meeting, which was adopted by the Court in the Scheduling Order Regarding Case Management Plan dated July 5, 2011 (the "Scheduling Order") (D.E. No. 10).

2.     The Scheduling Order set forth a detailed schedule for the disclosure and discovery of expert testimony.  Adams was required to disclose all expert reports by October 1, 2011, and any such experts were to be deposed on or before November 1, 2011.

3.     The Scheduling Order also reminded the parties of the expert report requirement of Rule 26(a)(2)(B), stating that "unless otherwise ordered, a party intending to call [an expert witness] must disclose a report signed by the witness containing the information required to be disclosed by Fed. R. Civ. P. 26(a)(2)(B)."

4.     In response to Plaintiff's interrogatory seeking the identity of any expert witness whose testimony Plaintiff intended to present, and information related to the basis for that testimony and the expert's qualifications, Plaintiff stated as follows:

> Newington Children's Hospital – now a part of CT Children's Medical Center
> Clinician: Cynthia K. Niedbala, M.S. Educational Diagnostician
> It is anticipated that Niedbala will offer testimony regarding her clinical records pertaining to the plaintiff. As for the substance of her opinions, see attached documents Plaintiff's Bates Nos. Nos. 161-171

5.     The document Plaintiff referred to in his interrogatory responses is referred to as a "Diagnostic Perceptual/Cognitive Assessment," and is dated December 3, 1990.

6.     This document does not comply with the timing or content requirements for expert report disclosures contained in the Scheduling Order, or the expert report disclosure requirements of Fed. R. Civ. Procedure 26(a)(2).

7.     The document does not contain a statement of the opinions Dr. Niedbala will express and the basis and reasons for them, the facts or data considered in forming any opinions, a list of exhibits that will be used to summarize or support any opinions, Dr. Niedbala's qualifications or publications, a list of cases in which Dr. Niedbala has testified in the past four years, or any information about Dr. Niedbala's compensation.

8.     Because Plaintiff failed to identify Dr. Niedbala as an expert witness in the time frame required by the Scheduling Order, and because Plaintiff has not made the disclosures related to Dr. Niedbala that the Scheduling Order and Fed. R. Civ. P. 26(a)(2) require, Plaintiff should be precluded from presenting Dr. Niedbala's testimony at trial.

9.     Attached in support of this Motion is Festival Fun Parks' Memorandum of Law in Support of the Motion, along with the following supporting exhibits:

2

    a.   Scheduling Order Regarding Case Management Plan dated July 5, 2011 (D.E. No. 10);

    b.   Festival Fun Parks' First Set of Interrogatories and Requests for Production on Plaintiff;

    c.   Plaintiff's Responses to Festival Fun Parks' First Set of Interrogatories and Requests for Production; and

    d.   "Diagnostic Perceptual/Cognitive Assessment" dated December 3, 1990.

 

Respectfully Submitted,

Dated: March 15, 2012          FISHER & PHILLIPS LLP

/s/ Risa B. Boerner_____
Risa B. Boerner
Attorney I.D. No. ct28341
James P. McLaughlin
Attorney I.D. No. phv05264
Fisher & Phillips LLP
201 King of Prussia Rd., Suite 650
King of Prussia, PA  19087
Telephone: (610) 230-2150
Facsimile: (610) 230-2151
E-Mail: rboerner@laborlawyers.com
       jmclaughlin@laborlawyers.com

*Attorneys for Defendant Festival Fun Parks, LLC d/b/a Lake Compounce*

3

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2012, a copy of the foregoing was filed electronically and served electronically on all attorneys and pro se parties of record as listed below. Notice of this filing will be sent be e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

> James V. Sabatini, Esquire
> Sabatini and Associates, LLC
> 1 Market Square
> Newington, CT 06111
>
> Attorney for Plaintiff

> /s/ Risa B. Boerner
> Risa B. Boerner

4

# EXHIBIT "A"

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANDREW ADAMS | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:11-CV-00427(JCH) |
| v. | : | |
| | : | |
| FESTIVAL FUN PARKS, LLC | : | JULY 5, 2011 |
| Defendant. | : | |

## SCHEDULING ORDER REGARDING CASE MANAGEMENT PLAN

Based on the Report of Parties' Planning [Doc. No. 8], the following dates are hereby adopted as reasonable and appropriate to serve the purposes of Fed.R.Civ.P.1:

**Damages Analysis:** Any party with a claim or counterclaim for damages will serve a damages analysis on or before **AUGUST 1, 2011.**

**Discovery Deadline:** All discovery, including all discovery relating to expert witnesses, will be completed (not propounded) by **FEBRUARY 1, 2012.**

**Discovery Relating To Expert Witnesses:** An expert witness is anyone, including a treating physician, who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence. Unless otherwise ordered, a party intending to call such a witness must disclose a report signed by the witness containing the information required to be disclosed by Fed. R. Civ. P. 26(a)(2)(B). All such expert reports will be disclosed by plaintiff on or before **OCTOBER 1, 2011,** and any such experts will be deposed on or before **NOVEMBER 1, 2011.** All such expert reports will be disclosed by defendant on or before **DECEMBER 1, 2011**, and any such experts will be deposed by **JANUARY 3, 2012.** Any motion related to preclusion of an expert must be filed by **MARCH 15, 2012.**

**Motions to Compel:** Any motion for an order compelling disclosure or discovery

pursuant to Fed. R. Civ. P. 37(a) must be filed within 30 days after the due date of the response. Failure to file a timely motion in accordance with this scheduling order constitutes a waiver of the right to file a motion to compel.

**Joint Trial Memorandum:** A joint trial memorandum in the form described in the attached addendum will be filed on or before **MARCH 15, 2012**. The original of this memorandum shall be filed with the Clerk of the Court, and one copy shall be submitted to Chambers. Counsel signing the memorandum must certify that it is the product of consultation between the lawyers who will be trying the case. If a summary judgment motion is filed, the joint trial memorandum will be due 30 days after a ruling on the motion.

**Dispositive Motions:** A dispositive motion may not be filed later than **MARCH 15, 2012**.

**Joint Status Reports of Counsel: :** A joint status report of counsel will be submitted on or before **OCTOBER 3, 2011**. The report must address the matters that are relevant to the case at the time and include, _inter alia_, a **detailed** description of the discovery conducted up to the date of the report, the current deadlines, and any amendments to pleadings or dispositive motions contemplated. Joint status reports of counsel addressing those matters will be submitted every 90 days thereafter until the matter is resolved. If a motion for summary judgment has been filed, or the case is set for trial, no further status reports are required.

**Extensions of Time:** All dates set forth in this Order are firm and will be extended only for good cause. The good cause standard requires a particularized showing that, despite due diligence, the party seeking the extension could not comply

-2-

with this order. Because of the importance of the discovery deadline to the entire schedule, motions to extend the discovery deadline will be viewed with disfavor. A motion to extend the discovery deadline will not be granted **unless the movant shows that discovery was commenced promptly and pursued with due diligence** in a good faith effort to comply with the deadline established by this order.

Counsel will provide their clients with a copy of this order.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 5th day of July, 2011.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge

–3–

JA 54

## ADDENDUM - PRETRIAL ORDER

Counsel for the parties shall jointly submit, in one continuous document signed by all counsel, a final pretrial memorandum (in compliance with Local Rule 6 of Civil Procedures and the Standing Order Regarding Trial Memoranda in Civil Cases incorporated in the Local Rules of Civil Procedure and modified hereby).

1. **TRIAL COUNSEL**: Counsel shall list the names, addresses and telephone numbers of the attorneys who will try the case. **Counsel trying the case must attend the pretrial conference, unless excused by the court.** Requests to be excused should be made no later than 72 hours before the conference.

2. **JURISDICTION**: Counsel shall set forth the basis for federal jurisdiction.

3. **JURY/NON-JURY**: Counsel shall state whether the case is to be tried to a jury or to the court.

4. **LENGTH OF TRIAL**: Counsel shall set forth a realistic estimate of trial days required, including an estimate of time for plaintiff's presentation (including cross-examination of its witnesses), and the defendant's presentation (including cross-examination of its witnesses).

5. **FURTHER PROCEEDINGS**: Counsel shall specify, with reasons, the necessity of any further proceedings prior to trial.

6. **NATURE OF CASE**: Counsel for each party shall separately state the nature of each cause of action asserted by each party and the relief sought.

   The parties shall set forth:

   a.    all parties and all claims alleged in the complaint, being sure to specify who asserts which claim(s) against whom;

b.    the claims that will be pursued at trial. Identify all prior action in the case that has resulted in the dismissal or withdrawal of any claim(s) or party(ies) (e.g. May 1, 2000, Ruling on Motion for Summary Judgment: Count II (false arrest) dismissed, Count IV (municipal liability) dismissed and City defendant dismissed.)) If plaintiff intends not to pursue certain claims at trial, identify these claims as well.

c.    the defenses that will be pursued at trial, specifically noting any special defenses and to what count they relate.

d.    an agreed, brief joint statement of the case that may be read to the jury.

7.    **TRIAL BY MAGISTRATE JUDGE:**  Counsel shall indicate whether their clients consent to a trial by a Magistrate Judge. If they do, a Consent Form should be submitted with the Pretrial Memorandum.

8.    **LIST OF WITNESSES:**  Counsel shall set forth the name and address of each witness to be called at trial, including a brief summary of the anticipated testimony. The list of witnesses should be divided into those witnesses the party will definitely call, and those witnesses it might call. Witnesses not included in this list -- except those used for unanticipated rebuttal or impeachment -- shall not be permitted to testify at trial, except for extraordinary good cause shown. For each expert witness a party shall file with the court, **at least five (5) days prior to the pretrial conference,** a biographical sketch and a statement of the area of the witness' expertise, each opinion to be expressed, a brief summary of the basis of each opinion, and a list of the materials on which the witness intends

–2–

to rely. A copy of the Rule 26 disclosure for any expert expected to testify at trial shall be provided as part of the pretrial compliance.

9.   **DEPOSITION TESTIMONY:**   Counsel shall list each witness who is expected to testify by deposition at trial. Such list shall include designation by page references of the deposition transcript which each party proposes to read into evidence. Cross-designations shall be listed as provided by Fed. R. Civ. P. 32(a)(4). The lists shall include all objections to deposition designations. A marked-up version of the deposition transcript should also be submitted [blue for plaintiff(s); red for defendant(s)]. Any questions about this procedure should be directed, in a timely fashion, to the court's law clerk.

Counsel offering deposition testimony shall mark a copy of the deposition transcript, in the margin, to indicate the testimony to be offered. Opposing counsel, using a different color ink, shall mark in the margin any objections, with citation to the Fed. R. Evid., as well as mark any further testimony opposing counsel wishes to offer; originating counsel shall then mark any objections to that cross-designated testimony.

After submission, the court will permit amendment of the deposition lists only for good cause shown. At the time of trial, the Court will permit reading of testimony from a deposition only in the order in which it was taken.

10.   **INTERROGATORIES/REQUESTS TO ADMIT.**   Counsel shall list any interrogatories or request to admit, and answers thereto, specifying the appropriate portions thereof that any party intends to offer at trial as evidence for purposes other than impeachment or cross-examination. Any objection to the

–3–

introduction of any of the foregoing shall be filed with the court in writing, together with a citation of authorities in support of the specific ground of objection, **no later than four (4) days prior to the pretrial conference** or such objection shall be deemed to have been waived.

11. **EXHIBITS**: Attach a list of all exhibits, with a brief description of each, that each party will offer at trial on its case-in-chief. Exhibits not listed, except unanticipated rebuttal and unanticipated impeachment exhibits, will not be admissible at trial except for good cause shown. Plaintiff should number starting at "1"; defendant should number starting at a point above where plaintiff's numbers stop (e.g., "51" or "101" or "501" or "1001"). Counsel shall mark all exhibits numerically with exhibit tags that can be obtained from the Clerk's Office upon request. **Copies of the actual exhibits shall be exchanged no later than seven (7) days prior to compliance with this Pretrial Order,** with the original set of exhibits for the Deputy Clerk and one complete copy of the exhibits for Judge Hall **three (3) days prior** to the pretrial conference. **Failure to comply with this paragraph will result in the exclusion of exhibits not listed or exchanged, unless the offering party can clearly demonstrate extreme prejudice would result.**

Any objection to the admissibility of any exhibit, other than on the grounds of relevance, shall be noted in the pretrial compliance. Any memorandum addressing exhibit evidentiary issues shall be filed with the court in writing at **least three (3) days prior to the pretrial conference.** Any objections not made

–4–

JA 58

in this manner, except objections as to relevance, may be deemed waived, absent a showing of excusable neglect or extreme prejudice.

12. **ANTICIPATED EVIDENTIARY PROBLEMS:** Counsel shall identify in the pretrial compliance memorandum a list of any other evidentiary problems anticipated by any party, together with memoranda of fact and law addressing the same.

13. **MOTIONS IN LIMINE:** Counsel shall file separately, in conjunction with this final pretrial memorandum, all motions in limine together with memoranda of authorities in support. A copy of any such motion shall be served on opposing counsel before the final pretrial memo is due. The memorandum in opposition to a motion in limine shall be filed and served on opposing counsel **not later than five (5) days before the pretrial conference.**

Any objections to expert testimony under Rule 701, 702 or 703 shall be made in a motion in limine, with a supporting memorandum. Failure to make such a motion will constitute a waiver of the objection.

14. **GLOSSARY:** If any party intends to present testimony or other evidence which will include medical or technical terms, the offering party shall file with the court, at least one (1) day prior to the pretrial conference, a glossary of such terms.

15. **TRIAL TO COURT/JURY:** Counsel for all parties shall confer in an effort to enter into a written stipulation of uncontroverted facts and into an agreed statement of the contested issues of fact and law, which stipulation and agreed statement will be set forth in the final pretrial memorandum. The stipulation of uncontroverted facts can be read to the jury, and no evidence shall be presented

–5–

JA 59

on the uncontested facts. If unable to stipulate to any facts, the parties shall so

state. If unable to stipulate to an agreed statement of contested issues of fact

and law, each party shall, to the extent there is not agreement, set forth its view

of the contested issues of fact and law.

a.      **Court**: Counsel for each party shall submit proposed findings of fact and

conclusions of law, citing relevant authority where appropriate, in hard

copy and in Word Perfect format, saved on CD-ROM. Counsel are

advised that the court does not, as a practice, request post-trial

submissions.

b.      **Jury**:

(1)     **Proposed Voir Dire Questions**: Each counsel shall attach a list of

questions it seeks to have asked of the jury panel.

(2)     **Proposed Jury Instructions**: Counsel shall attach requests for

jury instructions, with appropriate statutory and/or case citations.

They are <u>not</u> required to submit general jury instructions which, for

example, instruct the jury on its role, evidence in general, witness

credibility, unless the case presents an unusual situation in such

regard(s). In addition to filing an original copy with the Clerk of the

Court, counsel shall provide Chambers with the proposed jury

instructions in hard copy and in Word Perfect format, saved on CD-

ROM.

(3)     **Jury Interrogatories**: Counsel shall attach a proposed form of jury

–6–

Case: 13-1183   Document: 51   Page: 63   08/19/2013   1020229   458
Case 3:11-cv-00427-JCH   Document 29-2   Filed 03/15/12   Page 11 of 56

Case 3:11-cv-00427-JCH   Document 10   Filed 07/05/11   Page 10 of 10

interrogatories, if appropriate in this case.

–7–

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

ANDREW ADAMS,                                    )
                                                 )
                    Plaintiff,                   )
                                                 )
vs.                                              )        Case No. 3:11-cv-00427 (JCH)
                                                 )
FESTIVAL FUN PARKS, LLC,                         )
d/b/a LAKE COMPOUNCE                             )
                                                 )
                                                 )
                    Defendant.                   )
                                                 )

## FIRST SET OF INTERROGATORIES OF DEFENDANT
## FESTIVAL FUN PARKS DIRECTED TO PLAINTIFF ANDREW ADAMS

Defendant, Festival Fun Parks, by and through its undersigned counsel, and

pursuant to Federal Rule of Civil Procedure 33, hereby requests that Plaintiff Andrew

Adams answer the following Interrogatories, separately and under oath, within thirty (30)

days of service in accordance with the Federal Rules of Civil Procedure, the Local Rules

of the United States District Court for the District of Connecticut, and the instructions

and definitions set forth herein.

## INSTRUCTIONS AND DEFINITIONS

Please follow these instructions and use the following definitions in responding to

these Interrogatories.  Any term or word that is not defined herein has its usual and

customary meaning.

A.    In each response to these Interrogatories, provide all information in your

possession, custody, or control.  If you are able to provide only part of the information

sought, provide that partial information and specify the reason for your inability to provide the remainder.

B.    Whenever appropriate to these Interrogatories, the singular shall be interpreted as the plural and vice versa; the present tense shall include the past tense and vice versa; and the neuter shall include both the masculine and feminine.

C.    If any form of privilege or protection from disclosure is claimed as a ground for withholding any document and/or responsive information, the answering party shall set forth (i) the name of the document and/or responsive information, its date, the sender and/or speaker, recipient, persons to whom copies have been furnished, its subject matter, and all other information required for identification of the document and/or responsive information without revealing the information for which the privilege or other protection from disclosure is claimed, and (ii) the basis for the claim of privilege or protection from disclosure.

D.    The terms "and" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Interrogatories any information that might otherwise be construed to be outside their scope.

E.    Pursuant to Federal Rule of Civil Procedure 26(e) and Federal Rule of Civil Procedure 33, these Interrogatories are continuing in nature so as to require you to file a supplementary response and/or provide supplementary documents if you subsequently obtain additional or different information or documents before the trial.

F.    "Plaintiff" or "you," as used herein, refers to Plaintiff Andrew Adams and all servants, representatives, investigators, related persons and entities, attorneys, and all other persons acting on his behalf.

JA 64

G.    "Defendant," as used herein, refers to Festival Fun Parks and all predecessors, successors, principals, officers, directors, agents, affiliates, employees, servants, representatives, investigators, related persons and entities, attorneys, and all other persons acting on its behalf.

H.    "Document" shall mean and include every writing, record, or graphic matter of every type and description in any form, however produced or reproduced, tangible or retrievable in any way, whether prepared by you, or received by you and wherever located, now or at any time in your possession, custody or control, including, but not limited to, papers, correspondence, memoranda, notes, interoffice communications, charts, proposals, lists, notebooks, circulars, brochures, catalogues, advertisements, plans, handbooks, manuals, letters, minutes, resolutions, statements, contracts, agreements, summaries, messages, diaries, address books, rolodexes, calendars, personal planners, telephone logs, telephone records, books of account, bills, checks and check stubs, receipts, invoices, vouchers, orders, printouts, e-mails, maps, charts, diagrams, blue prints, sketches, models, prototypes, electronically stored information, CD-ROMs, disks or diskettes, audio or video tape, palm pilot, blackberry, or other PDA data, and/or any other such documents or form of written, printed or electronically stored information, data or words. "Document" also includes any preliminary notes and drafts, and all originals, copies, and any copy that contains any notation or other addition to or modification of the original. Without limitation of the term "control" as used above, a document is deemed to be in your control if you have the right to secure the document or a copy thereof from another person, of public or private entity which has actual possession thereof. If a document was, but is no longer in your possession or subject to

your control, state what disposition was made of it, by whom and the date or dates, or approximate date or dates, on which such disposition was made, and why.

I.      "Person" means any natural individual in any capacity whatsoever or any entity or organization, including divisions, departments, or other units therein, and shall include, but not be limited to, a public or private corporation, partnership, joint venture, voluntary unincorporated association, organization, proprietorship, trust, state, government agency, commission, bureau, or department.

J.      1.      The term "identify" with respect to a natural person means to:

        (a)      state his or her name; and

        (b)      state his or her current or last known residence, address and telephone number.

2.      The term "identify" with respect to a document or report means to state its:

        (a)      date;.

        (b)      title or content identifier;

        (c)      author; and

        (d)      current location.

3.      The term "identify" with respect to a communication, means to state its:

        (a)      date;

        (b)      names and titles of persons involved; and

        (c)      the content of the communication.

4.      The term "identify" with respect to a transaction, event, incident or

occurrence means to:

        (a)     state the date thereof;

        (b)     identify each person involved; and

        (c)     identify the location of the transaction, event, incident or

occurrence.

    K.    "Reflect(s), relate(s) to, or refer(s) to" means pertains to, refers to, concerns, evidences, embodies, comprises, or has any logical or factual connection with the subject matter of the Interrogatories.

    L.    "State in detail the factual basis for your contention," as used in these Interrogatories, means that you should fully and completely describe every act, event, occurrence, omission, document or communication of which you know that supports your contention, as well as identify any witnesses whose testimony you expect will support your position.

    M.    "Action" means the civil litigation pending between Plaintiff Andrew Adams and Defendant Festival Fun Parks in the United States District Court for the District of Connecticut, No. 3:11- cv-00427 (JCH).

    N.    "Complaint" means the document Plaintiff filed in the United States District Court for the District of Connecticut on March 18, 2011.

    O.    "Health Care Provider" means any doctor or other practitioner or institution of medical science or healing art, including but not limited to, counselors, nurses, chiropractors, psychologists, psychiatrists, podiatrists, dentists, optometrists, social workers, therapists, obstetricians, and physical/occupational therapists, as well as hospitals, clinics, hospices, and other institutions providing health care.

## INTERROGATORIES

1.     Identify any person from whom you have obtained or will obtain a written or oral report, statement, memorandum, affidavit, declaration, or testimony regarding any of the allegations in your Complaint and describe the general subject matter of the report, statement, memorandum, affidavit, declaration, or testimony.

2.     Describe in detail the amount of damages that you are claiming in this Action for Festival Fun Park's alleged violations of the Americans with Disabilities Act, the Connecticut Fair Employment Practices Act, and Title VII of the Civil Rights Act. Include in your description the basis of each calculation of damages by item, including each and every factor used in making said calculation, and identify any documents that record or relate to your damages or that record the basis of your calculation of damages.

3.     Identify each and every Health Care Provider who has examined, diagnosed, and/or treated the diagnosis of your alleged "mental retardation," including, but not limited to, any Health Care Provider who made any recommendation in regards to your employment or any accommodation related thereto.   For each such Health Care Provider, state the dates you were examined, diagnosed, or received treatment, and describe the diagnosis and/or treatment.

4.     Identify each person not already identified whom you know or believe has any knowledge or information related to any and all facts, circumstances, or issues raised in the Complaint, and for each such person, describe in detail the nature of his or her information or knowledge.

5.     Identify each and every statement, whether written or oral, made at any

time by Defendant, or any of its current or former agents or representatives, that you contend or believe constitutes an admission or declaration against interest on the part of Defendant or any of its current or former agents or representatives with regard to the subject matter of your Complaint.

6.    Identify each expert witness you have reason to believe you will engage, use, or ask to provide testimony in connection with this matter and, as to each such person, describe in detail his or her profession or occupation and the field in which he or she allegedly is an expert, the subject matter about which he or she is expected to testify, the substance of the opinion to which he or she is expected to testify, give a summary of the grounds upon which he or she bases that opinion, and identify all documents upon which he or she is expected to rely in support of his or her testimony.

7.    Identify each employee of Festival Fun Parks (if any) that you notified, informed, or otherwise apprised of your alleged "mental retardation," and for each such person identify the date and substance of the communication related to your "mental retardation," and whether the notification was made in writing.

8.    Describe in detail your professional qualifications and experience that would qualify you to work in the paint department at Lake Compounce.

9.    Identify each instance of harassment you experienced while employed by Festival Fun Parks, and for each such instance identify the representative of Festival Fun Parks that allegedly harassed you, the date on which the alleged harassment occurred, the location in which the alleged harassment occurred; and describe the substance of the alleged harassment.

10.    Identify each complaint you made to a representative of Festival Fun

Parks of any alleged harassment, and for each such complaint identify the representative of Festival Fun Parks to whom you reported the alleged harassment, identify the date on which you reported the alleged harassment, describe the substance of the complaint, and state whether the complaint was made in writing.

11.    Identify each instance of discrimination you experienced while employed by Festival Fun Parks, and for each such instance identify the representative of Festival Fun Parks that allegedly discriminated against you, the date on which the alleged discrimination occurred, the location in which the alleged discrimination occurred; and describe the substance of the alleged discrimination.

12.    Identify each complaint you made to a representative of Festival Fun Parks of any alleged discrimination, and for each such complaint identify the representative of Festival Fun Parks to whom you reported the alleged discrimination, identify the date on which you reported the alleged discrimination, describe the substance of the complaint, and state whether the complaint was made in writing.

13.    State in detail the factual basis for your contention that "defendant treated the plaintiff adversely different from similarly situated non-male employees."

14.    Identify the discriminatory employment practice(s), if any, that you opposed during your employment with Festival Fun Parks.   For each discriminatory practice that you identify as having opposed, identify the statement, writing, or other communication you made to a representative of Festival Fun Park in which you opposed the allegedly discriminatory employment practice(s), and identify the representative of Festival Fun Parks with whom you so communicated.

15.    Identify any and all conduct by Festival Fun Parks that constituted

discharging, expelling, or otherwise discriminating against you as a result of any opposition to a discriminatory employment practice identified above.

16.    Identify by case or docket number any complaint or charge you have filed, or any proceeding with which you have testified or assisted, and for each such complaint, charge or proceeding describe in detail the subject of the complaint, charge, or proceeding, and the state the current status of the litigation, charge, or proceeding.

17.    Describe in detail all your efforts to secure employment with any person between your separation from Festival Fun Parks through the present.  Your response should include an identification of any and all applications or interviews for employment and any and all attempts to establish or to buy a business operation or establish self-employment.  If an offer of employment was extended to you, please describe each offer, indicating by whom and when made and the full terms of the offer (salary, fringe benefits, bonuses, conditions of employment, etc.), whether you accepted or refused any offer of employment, and the identity of any documents which record or reflect any of the above.

18.    Identify each document or other fact that you believe will support or refute any of the allegations in your Complaint to the extent such document or other fact is not otherwise identified in any other answer to these Interrogatories

Date:  August 11, 2011

FISHER & PHILLIPS LLP

Risa B. Boerner, Esquire
Fisher & Phillips LLP
Radnor Financial Center
201 King of Prussia Road,
Radnor, Pennsylvania 19087
(610) 230-2132
(610) 230-2151 (facsimile)
rboerner@laborlawyers.com

*Counsel for Defendant*
*Festival Fun Parks LLC*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2011, a copy of the foregoing First Set of Interrogatories of Defendant Festival Fun Parks Directed to Plaintiff Andrew Adams were served by first-class U.S. Mail on counsel for Plaintiff Andrew Adams, as follows:

James V. Sabatini, Esquire
Sabatini & Associates, LLC
One Market Square
Newington, Connecticut 06111

*Counsel for Plaintiff*

Risa B. Boerner

# EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

ANDREW ADAMS,                          )
                                       )
            Plaintiff,                 )
                                       )        Case No. 3:11-cv-00427 (JCH)
vs.                                    )
                                       )
FESTIVAL FUN PARKS, LLC,               )
d/b/a LAKE COMPOUNCE                   )
                                       )
                                       )
            Defendant.                 )
                                       )

## PLAINTIFF'S RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Defendant, Festival Fun Parks, by and through its undersigned counsel, and pursuant to Federal Rule of Civil Procedure 33, hereby requests that Plaintiff Andrew Adams answer the following Interrogatories, separately and under oath, within thirty (30) days of service in accordance with the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Connecticut, and the instructions and definitions set forth herein.

## INSTRUCTIONS AND DEFINITIONS

Please follow these instructions and use the following definitions in responding to these Interrogatories. Any term or word that is not defined herein has its usual and customary meaning.

A.     In each response to these Interrogatories, provide all information in your possession, custody, or control. If you are able to provide only part of the information sought,

Error! Unknown document property name.

provide that partial information and specify the reason for your inability to provide the remainder.

B.    Whenever appropriate to these Interrogatories, the singular shall be interpreted as the plural and vice versa; the present tense shall include the past tense and vice versa; and the neuter shall include both the masculine and feminine.

C.    If any form of privilege or protection from disclosure is claimed as a ground for withholding any document and/or responsive information, the answering party shall set forth (i) the name of the document and/or responsive information, its date, the sender and/or speaker, recipient, persons to whom copies have been furnished, its subject matter, and all other information required for identification of the document and/or responsive information without revealing the information for which the privilege or other protection from disclosure is claimed, and (ii) the basis for the claim of privilege or protection from disclosure.

D.    The terms "and" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Interrogatories any information that might otherwise be construed to be outside their scope.

E.    Pursuant to Federal Rule of Civil Procedure 26(e) and Federal Rule of Civil Procedure 33, these Interrogatories are continuing in nature so as to require you to file a supplementary response and/or provide supplementary documents if you subsequently obtain additional or different information or documents before the trial.

F.    "Plaintiff" or "you," as used herein, refers to Plaintiff Andrew Adams and all servants, representatives, investigators, related persons and entities, attorneys, and all other persons acting on his behalf.

Error! Unknown document property name.

JA 76

G.    "Defendant," as used herein, refers to Festival Fun Parks and all predecessors, successors, principals, officers, directors, agents, affiliates, employees, servants, representatives, investigators, related persons and entities, attorneys, and all other persons acting on its behalf.

H.    "Document" shall mean and include every writing, record, or graphic matter of every type and description in any form, however produced or reproduced, tangible or retrievable in any way, whether prepared by you, or received by you and wherever located, now or at any time in your possession, custody or control, including, but not limited to, papers, correspondence, memoranda, notes, interoffice communications, charts, proposals, lists, notebooks, circulars, brochures, catalogues, advertisements, plans, handbooks, manuals, letters, minutes, resolutions, statements, contracts, agreements, summaries, messages, diaries, address books, rolodexes, calendars, personal planners, telephone logs, telephone records, books of account, bills, checks and check stubs, receipts, invoices, vouchers, orders, printouts, e-mails, maps, charts, diagrams, blue prints, sketches, models, prototypes, electronically stored information, CD-ROMs, disks or diskettes, audio or video tape, palm pilot, blackberry, or other PDA data, and/or any other such documents or form of written, printed or electronically stored information, data or words. "Document" also includes any preliminary notes and drafts, and all originals, copies, and any copy that contains any notation or other addition to or modification of the original. Without limitation of the term "control" as used above, a document is deemed to be in your control if you have the right to secure the document or a copy thereof from another person, of public or private entity which has actual possession thereof. If a document was, but is no longer in your possession or subject to your control, state what disposition was made of it, by whom and the date or dates, or approximate date or dates, on which such disposition was made, and why.

Error! Unknown document property name.

JA 77

I.    "Person" means any natural individual in any capacity whatsoever or any entity or organization, including divisions, departments, or other units therein, and shall include, but not be limited to, a public or private corporation, partnership, joint venture, voluntary unincorporated association, organization, proprietorship, trust, state, government agency, commission, bureau, or department.

J.    1.    The term "identify" with respect to a natural person means to:

        (a)    state his or her name; and

        (b)    state his or her current or last known residence, address and telephone number.

    2.    The term "identify" with respect to a document or report means to state its:

        (a)    date;

        (b)    title or content identifier;

        (c)    author; and

        (d)    current location.

    3.    The term "identify" with respect to a communication, means to state its:

        (a)    date;

        (b)    names and titles of persons involved; and

        (c)    the content of the communication.

    4.    The term "identify" with respect to a transaction, event, incident or occurrence means to:

        (a)    state the date thereof;

        (b)    identify each person involved; and

**Error! Unknown document property name.**

(c)    identify the location of the transaction, event, incident or

occurrence.

K.    "Reflect(s), relate(s) to, or refer(s) to" means pertains to, refers to, concerns,

evidences, embodies, comprises, or has any logical or factual connection with the subject matter

of the Interrogatories.

L.    "State in detail the factual basis for your contention," as used in these

Interrogatories, means that you should fully and completely describe every act, event,

occurrence, omission, document or communication of which you know that supports your

contention, as well as identify any witnesses whose testimony you expect will support your

position.

M.    "Action" means the civil litigation pending between Plaintiff Andrew Adams and

Defendant Festival Fun Parks in the United States District Court for the District of Connecticut,

No. 3:11- cv-00427 (JCH).

N.    "Complaint" means the document Plaintiff filed in the United States District

Court for the District of Connecticut on March 18, 2011.

O.    "Health Care Provider" means any doctor or other practitioner or institution of

medical science or healing art, including but not limited to, counselors, nurses, chiropractors,

psychologists, psychiatrists, podiatrists, dentists, optometrists, social workers, therapists,

obstetricians, and physical/occupational therapists, as well as hospitals, clinics, hospices, and

other institutions providing health care.

Error! Unknown document property name.

## INTERROGATORIES

1.    Identify any person from whom you have obtained or will obtain a written or oral report, statement, memorandum, affidavit, declaration, or testimony regarding any of the allegations in your Complaint and describe the general subject matter of the report, statement, memorandum, affidavit, declaration, or testimony.

**ANSWER:**

Subject to and without waiving the Objection: one or more of the following individuals will be deposed.

1.    Justin Walters (employed by defendant): Walters will likely have discoverable information on plaintiff's employment with the defendant, his conduct directed towards the plaintiff, and the allegations set forth in plaintiff's Complaint.

2.    Bill Cook (employed by defendant): Cook will likely have discoverable information on plaintiff's employment, plaintiff's job performance and the allegations set forth in plaintiff's Complaint.

3.    Joseph Fecko (employed by defendant): Fecko will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

4.    Tommy Juskevicious (employed by defendant) Juskevicious will likely have discoverable information on plaintiff's employment and the allegations set forth in plaintiff's Complaint.

5.    Wayne Olsen (employed by the defendant) Olsen will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

Error! Unknown document property name.

6.      Jim Stevens (employed by defendant) Stevens will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

7.      Jerry Brick (employed by the defendant) Brick will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

8.      Michael Hayes (employed by defendant) Hayes will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

9.      John Fitch (employed by defendant) Fitch will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

10.     Richard Aylward (former employee of the defendant, current address unknown) Aylward will likely have discoverable information on plaintiff's employment, plaintiff's job performance, the allegations set forth in plaintiff's Complaint.

11.     Bryn Goldbeck (employee of the defendant) Goldbeck will likely have discoverable information on plaintiff's employment, plaintiff's job performance, the allegations set forth in plaintiff's Complaint.

12.     Holly Byrnes (former employee of defendant, current address unknown) Byrnes will likely have discoverable information on plaintiff's employment, plaintiff's job performance, the allegations set forth in plaintiff's Complaint.

13.     `Jim Lenois (former employee of defendant, current address unknown) Lenois will likely have discoverable information on plaintiff's employment, plaintiff's job performance,

the allegations set forth in plaintiff's Complaint.

14.    Rich Booch (employee of defendant) Booch will likely have discoverable

information on plaintiff's employment, plaintiff's job performance, the allegations set forth in

plaintiff's Complaint.

15.    Marianne Dudac (former employee of defendant, current address unknown)

Dudac will likely have discoverable information on plaintiff's employment, plaintiff's job

performance, the allegations set forth in plaintiff's Complaint.

16.    Cynthia K. Niedbala, M.S., Educational Diagnostician (formerly with Newington

Children's Hospital, Newington, Connecticut, current address unknown) Niedbala will likely

have discoverable information concerning plaintiff's mental disability.

2.    Describe in detail the amount of damages that you are claiming in this Action for

Festival Fun Park's alleged violations of the Americans with Disabilities Act, the Connecticut

Fair Employment Practices Act, and Title VII of the Civil Rights Act.   Include in your

description the basis of each calculation of damages by item, including each and every factor

used in making said calculation, and identify any documents that record or relate to your

damages or that record the basis of your calculation of damages.

**ANSWER:**

1.    Back Pay: 10/31/09 through present date of December 1, 2011, at $10.66 per hour, 40

hours per week equals $46,051.20  (subject to offset from wages and income earned post

termination)(further subject to any overtime worked)

2.    Front Pay: Two years - $44,345.60(subject to additional overtime pay and to any offset

Error! Unknown document property name.

from current wages and/or income)

3.      Emotional Distress - $50,000.00

4.      Consequential Damages: will be supplied

5.      Attorneys' Fees & Court Costs: will be supplied

6.      Punitive Damages: To be determined by trier of fact

3.      Identify each and every Health Care Provider who has examined, diagnosed, and/or treated the diagnosis of your alleged "mental retardation," including, but not limited to, any Health Care Provider who made any recommendation in regards to your employment or any accommodation related thereto.  For each such Health Care Provider, state the dates you were examined, diagnosed, or received treatment, and describe the diagnosis and/or treatment.

**ANSWER:**

Subject to and without waiving the objection, plaintiff identifies the following

1.      Newington Children's Hospital

Clinician: Cynthia K. Niedbala, M.S. Educational Diagnostician

Date of Testing: 1990

The Newington Children's Hospital moved or became a part of the Connecticut Children's Medical Center, 282 Washington Street, Hartford, Connecticut 06016 in 1996.

4.      Identify each person not already identified whom you know or believe has any knowledge or information related to any and all facts, circumstances, or issues raised in the

Error! Unknown document property name.

Complaint, and for each such person, describe in detail the nature of his or her information or knowledge.

**ANSWER:**

See individuals identified in response to Interrogatory No. 1

5.      Identify each and every statement, whether written or oral, made at any time by Defendant, or any of its current or former agents or representatives, that you contend or believe constitutes an admission or declaration against interest on the part of Defendant or any of its current or former agents or representatives with regard to the subject matter of your Complaint.

**ANSWER:**

Subject to and without waiving the Objection, plaintiff identifies the following:

1.      Justin Walters stated: Andy get down on your knees that is the best spot for you.

2.      I went looking for my blow torch that had my name on it. When I found it the word "SUCKS" was written on it.

3.      Mario Abela, my other boss in the shop, told me that Justin Walters liked to play jokes on me.

4.      Walters, told the me that he "had" my mother last night and that she was good.

5.      Mario Abela told me to give Walters a chance and that he was not so bad.

6.      Fitch told me that I would have to deal with it (Walter's harassment) if I wanted to work in the department.

7.      Walters told me that being on my knees was my best position and that I liked being on my knees because I liked guys so much.

8.      Walters threw and smashed an apple on my truck.

Error! Unknown document property name.

JA 84

Additional admissions may be discovered during the course of discovery.

6.    Identify each expert witness you have reason to believe you will engage, use, or ask to provide testimony in connection with this matter and, as to each such person, describe in detail his or her profession or occupation and the field in which he or she allegedly is an expert, the subject matter about which he or she is expected to testify, the substance of the opinion to which he or she is expected to testify, give a summary of the grounds upon which he or she bases that opinion, and identify all documents upon which he or she is expected to rely in support of his or her testimony.

**ANSWER:**

Subject to and without waiving the objection, plaintiff identifies the following:

Newington Children's Hospital – now a part of CT Children's Medical Center

Clinician: Cynthia K. Niedbala, M.S. Educational Diagnosticia

It is anticipated that Niedbala will offer testimony regarding her clinical records pertaining to the plaintiff. As for the substance of her opinions, see attached documents Plaintiff's Bates Nos. Nos. 161-171

7.    Identify each employee of Festival Fun Parks (if any) that you notified, informed, or otherwise apprised of your alleged "mental retardation," and for each such person identify the date and substance of the communication related to your "mental retardation," and whether the notification was made in writing.

**ANSWER:**

Error! Unknown document property name.

I identified in my job application with the defendant that I was a slow learner. I also informed my bosses and my general manager about my learning disability.

8.    Describe in detail your professional qualifications and experience that would qualify you to work in the paint department at Lake Compounce.

**ANSWER:**

See attached copy of my resume and May 24, 2009 memo from Jerry Brick. Plaintiff's Bates Nos. 6; 172

9.    Identify each instance of harassment you experienced while employed by Festival Fun Parks, and for each such instance identify the representative of Festival Fun Parks that allegedly harassed you, the date on which the alleged harassment occurred, the location in which the alleged harassment occurred; and describe the substance of the alleged harassment.

**ANSWER:**

Feb. 2009 and July 2009: Walters, told me that being on my knees was my best position and that I liked being on my knees because I liked guys so much.

June 2009: Walters said that he "had" my mother last night and that she was good.

June 2, 2009: I went looking for my blow torch that had my name on it. When I found it the word "SUCKS" was written on it.

July 2009 – Walters threw nuts and bolts towards me and they landed into the parts washer and the fluid splashed onto me.

August 2009 – Walters put his palette of 2 Water Park Pumps in my work area.

September 2009 - Walters threw and smashed an apple on my truck.

Error! Unknown document property name.

October 2009 – I was working on the sky ride at the park. Walters questioned the work that I performed on the ride.

10.    Identify each complaint you made to a representative of Festival Fun Parks of any alleged harassment, and for each such complaint identify the representative of Festival Fun Parks to whom you reported the alleged harassment, identify the date on which you reported the alleged harassment, describe the substance of the complaint, and state whether the complaint was made in writing.

**ANSWER:**

February 2009 – I verbally reported Walters "on you knees" comment to John Fitch.

June 2009 – I showed my blow torch with the word "sucks" on it to Fitch

July 2009 – I verbally reported to John Fitch and Mario that Walters was putting things in my work area

July 2009, I told Mario that I was having a problem with Walters picking on me.

August 2009 – I told Mario about Walters putting things in my work area

September 2009 – I told Fitch about Walters throwing an apple at my truck

October 2009 – I told Jerry Brick about the problems I was having at the shop and asked to work in the paint shop.

11/8/09 email – see attached plaintiff's Bates No. 20

11.    Identify each instance of discrimination you experienced while employed by Festival Fun Parks, and for each such instance identify the representative of Festival Fun Parks that allegedly discriminated against you, the date on which the alleged discrimination occurred,

Error! Unknown document property name.

the location in which the alleged discrimination occurred; and describe the substance of the alleged discrimination.

**ANSWER:**

Justin Walters called me stupid on multiple occasions.

In October 2009, Walters said that I did not know what I was doing.

In June 2009, someone wrote the word "sucks" next to my name located on my blow torch.

In September 2009, Walters threw and smashed an apple on my truck.

In February and July 2009 Walters, told me that being on my knees was my best position and that I liked being on my knees because I liked guys so much.

In June 2009 Walters, told the plaintiff that he "had" plaintiff's mother last night and that she was good.

In October 2009 I spoke to Jerry Brick, and asked if he could find a new position to work because of the problems I was having and I was told that there were no open positions in the painting department.

12.    Identify each complaint you made to a representative of Festival Fun Parks of any alleged discrimination, and for each such complaint identify the representative of Festival Fun Parks to whom you reported the alleged discrimination, identify the date on which you reported the alleged discrimination, describe the substance of the complaint, and state whether the complaint was made in writing.

**RESPONSE:**

Error! Unknown document property name.

February 2009 – I verbally reported Walters "on you knees" comment to John Fitch.

June 2009 – I showed my blow torch with the word "sucks" on it to Fitch

July 2009 – I verbally reported to John Fitch and Mario that Walters was putting things in my work area

July 2009, I told Mario that I was having a problem with Walters picking on me.

August 2009 – I told Mario about Walters putting things in my work area

September 2009 – I told Fitch about Walters throwing an apple at my truck

October 2009 – I told Jerry Brick about the problems I was having at the shop and asked to work in the paint shop.

11/8/09 email – see attached plaintiff's Bates No. 20


13.     State in detail the factual basis for your contention that "defendant treated the plaintiff adversely different from similarly situated non-male employees."

**ANSWER:**

See amended complaint as the amended complaint eliminated the allegation


14.     Identify the discriminatory employment practice(s), if any, that you opposed during your employment with Festival Fun Parks.   For each discriminatory practice that you identify as having opposed, identify the statement, writing, or other communication you made to a representative of Festival Fun Park in which you opposed the allegedly discriminatory employment practice(s), and identify the representative of Festival Fun Parks with whom you so communicated.

Error! Unknown document property name.

**ANSWER:**

February 2009 – I verbally reported Walters "on you knees" comment to John Fitch.

June 2009 – I showed my blow torch with the word "sucks" on it to Fitch

July 2009 – I verbally reported to John Fitch and Mario that Walters was putting things in my work area

July 2009, I told Mario that I was having a problem with Walters picking on me.

August 2009 – I told Mario about Walters putting things in my work area

September 2009 – I told Fitch about Walters throwing an apple at my truck

October 2009 – I told Jerry Brick about the problems I was having at the shop and asked to work in the paint shop.

11/8/09 email – see attached plaintiff's Bates No. 20

15.    Identify any and all conduct by Festival Fun Parks that constituted discharging, expelling, or otherwise discriminating against you as a result of any opposition to a discriminatory employment practice identified above.

**ANSWER:**

I complained to the defendant that Walters was harassing me. Defendant did not end the harassment. I asked the defendant for a job transfer. Defendant did not transfer me. Defendant terminated my employment.

16.    Identify by case or docket number any complaint or charge you have filed, or any proceeding with which you have testified or assisted, and for each such complaint, charge or

proceeding describe in detail the subject of the complaint, charge, or proceeding, and the state the current status of the litigation, charge, or proceeding.

**ANSWER:**

Objection pending

17.    Describe in detail all your efforts to secure employment with any person between your separation from Festival Fun Parks through the present. Your response should include an identification of any and all applications or interviews for employment and any and all attempts to establish or to buy a business operation or establish self-employment. If an offer of employment was extended to you, please describe each offer, indicating by whom and when made and the full terms of the offer (salary, fringe benefits, bonuses, conditions of employment, etc.), whether you accepted or refused any offer of employment, and the identity of any documents which record or reflect any of the above.

**ANSWER:**

1.    M&M Market and Deli, LLC, 1277 Stafford Avenue, Bristol, CT 06010. See attached plaintiff's Bates Nos. 129-160

2.    Illusions, 1639 Wolcott Road, Wolcott, CT 06717. See attached plaintiff's Bates Nos. 18-19

3.    Andrew Adams d/b/a Gold Leaf Galleries, home address. See attached plaintiff's Bates Nos. 107-128

Error! Unknown document property name.

18.     Identify each document or other fact that you believe will support or refute any of the allegations in your Complaint to the extent such document or other fact is not otherwise identified in any other answer to these Interrogatories

**ANSWER:**

Objection pending

Error! Unknown document property name.

Date:  August 11, 2011

FISHER & PHILLIPS LLP

_____
Risa B. Boerner, Esquire
Fisher & Phillips LLP
Radnor Financial Center
201 King of Prussia Road,
Radnor, Pennsylvania  19087
(610) 230-2132
(610) 230-2151 (facsimile)
rboerner@laborlawyers.com

*Counsel for Defendant Festival Fun
Parks LLC*

Error! Unknown document property name.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2011, a copy of the foregoing First Set of Interrogatories of Defendant Festival Fun Parks Directed to Plaintiff Andrew Adams were served by first-class U.S. Mail on counsel for Plaintiff Andrew Adams, as follows:

James V. Sabatini, Esquire
Sabatini & Associates, LLC
One Market Square
Newington, Connecticut 06111

*Counsel for Plaintiff*

_____

Risa B. Boerner

Error! Unknown document property name.

**EXHIBIT "D"**



NEWINGTON
CHILDREN'S HOSPITAL

**EDUCATIONAL EVALUATION & CONSULTING SERVICES**
**(203) 667-5315**

DATE: December 3, 1990
RE: Andrew Adams
Medical Record: 132576

Mr. & Mrs. Lawrence Adams
1272 Stafford Avenue
Bristol, Connecticut 06010

Dear Mr. & Mrs. Adams:

Enclosed please find Andrew's Diagnostic Perceptual/Cognitive
Assessment. Copies of this evaluation have been sent only
to those who have been indicated on the signed release.

Should you have questions or concerns regarding specific test
results or recommendations, please contact Educational Evaluation
and Consulting Services at 667-5315 for assistance.

Sincerely,

Barbara E. Brown, M.S.
Director

Enclosure

BEB/dw

P000161

JA 96

# NEWINGTON CHILDREN'S HOSPITAL

## DIAGNOSTIC PERCEPTUAL/COGNITIVE ASSESSMENT

## EDUCATIONAL EVALUATION AND CONSULTING SERVICES

Andrew Adams                     Medical #: 132576
BD: 8/15/79                      Date of Testing: 10/30/79
CA: 11+3                         Referral: Parents -
Grade: 5.2 Special                 Mr. and Mrs. Lawrence Adams
Education (1990-91)              Clinician: Cynthia K. Niedbala, M.S.
Stafford Elementary School         Educational Diagnostician
Bristol, Connecticut

## Background Information and Reason for Referral

Per parental report, Andy has been involved in specialized
services, initially for speech and language needs, since
preschool.  Specific educational data regarding his performance
throughout the primary grades was not available for review prior
to this assessment.  However, per parental report, Andy has
participated within the Aim program, Stafford Elementary School,
Bristol, Connecticut, since kindergarten age.

The results of a triennial psychological review, completed within
his school system, (January, 1990), revealed substantial
deficiencies in verbal and non-verbal spheres, which resulted in
a composite score which was marginally within the Borderline
range.  Visual motor integrative skills were displayed three
years below his chronological age.  An educational assessment
(April, 1990) revealed reading, spelling and mathematics skills
to be within a second to third grade skill range.  A speech and
language assessment indicated continued deficiencies in receptive
and expressive vocabulary, while selected language processing
skills requiring categorization and determination of differences
were displayed as above average.

Andy currently continues to participate in a self-contained
special educational program, designed to meet his needs as a
student with mild Mental Retardation, and/or Borderline
abilities.  He is currently mainstreamed with fifth grade
students for art, music, physical education,   and homeroom,
following a similar program model to what was initiated in fourth
grade.

Andy was referred for this Diagnostic Perceptual/Cognitive
Assessment by his parents, Mr. and Mrs. Lawrence Adams, to
determine current processing and academic achievement levels with
recommendations for programming.

P000162

Individualized Educational Program/Transition Services

Student: _Andrew Adams_____

Long Term Goal: INDEPENDENT LIVING

( ) No special skills training needed
( ) Independent (House or Apartment)    ( ) Supervised Living    ( ) Group Home    ( ) Family
( ) Other
(✓) Specialized skills training in:
   (✓) Activities of Daily Living  (✓ Social Skills    (✓ Self-Advocacy    (✓ Financial Planning
   (✓ Money Management  (✓ Legal    ( ) Other: _____

Goal Statement: _____
Evaluation Schedule Code:  0 – Not Addressed    1 – Partial    2 – Half    3 – Most    4 – Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will complete all of the needed steps to open a checking account and to maintain it on a daily basis independently. | student/staff | Unit Tests in Banking and teacher made activities | 1/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will plan menu for a day, including the correct number of foods from each of the pyramid groups to make it nutritionally sound. | student/staff | Teacher - Made Evaluation | 1/96 | 2 | | | |
| End of Year Summary: | | | | | | | |

Justification Statement:  Did the PPT conclude a need in this area?  Yes _____    No _____
If no, please provide a justification statement indicating the reasons:

Case 3:11-cv-00427-JCH    Document 29-2    Filed 03/15/12    Page 48 of 56

P000163

JA 98

Long Term Goal: INDEPENDENT LIVING

pg. 2

Evaluation Schedule Code:   0 - Not Addressed     1 - Partial    2 - Half    3 - Most    4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will independently sort, launder and iron as needed his laundry.  End of Year Summary: | Staff | Teacher-Made Checklists and Student Self-Evaluation | 3/96 | 3 | | | |
| Andy will maintain acceptable personal hygiene, e.g. clean hair, hands and nails and acceptable clothing.  End of Year Summary: | Staff/ student/ parents | Student Self-Evaluation | 3/96 | 2 | | | |
| Andy will identify the time in 1 minute intervals and will state the time in 15 minute intervals before or after that time.  End of Year Summary: | Staff | Teacher-Made Evaluation and situational assessment. | 2/96 | 2 | | | |
| Andy will complete a unit on basic First Aid and will state/display behavior needed in an emergency situation.  End of Year Summary: | Staff/ parents | Basic First Aid, scoring at least 90% on each unit test. | 1/96 | 2 | | | |

P000164

JA 99

Case 3:11-cv-00427-JCH   Document 29-2   Filed 03/15/12   Page 50 of 56

Long Term Goal: INDEPENDENT LIVING

pg. 3

Evaluation Schedule Code:  0 - Not Addressed     1 - Partial     2 - Half     3 - Most     4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will set an alarm clock and a clock radio, digital and standard, to the correct time and set the alarm using the correct buttons. | Student/staff parents | Teacher-Made Checklists | 10/95 | → | | | |
| End of Year Summary: | | | | | | | |
| Andy will state and write the sizes he needs for his personal clothing. | student/staff | Self-Evaluation | 1/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will complete unit on ordering from a catalog, scoring at least 95% on each unit | Student/staff | Ordering from a Catalog | 11/96 | — | | | |
| End of Year Summary: | | | | | | | |
| Andy will use a sales tax chart to compute tax and then add it to a price to get total. | student, staff | Teacher-Made Activities | 12/96 | — | | | |
| End of Year Summary: | | | | | | | |

P000165

JA 100

Case 3:11-cv-00427-JCH    Document 29-2    Filed 03/15/12    Page 51 of 56

Long Term Goal: INDEPENDENT LIVING

Pg. return

Evaluation Schedule Code:   0 - Not Addressed    1 - Partial    2 - Half    3 - Most    4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will state under what conditions and the method to use a portable fire extinguisher. | staff/parents | Information Checklist and Situational Assessment | 2/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| Andy will state and demonstrate 2 methods of clearing a clogged toilet or drain. | staff/parents | Teacher-Made Checklists | 2/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will complete Everyday Living Skills, lessons 4-10 scoring at least 90% on each unit test. | student/staff | Everyday Living Skills | 2/96 | 3 | | | |
| End of Year Summary: | | | | | | | |
| | | | | | | | |
| End of Year Summary: | | | | | | | |

P000166

JA 101

Case 3:11-cv-00427-JCH   Document 29-2   Filed 03/15/12   Page 52 of 56

Individualized Educational Program/Transition Services

Student: *Andy Adams*

Long Term Goal: EMPLOYMENT/POSTSECONDARY EDUCATION

( ) 4 Year College ( ) 2 Year College (✓) Postsecondary vocational training ( ) Ind.Competitive Employme
(✓) 1 Time-limited assistance for Employment ( ) Supported Employment ( ) Apprenticeship/Training
( ) Military ( ) Other: _____

Goal Statement: _____

Evaluation Schedule Code:  0 – Not Addressed   1 – Partial   2 – Half   3 – Most   4 – Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will work in a community job-site two days a week. | student/job coach | Work-site and supervisor evaluations | 4/96 | 3 | | | |
| **End of Year Summary:** | | | | | | | |
| Andy will read the want ads, and evaluate the qualifications needed, and the benefits and drawbacks of each opening, stating which he is qualified for and which he would like. | student/staff | Teacher-made activities and evaluations. | 4/96 | 2 | | | |
| **End of Year Summary:** | | | | | | | |

P000167

JA 102

Students: _Andy Quinn_

**Long Term Goal: EMPLOYMENT/POSTSECONDARY EDUCATION**

Evaluation Schedule Code:   0 - Not Addressed      1 - Partial      2 - Half   3 - Most      4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule 1st MP | 2nd MP | 3rd MP | 4th MP |
|---|---|---|---|---|---|---|---|
| Andy will prepare a resume of his education and employment experiences. | student/staff | Evaluation of Resume | 4/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| When a supervisor or co-worker is speaking to him, Andy will establish eye contact with the person. | student/staff | Self-evaluation | 4/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| During a performance review, Andy will describe his work in a positive manner. | student/staff | self evaluation and staff evaluation | 9/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| Andy will discuss a complaint about work situation with his supervisor. | student/staff | self evaluation and staff evaluation | 4/96 | 1 | | | |
| End of Year Summary: | | | | | | | |

P000168

JA 103

Case 3:11-cv-00427-JCH   Document 29-2   Filed 03/15/12   Page 54 of 56

Long Term Goal: EMPLOYMENT/POSTSECONDARY EDUCATION

Evaluation Schedule Code:   0 - Not Addressed     1 - Partial     2 - Half     3 - Most     4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule 1st MP | 2nd MP | 3rd MP | 4th MP |
|---|---|---|---|---|---|---|---|
| Andy will identify and state the meanings for all food prep. terms in Brigance Essential Skills. | staff | Evaluation Checklist | 12/95 | 2 | | | |
| **End of Year Summary:** | | | | | | | |
| Andy will identify and carry out in sequential steps for the recipe directions in Brigance Essential Skills. | Staff | Evaluation Checklist | 4/96 | 1 | | | |
| **End of Year Summary:** | | | | | | | |
| Andy will explore Technical School opportunities in the culinary area | Staff/Student/ parents | Evaluation by Andy of each visitation | 4/96 | 2 | | | |
| **End of Year Summary:** | | | | | | | |
| Andy will be referred to B.R.S. | Staff/Student/ parents | Referal proc. begun | 4/96 | 4 | | | |
| **End of Year Summary:** | | | | | | | |

P000169

JA 104

Case 3:11-cv-00427-JCH    Document 29-2    Filed 03/15/12    Page 55 of 56

Individualized Educational Program/Transition Services

Student: _Andy Adams_____

Long Term Goal: COMMUNITY PARTICIPATION

( ) No special skills training needed
( ) Specialized skills training in:

   ( )   Transportation   ( )   Recreation/Leisure   ( )   Consumerism
   ( )   Medical   ( )   Other

Goal Statement: _____

Evaluation Schedule Code: 0 - Not Addressed    1 - Partial    2 - Half    3 - Most    4 - Goal/Accomplishe

| Annual Statements of Needed Services: Objectives | Person/Program/ Agency Responsible | Evaluation Criteria | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will plan the route and take a public bus to a local destination. | student/staff | Checklist Evaluation | 2/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| Andy will identify local agencies that may offer support after graduation. | student/staff/ parents | Agency Response Checklist | 4/96 | 1 | | | |
| End of Year Summary: | | | | | | | |

Justification Statement: Did the PPT conclude a need in this area?  Yes ____    No ____
If no, please provide a justification statement indicating the reasons:

JA 105

P000170

Case 3:11-cv-00427-JCH    Document 29-2    Filed 03/15/12    Page 56 of 56

Student: Andy Adams

pg. 2

Long Term Goal: COMMUNITY PARTICIPATION

Evaluation Schedule Code:   0 - Not Addressed    1 - Partial    2 - Half    3 - Most    4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will identify community clubs and organizations that may be of interest and will make an initial contact. | student/staff | Results from Telephone Poll/ Contact Poll | 4/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| Andy will identify places in this community where he can spend leisure/recreation time, and will plan an activity that he and a friend can attend. | student/staff parents | evaluations of student/staff/parents | 2/96 | 4 | | | |
| End of Year Summary: | | | | | | | |
| Andy will locate name in white pages of the phone book independently. | student/staff | Teacher-made checklists | 1/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will locate a phone number in the yellow pages of a needed service. | staff | Teacher-made checklists | 4/96 | 2 | | | |
| End of Year Summary: | | | | | | | |

P000171

JA 106

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANDREW ADAMS, | : |
| Plaintiff, | : |
| | : |
| v. | :     CASE NO.:  3:11-cv-00427-JCH |
| | : |
| FESTIVAL FUN PARKS, LLC, | : |
| D/B/A LAKE COMPOUNCE, | : |
| | : |
| Defendant. | : |

## MOTION OF DEFENDANT FESTIVAL FUN PARKS, LLC
## FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a), Defendant Festival Fun Parks, LLC, d/b/a Lake Compounce ("Festival Fun Parks"), hereby respectfully moves this Court for entry of Summary Judgment on each count in the Amended Complaint filed by Plaintiff Andrew Adams ("Adams"), on the following grounds:

1.      Plaintiff has failed to establish a prima facie case of discrimination, harassment or retaliation under the Americans with Disabilities Act ("ADA"), the Connecticut Fair Employment Practices Act ("CFEPA"), and Title VII of the Civil Rights Act of 1964, as amended ("Title VII").

2.      Plaintiff is not disabled within the meaning of the ADA or the CFEPA.

3.      Plaintiff has not suffered an adverse employment action because of his disabilities; his employment with Festival Fun Parks was not terminated, he was not constructively discharged from this employment, and Festival Fun Parks' decision not to transfer him to another position is not an adverse employment action.

4.    Plaintiff has not establish a prima facie case of sexual harassment under Title VII or the CFEPA.

5.    Plaintiff has not established a prima facie case of gender discrimination under Title VII or the CFEPA.

6.    Plaintiff has not established a prima facie case of retaliation under Title VII or the CFEPA.

7.    Plaintiff cannot establish that Festival Fun Parks' legitimate, non-discriminatory reasons for not transferring him to another department are pretextual, or that Festival Fun Parks possessed discriminatory intent.

8.    Attached in support of this Motion is Festival Fun Parks' Local Rule 56(a) Statement and Memorandum of Law, and the following exhibits thereto:

a.   Plaintiff's Amended Complaint;

b.   Excerpts from relevant portions of the January 20, 2012 Deposition of Andrew Adams, including exhibits thereto;

c.   Declaration of Gerard Brick; and

d.   Excerpts from relevant portions of Plaintiff's Responses to Festival Fun Parks First Set of Interrogatories.

Respectfully Submitted,

Dated: March 15, 2012

FISHER & PHILLIPS LLP

*/s/ Risa B. Boerner*
Risa B. Boerner
Attorney I.D. No. ct28341
James P. McLaughlin
Attorney I.D. No. phv05264
Fisher & Phillips LLP
201 King of Prussia Rd., Suite 650
King of Prussia, PA  19087
Telephone: (610) 230-2150
Facsimile: (610) 230-2151
E-Mail: rboerner@laborlawyers.com
        jmclaughlin@laborlawyers.com

*Attorneys for Defendant Festival Fun Parks,*
*LLC d/b/a Lake Compounce*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 15, 2012, a copy of the foregoing was filed electronically and served electronically on all attorneys and pro se parties of record as listed below.  Notice of this filing will be sent be e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF system.

> James V. Sabatini, Esquire
> Sabatini and Associates, LLC
> 1 Market Square
> Newington, CT 06111
>
> Attorney for Plaintiff

> */s/ Risa B. Boerner*
> Risa B. Boerner

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANDREW ADAMS, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO.:  3:11-cv-00427-JCH |
| | : | |
| FESTIVAL FUN PARKS, LLC, | : | |
| D/B/A LAKE COMPOUNCE, | : | |
| | : | |
| Defendant. | : | |

MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF DEFENDANT
FESTIVAL FUN PARKS, LLC FOR SUMMARY JUDGMENT

## I.      INTRODUCTION

Defendant, Festival Fun Parks, LLC d/b/a Lake Compounce ("Defendant," "Festival Fun Parks," or "Lake Compounce"), by and through its undersigned counsel, Fisher & Phillips LLP, respectfully submits this Memorandum of Law in support of its Motion for Summary Judgment.

## II.     SUMMARY OF THE CASE

Plaintiff Andrew Adams ("Plaintiff") instituted this action against Festival Fun Parks claiming eight separate causes of action:  (1) violation of the Americans With Disabilities Act ("ADA") – disability discrimination; (2) violation of the Connecticut Fair Employment Practices Act (the "CFEPA") – disability discrimination; (3) violation of the CFEPA – gender discrimination; (4) violation of Title VII of the Civil Right Act of 1964, as amended ("Title VII") – gender discrimination; and (5) violation of Title VII – hostile work environment sexual harassment; (6) violation of the CFEPA – hostile work environment sexual harassment; (7) violation of the CFEPA – retaliation; and (8) violation of Title VII – retaliation. See Plaintiff's Amended Complaint, a true and correct copy of which is attached hereto as Exhibit A (hereinafter "Exh. A").

Summary judgment should be granted in Lake Compounce's favor on each claim for the following reasons, as well as those set forth more fully below:

- Plaintiff cannot establish a prima facie claim for disability discrimination under the ADA and the CFEPA because he has presented no admissible evidence that he is disabled within the meaning of these statutes; and

- Plaintiff cannot establish that he suffered an adverse employment action, a necessary element of his prima facie case on each of his claims -- his ADA and CFEPA disability claims, his Title VII and CFEPA gender discrimination claims, his Title VII sexual harassment claim, and his Title VII and CFEPA retaliation claims; and

- Even if Plaintiff could make out a prima facie case on his claims, Festival Fun Parks is entitled to summary judgment because it possesses a legitimate non-discriminatory basis for the alleged adverse employment action, and Plaintiff can present no evidence that this legitimate action was pretextual.

III.    **STATEMENT OF FACTS**

A.    **Plaintiff's Employment with Festival Fun Parks**

Plaintiff was a Mechanic Helper at the Lake Compounce theme park at the time of the termination of his employment.[1]  See January 20, 2012 deposition of Plaintiff at pp. 16:2-10, a true and correct copy of the relevant portions of which is attached hereto as Exhibit B (hereinafter "Exh. B").  As a Mechanic Helper, Plaintiff's responsibilities included washing parts

---

[1]    Festival Fun Parks owns and operates the Lake Compounce theme park located in Bristol, Connecticut, where Plaintiff was employed.  See Exh. C, Declaration of J. Brick, at ¶ 3. "Festival Fun Parks" and "Lake Compounce" are therefore used interchangeably.

2

of the rides, assisting other mechanics take things apart, cleaning out the shop, and assisting with various park departments as needed.  See Exh. B at 16:11-19.

Prior to working full-time as a Mechanic Helper, Plaintiff had previously worked for Lake Compounce as a seasonal employee each summer in the years between 1997 and 2007. See Exh. B at 13:15-19; 13:25-14:4; 14:12-15; 15:14-16:1.  Between 1997 and 2003, Adams held various positions at Lake Compounce, including ride operator, ride trainer, and assistant ride supervisor.  See Exh. B at 13:15-14:11.  However, in August of 2003, before the conclusion of the 2003 season, Adams voluntarily resigned his employment with Lake Compounce.  See Exh. B at 14:12-25.  He did so by orally notifying park management that he was resigning.  See Exh. B at 14:23-15: 5.  After his resignation in 2003, Adams reapplied for a position at Lake Compounce and returned as a seasonal employee in 2004.  See Exh. B at 22:9-18.  Adams worked at Lake Compounce during the 2004 through 2007 seasons in various capacities, including as an assistant ride coach and a housekeeping supervisor.  See Exh. B at 15:14-22. Plaintiff's seasonal employment ended after the 2007 season, and he became a full-time employee in 2008.  See Exh. B at 15:23-16:5.  He held the position of Mechanic Helper for the duration of his full-time employment with Festival Fun Parks.  See Exh. B at 16:6-10.

### B.    Plaintiff's Resignation of His Employment With Festival Fun Parks

Although Plaintiff alleges in his Complaint that Festival Fun Parks terminated his employment, at his deposition he testified that he resigned.  See Exh. A at ¶ 28; Exh. B at pp. 87:16-22.  After notifying John Fitch that he intended to give notice, in preparation for leaving Lake Compounce, Plaintiff took all his accrued vacation and holiday pay, a total of two weeks paid leave.  See Exh. B at 88:11-14.  Following his return from this two-week leave, Plaintiff met with Jerry Brick and his immediate supervisor, Mario Abela.  See Exh. B at 88:8-10.  At the

3

meeting, Mr. Brick advised Plaintiff that he had notified the Festival Fun Parks corporate office that Plaintiff was resigning, and they discussed which day would be Plaintiff's last day of work at Lake Compounce.  See Exh. B at pp. 88:22-89:9

At his deposition, Plaintiff admitted that no one at Lake Compounce told him he was being terminated or fired, and he believed that he had resigned his employment with Lake Compounce.  See Exh. B at pp. 89:24-90:5.  After conferring with his counsel at a break during his deposition, Adams modified his testimony to state that he "[r]esigned, because I couldn't deal with it no more, being picked on."  Exh. B at p. 91:8-13.

### C.    Plaintiff's Disability Discrimination Claim

With respect to his disability, Plaintiff alleges that he "suffers from mental retardation." Exh. A at ¶ 7.  At his deposition, Plaintiff testified that he is disabled because it takes him time to do things, and that he has to go at a slower pace to pick things up.  See Exh. B at 105:12-14.   He also testified that he can only read at a fourth grade level or thereabouts, and that he can't remember more than five things at a time.  See Exh. B at 112:17-21.  Notably, this assessment – that Plaintiff reads at a third or fourth grade level of reading – was made when plaintiff was in the fifth grade.  See Exh. B at 119:17-22.  Plaintiff admitted that when this test was administered, that performance was roughly at grade level for the age he was at the time.  See Exh. B at 119:23-25.  He has not undergone any additional testing for his alleged disability.  See Exh. B at 112:19-22.

The only evidence Plaintiff has presented of his disability, other than his own testimony, is an unsworn and unauthenticated report which refers to, but does not include, an assessment of his mental abilities prepared in 1989, along with an individual education plan which appears to

have been prepared in 1990; neither of these documents contain any diagnosis of a mental disability. A copy of these documents is attached hereto as Exhibit D-9 to Exhibit B.

**D.      Plaintiff's Gender Discrimination Claims**

Plaintiff bases his gender discrimination claims on his general allegation that he "got treated and picked on, [and] no one else got the same treatment." See Exh. B at 90:6-13. The only instance of "getting picked on" that Plaintiff identifies in support of his gender discrimination claims is Justin Walters' alleged statement that Plaintiff being on his knees was the best position for him. See Exh. B at 92:21-93:4. Plaintiff alleges Mr. Walters made this remark because, like Mr. Walters at the time, Plaintiff wasn't married and didn't have a girlfriend. See Exh. B at 93:5-10; 95:5-13.

**E.      Plaintiff's Sexual Harassment Claims**

Plaintiff bases his sexual harassment/hostile work environment claim on some of the same conduct which is the basis for his disability and gender discrimination claims. Specifically, he alleges that he was sexually harassed by Justin Walters, who allegedly told Plaintiff that he liked being on his knees because that was the best position for him, and that Mr. Walters had told him that he "had" his mother and she was good. See Exh. B at 97:2-4; see Plaintiff's Response to Interrogatory No. 9 of Defendant's First Set of Interrogatories, a copy of which is attached hereto as Exhibit D.

**F.      Plaintiff's Retaliation Claims**

Plaintiff alleges in his Complaint that his employment was terminated in retaliation for his complaints of sexual harassment and disability discrimination. See Exh. A at ¶ 79.

5

IV.    **ARGUMENT**

A.    **Legal Standard For Grant Of Summary Judgment**

Summary judgment is appropriate where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). Summary judgment is properly entered against "the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992), cert. denied, 506 U.S. 965 (1992). A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must "designate specific facts showing that there is a genuine issue for trial." Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.")

In order to defeat a summary judgment motion, "the party opposing summary judgment...must set forth 'specific facts' demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). A party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R. Civ. P.

6

56(e), or conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Stated differently, "some metaphysical doubt as to the material facts" is insufficient to defeat a claim for summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

**B.      Summary Judgment Should Be Granted Because Plaintiff Has Failed To Establish A Prima Facie Case Of Discrimination.**

When analyzing claims under the ADA, the CFEPA, and Title VII, the Court applies the three part burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Sample v. Wal-Mart Stores, Inc., 273 F. Supp. 2d 185, 188 (D. Conn. 2003) (holding that the McDonnell Douglas burden shifting analysis applies to actions for disability discrimination brought under the ADA and the CFEPA and that the legal analysis of these claims is identical); Crocco v. Advance Stores Inc., 421 F. Supp. 2d 485, 495 (D. Conn. 2006) (holding that legal analysis for CFEPA and Title VII sexual harassment hostile work environment claims is coextensive and applying McDonnell Douglas to jointly evaluate claims); Byra-Grzegorczyk v. Bristol-Myers Squibb Co., 572 F. Supp. 2d 233, 242 (D. Conn. 2008) (holding that "analysis is the same" for Title VII and CFEPA gender discrimination claims). All the claims contained in Plaintiff's Complaint are subject to the three part burden-shifting analysis outlined in McDonnell Douglas.

Under McDonnell Douglas, the plaintiff must first establish a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class. See, e.g., Farias v.

Instructional Sys., 259 F.3d 91, 98 (2d Cir. 2001).  If the plaintiff succeeds, a presumption of discrimination arises and the burden shifts to the defendant to proffer some legitimate, nondiscriminatory reason for the adverse decision or action.  See id.  If the defendant proffers such a reason, the presumption of discrimination created by the prima facie case drops out of the analysis, and the defendant "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000).  The plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination."  Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143 (2000).

The first prong of the three part analysis is a determination of whether the plaintiff has met his initial obligation to establish a prima facie case of discrimination.  See, e.g., Mario v. P & C Food Markets, Inc., 313 F.3d 758, 767 (2d Cir. 2002).  If a plaintiff fails to establish a prima facie case of discrimination, summary judgment in favor of the defendant is appropriate.  See, e.g., Paulino v. N.Y. Printing Pressman's Union, Local Two, 301 Fed. Appx. 34, 37 (2d Cir. 2008).

### 1.    Plaintiff Has Failed To Establish A Prima Facie Case That Festival Fun Parks Discriminated Against Him In Violation of The ADA or The CFEPA.

Under the McDonnell Douglas burden shifting framework, Plaintiff must establish a prima facie case of discrimination under the ADA and the CFEPA by showing that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable

accommodation; and (4) he suffered adverse employment action because of his disability." Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001). See also Lovell v. United Airlines, Inc., 728 F. Supp. 2d 1096, 1107 n.8 (D. Hawaii 2010) (holding that the 2007 amendments to the ADA did not disturb the elements of a prima facie case for disability discrimination). The final prong of the prima facie case requires that Plaintiff establish that he suffered an adverse employment action "**because of** his disability." Parker v. Columbia Pictures Indus., 204 F.3d 326, 332 (2d Cir. 2000) (emphasis added).

Plaintiff has failed to establish a cause of action for disability discrimination because (1) Plaintiff has not put forth evidence that could support a finding that he suffers from a disability within the meaning of the ADA; (2) Plaintiff cannot demonstrate he suffered an adverse employment action as a result of Festival Fun Parks' alleged discriminatory acts; and (3) Plaintiff cannot demonstrate that he suffered an adverse employment action (if one did exist) because of his alleged disabilities. Therefore, Festival Fun Parks is entitled to judgment in its favor as to Plaintiff's claim of disability discrimination.

### a.    Plaintiff Cannot Demonstrate That He Suffers From A Disability Within The Meaning of The ADA or The CFEPA.

Plaintiff must demonstrate that he is disabled within the meaning of the ADA and the CFEPA. Under the ADA, an individual may show that he suffers from a disability in three ways: (1) the person suffered from an actual physical or mental impairment that substantially limits one or more major life activity; (2) the person has a record of such impairment; or (3) the individual has been regarded as having such an impairment.[2] 42 U.S.C. §12102. In this case, Plaintiff has

---

[2]    Plaintiff has not alleged discrimination based on the theory that he has a record of a disability and, as a result, Defendant does not address the viability of such a claim. See generally Exh. A.

produced no evidence that he suffers from a mental disability, even under the CFEPA's comparatively broad definition of "disability." See Martinez v. Conn. Library, 2011 U.S. Dist. LEXIS 107848, *72-73 (D. Conn. 2011).

Plaintiff alleges in his Complaint that he suffers from mental retardation. See Exh. A at ¶ 15. At his deposition, Plaintiff testified that he is disabled because it takes him time to do things, that he has to go at a slower pace to pick things up. See Exh. B at 105:12-14. He also testified that he was found to read at a third or fourth grade level when he was in approximately fifth grade. See Exh. B at 119:17-25. In support of his claim that he is disabled for purposes of the ADA and the CFEPA, Plaintiff produced an unsworn summary of an educational plan that appears to have been prepared in 1990. See Exhibit D-9 to Exh. B. The educational plan refers to an analysis undertaken by a Dr. Cynthia Neidbala in approximately 1990. See id. Plaintiff has not produced a copy of Dr. Neidbala's report, or provided any other support for his allegation that he is mentally disabled. [3]

Plaintiff's failure to present any evidence that could substantiate a finding that he is disabled for purposes of the ADA or the CFEPA is fatal to his prima facie case. "Courts in the Second Circuit have consistently held that when a plaintiff fails to offer any medical evidence substantiating the specific limitations to which he claims he is subject due to his conditions, he cannot establish that he is disabled within the meaning of the ADA." Buotote v Illinois Tool Works, Inc., 2011 U.S. Dist. LEXIS 97850, *19, No. 3:09-cv-2144 (JBA) (D. Conn. August 30, 2011), citing Baerga v. Hosp. for Special Surgery, 2003 U.S. Dist. LEXIS 17201, *6. No. 97-

---

[3]     To the extent he contends Dr. Niedbala is an expert witness, Plaintiff may not rely on Dr. Niedbala's "opinion" to establish he is disabled because he has not submitted the expert report required by Fed. R. Civ. P. 26(a)(2). The deadline for disclosure of expert reports was October 1, 2011. See July 5, 2011 Scheduling Order Regarding Case Management Plan (D.E. No. 10).

CIV-0230 (DAB) (S.D.N.Y. Sept. 30, 2003); see also Douglas v. Victor Capital Group, 21 F.Supp.2d 379, 392 (S.D.N.Y. 1998) ("Plaintiff's testimony as to the (alleged) limits on his ability to walk, without supporting medical testimony, simply is not sufficient to establish a prima facie case under the ADA."). Quite simply, Plaintiff cannot rely on his own conclusory assertions to establish his prima facie case that he is disabled.[4]

Nor can Plaintiff rely upon unsworn summary reports to substantiate his claim that he is disabled. Unsworn reports such as the education plan prepared for him when he was in the fourth grade are hearsay, and therefore cannot be considered for purposes of summary judgment. See, e.g., Fall v. New York State United Teachers, 289 Fed. Appx. 419 (2d Cir. 2008) ("[t]he unsworn audiologist reports offered by [plaintiff] constitute inadmissible hearsay evidence); Weltz v. City of New York, 2004 U.S. Dist. LEXIS 17036, *5, No. 99-Civ.-3932 (RCC) (S.D.N.Y. August 25, 2004) (unsworn doctor's letters are inadmissible hearsay and may not properly be considered in opposition to a motion for summary judgment); Raskin v. Wyatt Co., 125 F.3d 55, (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").

Not only has Plaintiff failed to establish that he suffers from an actual disability, but there is also no evidence that Plaintiff was regarded as disabled under the ADA.[5] "To prove a 'regarded as' claim under the post-amendment version of the ADA, plaintiff must show he was

---

[4] The fact that CFEPA defines "disability" more broadly than the ADA does not obviate Plaintiff's obligation to put forth medical evidence in order to make a prima facie case. See Buotote, 2011 U.S. Dist. LEXIS 97850, *20, finding that while the CFEPA applies more broadly than the ADA, the evidentiary standards are the same, and concluding that "the need for corroborating evidence of disability under the ADA is also required under the CFEPA."

[5] While Plaintiff has not pled a "regarded as" disability discrimination claim – and therefore has arguably waived a disability claim on this theory – Festival Fun Parks nevertheless addresses the viability of such a claim in the event that Plaintiff contends that he has pled this claim.

'subjected to an action prohibited under the (ADA) because of an actual or perceived physical or mental impairment whether or not the impairment limits a major life activity." Wurzel v. Whirlpool Corp., 2010 U.S. Dist. LEXIS 36635, at *20 , No. 3:09-CV-498 (N.D. Ohio. Apr. 14, 2010) (quoting 42 U.S.C. § 12102(3)(A)).   In addition, "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate . . . that the employer regarded the employee as disabled . . . Plaintiff must show that defendants perceived his impairment as substantially limiting the exercise of a major life activity." Piascyk v. City of New Haven, 64 F. Supp. 2d 19, 32 (D. Conn. 1999), citing Reeves, 140 F.3d at 153.   Plaintiff cannot establish that Festival Fun Parks regarded him as disabled or subjected him to prohibited action because of this perceived disability. To the extent Plaintiff has asserted a claim for "regarded as" disability discrimination, that claim, too, lacks the necessary evidentiary support to make a prima facie case of disability discrimination.   See Piascyk, 64 F. Supp. 2d at 32-34 (holding that plaintiff had not established he was "regarded as" disabled by his employer when the only supporting evidence to support plaintiff's claim was doctor's reports and his own testimony on defendant's knowledge of his disability).

In short, Plaintiff has not met his burden of production to establish that he is disabled for purposes of the ADA or the CFEPA.   On this basis alone, Festival Fun Parks is entitled to summary judgment on Plaintiff's disability claims.

b.   **Plaintiff Cannot Demonstrate That He Suffered an Adverse Employment Action Because of His Disability.**

As noted above, the fourth prong of the prima facie disability discrimination case requires that Plaintiff suffer an adverse employment action because of his disability. See, e.g., Giordano, 274 F.3d at 747 (2d Cir.2001).   Plaintiff, however, has failed to demonstrate that he suffered an

12

JA 122

adverse employment action – whether by the termination of his employment, actually or constructively, or by a failure to transfer.

In the Second Circuit, in order to establish he has suffered an adverse employment action, Plaintiff must show that he has endured a materially adverse change in the terms and conditions of employment.  See, e.g., Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).  To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. See id.  A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a material loss of benefits, or significantly diminished material responsibilities. See id.

### i.     Plaintiff's Employment With Festival Fun Parks Was Not Terminated.

First and foremost, Plaintiff testified at his deposition that he voluntarily resigned his employment with Festival Fun Parks; his employment was not terminated.  See Exh. B at 89:24-90:5.  There can be no factual dispute over this issue when the Plaintiff himself admits that his employment was not actually terminated.  Indeed, Plaintiff repeatedly testified at his deposition that he had resigned, and that his employment had not been terminated.  Id.; see Exh. B at 91:11-13, 91:20-92:17.

### ii.    Plaintiff Was Not Constructively Discharged From His Employment With Festival Fun Parks.

While Plaintiff admitted that he had resigned his employment, he later modified his testimony to suggest he had been forced to resign.  After conferring with his counsel at a break during his deposition, Plaintiff testified that he was forced to resign as a result of the alleged discriminatory conduct, apparently claiming that he had been constructively discharged.  Exh. B

13

JA 123

at pp. 91:8-13, 92:11-12.  On this point, Plaintiff testified that he "[r]esigned, because I couldn't deal with it no more, being picked on."  Exh. B at p. 92: 11-12.

In order to establish that he was constructively discharged, and therefore that he suffered the adverse employment action that is required to state a <u>prima</u> <u>facie</u> claim, Plaintiff must satisfy the constructive discharge standard under Connecticut law.   The Supreme Court of Connecticut utilizes the same definition of constructive discharge as the Second Circuit Court of Appeals.  <u>See, e.g.</u>, <u>Brittell v. Dep't of Corr.</u>, 247 Conn. 148, 178, 717 A.2d 1254 (1998).  To establish a claim of constructive discharge, a plaintiff must show that "an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." <u>Chertkova v. Conn. Gen. Life Ins. Co.</u>, 92 F.3d 81, 89 (2d Cir. 1996). A plaintiff must satisfy two prongs of this standard by showing: (1) the employer's conduct was intentional, and (2) working conditions had reached an intolerable level.  <u>See</u> <u>Petrosino v. Bell Atl.</u>, 385 F.3d 210, 229 (2d Cir. 2004).  For working conditions to be judged intolerable, they must be "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." <u>Chertkova</u>, 92 F.3d at 89.  Whether working conditions are intolerable "is based on an objective standard of whether a reasonable person in the employee's position would have felt compelled to resign.  An employee's subjective opinion that his or her working conditions are intolerable is not sufficient to establish constructive discharge." <u>Murphy v. BeavEx</u>, 544 F. Supp. 2d 139, 153 (D. Conn. 2008) (citing <u>Goldfarb v. Town of West Hartford</u>, 474 F. Supp. 2d 356, 374 (D. Conn. 2007)).

Plaintiff presents insufficient evidence to support a finding that the alleged discriminatory conduct that occurred at Lake Compounce was "so difficult and unpleasant" that a reasonable person would have felt compelled to resign.  Indeed, this conclusion is buttressed by the fact that

14

Plaintiff testified at his deposition that the type of conduct about which Plaintiff allegedly complained to management – the occasional off-color comment and criticism of his performance – was not unusual in the mechanic's shop where he worked. See Exh. B at 99:9-21. This type of conduct does not create an intolerable working environment. See, e.g., Goldfarb, 474 F. Supp. 2d at 374 (D. Conn. 2007) (holding that a co-worker's "overly critiquing" comments of plaintiff's work is not sufficient to show constructive discharge). Further, Plaintiff's claim that his working conditions were intolerable is contradicted by his own behavior -- Plaintiff admits to engaging in workplace banter of a sexual nature, including approaching a female co-worker named Brynn Goldbeck and asking her if "she wanted to go to bed." See Exh. B at 80:18-22.

Nor can Plaintiff present any evidence that Festival Fun Parks intentionally created the allegedly intolerable atmosphere. See Wilburn  v. Fleet Fin. Group, Inc., 170 F. Supp. 2d 219, 239 (D. Conn. 2001) (finding employee had not been constructively discharged because "she has not presented, as she must, any evidence suggesting that her supervisors' handling of the situation "was part of a *deliberate* attempt to make her working conditions intolerable.") (emphasis in original).  Plaintiff can present no evidence that Festival Fun Parks acted with the intent to create an intolerable work environment, and the alleged failure of Festival Fun Parks management to properly address his complaints is not the type of conduct the Second Circuit considers "intentional." See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 74 (2d Cir. 2000)  ("ineffective or even incompetent . . . handling of [complaints] . . . does not rise to the level of deliberate action required...").

                               **iii.**    **The Alleged Failure to Transfer Plaintiff To The Paint Shop Does Not Qualify As An Adverse Employment Action.**

Finally, Plaintiff has alleged that he requested a transfer to the paint shop and was not transferred. A failure to transfer may constitute an adverse employment action under certain circumstances. See Nonnenmann v. City of New York, 174 F. Supp. 2d 121, 132 (S.D.N.Y. 2001). Where "the change in position would have resulted in a significant change in duties and could potentially lead to increased opportunities for advancement," courts have held a failure to transfer to constitute an adverse employment action. Belch v. Jefferson County, 108 F. Supp. 2d 143, 154 (N.D.N.Y. 2000).

Here, Plaintiff can offer no evidence that a transfer to the paint shop would have led to increased opportunities for advancement, or even an increase in salary, wages, or other remuneration. Further, Plaintiff admits that he is aware of no open position in the paint shop at the time he inquired about possibly transferring there. See Exh. B at 84:13. While Plaintiff testified that he thought "there was a lot of things that had to get done that year" in the paint shop, see Exh. B at 86:18-19, he admitted that he had no knowledge of any additional staff being added to the paint shop in 2009. See Exh. B at 86:20-23. In fact, there were no open positions at the time Plaintiff resigned his employment at Lake Compounce, nor have there been since. See Exh. C at ¶¶ 4 – 5.

The failure to create a position for a disgruntled employee generally does not rise to the level of an adverse employment action. See, e.g., Williams v. R.H. Donnelley, Inc., 199 F. Supp. 2d 172, 178 (S.D.N.Y. 2002). While courts have recognized that failure to create a position can constitute adverse employment action when a position is promised but never created, see Brooks v. Hevesi, 1998 U.S. Dist. LEXIS 730, *2 n.2, No. 95-Civ.-3209 (JSM) (S.D.N.Y. January 27, 1998), that is not the case here. Plaintiff has not produced, and cannot present, any evidence that he was promised a transfer to the paint shop. No open position existed, and the law does not

16

require that a position be created for him. On these facts, Plaintiff cannot establish that Festival

Fun Parks' decision not to transfer him to the paint shop constituted the "material adverse

employment action" required to state a claim.

As a result of the foregoing, Defendant is entitled to summary judgment in its favor as

to Plaintiff's disability discrimination claim because Plaintiff has failed to establish a <u>prima facie</u>

case of disability discrimination.

### 2.    Plaintiff Cannot Establish A <u>Prima Facie</u> Case of Sexual Harassment Under Title VII or The CFEPA.

Plaintiff asserts claims for sexual harassment/hostile work environment under Title VII

and the CFEPA.  The analysis of discrimination and retaliation claims under the CFEPA is the

same as under Title VII.    As with Plaintiff's disability discrimination claims, the Title

VII and the CFEPA discrimination claims are both analyzed under the <u>McDonnell Douglas</u>

burden-shifting analysis.  <u>See, e.g.</u>, <u>Hall v. Family Care Home Visiting Nurse & Home Care</u>

<u>Agency, LLC</u>, 696 F. Supp. 2d 190, 198 (D. Conn. 2010).

In order to maintain a hostile work environment claim under Title VII and the CFEPA,

Plaintiff must establish the following <u>prima facie</u> case: (1) the workplace was permeated with

discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his

work environment, and (2) that a specific basis exists for imputing the conduct that created the

hostile environment to the employer.  <u>See</u> <u>Jamilik v. Yale University</u>, 362 Fed. Appx. 148, 151

n.2 (2d Cir. 2009) (noting that "CFEPA claims are governed by the same standards applicable

to Title VII claims," and analyzing CFEPA and Title VII sexual harassment claims

coextensively).

In making the determination of whether the employer's conduct was sufficiently severe,

courts consider the frequency of the discriminatory conduct; its severity; whether it is physically

17

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance as factors for determining whether a hostile work environment exists.  Kaytor v. Elec. Boat Corp., 609 F.3d 537, 547  (2d Cir. 2010) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

In addition, a hostile work environment claim requires proof that the work environment was both subjectively and objectively hostile.  See, e.g., DeSalvo v. Volhard, 312 Fed. Appx. 394, 396 (2d Cir. 2009); Faragher v. Boca Raton, 524 U.S. 775, 787 (1998).  To show the latter, "a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment."  DeSalvo, 312 Fed. Appx. at 396, citing Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000).  Plaintiff's allegations fall far short of the standard set forth in Quinn because he neither points to any conduct that is discriminatory on the basis of his sex, nor does he indicate that any severe conduct has occurred.  Plaintiff has not alleged and cannot establish the requisite elements of a hostile work environment claim and, therefore, Defendant is entitled to summary judgment.

Plaintiff alleges generally in his Complaint that he was repeatedly subject to sexual harassment by his co-worker that was repetitious and continuous.  See Exh. A at ¶ 62.  At his deposition, Plaintiff testified that Justin Walters, a co-worker, told Plaintiff once that Plaintiff liked being on his knees, and that being on his knees was the best position for him.  See Exh. B at 97:2-4; see Exh. A at ¶ 17.  Plaintiff also testified that Mr. Walters sexually harassed him by "constantly staring me down, when I'm down on my knees working on my rides, just staring at me."  Exh. B at p. 97:9-11.  Plaintiff also alleges in his Complaint that Mr. Walters stated to Plaintiff that he "had" Plaintiff's mother and that she was good (although he did not cite this as

an example of harassing conduct at his deposition). See Exh. A at ¶ 19. These are the sum-total of Plaintiff's allegations that support his claim for a hostile work environment that could possibly be interpreted as comments of a sexual nature.

The alleged comments of a sexual nature are limited and, while they may have been subjectively perceived as offensive by Plaintiff, were isolated. These allegations are not the "pervasive and regular...harassment" necessary to establish a hostile work environment claim. See, e.g., Faragher, 524 U.S. at 787 n.1 (harassment must be more than episodic, but must be continuous and concerted in order to be considered pervasive) (citing Carero v. New York City Housing Auth., 890 F.2d 569, 577 (2d Cir. 1989); Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004) ("Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment.").

Furthermore, Plaintiff has entirely failed to demonstrate that the alleged discrimination would have detrimentally affected a reasonable person of Plaintiff's gender and position. See generally Exhibit A. In order for Festival Fun Parks' alleged conduct to be actionable, a reasonable person must find such actions hostile or abusive. See Faragher, 524 U.S. at 787 (holding that even the "mere" use of a "racial epithet which engenders offensive feelings in an employee" does not violate Title VII).

Moreover, Plaintiff cannot rely on alleged harassing comments of his co-workers that were of a non-sexual nature, such as calling him "stupid" and throwing things at him, to support his hostile work environment sexual harassment claim. See, e.g., Perry v. Ethan Allen, Inc., 115 F.3d 143, 148 (2d Cir. 1995) (affirming grant of summary judgment on sexual harassment claim on grounds that the "few instances of harassment which . . . [plaintiff] recounted were not of a sexual nature."); see also DeSalvo, 312 Fed. Appx. at 396 (finding that multiple alleged insults

19

by co-workers that concerned work-related issues and did not concern Plaintiff's protected status were insufficient to create hostile work environment).  The alleged comments and insults made by co-workers were made infrequently, were not of a sexual nature other than one or, at most, two discrete comments, and in no event were they the "severe and pervasive" comments necessary to create a hostile work environment.

### 3.    Plaintiff Cannot Establish A <u>Prima Facie</u> Case of Gender Discrimination Under Title VII or The CFEPA.

Claims for gender discrimination are also addressed under the <u>McDonnell Douglas</u> three part burden-shifting analysis.  <u>See Dawson v. Bumble & Bumble</u>, 398 F.3d 211, 217 (2d Cir. 2005).  Adams must therefore make a prima facie case of gender discrimination by showing that (1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class.  <u>See</u> <u>id</u>.  Plaintiff's gender discrimination claim is based on his allegation that Festival Fun Parks discriminated against him "because [he] did not act more masculine [and] thus did not fit a stereotype of his gender."  Exh. A at ¶ 50(f), 56(f).

The U.S. Supreme Court has recognized that a claim under Title VII exists for failure to conform to gender stereotypes.  <u>See</u> <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 251 (1989). While courts have rarely found such discrimination to exist, the Second Circuit has held that a plaintiff can "fail to conform" to gender stereotypes in two ways: (1) through behavior or (2) through appearance. <u>See</u>  <u>Dawson v. Bumble & Bumble</u>, 398 F.3d at 217.

JA 130

The only specific fact that Adams alleges related to his gender discrimination claim is based on his behavior. Specifically, at his deposition, Adams testified that he was treated differently because he was not married and did not go on dates. See Exh. B at 93:5-10, 94:24-95:3.

Adams' gender discrimination claims must fail for the same reason his disability discrimination and sexual harassment claims fail: he has not suffered any adverse employment action. Even assuming *arguendo* that Adams could establish an adverse employment action, he can put forth no evidence that this action was taken <u>because of</u> his failure to conform to gender stereotypes.

### 4. Plaintiff Cannot Establish A <u>Prima Facie</u> Case of Retaliation Under Title VII or The CFEPA.

Plaintiff claims that Festival Fun Parks violated the CFEPA by retaliating against him on the basis of his alleged disabilities. Although Plaintiff does not assert a claim of retaliation under the ADA, courts in the Second Circuit have held that retaliation claims under the ADA and the CFEPA are analyzed in the same manner. See <u>Gomez v. Laidlaw Transit, Inc.</u>, 455 F. Supp. 2d 81, 90 (D. Conn. 2006). Therefore, in order to state a <u>prima facie</u> retaliation claim under the CFEPA, the Plaintiff must establish (1) he was engaged in protected activity; (2) the alleged retaliator knew that plaintiff was involved in protected activity; (3) an adverse decision or course of action was taken against plaintiff; and (4) a causal connection exists between the protected activity and the adverse action. See <u>Weixel v. Bd. of Educ. of the City of N.Y.</u>, 287 F.3d 138, 148-49 (2d Cir. 2002). Retaliation claims are analyzed under the same burden-shifting framework established for Title VII cases. See <u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 719 (2d Cir. 2002).

21

JA 131

Plaintiff cannot make out a prima facie case because he cannot identify a legally recognized adverse employment action that was taken against him. For the reasons set forth in Section IV.B.1.b, supra, Plaintiff never suffered an adverse employment action. His employment was not terminated, he was not denied a transfer to an open position, and his employment with Festival Fun Parks was not constructively terminated.

Even if he could identify a recognized adverse employment action, Plaintiff cannot put forth any evidence of a causal connection between the protected activity and the alleged adverse action. The absence of evidence of such a connection warrants the entry of summary judgment on a disability retaliation claim. See Rosinski v. Am. Axle & Mfg., Inc., 402 Fed. Appx. 535, 538 (2d Cir. 2010) (plaintiff's claims under the ADA dismissed because "she did not provide any evidence that any of the adverse actions taken against her had anything to do with any disability she may have had or have been perceived to have"). As a result, Plaintiff cannot establish the third element of his prima facie CFEPA retaliation claim. Therefore, Festival Fun Parks is entitled to summary judgment in its favor as to Plaintiff's retaliation claim because Plaintiff has failed to establish a prima facie case of retaliation under the CFEPA.

### C.   Festival Fun Parks Can Fulfill Its Burden Of Showing A Nondiscriminatory Reason For Its Failure to Transfer Plaintiff to Another Department.

If Plaintiff is found to have met his burden to establish a prima facie case of disability discrimination under the ADA, the CFEPA, and/or Title VII, the second prong of the McDonnell Douglas framework provides that Defendant must "articulate some legitimate, nondiscriminatory reason for the employee's [termination]." McDonnell Douglas, 411 U.S. at 802. In fact, the employer "is not required to prove that the articulated reason *actually motivated* its actions." Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001) (emphasis added).

22

JA 132

Although Plaintiff cannot meet his burden under the first prong of the <u>McDonnell Douglas</u> analysis, even if that were possible, there can be no genuine issue of material fact as to whether Defendant had a legitimate, non-discriminatory reason for the alleged adverse employment action. Plaintiff concedes that he resigned, and for the reasons stated above, as a matter of law, his allegation of constructive termination must fail. Accordingly, the only remaining "adverse employment action" that might be claimed by the plaintiff is that he was not transferred to the paint shop. That claim, too, must fail for the reasons stated above. Even if it could withstand summary judgment, there is no genuine issue of material fact as to the reason that he was not transferred: there was no position open in the paint shop at the time Plaintiff suggested he would be interested in transferring to the paint shop. <u>See</u> Exh. B, 86:12-14, 20-22 (in which Plaintiff admits that no one told him that there was an open position in the paint shop and that he had no knowledge that Lake Compounce was hiring anyone in the paint department); <u>see also</u> Exh. C at ¶¶ 4 – 6 (confirming that there were no open positions in the paint department at the time and that no full-time positions have been created in that department since the time of Plaintiff's resignation).

It cannot reasonably be disputed that Plaintiff was not transferred to the paint shop because there were no openings at that time. Therefore, Defendant has fulfilled its burden under the second prong of the <u>McDonnell Douglas</u> analysis by demonstrating a legitimate, non-discriminatory reason for the alleged failure to transfer Plaintiff's employment – the lack of open positions in the paint shop.

**D.    Summary Judgment Should Be Granted Because Plaintiff Cannot Establish That Festival Fun Parks' Legitimate, Non-Discriminatory Reasons Are Pretextual Or That It Possessed Discriminatory Intent.**

23

JA 133

After a defendant meets its burden under the second prong of the McDonnell Douglas framework by articulating a legitimate rationale for the adverse action, the burden of production shifts back to the plaintiff to show that the defendant's articulated reason was merely a pretext. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, (1993). On a summary judgment motion, this means that the plaintiff must establish a genuine issue of material fact as to whether the employer's reason for the adverse action is false, and as to whether it is more likely than not that a discriminatory reason motivated the employer to make the adverse employment decision. See Lafferty v. Owens, Schine & Nicola, P.C, 2012 U.S. Dist. LEXIS 5276, *18-19, No. 3:09-cv-1045 (MRK) (D. Conn. January 18, 2012) (citing Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1225 (2d Cir. 1994)).

The third and final prong of the analysis shifts the burden back to the plaintiff "who must now show by a preponderance of the evidence that the employer's explanation is pretextual." See Fuentes, 32 F.3d at 763; see also McDonnell Douglas, 411 U.S. at 804. The question at this stage is "whether the employer intentionally discriminated . . . . [P]roof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct. In other words, it is not enough . . . to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." Heaney v. Fogarty, Cohen, Selby & Nemiroff, LLC, 2005 U.S. Dist. LEXIS 35879, *12, No. 3:03-CV-2008 (MRK) (D. Conn. December 14, 2005), citing Reeves, 530 at 146-147 (emphasis in original).

Plaintiff, however, can offer no evidence that would demonstrate that the legitimate decision not to transfer him to the paint shop should not be believed. In fact, Plaintiff's alleged disabilities played no part in the decision not to transfer Plaintiff to the paint shop. See Exh. C at

24

JA 134

¶ 7.  Nor can Plaintiff establish pretext based on his allegations that discriminatory comments were made regarding his gender.  In fact,  Plaintiff has not (and cannot) put forth any evidence that the alleged comments regarding Plaintiff's compliance with accepted gender norms were related to any of the alleged adverse employment actions he has identified.  Nor can Plaintiff establish pretext based on his allegations that he was sexually harassed by being subject to a hostile work environment.  Plaintiff never complained to anyone at Festival Fun Parks that he was being sexually harassed.  See Exh. B at 102:1-3.

Under the third prong of the McDonnell Douglas framework, Plaintiff has not produced, and cannot produce, any evidence that would suggest that Festival Fun Parks' reasoning regarding its failure to transfer him was fabricated or that Festival Fun Parks intended to discriminate against Plaintiff in any way.  As a matter of law, Plaintiff cannot carry his burden under the third prong of the McDonnell Douglas framework and, therefore, Festival Fun Parks is entitled to judgment in its favor as to all Counts contained in Plaintiff's Complaint.

## V.    CONCLUSION

As a result of the foregoing, Defendant is entitled to Summary Judgment in its favor on all Counts contained within Plaintiff's Complaint.

Respectfully Submitted,

Dated: March 15, 2012                    FISHER & PHILLIPS LLP

/s/ Risa B. Boerner
Risa B. Boerner
Attorney I.D. No. ct28341
James P. McLaughlin
Attorney I.D. No. phv05264
Fisher & Phillips LLP
201 King of Prussia Rd., Suite 650
King of Prussia, PA  19087
Telephone: (610) 230-2150

25

Facsimile: (610) 230-2151
E-Mail: rboerner@laborlawyers.com
jmclaughlin@laborlawyers.com

*Attorneys for Defendant Festival Fun Parks,*
*LLC d/b/a Lake Compounce*

26

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2012, a copy of the foregoing was filed electronically and served electronically on all attorneys and pro se parties of record as listed below.  Notice of this filing will be sent be e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF system.

James V. Sabatini, Esquire
Sabatini and Associates, LLC
1 Market Square
Newington, CT 06111

Attorney for Plaintiff


*/s/ Risa B. Boerner*
Risa B. Boerner

27

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANDREW ADAMS, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : CASE NO.: 3:11-cv-00427-JCH |
| | : |
| FESTIVAL FUN PARKS, LLC, | : |
| D/B/A LAKE COMPOUNCE, | : |
| | : |
| Defendant. | : |

## LOCAL RULE 56(a)1 STATEMENT OF DEFENDANT FESTIVAL FUN PARKS, LLC D/B/A LAKE COMPOUNCE

1.    Festival Fun Parks owns and operates the Lake Compounce theme park located in Bristol, Connecticut, where Plaintiff was employed. See Declaration of Gerard Brick at ¶ 3, a true and correct copy of which is attached to Defendant's Memorandum of Law in Support of Motion for Summary Judgment as Exhibit C (hereinafter "Exhibit C to Mem.")).

2.    Gerard ("Jerry") Brick is the general manager of the Lake Compounce theme park, and has been since January 1, 2005. See Exhibit C to Mem. at ¶ 2.

3.    Plaintiff was a Mechanic Helper at the Lake Compounce theme park at the time of the termination of his employment. See January 20, 2012 deposition of Plaintiff at 16:6-10.  A true and correct copy of the relevant portions of Plaintiff's deposition is attached to Defendant's Memorandum of Law in Support of Motion for Summary Judgment as Exhibit B (hereinafter "Exhibit B to Mem.").

4.    Plaintiff's duties as a Mechanic Helper included washing parts of the rides, assisting other mechanics take things apart, cleaning out the shop, and assisting with various park departments as needed. See Exhibit B to Mem. at 16:11-19.

5.      Plaintiff previously worked for Lake Compounce as a seasonal employee each summer in the years between 1997 and 2007.  <u>See</u> Exhibit B to Mem. at 13:15-19, 13:25-14:4, 14:12-15, 15:14-16:1.

6.      Between 1997 and 2003, Adams held various positions at Lake Compounce, including ride operator, ride trainer, and assistant ride supervisor.  <u>See</u> Exhibit B to Mem. at 13:15-14:11.

7.      In August of 2003, before the conclusion of the 2003 season, Adams voluntarily resigned his employment with Lake Compounce.  <u>See</u> Exhibit B to Mem. at 14:12-25.

8.      Adams voluntarily resigned his employment with Lake Compounce in August of 2003 by orally notifying park management that he was resigning. <u>See</u> Exhibit B to Mem. at 15:2-5.

9.      Adams reapplied for a position at Lake Compounce in 2004 and returned as a seasonal employee in 2004.  <u>See</u> Exhibit B to Mem. at 22:13-18.

10.     Adams worked at Lake Compounce during the 2004 through 2007 seasons in various capacities, including as an assistant ride coach and a housekeeping supervisor. <u>See</u> Exhibit B to Mem. at 15:14-22.

11.     Plaintiff became a full-time employee of Lake Compounce in 2008. <u>See</u> Exhibit B to Mem. at 15:23-16:10.

12.     Plaintiff held the position of Mechanic Helper while employed by Lake Compounce in 2008 and 2009. <u>See</u> Exhibit B to Mem. at 16:6-10.

13.     In October 2009, Plaintiff resigned his employment with Lake Compounce. <u>See</u> Exhibit B to Mem. at 90:4-5; 92:16-17.

2

14.    No one at Lake Compounce ever told Plaintiff he was being terminated or fired. See Exhibit B to Mem. at 89:24-90:5.

15.    Plaintiff never complained to anyone at Lake Compounce that he was being sexually harassed. See Exhibit B to Mem. at 102:1-3.

16.    Plaintiff never complained to anyone at Lake Compounce that he thought that he was being discriminated against based on his gender or sex.  See Exhibit B to Mem. at 101:22-25.

17.    At the time Plaintiff resigned his employment, there were no open positions in the paint shop at Lake Compounce.  See Exhibit B to Mem. at 84:13; Exh. C to Mem. at ¶ 4.

18.    At the time he resigned, Plaintiff had no knowledge of any additional staff being added to the paint shop in 2009.  See Exhibit B to Mem. at 86:20-23.

19.    There have been no open positions in the paint shop since Plaintiff resigned his employment.  See Exhibit C to Mem. at ¶ 5.

20.    No new positions have been created in the paint shop at Lake Compounce since Plaintiff resigned his employment. See Exhibit C to Mem. at ¶ 6.

21.    Plaintiff's alleged disabilities played no part in the decision not to transfer him to the paint shop.  See Exhibit C to Mem. at ¶ 7.

22.    During his employment with Lake Compounce, Plaintiff approached a female co-worker named Brynn Goldbeck and asked her if "she wanted to go to bed."  See Exhibit B to Mem. at 80:18-22.

23.    When Plaintiff was offered a position in the mechanic's shop, his supervisors notified him that in that position, he would hear the occasional off-color comment and his performance may be occasionally criticized.  See Exhibit B to Mem. at 99:9-21.

3

24.     In support of his claim that he is disabled, Plaintiff has produced what appears to be the introductory pages of a diagnostic assessment and educational plan that were prepared in 1990.  A true and correct copy of these documents is attached to Exhibit B to Mem. as Exhibit D-9.  Plaintiff does not have and has not produced the actual assessment referenced in these documents.  See Exhibit B to Mem. at 117:8-21.


Respectfully Submitted,

Dated: March 15, 2012              FISHER & PHILLIPS LLP

/s/ Risa B. Boerner
Risa B. Boerner
Attorney I.D. No. ct28341
James P. McLaughlin
Attorney I.D. No. phv05264
Fisher & Phillips LLP
201 King of Prussia Rd., Suite 650
King of Prussia, PA  19087
Telephone: (610) 230-2150
Facsimile: (610) 230-2151
E-Mail: rboerner@laborlawyers.com
        jmclaughlin@laborlawyers.com


*Attorneys for Defendant Festival Fun Parks,
LLC d/b/a Lake Compounce*

4

JA 141

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2012, a copy of the foregoing was filed electronically and served electronically on all attorneys and pro se parties of record as listed below.  Notice of this filing will be sent be e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF system.

> James V. Sabatini, Esquire
> Sabatini and Associates, LLC
> 1 Market Square
> Newington, CT 06111
>
> Attorney for Plaintiff

> */s/ Risa B. Boerner*
> Risa B. Boerner

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ANDREW ADAMS,                           :
                                        :
             Plaintiff,                 :
                                        :
       v.                               :    CASE NO.: 3:11-cv-00427-JCH
                                        :
FESTIVAL FUN PARKS, LLC,                :
D/B/A LAKE COMPOUNCE,                   :
                                        :
             Defendant.                 :

CORRECTED EXHIBITS A-D TO DEFENDANT FESTIVAL
FUN PARKS, LLC, D/B/A LAKE COMPOUNCE'S
MOTION FOR SUMMARY JUDGMENT [ECF 30]

       Defendant Festival Fun Parks, LLC, d/b/a Lake Compounce files herewith corrected

Exhibits A-D to Defendant's Motion for Summary Judgment [ECF 30] originally filed on

3/15/12.

                                   Respectfully submitted,

                                   FISHER & PHILLIPS LLP

                                   /s/    Risa B. Boerner
                                   Risa B. Boerner
                                   Attorney I.D. No. ct28341
                                   James P. McLaughlin
                                   Attorney I.D. No. phv05264
                                   Fisher & Phillips LLP
                                   201 King of Prussia Rd., Suite 650
                                   Radnor, PA  19087
                                   Telephone: (610) 230-2150
                                   Facsimile: (610) 230-2151
                                   E-Mail: rboerner@laborlawyers.com
                                             jmclaughlin@laborlawyers.com

                                   Attorneys for Defendant Festival Fun Parks,
                                   LLC d/b/a Lake Compounce

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| ANDREW ADAMS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO.:  3:11-cv-00427-JCH |
| | : | |
| FESTIVAL FUN PARKS, LLC, | : | |
| D/B/A LAKE COMPOUNCE, | : | |
| | : | |
| Defendant. | : | |

### CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2012, a copy of the foregoing Corrected Exhibits A-D To Defendant's Motion for Summary Judgment was filed electronically and served electronically on all attorneys and pro se parties of record as listed below.  Notice of this filing will be sent be e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF system.

> James V. Sabatini, Esquire
> Sabatini and Associates, LLC
> 1 Market Square
> Newington, CT 06111

> /s/     *Risa B. Boerner*
> Risa B. Boerner
> James P. McLaughlin
> Fisher & Phillips LLP
> 201 King of Prussia Rd., Suite 650
> Radnor, PA  19087
> Telephone: (610) 230-2150
> Facsimile: (610) 230-2151
> E-Mail: rboerner@laborlawyers.com
>                jmclaughlin@laborlawyers.com

> *Attorneys for Defendant Festival Fun Parks,*
> *LLC d/b/a Lake Compounce*

**EXHIBIT "A"** .

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANDREW ADAMS, | : | |
| | : | |
| Plaintiff, | : | Case No.: 3:11 cv 00427 (JCH) |
| | : | |
| | : | |
| vs. | : | |
| | : | |
| FESTIVAL FUN PARKS, LLC, d/b/a | : | |
| LAKE COMPOUNCE THEME PARK, | : | |
| | : | |
| Defendant. | : | September 6, 2011 |

**Jury Trial Demanded**

### FIRST AMENDED COMPLAINT

Plaintiff, Andrew Adams, by and through his attorneys, Sabatini and Associates, LLC, complaining of the defendant, respectfully alleges:

### PARTIES

1. Plaintiff Andrew Adams is a Connecticut citizen residing in the City of Bristol.

2. Defendant, Festival Fun Parks, LLC d/b/a Lake Compounce Theme Park, is a limited liability company organized and existing under the laws of the State of Delaware. Defendant's principal place of business is 4590 Macarthur Blvd., Newport Beach, California.

3. At all times material, plaintiff is an employee within the meaning of the Americans With Disabilities Act of 1990 (ADA), Title VII and the Connecticut Fair Employment Practices Act 46a-60(a)(1) *et seq.*

4. At all times material, defendant is an employer within the meaning of the ADA, Title VII and the Connecticut Fair Employment Practices Act 46a-60(a)(1) *et seq.*

16.  Defendant, by and through its employees, threw and smashed an apple on plaintiff's truck.

17.  Defendant, by and through its employee, Walters, told the plaintiff that being on his knees was his best position and that he liked being on his knees because he liked guys so much.

18.  Walters would repeatedly make the above-referenced comment when plaintiff was required to get on his knees to perform his job duties.

19.  Defendant, by and through its employees Walters, told the plaintiff that he "had" plaintiff's mother last night and that she was good.

20.  Plaintiff complained to his immediate supervisor, John Fitch, about the harassment.

21.  Fitch told the plaintiff that he would have to deal with it if he wanted to work in the department.

22.  Fitch failed to end the harassment.

23.  Upon information and belief, Fitch failed to make any effort to end the harassment.

24.  Plaintiff spoke to Fitch's supervisor, Mario Abela about the harassment by Walters and was told to give Walters a chance and that he was not so bad.

25.  Plaintiff spoke to defendant's general manager, Jerry Brick, and asked if he could find a new position to work because of the problems he was having.

26.  Plaintiff asked if he could work in the painting department.

27.  Defendant told the plaintiff that there were no open positions in the painting department.

28. On October 31, 2009, defendant terminated plaintiff's employment.

29. At all times material, defendant was aware of plaintiff's mental disability.

30. Defendant sexually harassed the plaintiff and harassed the plaintiff on the basis of his disability.

31. At all times material, plaintiff's disability does not prevent him from performing the essential functions of his job with or without a reasonable accommodation.

32. Any excuse to be given by the defendant regarding plaintiff's termination would be a pretext for the termination.

33. Plaintiff filed charges on the following date: February 22, 2010 with the Equal Employment Opportunity Commission (EEOC).

34. Plaintiff's receipt of the right to sue letter is pending.

35. Plaintiff filed charges on the following date: February 22, 2010, with the Commission on Human Rights and Opportunities (CHRO).

36. Plaintiff received a release of jurisdiction (copy attached as Exhibit 1) on the following date: December 29, 2010.

### FIRST COUNT
### (Disability Discrimination In Violation Of The ADA)

1. Plaintiff repeats the allegations in paragraphs 1 through 41 above as if fully incorporated herein.

37. Defendant's actions violate the Americans With Disabilities Act of 1990 as amended, which prohibits discrimination on the basis of disability.

38. Defendant, by and through its agents and/or employees, violated the Americans With Disabilities Act, in one or more of the following ways:

(a)    In that defendant interfered with plaintiff's privilege of employment on the basis of plaintiff's disability;

(b)    In that defendant discriminated against the plaintiff in such a way that it adversely affected his status as an employee including termination;

(c)    In that defendant terminated plaintiff's employment; and

(d)    In that defendant treated the plaintiff adversely different from similarly situated non-disabled employees;

39.    As a direct and proximate result of defendant's unequal treatment and discrimination, plaintiff has been deprived of his employment and equal employment opportunities because of her disability.

40.    As a further direct and proximate result of defendant's discrimination of the plaintiff, plaintiff has been deprived of income, wages, and benefits.

41.    As a further result of defendant's termination and discrimination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment, emotional distress, and harm to professional reputation.

42.    Plaintiff has suffered and will continue to suffer injuries and losses as a result of defendant's wrongful and discriminatory acts.

43.    Defendant's conduct towards the plaintiff was arbitrary and discriminatory all in violation of the ADA. The defendant exhibited ill will, malice, improper motive and indifference to the plaintiff's civil rights by terminating his employment on the basis of his disability.

## SECOND COUNT
### (Disability Discrimination in Violation of C.G.S. §46a-60(a)(1))

1. Plaintiff repeats the allegations in paragraphs 1 through 43 above as if fully incorporated herein.

44. Defendant, by and through its agents, servants, and/or employees, violated the Connecticut Fair Employment Practices Act C.G.S. §46a-60a *et seq.* in one or more of the following ways.

    a.    In that defendant interfered with plaintiff's privilege of employment on the basis of plaintiff's disability;

    b.    In that defendant limited and classified the plaintiff by his disability in such a way that deprived him of opportunities and recognition given to other similarly situated coworkers;

    c.    In that defendant discriminated against the plaintiff in such a way that adversely affected his status as an employee;

    d.    In that defendant treated the plaintiff adversely different from similarly situated non-disabled employees;

    e.    In that defendant terminated plaintiff's employment on account of his disability; and

    f.    In that defendant intentionally discriminated against the plaintiff;

45. As a direct and proximate result of defendant's unequal treatment and discrimination, plaintiff has been deprived of his employment and equal employment opportunities because of his disability.

46. As a further direct and proximate result of defendant's discrimination of the plaintiff, plaintiff has been deprived of income, wages, and benefits.

47. As a further result of defendant's termination and discrimination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment, emotional distress, and harm to professional reputation.

48. Plaintiff has suffered and will continue to suffer injuries and losses as a result of defendant's wrongful and discriminatory acts.

49. Defendant's conduct towards the plaintiff was arbitrary and discriminatory all in violation of the C.G.S. Section 46a-60(a)(1). The defendant exhibited ill will, malice, improper motive and indifference to the plaintiff's civil rights by terminating him employment on the basis of his disability.

## THIRD COUNT
### (Gender Discrimination in Violation of C.G.S. §46a-60(a)(1))

1. Plaintiff repeats the foregoing allegations as if the same were repeated herein.

50. Defendant's actions violated Connecticut Fair Employment Practices Act, C.G.S. §46a-60(a)(1) as amended, which prohibit discrimination on the basis of gender in one or more of the following ways:

    (a)    In that defendant terminated plaintiff's employment because of his gender;

    (b)    In that defendant interfered with plaintiff's privilege of employment on the basis of plaintiff's gender;

    (c)    In that defendant limited and classified the plaintiff by his gender in such a way that deprived herein of opportunities and recognition given to other similarly situated coworkers;

    (d)    In that defendant discriminated against the plaintiff in such a way that adversely affected his status as an employee;

(e)    In that defendant treated the plaintiff adversely different from similarly situated non-male employees; and

(f)    In that defendant discriminated against the plaintiff because the plaintiff did not act more masculine thus did not fit a stereotype of his gender.

51.    As a direct and proximate result of defendant's discrimination and wrongful termination, plaintiff has been deprived of his employment and equal employment opportunities because of his gender.

52.    As a further direct and proximate result of defendant's discrimination of the plaintiff, plaintiff has been deprived of income, wages and benefits.

53.    As a further result of defendant's termination and discrimination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment and emotional distress.

54.    Plaintiff has suffered and will continue to suffer injuries as a result of defendant's wrongful and discriminatory acts.

55.    Defendant's termination and unequal treatment of the plaintiff was arbitrary, unreasonably discriminatory and retaliatory all in violation of Connecticut's Fair Employment Practices Act. The defendant exhibited ill will, malice, improper motive, and indifference to the plaintiff's civil rights by terminating him on the basis of his gender.

### FOURTH COUNT
### (Gender Discrimination in Violation of Title VII)

1.    Plaintiff repeats the foregoing allegations as if the same were repeated herein.

56.    Defendant's actions violated Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991 in one or more of the following ways.

(a)    In that defendant terminated plaintiff's employment because of his gender;

(b)    In that defendant interfered with plaintiff's privilege of employment on the basis of plaintiff's gender;

(c)    In that defendant limited and classified the plaintiff by his gender in such a way that deprived herein of opportunities and recognition given to other similarly situated coworkers;

(d)    In that defendant discriminated against the plaintiff in such a way that adversely affected his status as an employee;

(e)    In that defendant treated the plaintiff adversely different from similarly situated non-male employees; and

(f)    In that defendant discriminated against the plaintiff because the plaintiff did not act more masculine thus did not fit a stereotype of his gender.

57.  As a direct and proximate result of defendant's discrimination and wrongful termination, plaintiff has been deprived of his employment and equal employment opportunities because of his gender.

58.  As a further direct and proximate result of defendant's discrimination of the plaintiff, plaintiff has been deprived of income, wages and benefits.

59.  As a further result of defendant's termination and discrimination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment and emotional distress.

60.  Plaintiff has suffered and will continue to suffer injuries as a result of defendant's wrongful and discriminatory acts.

61.  Defendant's termination and unequal treatment of the plaintiff was arbitrary, and unreasonably discriminatory all in violation of Title VII. The defendant exhibited ill will, malice, improper motive, and indifference to the plaintiff's civil rights by

terminating him on the basis of his gender.

## FIFTH COUNT
### (Hostile Work Environment Sexual Harassment In Violation of Title VII)

1.  Plaintiff repeats the foregoing allegations as if the same were repeated herein.

62.  Plaintiff was repeatedly subjected to sexual harassment by his co-worker. The harassment was repetitious and continuous.

63.  The harassment was unwelcome.

64.  The harassment was based upon his gender and was sexual in nature.

65.  Plaintiff subjectively, reasonably and objectively perceived his work environment to be hostile.

66.  Defendant knew or should have known that the plaintiff was being sexually harassed and unreasonably failed to stop the sexual harassment.

67.  As a direct and proximate result of the hostile work environment sexual harassment, plaintiff suffered damages.

## SIXTH COUNT
### (Hostile Work Environment Sexual Harassment In Violation of C.G.S. §46a-60(a)(1)))

1.  Plaintiff repeats the foregoing allegations as if the same were repeated herein.

68.  Plaintiff was repeatedly subjected to sexual harassment by his co-worker. The harassment was repetitious and continuous.

69.  The harassment was unwelcome.

70.  The harassment was based upon his gender and was sexual in nature.

71.  Plaintiff subjectively, reasonably and objectively perceived his work environment to be hostile.

72.  Defendant knew or should have known that the plaintiff was being sexually

harassed and unreasonably failed to stop the sexual harassment.

73. As a direct and proximate result of the hostile work environment sexual harassment, plaintiff suffered damages.

## SEVENTH COUNT
### (Retaliation In Violation of Connecticut Fair Employment Practices Act C.G.S. §46a-60(a)(4))

1. Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein.

74. Defendant, by and through its agents, servants, and/or employees, violated the Connecticut Fair Employment Practices Act C.G.S. §46a-609(a)(4) *et seq.* in one or more of the following ways.

    a.    In that defendant retaliated against the plaintiff in response to his complaint that he was being sexually harassed;

    b.    In that defendant retaliated against the plaintiff for his protesting of discriminatory conduct and treatment directed towards him on the basis of his disability.

75. As a result of defendant's violation of Connecticut Fair Employment Practices Act C.G.S. §46a-60(a)(4), plaintiff suffered damages including: loss of employment, loss of income and wages and benefits, and harm to his professional reputation.

76. As a further result of defendant's retaliatory termination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment, and emotional distress.

77. Plaintiff has suffered and will continue to suffer injuries as a result of defendant's wrongful and retaliatory acts.

78. Defendant's retaliatory conducted toward the plaintiff was arbitrary,

unreasonably discriminatory and retaliatory all in violation of Connecticut Fair

Employment Practices Act C.G.S. §46a-609(a)(4) *et seq*. The defendant exhibited ill

will, malice, improper motive, and indifference to the plaintiff's civil rights by retaliating

against him.

### EIGHTH COUNT
### (Retaliation In Violation of Title VII)

   1.  Plaintiff repeats and re-alleges the allegations set forth above as though fully

set forth herein.

   79.  Defendant, by and through its agents, servants, and/or employees, violated

Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991. in

one or more of the following ways.

   a.      In that defendant retaliated against the plaintiff in response to his

complaint that he was being sexually harassed;

   b.      In that defendant retaliated against the plaintiff for his protesting of

discriminatory conduct and treatment directed towards him on the basis of his disability.

   80.  As a result of defendant's violation of Title VII, plaintiff suffered damages

including: loss of employment, loss of income and wages and benefits, and harm to his

professional reputation.

   81.  As a further result of defendant's retaliatory termination of the plaintiff,

plaintiff has suffered severe humiliation, embarrassment, and emotional distress.

   82.  Plaintiff has suffered and will continue to suffer injuries as a result of

defendant's wrongful and retaliatory acts.

   83.  Defendant's retaliatory conducted toward the plaintiff was arbitrary,

unreasonably discriminatory and retaliatory all in violation of Title VII. The defendant

exhibited ill will, malice, improper motive, and indifference to the plaintiff's civil rights by retaliating against him.

Case: 13-1183    Document: 51    Page: 160    08/19/2013    1020229    458
Case 3:11-cv-00427-JCH   Document 35   Filed 04/27/12   Page 16 of 60

Case 3:11-cv-00427-JCH   Document 13   Filed 09/06/11   Page 14 of 17

## DEMAND FOR RELIEF

WHEREFORE, plaintiff prays for appropriate compensatory damages including: compensatory damages; damages for back pay, front pay, bonuses, personal days, lost pension benefits, emotional distress; consequential damages; punitive damages; reasonable attorneys' fees; costs; interest; job reinstatement; prejudgment interest; for an injunction requiring the removal of any and all adverse information contained in plaintiff's personnel file; for a trial by jury; and for all other just and proper relief.

DATE: September 6, 2011

        /s/ James Sabatini
James V. Sabatini, Esq.
Fed. No.: CT 19899
SABATINI AND ASSOCIATES, LLC
1 Market Square
Newington, CT 06111
Tel. No.: (860) 667-0839
Fax No.: (860) 667-0867
Email: jsabatini@sabatinilaw.com


ATTORNEY FOR PLAINTIFF

## ELECTRONIC CERTIFICATE OF SERVICE

   I hereby certify that on September 6, 2011 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


                                        ____/s/ James V. Sabatini
                                        James V. Sabatini

Case: 13-1183    Document: 51    Page: 162    08/19/2013    1020229    458
Case 3:11-cv-00427-JCH    Document 35    Filed 04/27/12    Page 18 of 60

Case 3:11-cv-00427-JCH    Document 13    Filed 09/06/11    Page 16 of 17

**EXHIBIT 1**

Case 3:11-cv-00427-JCH   Document 13   Filed 03/06/11   Page 57 of 57

## STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

**Andrew Adams**
COMPLAINANT

vs.                                                    **DATE: December 29, 2010**

**Palace Entertainment d/b/a Lake Compounce Theme Park**
RESPONDENT

CHRO Case No. 1030252

## RELEASE OF JURISDICTION

Pursuant to the request for a release of jurisdiction, the Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint in accordance with CONN. GEN. STAT. § 46a-101. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred or in which the Respondent transacts business. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at 25 Sigourney Street, Hartford, CT 06106 at the same time all other parties are served. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

In granting this release, the Commission expressly finds in accordance with CONN. GEN. STAT. §§ 46a-100 and 46a-101(b) that all conditions precedent to the issuance of the release have been met. The complaint was timely filed under CONN. GEN. STAT. § 46a-82 and the complaint has been pending for a period of not less than 210 days. The complaint is not currently scheduled for public hearing nor is there reason to believe that the complaint will be resolved within a period of 30 days from the date the Commission received the request.

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

With the granting of this release of jurisdiction, the Commission administratively dismisses this complaint in accordance with CONN. GEN. STAT. § 46a-101(d) without cost or penalty to any party.

Very truly yours,

*[signature]*

Robert J. Brothers, Jr.
Executive Director

cc:  Complainant's counsel James V. Sabatini by e-mail to: jsabatini@sabatinilaw.com
Respondent's Attorney: Christopher H. Mills by e-mail to: cmills@laborlawyers.com

# EXHIBIT "B"

Adams  v. Festival Fun Parks

1/20/2012                                                    Andrew  Adams

                                                              Page 13

1       A    Yes, I did.

2       Q    And again in 1999?

3       A    Yes.

4       Q    Was there a break at all between then and 2009,

5    when you weren't working for Lake Compounce seasonally?

6       A    I believe 2003 I took a little break, and then

7    went back in '05.

8       Q    And when was it that you stopped working

9    seasonally, and started working full-time for Lake

10   Compounce?

11      A    With benefits and all of that?

12      Q    Yes.

13      A    That started in May 2008, right on Memorial Day

14   weekend.

15      Q    How long were you a ride operator for Lake

16   Compounce, as a seasonal employee?

17      A    It had to be about five years.

18      Q    So from 1997 to 2002?

19      A    Yeah.

20      Q    And then what was your position with Lake

21   Compounce?

22      A    I became a ride trainer.

23      Q    So in 2002 you became a ride trainer?

24      A    Yes.

25      Q    And then how long were you a ride trainer for Lake

Adams   v. Festival Fun Parks

1/20/2012                                                Andrew  Adams

Page 14

1    Compounce?

2        A    Two years.

3        Q    So 2002 to 2004, on a seasonal basis?

4        A    Yes.

5        Q    And then in 2004 what position did you hold?

6        A    They made me assistant ride supervisor.  They call

7    it coach, but I call it supervisor.

8        Q    And just going back to the last question about

9    being a ride trainer, you were a ride trainer in 2002.  And

10   than I believe you testified that you took a break in 2003?

11       A    Yes.

12       Q    So in 2003 you didn't work for Lake Compounce at

13   all?

14       A    I worked, but I took a break in the middle of the

15   summer.  So by the middle of August I left for a while.

16       Q    Why did you leave?

17       A    I was having some problems with management at the

18   time.

19       Q    What type of problems?

20       A    Being accused of not picking up vomit on a ride,

21   when I called for help and no one came.  And I got written

22   up for that, and I thought it wasn't fair.

23       Q    And so what did you do?

24       A    I just left.  I told them I'm leaving.

25       Q    You quit?

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

Page 15

1     A    Yes.

2     Q    Did you submit a written letter of resignation?

3     A    No, I did not.

4     Q    You just verbally quit?

5     A    Yes.

6     Q    Or orally?

7     A    Well, I said I wasn't going to sign the written

8  document, and they said I had to.  So I did.  And that's

9  when I quit.

10    Q    You signed the write-up?

11    A    Yes, I did.

12    Q    And then you quit?

13    A    Yes.

14    Q    I think you were saying that you were promoted to

15 assistant ride coach in 2004?

16    A    Yes.

17    Q    Is that the same position that you held until you

18 left in 2009, or did your position change again?

19    A    It changed again.

20    Q    When did it change?

21    A    The beginning of 2007.  I was a housekeeping

22 supervisor.

23    Q    And how long did you hold that position with Lake

24 Compounce?

25    A    It was until the end of the season, end of

Adams   v. Festival Fun Parks

1/20/2012                                      Andrew  Adams

Page 16

1    October 31st, 2007.

2        Q    And then what about 2008, what position did you

3    hold then?

4        A    That's when I went in to work for the ride

5    mechanics shop at the park.

6        Q    And what position did you have?

7        A    They call them mechanic helper.

8        Q    Did your position change again, before you left in

9    2009?

10        A    No.

11        Q    What were your responsibilities as a mechanic

12    helper?

13        A    Washing parts for the rides; you know, in the off

14    season they all get taken apart.  Helping the other

15    mechanics with like taking things apart, they had me clean

16    the shop up, and helping out in the paint department when it

17    was needed, and helping out doing ride stuff out in the

18    park, like helping them fix the roller coaster or

19    retracking.

20        Q    While you held that position, did you ever help in

21    other departments?

22        A    No.

23        Q    Who did you primarily work with in that position,

24    as a mechanic helper?

25        A    I worked with everyone.  So do you want a special

Adams   v. Festival Fun Parks

1/20/2012                                              Andrew   Adams

Page 22

1   and a hard time taking tests.  So they knew they had to

2   spend extra time with me, when it came time to train me on

3   rides.

4        Q    And what did you put in your application form?

5        A    I put down I'm a special ed student.

6        Q    So what position were you rehired into in 2004, I

7   guess when you came back to Lake Compounce?

8        A    In --

9        Q    After you had taken your break and you came back,

10  was your position still ride trainer at that -- or, I'm

11  sorry, assistant ride supervisor at that point?

12       A    Yes.

13       Q    So you were hired back into the same position that

14  you had when you left?

15       A    Yes.

16       Q    And this was still a seasonal position at that

17  point, right?

18       A    Yes, it was.

19       Q    How did you come to switch from seasonal

20  employment to full-time employment with Lake Compounce?

21       A    Like, how did it happen?

22       Q    Did you request it?

23       A    Yes, I did.  I talked to the general manager, and

24  said, you know, I've been here for 13 years, this is what I

25  want to do and I want to stay on.

Adams   v. Festival Fun Parks

1/20/2012                                                    Andrew  Adams

Page 80

1    it?

2        A    No.

3        Q    Did he approach you, or did you approach him?

4        A    He approached me about it.  And we talked in the

5    office privately.

6        Q    And how soon was it after you made the comment to

7    Brynn did that happen?

8        A    It was the next day that he talked to me about it.

9        Q    Did you ever make any other comments that you

10   remember, to any other co-workers that had any sexual

11   content to them?

12       A    Not that I know of.

13       Q    Were there other times that you thought you were

14   being egged on to say things you weren't comfortable saying?

15       A    Yeah, because guys in the shop they -- because I

16   don't have a girlfriend, they figured you don't have the

17   guts to say certain things.

18       Q    What types of things did you say, that you weren't

19   uncomfortable saying?

20           ATTORNEY SABATINI:  Objection to form.

21           THE WITNESS:  Just what I said to Brynn, "do you

22       want to go to bed."

23   Q    (By Attorney Boerner) Did you make any other comments

24   that you were uncomfortable saying?

25       A    Just to Brynn.

Adams   v. Festival Fun Parks

1/20/2012                                                    Andrew  Adams

                                                              Page 84

1   October.

2         Q    Okay.  And what did Jerry Brick say?

3         A    He told me there's no other positions available,

4   he says, you know, there's nothing else for you, unless you

5   work in the maintenance shop.

6         Q    Did you ask to go to any specific other

7   department, or any department?

8         A    I asked to go in the paint department.

9         Q    When Jerry said there were no other positions, you

10  mean he said there were no open positions in the paint

11  department?

12        A    Correct.

13        Q    Had you seen any positions in the paint department

14  posted anywhere?

15        A    No, but I got a call from Jim Stevens telling me

16  what just happened, that they took people from the main shop

17  and sent them over to help him out prepping stuff and

18  sanding stuff, and stuff like that, to get ready for him to

19  paint.

20        Q    How many full-time employees were there in the

21  paint shop at the time?

22        A    There was only two.

23        Q    Who were they?

24        A    Jim Stevens and -- what was his name?  Richie, but

25  I don't know his last name.

Brandon Smith Reporting & Video
860-549-1850     production@brandonreporting.com   249 Pearl Street

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

                                                        Page 86

1    called -- Sherwin-Williams.

2         Q    What else do you know about his experience?

3         A    He was a supervisor there for a while.  That's all

4    I basically know about him.

5         Q    What about Rich, do you know anything about his

6    experience in painting?

7         A    No, I don't.

8         Q    Did you have any other further discussion with

9    Jerry Brick, about potentially moving to the painting

10   department?

11        A    No.

12        Q    Had anybody told you, before you asked, that there

13   was an open position in that department?

14        A    No.  The only person I talked to was Jerry Brick.

15        Q    Did you have any reason to think that Lake

16   Compounce was hiring anyone, for a full-time position in the

17   paint department at that time?

18        A    I would, because there was a lot of things that

19   had to get done that year.

20        Q    Did you have any knowledge that Lake Compounce was

21   hiring anybody in the paint department at that time?

22        A    No.

23        Q    Okay.  Getting back to the position that you

24   applied for.  In 2008 and 2009, other than applying to Coke,

25   before you left Lake Compounce, did you apply for any other

Adams  v. Festival Fun Parks

1/20/2012                                        Andrew  Adams

                                                        Page 87

 1    positions any place other than Lake Compounce?

 2        A     No.

 3        Q     Did your co-workers at Lake Compounce throw you a

 4    fair well party the day before you left?

 5        A     Well, no.  It was just our normal breaktime.  It

 6    was coffee and doughnuts that I didn't have to pay for his

 7    time.  So it wasn't like a party that we normally do for

 8    everyone else.

 9        Q     So they bought coffee and doughnuts for you?

10        A     Yeah.

11        Q     Who was there?

12        A     Mario Abela, John Fitch, Jordan, Kyle, Joe, Joey,

13    Chris Reeves.  That's it.  That's all I can remember.

14        Q     Was Justin Walters there?

15        A     No.

16        Q     When did you have your first discussion with Lake

17    Compounce about your employment ending at Lake Compounce?

18        A     It was towards the end of September, when I had

19    spoken to John Fitch.

20        Q     And tell me about that discussion?

21        A     Basically went to John saying that I'm giving him

22    notice soon, I'm having a hard time here.  And he asked why.

23    And I said I feel I can't do the job, everybody picks on me,

24    every time I call for help on the radio, I get nothing but a

25    lot of -- what's that word -- intimidation from people

Adams   v.   Festival Fun Parks

1/20/2012                                          Andrew   Adams

Page 88

1   saying, oh, my God, we got to bail Andy out again.

2          And basically he said, you know, keep looking for

3   a job and still work here, you know, we'll find you

4   something else to do in the shop until you find a job.  But

5   he did mention to me if you have any of your holiday time,

6   or any of your vacation time, to use it up, because if you

7   don't you don't get it, you lose it.

8          So I started taking all of my holiday pay, and my

9   vacation time up.  When I came back Jerry Brick had a

10  meeting with me and Mario Abela.

11     Q    How long were you out on your vacation and holiday

12  time?

13     A    I took I believe two weeks, because that's what

14  was owed to me.

15     Q    Who initiated the meeting that you had after that,

16  with Jerry Brick and Mario Abela?

17     A    Who was there?

18     Q    Who initiated it?

19     A    Oh, I don't know.  I went to work that day and

20  Jerry said can we see you upstairs, please.  So I went

21  upstairs to the office.

22     Q    And what did you discuss with them at that point?

23     A    That's when he said to me, you know, I've called

24  corporate up and told corporate you're leaving, so we need

25  to know from you when your last day is.  And Mario said,

Adams  v. Festival Fun Parks

1/20/2012                                             Andrew  Adams

Page 89

1  well, we're going to give him to October 31st, to the end of

2  the season.

3          And that's when Jerry said to me, okay, and if you

4  can't get a job or find a job, Andy, I'll let you collect

5  unemployment and I won't appeal the case, I'll let you get

6  it.

7      Q    And what did you say to them?

8      A    I said thank you very much.  And then that's how

9  it ended.

10     Q    Was anything discussed, that you haven't described

11 to me, during that meeting?

12     A    Right after my last day I handed him my keys, and

13 they gave me my termination slip.  And then a couple of

14 days, after I couldn't find a job, I called unemployment to

15 put a case in.

16     Q    During that meeting with Jerry Brick and Mario

17 Abela, that you were just describing, was anything else

18 discussed between you, other than what we've already talked

19 about?

20     A    No.

21     Q    Did you have any other discussions with anyone

22 after that, about leaving Lake Compounce?

23     A    Not that I recall.

24     Q    Okay.  Did anybody at Lake Compounce tell you that

25 you were being terminated or fired?

Adams  v.  Festival Fun Parks

1/20/2012                                                    Andrew  Adams

Page 90

1      A    No.

2      Q    Do you believe that you were fired?

3      A    No.  I wouldn't say I believe I was, no.

4      Q    So you resigned from Lake Compounce?

5      A    Yes.

6      Q    Okay.  All right.  Are you claiming that Lake

7  Compounce discriminated against you, based opinion your

8  gender, being a man?

9      A    Yes.

10     Q    Okay.  How is that?

11     A    Well, because the way I got treated and picked on,

12  no one else got the same treatment.  So I feel I was being

13  mistreated.

14     Q    Okay.

15          ATTORNEY BOERNER:  Off the record.

16

17   (A lunch recess was taken from 12:32 p.m. to 1:13 p.m.)

18

19  Q   (By Attorney Boerner) I understand that you want to

20  change some of your testimony from earlier, is that right?

21     A    Yes.

22     Q    Why do you want to change your testimony?

23     A    Because I feel the question that you asked about

24  the termination, the do you feel you were terminated or did

25  you quit.  I feel I was terminated because of being -- of

Adams   v. Festival Fun Parks

1/20/2012                                    Andrew   Adams

                                                    Page 91

1   them not finding nothing else in the park for me to do, and

2   me being picked on, nobody was doing anything about it.  So

3   I felt like I was being forced out of there.

4        Q    What made you change your testimony from earlier?

5        A    Because I thought about it more.  If the park

6   really wanted me, they would have found another job in the

7   park and they wouldn't have me leave.

8        Q    Did you discuss that with your attorney during the

9   break?

10       A    Yes.

11       Q    And after talking to your attorney, you want to

12  change your testimony?

13       A    Yes.

14       Q    And you understood that earlier you were

15  testifying under oath, correct?

16       A    Yes.

17       Q    And you testified earlier that you resigned,

18  right?

19       A    Yes.  Because I was being forced out of there.

20       Q    Earlier you said you weren't terminated, right?

21       A    Yes.

22       Q    And now you're saying that you were?

23       A    Yes.

24       Q    Okay.  Did anyone ever tell you that you were

25  being terminated?

Adams  v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

                                                          Page 92

1      A    No.  But working at a place and being picked on

2  and bullied, and your managers aren't doing nothing to stop

3  it...

4      Q    Nobody ever told you you were being terminated, is

5  that right?

6      A    Yes.

7      Q    And nobody ever told you you were being fired,

8  right?

9      A    Correct.

10     Q    Okay.  Sir, you did resign, right?

11     A    Resigned, because I couldn't deal with it no more,

12  being picked on.

13     Q    You resigned because you feel you were being

14  picked on?

15     A    Right.

16     Q    Okay.  But you did resign, correct?

17     A    Yes.

18     Q    Do you think that if you hadn't been a man, you

19  would have been treated differently at Lake Compounce?

20     A    No.

21     Q    Do you think your sex or gender had anything to do

22  with your treatment?

23     A    Yes.

24     Q    How so?

25     A    Because the way Justin said the remark to me, he

Adams  v. Festival Fun Parks

1/20/2012                                         Andrew  Adams

Page 93

1    doesn't talk that way to anyone else that works there.

2        Q    What remark are you talking about?

3        A    About being on your knees, that's your best

4    position for you.

5        Q    Is there anything, other than that, that you feel

6    is an example of you being treated differently because of

7    your sex or gender?

8        A    Yeah.  Well I don't have a girlfriend, that's one

9    reason why I think he makes that remark, not like the rest

10   of the married guys in there.

11       Q    Anything else that is an example of you being

12   treated differently because of your sex or gender?

13       A    No.

14       Q    You understand that you have a claim for gender

15   discrimination in this lawsuit?

16       A    Yes.

17       Q    Other than the one comment about on your knees

18   that Justin Walters made, are there any other times you felt

19   you were being discriminated against at Lake Compounce?

20       A    No, just that time when he said that to me.

21       Q    Okay.  And how did you feel that that comment was

22   discriminating, based upon on your gender or sex?

23       A    How did it make me feel?

24       Q    Why did you think that that related to your gender

25   or your sex?

Adams  v.  Festival Fun Parks

1/20/2012                                          Andrew  Adams

Page 94

```
 1      A    Because I don't date girls, I don't go on dates.
 2   And just because I have friends, you know, that I hang out
 3   with boys, does he think that that's what I am?
 4      Q    Are you a homosexual?
 5      A    No.
 6      Q    Did you ever hear Justin Walters make similar
 7   comments to other employees?
 8      A    Not that I know of.
 9      Q    Did you ever hear Justin Walters make any other
10   derogatory comments to other employees, other than what
11   you've already described?
12      A    Not if I was around.  I didn't see it, no.
13      Q    Okay.  Did you hear about it?
14      A    No.
15      Q    Did you see any conduct by Justin Walters, where
16   you felt that he was treating any other employee badly,
17   other than what you've already described?
18      A    Well, I seen him one time grab an employee by the
19   shirt, and throw him up against -- well, not throw him up,
20   but pin him up against a fence, because some employee said
21   something to him that he didn't like.
22      Q    What employee was that?
23      A    Jordan.
24      Q    Anything else?
25      A    No.
```

Brandon Smith Reporting & Video
860-549-1850    production@brandonreporting.com    249 Pearl Street

JA 178

Adams  v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

Page 95

1    Q    Did you ever hear anybody, other than Justin

2    Walters, make similar comments to you or anyone else?

3    A    No.

4    Q    Did you feel that any female employees were

5    treated differently than you, or received better treatment

6    than you?

7    A    Well, there were no females in the maintenance

8    shop.

9    Q    How about other male employees, do you think they

10   were treated differently or better than you?

11   A    Yeah.

12   Q    In what way?

13   A    Well, they're all married and have girls.  So, of

14   course, he's not going to say anything bad about those

15   people.  I was the only one that got picked on.

16   Q    Is Justin Walters married?

17   A    No.

18   Q    I knew you mentioned earlier that he dated Brynn

19   Goldbeck.  Was that the whole time that you were there, or

20   part of the time?

21   A    For part of the time, and she broke up with him.

22   Q    Was he dating anyone else at the time you were

23   there?

24   A    No.

25   Q    Did you talk to anyone about the comment that

Adams  v. Festival Fun Parks

1/20/2012                                                    Andrew  Adams

Page 96

1   Justin Walters made, that you described, about getting on

2   your knees?

3        A    The only one is Booch, Jim Stevens, Wayne Olsen.

4   And the ones that were there when it happened, which were

5   Kyle, Tommy J., Joe, and that's it; that's all that were

6   there.

7        Q    Okay.  And the only people that you told about it

8   were Booch, Jim Stevens and Wayne Olsen?

9        A    Yes.

10       Q    And you didn't tell any manager or director about

11  it?

12       A    No.

13       Q    Are you claiming that Lake Compounce sexually

14  harassed you?

15       A    Yeah -- well, that means Justin that worked there,

16  is that what you're referring to it by?

17       Q    Well, you're suing Lake Compounce -- let me

18  rephrase the question.

19       A    Okay.

20       Q    You understand that you have a claim against Lake

21  Compounce for sexual harassment?

22       A    Right.

23       Q    Who, at Lake Compounce, sexually harassed you?

24       A    Justin Walters.

25       Q    Anyone else, other than that?

Adams   v. Festival Fun Parks

1/20/2012                                        Andrew  Adams

Page 97

1    A    Not that I know of, no.

2    Q    How did he sexually harass you?

3    A    The day when he told me get on your knees, that's
4  your best position.

5    Q    Any other instances where he sexually harassed
6  you?

7    A    Just calling me stupid, or what the heck is the
8  matter with you.

9    Q    Okay.  Anything else?

10    A    Just constantly staring me down, when I'm down on
11  my knees working on my rides, just staring at me.

12    Q    Okay.  Anything else?

13    A    And then just throwing things at me.

14    Q    Okay.  Is that all?

15    A    Yes.

16    Q    Did you ever talk to Justin Walters about any of
17  these things, the on your knees comment?

18    A    No, I didn't want to get in a confrontation with
19  him.

20    Q    Did you ever talk to him about the other things
21  you described, calling you stupid, saying what's the matter
22  you, staring at you or throwing things at you?

23    A    No, I just walked away.

24    Q    Were there any witnesses to the calling you stupid
25  or saying what's the matter with you?

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew Adams

Page 102

1     Q    Did you ever tell anybody at Lake Compounce that

2   you thought you were being sexually harassed?

3     A    No.

4     Q    You understand that you have a claim for

5   retaliation in this case?

6     A    Yes.

7     Q    I know that we touched on this briefly before, but

8   can you just describe to me how you feel Lake Compounce

9   retaliated against you?

10    A    Basically they couldn't find another position to

11  make me feel where I'm not going to get picked on.  If they

12  really wanted me there, they would have found a way to stop

13  all of this from happening.

14    Q    Is there any other way that you feel they

15  retaliated against you?

16    A    Well, Justin Walters always put these big water

17  park pumps right in front of my work station, where my

18  toolbox is, where I can't open my drawers.  And I couldn't

19  move them, because I didn't a forklift license at the time.

20         So Jordan moved them for me, because he had a

21  forklift license, and he put them in his spot.  And then

22  that's when Justin called me on the radio, and said did you

23  move my pumps.  And I said not me, someone else did.

24         And I came back from the park, back into the shop,

25  and the pumps were back in my spot again, where I can't get

Adams  v. Festival Fun Parks

1/20/2012                                            Andrew  Adams

Page 105

1      Q      Are there any other ways in which you think Lake
2   Compounce retaliated against you?
3      A      Not that I can think of right now.
4      Q      And what do you think you were being retaliated
5   against for?
6      A      I think just Justin didn't like me, he was trying
7   to find a way to maybe make me mad and leave the company.
8      Q      What conduct did you engage in, that you think
9   caused Lake Compounce to retaliate against you?  Is there
10  anything else, other than what you've described -- that
11  Justin didn't like you?
12     A      I think in my heart, since I'm a slow learner, it
13  takes me time to do things, and I have to constantly go at a
14  slower pace to pick it up.
15     Q      And you think you were retaliated against by Lake
16  Compounce because of that?
17     A      Yeah.
18     Q      And who, specifically, retaliated against you?
19     A      Well, one thing was Justin Walters.  John Fitch --
20  there was one day I was working on a ride, it took me all
21  day, I couldn't figure out how to fix the ride.  And he came
22  back into the shop and goes you're still work on that piece.
23            I'm like I'm having a hard time.  He goes you
24  should remember this by now, you've been with us for a
25  while.  So instead of showing me, all he did was basically

Adams   v. Festival Fun Parks

1/20/2012                                                    Andrew  Adams

Page 112

1    know in life.

2         Q     Has a doctor ever diagnosed you with having a

3    disability?

4         A     My physical doctor, when I was a kid.

5         Q     Are you talking about the Newington --

6         A     No, it was a regular doctor.

7         Q     What doctor was that?

8         A     Dr. Blumer.

9         Q     And what was his diagnosis?

10        A     It came out as a slight mental retardation.

11        Q     Do you have any medical records that relate to

12   that diagnosis?

13        A     My mom probably has them.  I don't.

14        Q     What are your symptoms?

15        A     As a slow learner?

16        Q     Yes.

17        A     Spelling is number one.  Reading, I can only read,

18   I think, normally third grade reading -- third, fourth grade

19   level of reading.  Remembering a lot of things all at once;

20   I can only remember up to five things, and after that I

21   can't remember.  That's all really I can think of.

22        Q     How does that affect your day-to-day life?

23        A     Well, I can't really get out and go get a really

24   good job because of my disability, I can never be in college

25   because I can't take college courses.

Adams   v. Festival Fun Parks

1/20/2012                                        Andrew  Adams

                                                      Page 119

1        A     No, this was just end of the year -- my report

2    card that I get every year.

3        Q     Okay.  So there's no relationship between this and

4    Dr. Niedbala?

5        A     No.

6        Q     Okay.  All right.  And there's no assessment of

7    your mental abilities in these documents, the individualized

8    education program and training service documents, correct?

9        A     No.  It's just talks about what she did to teach

10   me stuff.

11       Q     Okay.  If you look back at the background section

12   of the report, that's P162, that document, and you read down

13   at the second to the last paragraph, it says that you're

14   mainstreamed with fifth grade students.  Do you see that,

15   the second to last paragraph on the page?

16       A     Yeah.

17       Q     And you told me earlier that you had this

18   assessment around the time of the fourth grade, right?

19       A     Yes.

20       Q     So at that point you were being taught with fifth

21   grade students?

22       A     Yes.

23       Q     And that was roughly your grade level, for the age

24   that you were at the time?

25       A     Correct.

                  Brandon Smith Reporting & Video
860-549-1850      production@brandonreporting.com   249 Pearl Street

                              JA 185



NEWINGTON
CHILDREN'S HOSPITAL

**EDUCATIONAL EVALUATION & CONSULTING SERVICES**
**(203) 667-5315**

DATE: December 3, 1990
RE: Andrew Adams
Medical Record: 132576

Mr. & Mrs. Lawrence Adams
1272 Stafford Avenue
Bristol, Connecticut 06010

Dear Mr. & Mrs. Adams:

Enclosed please find Andrew's Diagnostic Perceptual/Cognitive
Assessment.  Copies of this evaluation have been sent only
to those who have been indicated on the signed release.

Should you have questions or concerns regarding specific test
results or recommendations, please contact Educational Evaluation
and Consulting Services at 667-5315 for assistance.

Sincerely,

Barbara E. Brown, M.S.
Director

Enclosure

BEB/dw

P000161

JA 186

DEFENDANT'S
EXHIBIT NO. 9
FOR IDENTIFICATION

# NEWINGTON CHILDREN'S HOSPITAL

## DIAGNOSTIC PERCEPTUAL/COGNITIVE ASSESSMENT
## EDUCATIONAL EVALUATION AND CONSULTING SERVICES

Andrew Adams
BD: 8/15/79
CA: 11+3
Grade: 5.2 Special
Education (1990-91)
Stafford Elementary School
Bristol, Connecticut

Medical #: 132576
Date of Testing: 10/30/79
Referral: Parents -
  Mr. and Mrs. Lawrence Adams
Clinician: Cynthia K. Niedbala, M.S.
  Educational Diagnostician

## Background Information and Reason for Referral

Per parental report, Andy has been involved in specialized
services, initially for speech and language needs, since
preschool.  Specific educational data regarding his performance
throughout the primary grades was not available for review prior
to this assessment.  However, per parental report, Andy has
participated within the Aim program, Stafford Elementary School,
Bristol, Connecticut, since kindergarten age.

The results of a triennial psychological review, completed within
his school system, (January, 1990), revealed substantial
deficiencies in verbal and non-verbal spheres, which resulted in
a composite score which was marginally within the Borderline
range.  Visual motor integrative skills were displayed three
years below his chronological age.  An educational assessment
(April, 1990) revealed reading, spelling and mathematics skills
to be within a second to third grade skill range.  A speech and
language assessment indicated continued deficiencies in receptive
and expressive vocabulary, while selected language processing
skills requiring categorization and determination of differences
were displayed as above average.

Andy currently continues to participate in a self-contained
special educational program, designed to meet his needs as a
student with mild Mental Retardation, and/or Borderline
abilities.  He is currently mainstreamed with fifth grade
students for art, music, physical education,   and homeroom,
following a similar program model to what was initiated in fourth
grade.

Andy was referred for this Diagnostic Perceptual/Cognitive
Assessment by his parents, Mr. and Mrs. Lawrence Adams, to
determine current processing and academic achievement levels with
recommendations for programming.

Individualized Educational Program/Transition Services

Student: _Andrew Adams_____

Long Term Goal: INDEPENDENT LIVING

( ) No special skills training needed
( ) Independent (House or Apartment)    ( ) Supervised Living    ( ) Group Home    ( ) Family
( ) Other
(✓) Specialized skills training in:
  (✓) Activities of Daily Living    (✓) Social Skills    (✓) Self-Advocacy    (✓) Financial Planning
  (✓) Money Management    (✓) Legal    ( ) Other: _____

Goal Statement:
Evaluation Schedule Code:   0 - Not Addressed    1 - Partial    2 - Half    3 - Most    4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will complete all of the needed steps to open a checking account and to maintain it on a daily basis independently. | Student/staff | Unit Tests in Banking and teacher made activities | 6/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will plan menu for a day, including the correct number of foods from each of the pyramid groups to make it nutritionally sound. | Student/staff | Teacher - Made Evaluation | 6/96 | 2 | | | |
| End of Year Summary: | | | | | | | |

Justification Statement:  Did the PPT conclude a need in this area?  Yes _____.    No _____
If no, please provide a justification statement indicating the reasons:

Case 3:11-cv-00427-JCH   Document 35   Filed 04/27/12   Page 46 of 60

P000163

JA 188

Long Term Goal: INDEPENDENT LIVING

pg. *[signature]*

Evaluation Schedule Code:   0 – Not Addressed   1 – Partial   2 – Half   3 – Most   4 – Goal Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will independently sort, launder and iron as needed his laundry. | Staff | Teacher-Made Checklists and Student Self-Evaluation | 3/96 | 3 | | | |
| *End of Year Summary:* | | | | | | | |
| Andy will maintain acceptable personal hygiene, e.g. clean hair, hands and nails and acceptable clothing. | Staff/ student/ parents | Student Self-Evaluation | 3/96 | 2 | | | |
| *End of Year Summary:* | | | | | | | |
| Andy will identify the time in 1 minute intervals and will state the time in 15 minute intervals before or after that time. | Staff | Teacher-Made Evaluation and situational assessment. | 2/96 | 2 | | | |
| *End of Year Summary:* | | | | | | | |
| Andy will complete a unit on basic First Aid and will state/display behavior needed in an emergency situation. | Staff/ parents | Basic First Aid, scoring at least 90% on each unit test. | 1/96 | 2 | | | |
| *End of Year Summary:* | | | | | | | |

Case 3:11-cv-00427-JCH   Document 35   Filed 04/27/12   Page 47 of 60

P000164

JA 189

**Long Term Goal: INDEPENDENT LIVING**

pg. 3

Evaluation Schedule Code:  0 - Not Addressed    1 - Partial    2 - Half    3 - Most    4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will set an alarm clock and a clock radio, digital and standard, to the correct time and set the alarm using the correct buttons. | Student/Staff parents | Teacher-Made Checklists | 10/95 | — | | | |
| End of Year Summary: | | | | | | | |
| Andy will state and write the sizes he needs for his personal clothing. | student/staff | Self-Evaluation | 1/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will complete unit on ordering from a catalog, scoring at least 90% on each unit | Student/staff | Ordering form a Catalog | 11/96 | — | | | |
| End of Year Summary: | | | | | | | |
| Andy will use a sales tax chart to compute tax and then add it to a price to get total. | student, staff | Teacher-Made Activities | 12/96 | — | | | |
| End of Year Summary: | | | | | | | |

Case 3:11-cv-00427-JCH   Document 35   Filed 04/27/12   Page 48 of 60

P000165

JA 190

Long Term Goal: INDEPENDENT LIVING

*pg. minimum*

Evaluation Schedule Code:  0 - Not Addressed    1 - Partial    2 - Half    3 - Most    4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will state under what conditions and the method to use a portable fire extinguisher. | staff/parents | Information Checklist and Situational Assessment | 2/96 | 1. | | | |
| End of Year Summary: | | | | | | | |
| Andy will state and demonstrate 2 methods of clearing a clogged toilet or drain. | staff/parents | Teacher-Made Checklists | 2/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will complete Everyday Living Skills, Lessons 4-10 scoring at least 90% on each unit test. | student/staff | Everyday Living Skills | 2/96 | 3 | | | |
| End of Year Summary: | | | | | | | |
| | | | | | | | |
| End of Year Summary: | | | | | | | |

Case 3:11-cv-00427-JCH   Document 35   Filed 04/27/12   Page 49 of 60

P000166

JA 191

Individualized Educational Program/Transition Services

Student: *Andy Adams*

Long Term Goal: EMPLOYMENT/POSTSECONDARY EDUCATION

( ) 4 Year College ( ) 2 Year College (✓) Postsecondary vocational training ( ) Ind.Competitive Employme
(✓) 1 Time-limited assistance for Employment ( ) Supported Employment ( ) Apprenticeship/Training
( ) Military ( ) Other: _____

Goal Statement: _____

Evaluation Schedule Code:   0 - Not Addressed   1 - Partial   2 - Half   3 - Most   4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation 1st MP | 2nd MP | Schedule 3rd MP | 4th MP |
|---|---|---|---|---|---|---|---|
| Andy will work in a community job-site two days a week. | student/job coach | work-site and supervisor evaluations | 4/96 | 3 | | | |
| End of Year Summary: | | | | | | | |
| Andy will read the want ads, and evaluate the qualifications needed, and the benefits and draw backs of each opening, stating which he is qualified for and which he would like. | student/staff | Teacher-made activities and evaluations. | 4/96 | 2 | | | |
| End of Year Summary: | | | | | | | |

Case 3:11-cv-00427-JCH   Document 35   Filed 04/27/12   Page 50 of 60

P000167

JA 192

Long Term Goal: EMPLOYMENT/POSTSECONDARY EDUCATION

Evaluation Schedule Code:   0 - Not Addressed    1 - Partial    2 - Half    3 - Most    4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will prepare a resume of his education and employment experiences. | student/staff | Evaluation of Resume | 4/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| When a supervisor or co-worker is speaking to him, Andy will establish eye contact with the person. | student/staff | Self-evaluation | 4/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| During a performance review, Andy will describe his work in a positive manner. | student/staff | self-evaluation and staff evaluation | 3/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| Andy will discuss a complaint about work situation with his supervisor. | student/staff | self evaluation and staff evaluation | 4/96 | 1 | | | |
| End of Year Summary: | | | | | | | |

Case: 3:11-cv-00427-ICH   Document 35   Filed 04/27/12   Page 51 of 60

P000168

JA 193

**Long Term Goal:** EMPLOYMENT/POSTSECONDARY EDUCATION

Evaluation Schedule Code:   0 - Not Addressed    1 - Partial    2 - Half    3 - Most    4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will identify and state the meanings for all food prep. terms in Brigance Essential Skills. | staff | Evaluation Checklist | 12/95 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will identify and carry out in sequential steps for the recipe directions in Brigance Essential Skills. | Staff | Evaluation Checklist | 4/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| Andy will explore Technical School opportunities in the culinary area | Staff/Student/parents | Evaluation by Andy of each visitation | 4/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will be referred to B.R.S. | Staff/Student/parents | Referral proc. begun | 4/96 | 4 | | | |
| End of Year Summary: | | | | | | | |

Case 3:11-cv-00427-JCH   Document 35   Filed 04/27/12   Page 52 of 60

P000169

JA 194

Individualized Educational Program/Transition Services

Student: Andy Adams

Long Term Goal: COMMUNITY PARTICIPATION

( ) No special skills training needed
( ) Specialized skills training in:

  ( ) Transportation      ( ) Recreation/Leisure      ( ) Consumerism
  ( ) Medical             ( ) Other

Goal Statement: _____
Evaluation Schedule Code: 0 - Not Addressed    1 - Partial    2 - Half    3 - Most    4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives | Person/Program/ Agency Responsible | Evaluation Criteria | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will plan the route and take a public bus to a local destination. | student/staff | Checklist Evaluation | 2/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| Andy will identify local agencies that may offer support after graduation. | student/staff/ parents | Agency Response Checklist | 4/96 | 1 | | | |
| End of Year Summary: | | | | | | | |

Justification Statement: Did the PPT conclude a need in this area?  Yes _____    No _____
If no, please provide a justification statement indicating the reasons:

Case 3:11-cv-00427-JCH    Document 35    Filed 04/27/12    Page 53 of 60

P000170

JA 195

Student: Andy Adams                                                pg. 2

Long Term Goal: COMMUNITY PARTICIPATION

Evaluation Schedule Code:   0 - Not Addressed   1 - Partial   2 - Half   3 - Most   4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will identify community clubs and organizations that may be of interest and will make an initial contact. | student/staff | Results from Telephone Poll/ Contact Poll | 4/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| Andy will identify places in the community where he can spend leisure/recreation time, and will plan an activity that he and a friend can attend. | student/staff parents | evaluations of student/staff/parents | 2/96 | 4 | | | |
| End of Year Summary: | | | | | | | |
| Andy will locate name in white pages of the phone book independently. | student/staff | Teacher-made checklists | 1/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will locate a phone number in the yellow pages of a needed service. | staff | Teacher-made checklists | 4/96 | 2 | | | |
| End of Year Summary: | | | | | | | |

Case 3:11-cv-00427-JCH   Document 35   Filed 04/27/12   Page 54 of 60

P000171

JA 196

# EXHIBIT "C"

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ANDREW ADAMS,         : | |
|            : | |
|         Plaintiff,      : | |
|            : | |
|      v.              : | CASE NO.: 3:11-cv-00427-JCH |
|            : | |
| FESTIVAL FUN PARKS, LLC,   : | |
| D/B/A LAKE COMPOUNCE,    : | |
|            : | |
|         Defendant.    : | |

## DECLARATION OF GERARD BRICK IN SUPPORT OF THE MOTION OF DEFENDANT FESTIVAL FUN PARKS, LLC FOR SUMMARY JUDGMENT

I, Gerard Brick, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I, Gerard Brick, am an adult, over 18 years of age, and am competent to make this Declaration in Support of the Motion of Defendant Festival Fun Parks, LLC d/b/a Lake Compounce ("Festival Fun Parks" or "Lake Compounce") for Summary Judgment. I have knowledge of the facts stated herein, and would and could testify to them in Court if called upon to do so.

2.      I am the General Manager of the Lake Compounce theme park located in Bristol, Connecticut, and have been since January 1, 2005.

3.      Festival Fun Parks owns and operates the Lake Compounce theme park located in Bristol, Connecticut, where Plaintiff Andrew Adams was employed.

4.      At the time Mr. Adams resigned his employment at Lake Compounce, there were no open positions in the paint shop.

5.     There have been no open positions in the paint shop since Mr. Adams resigned his employment with Lake Compounce.

6.     No new positions have been created in the paint shop since Mr. Adams resigned his employment with Lake Compounce.

7.     Mr. Adams' alleged disabilities played no part in my decision not to transfer him to the paint shop.

I declare under penalty of perjury that the foregoing is true and correct.

_Gerard W Brick_

Gerard Brick

Dated: 3/13/2012

2

# EXHIBIT "D"

I identified in my job application with the defendant that I was a slow learner. I also informed my bosses and my general manager about my learning disability.

8.    Describe in detail your professional qualifications and experience that would qualify you to work in the paint department at Lake Compounce.

**ANSWER:**

See attached copy of my resume and May 24, 2009 memo from Jerry Brick. Plaintiff's Bates Nos. 6; 172

9.    Identify each instance of harassment you experienced while employed by Festival Fun Parks, and for each such instance identify the representative of Festival Fun Parks that allegedly harassed you, the date on which the alleged harassment occurred, the location in which the alleged harassment occurred; and describe the substance of the alleged harassment.

**ANSWER:**

Feb. 2009 and July 2009:Walters, told me that being on my knees was my best position and that I liked being on my knees because I liked guys so much.

June 2009: Walters said that he "had" my mother last night and that she was good.

June 2, 2009: I went looking for my blow torch that had my name on it. When I found it the word "SUCKS" was written on it.

July 2009 – Walters threw nuts and bolts towards me and they landed into the parts washer and the fluid splashed onto me.

August 2009 – Walters put his palette of 2 Water Park Pumps in my work area.

September 2009 - Walters threw and smashed an apple on my truck.

Error! Unknown document property name.

October 2009 – I was working on the sky ride at the park.  Walters questioned the work that I performed on the ride.


10.    Identify each complaint you made to a representative of Festival Fun Parks of any alleged harassment, and for each such complaint identify the representative of Festival Fun Parks to whom you reported the alleged harassment, identify the date on which you reported the alleged harassment, describe the substance of the complaint, and state whether the complaint was made in writing.

**ANSWER:**

February 2009 – I verbally reported Walters "on you knees" comment to John Fitch.

June 2009 – I showed my blow torch with the word "sucks" on it to Fitch

July 2009 – I verbally reported to John Fitch and Mario that Walters was putting things in my work area

July 2009, I told Mario that I was having a problem with Walters picking on me.

August 2009 – I told Mario about Walters putting things in my work area

September 2009 – I told Fitch about Walters throwing an apple at my truck

October 2009 – I told Jerry Brick about the problems I was having at the shop and asked to work in the paint shop.

11/8/09 email – see attached plaintiff's Bates No. 20


11.    Identify each instance of discrimination you experienced while employed by Festival Fun Parks, and for each such instance identify the representative of Festival Fun Parks that allegedly discriminated against you, the date on which the alleged discrimination occurred,

Error! Unknown document property name.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANDREW ADAMS, | : | |
| | : | |
| Plaintiff, | : | Case No.: 3:11 cv 00427 (JCH) |
| | : | |
| | : | |
| vs. | : | |
| | : | |
| FESTIVAL FUN PARKS, LLC, d/b/a | : | |
| LAKE COMPOUNCE THEME PARK, | : | |
| | : | |
| Defendant. | : | MAY 4, 2012 |

PLAINTIFF'S OBJECTION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, in the above-entitled action, by and through his attorneys, Sabatini and

Associates, LLC, respectfully objects to Defendants' Motion for Summary Judgment dated

March 15, 2012 and submits his memorandum of law in opposition attached hereto.

Specifically, plaintiff objects on the grounds that genuine issues of material fact exist,

thereby rendering judgment as a matter of law inappropriate.

In support of the Objection, plaintiff submits his Local Rule 56(a)(2) Statement of

Disputed Facts, Memorandum of Law in support of the Objection, Affidavits of James V.

Sabatini, Esq. and Andrew Adams, deposition testimony and exhibits.

PLAINTIFF,

By   /s/ James V. Sabatini
James V. Sabatini, Esquire   CT 19899
Sabatini and Associates, LLC
One Market Square
Newington, CT 06111
Tel. No.: 860-667-0839
Fax No.: 860-667-0867
e-mail: jsabatini@sabatinilaw.com
Attorney for Plaintiff

## ELECTRONIC CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2012, a copy of the foregoing Motion For Extension of Time to Respond To Defendant's Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ James V. Sabatini
James V. Sabatini

UNITED STATES DISTRICT COURT
**DISTRICT OF CONNECTICUT**

ANDREW ADAMS,                      :
                                   :
                    Plaintiff,     :        Case No.:  3:11 cv 00427 (JCH)
                                   :
                                   :
        vs.                        :
                                   :
FESTIVAL FUN PARKS, LLC, d/b/a     :
LAKE COMPOUNCE THEME PARK,         :
                                   :
                    Defendant.     :        MAY 4, 2012

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF OBJECTION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

PLAINTIFF,


By    /s/ James V. Sabatini
James V. Sabatini, Esquire    CT 19899
Sabatini and Associates, LLC
One Market Square
Newington, CT  06111
Tel. No.:  860-667-0839
Fax No.:  860-667-0867
e-mail:  jsabatini@sabatinilaw.com

**ELECTRONIC CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2012, a copy of the foregoing Motion For Extension of Time to Respond To Defendant's Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ James V. Sabatini
James V. Sabatini

## TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………    i-iv

I.      INTRODUCTION………………………………………………    1

II.     STATEMENT OF FACTS………………………………………    3-8

III.    LAW AND ARGUMENT………………………………………    8

        A.      Legal Standard ………………………………………..    8

                1.      Summary Judgment..……………………………    8

                2.      Discrimination Standard…………………………    9

        B.      Plaintiff Can Establish Prima Facie Cases of Disability Discrimination,
                Sexual Harassment/Hostile-Work Environment, Gender Discrimination
                and Retaliation………………………………………………    14

                1.      Disability Discrimination under the ADA & CFEPA………    14

                2.      Sexual Harassment/Hostile Work Environment under Title

                        VII & CFEPA……………………………………    23

                3.      Gender Discrimination under Title VII & CFEPA…………    27

                4.      Retaliation under Title VII & CFEPA……………………..    32

        C.      Defendant's proffered reason for the adverse employment actions
                were pretext…………………………………………………    35

IV.     CONCLUSION………………………………………………..    39

# TABLE OF AUTHORITIES

## FEDERAL CASES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)…………………………………...9

Back v. Hastings On Hudson Union Free School Dist., 365 F.3d 107
(2d Cir. 2004)……………………………………………………………………...12, 35

Beason v. United Technologies Corp., 337 F.3d 271 (2d Cir.2003)……………………17

Blanco v. Brogan, 620 F. Supp. 2d 546 (S.D.N.Y. 2009)………………………………33

Bolmer v. Oliveira, 594 F.3d 134 (2d Cir. 2010)………………………………………12

Butts v. NY City Dept of House Pres. & Dev., 307 Fed. Appx 596 (2009)……………13

Byra-Grzegorczyk v. Bristol-Myers Squibb Co., 572 F. Supp. 2d 233
(D. Conn. 2008)…………………………………………………………………………33

Capobianco v. City of New York, 422 F.3d 47 (2d Cir. 2005)…………………………15

Carlton v. Mystic Transp., Inc., 202 F.3d 129 (2d Cir. 2000)………………………...13

Celotex Corp. v. Catreet, 477 U.S. 317 (1986)…………………………………………9

Sedor v. Frank, 42 F.3d 741 (2d Cir. 1994)………………………………………18-20

D'Amico v. City of New York, 132 F.3d 145 (2d.Cir.1998)……………………………..8

Davis v. State Univ. of New York, 802 F.2d 638 (2d Cir.1986)………………………...33

Dawson v. Bumble & Bumble, 398 F.3d 211 (2d Cir. 2005)…………………………27-28

DeCintio v. Westchester County Med. Center, 821 F.2d 111 (2d Cir.1987)……………33

Faragher v. City of Boca Raton, 524 U.S. 775 (1998)…………………………………23

Feingold v. New York, 366 F.3d 138(2d Cir. 2004)…………………………10, 23-24, 26

Francis v. City of Meriden, 129 F.3d 281 (2d Cir. 1997)………………………………16

Gallo v. Prudential Residential Services, Ltd. P'ship, 22 F.3d 1219 (2d Cir. 1994)…12-13

i

Gallo v. Second Taxing District of City Of Norwalk Operating Under The
Name Of South Norwalk Electric And Water, 507 F.Supp.2d 164 (D.Conn.2007)........11

Giordano v. City of New York, 274 F.3d 740 (2d Cir. 2001)................................14

Gross v. FBL Financial Services, Inc., 129 S.Ct. 2343 (2009).............................12

Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993)................................................25

Kessler v. Westchester County Dept. of Soc. Services, 461 F.3d 199 (2d Cir. 2006).....34

Mack v. Otis Elevator Co., 326 F.3d 116 (2d Cir. 2003)....................................23

McBride v. BIC Consumer Products Mfg. Co., Inc., 583 F.3d 92 (2d Cir. 2009).........21

McDonnell Douglas Corp. v. Green, 411 U.S. 792(1973).......................9-10, 13, 32

McGuiness v. Lincoln Hall, 263 F.3d 49 (2d Cir.2001)......................................11

Mecklenberg v. New York City Off–Track Betting, 42 F.Supp.2d 359
 (S.D.N.Y.1999).........................................................................................21, 31

Meiri v. Dacon, 759 F.2d 989 (2d Cir.1985)....................................................11

Montana v. First Fed. Sav. & Loan Ass'n of Rochester, 869 F.2d 100 (2d Cir. 1989)....13

Padilla v. Harris, 285 F. Supp. 2d 263 (D. Conn. 2003)....................................27

Parker v. Columbia Pictures Industries, 204 F.3d 326 (2d Cir. 2000).............12, 18, 20

Perry v. NYSARC, Inc., 424 F. App'x 23 (2d Cir. 2011)....................................12

Pimentel v. City of New York, 2002 WL 977535 (S.D.N.Y. 2002)....................21, 31

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)........................................27-28

Quaratino v. Tiffany & Co., 71 F.3d 58 (2d Cir. 1995)...................................10-11

Raytheon Co. v. Hernandez, 540 U.S. 44 (2003)................................................9

Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170 (2d Cir. 1996)........................34

Reeves v. Sandsderson Plumbing Prods., Inc., 530 U.S. 133 (2000)................12-13, 35

ii

Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426 (2d Cir.1999)………23

Sedor v. Frank, 42 F.3d 741 (2d Cir. 1994)………………………………………...17

Shain v. Ctr. for Jewish History, Inc., 418 F. Supp. 2d 360 (S.D.N.Y. 2005)…………..13

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993)…………………………………12, 35

Stratton v. Dept. for the Aging for the City of New York, 132 F.3d 869
 (2d Cir.1997)………………………………………………………………...11-12

Taylor v. Local 32E Serv. Employees Int'l, Union, 286 F. Supp. 2d 246
(S.D.N.Y. 2003) aff'd sub nom. Taylor v. Local 32E Serv. Employees Int'l Union,
118 F. App'x 526 (2d Cir. 2004)………………………………………………10-11

Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981)…………………………11

Terry v. Ashcroft, 336 F.3d 128 (2d Cir.2003)………………………………23, 32, 34

Weinstock v. Columbia Univ., 224 F.3d 33 (2d Cir.2000)……………………………9-10

Weixel v. Bd. Of Educ. Of the City of N.Y., 287 F.3d 138 (2d Cir. 2002)……………...33

Wilburn v. Fleet Financial Group, Inc., 170 F.Supp.2d 219 (D.Conn. 2001)……….21, 31

Zubrow v. Solvay Pharms, Inc., 207 Fed.Appx. 37 (2d Cir.2006)…………………………9

## STATE CASES

Dzubaty v. Milford Bd. of Educ., CV065000824S, 2007 WL 2570413
(Conn. Super. Ct. Aug. 20, 2007)………………………………………………17

## FEDERAL STATUTES

42 U.S.C. § 12101 *et seq*...……………………………………………...2-3, 14-16

42 U.S.C. § 2000e-2…………………………………………………………………….2

## STATE STATUTES

Conn. Gen. Stat. 46a-60(a)(1) *et seq*...…………………………………...2-3, 17

iii

**MISCELLANEOUS**

10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2722, at 384-85 (3d ed. 1998)…………………………………………………………..15

iv

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ANDREW ADAMS,** | : | |
| | : | |
| Plaintiff, | : | **Case No.:  3:11 cv 00427 (JCH)** |
| | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **FESTIVAL FUN PARKS, LLC, d/b/a** | : | |
| **LAKE COMPOUNCE THEME PARK,** | : | |
| | : | |
| Defendant. | : | **MAY 4, 2012** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

Plaintiff submits his Memorandum of Law in Support of his Objection to

Defendant's Motion for Summary Judgment.  As set forth below, genuine issues of

material fact exist and the defendants are not entitled to judgment as a matter of law.

Specifically, plaintiff objects on the grounds that the defendant discriminated against the

plaintiff on the basis of his disability and/or gender, sexually harassed the plaintiff,

terminated him on the basis of disability and/or gender and retaliated against him. Filed

with and supporting plaintiff's Objection is plaintiff's Local Rule 56(a)(2) Statement,

Affidavits of James V. Sabatini, Esq., and Andrew Adams, deposition testimony and

exhibits.

In brief, the plaintiff, Andrew Adams ("plaintiff" or "Adams") was hired full-time by the Defendant, Festival Fun Parks, LLC d/b/a Lake Compounce Theme Park ("Lake Compounce" or "defendant") in May 2008. While employed, the plaintiff was subjected to various comments and treatment outlined herein regarding his disability and gender that were offensive and discriminatory in nature. On October 31, 2009, the plaintiff was constructively terminated.

Plaintiff filed charges with the CHRO and EEOC on February 22, 2010. Plaintiff received a release of jurisdiction from the CHRO on December 29, 2010. (Exhibit 1 to the Amended Complaint, attached hereto as Ex. 7).

On March 16, 2011, plaintiff brought a complaint against Lake Compounce and subsequently amended the complaint on October 6, 2011 (attached hereto as Exhibit 7). The complaint alleges disability discrimination in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* (Count One); Disability Discrimination in Violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. 46a-60(a)(1) *et seq.* ("CFEPA") (Count Two); Gender Discrimination in Violation of CFEPA (Count Three); Gender Discrimination in Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2 ("Title VII") (Count Four); Hostile Work Environment in Violation of Title VII (Count Five); Hostile Work Environment in Violation of CFEPA (Count Six); Retaliation in Violation of CFEPA (Count Seven); and Retaliation in Violation of Title VII (Count Eight).

2

The defendants have moved for summary judgment. The plaintiff objects to summary judgment on the grounds that genuine issues of material fact exists. Specifically, summary judgment should be denied for three reasons:

1.  Plaintiff is disabled within the meaning of the ADA and CFEPA, and as such can establish a prima facie case for disability discrimination.

2.  Plaintiff has suffered adverse employment actions, including being sexually harassed at work, discriminated against on the basis of his disability and gender, being terminated on the basis of his disability and/or gender, and being retaliated against.

3.  Plaintiff's proffered non-discriminatory reason for termination is a pretext for discrimination and retaliation.

## II.    STATEMENT OF FACTS

Plaintiff, male, suffers from a slight mental retardation. Adams Dep. 111:10-12, 112:9-10, Ex. 1; Adams Affidavit ¶¶ 1-2, Ex. 2; Exhibit 4. Plaintiff's disability causes him to be a slow learner and to have difficulty remembering many things. Adams Dep. 105:12-14, Ex. 1; Adams Affidavit ¶ 3, Ex. 2; Exhibit 4.

Plaintiff commenced working at Lake Compounce as a seasonal worker in 1997, and continued to be a seasonal worker through 2007. Adams Dep. 12:6-14:15, 15:14-16:10, Ex. 1; Adams Affidavit ¶ 4, Ex. 2.

3

In 2008, the plaintiff was hired as a full-time employee as a mechanic or maintenance helper. Adams Dep. 16:2-7, Ex. 1; Adams Affidavit ¶ 5, Ex. 2. As a mechanic helper, the plaintiff's job was supposed to be assisting mechanics, but he often did jobs on his own, and still received mechanic helper pay. Adams Dep. 123:2-124:24, 126:13-23, Ex. 1; Adams Affidavit ¶ 6, Ex. 2.

At Lake Compounce, John Fitch was plaintiff's supervisor, Mario Abela was also a supervisor ahead of Fitch, and Jerry Brick was the general manager. Adams Dep. 17:11-17, 24:14-15, Ex. 1; Adams Affidavit ¶ 7, Ex. 2. John Fitch and Jerry Brick at Lake Compounce both knew of plaintiff's disability as a slow learner because plaintiff informed them of the same when he was hired and being trained. Adams Dep. 21:16-22:5, 24:16-25:4, Ex. 1; Adams Affidavit ¶ 8, Ex. 2.

While a full-time employee, the plaintiff was subject to sexual harassment and discrimination at work. Adams Affidavit ¶ 9, Ex. 2. The following is a summary of events:

1. In February & July 2009, Justin Walters, told the plaintiff, while working on his knees, that the plaintiff should get down on his knees because being on my knees was my best position because he liked men. Walters also stared the plaintiff down while the plaintiff worked on his knees. The plaintiff told John Fitch, about this comment. Fitch said that he informed the plaintiff that while working in the shop the plaintiff would get harassed and picked on and that

4

Fitch didn't want the plaintiff complaining to him. Fitch told the plaintiff to "be a man" and be tough. Adams Dep. 40:20-25, 42:2-6, 61:4-14, 97:2-11, Ex. 1; Adams Affidavit, ¶ 10, Ex. 2; Answers to Interrogatories, #5, 9-12, Ex. 3; Exhibit 6.

2.  In June 2009, Justin Walters told the plaintiff that he "had" the plaintiff's mother last night and that she was good. Adams Affidavit, ¶ 11, Ex. 2; Answers to Interrogatories, #5, 9-12, Ex. 3.

3.  On June 2, 2009, plaintiff could not find his blowtorch. When plaintiff found it in the shop, someone had written next to his name "sucks" in black permanent marker. The plaintiff informed John Fitch and Mike Hayes, in HR, of this incident. Adams Dep. 103:21-104:18, 167:21-25, Ex. 1; Adams Affidavit, ¶ 12, Ex. 2; Answers to Interrogatories, #5, 9-12, Ex. 3; Exhibit 6.

4.  In July 2009, Justin Walters through nuts and bolts at the plaintiff. When they landed in the parts washer, the fluid splashed onto the plaintiff. Adams Dep. 39:6-40:9, Ex. 1; Adams Affidavit, ¶ 13, Ex. 2; Answers to Interrogatories, #13, Ex. 3.

5.  In September 2009, Justin Walters threw an apple at plaintiff's truck. The plaintiff told John Fitch about this, but Fitch did not reprimand Walters or do anything about it. Adams Dep. 38:4-39:1, 61:4-25, 169:11-170:19; Adams Affidavit, ¶ 14, Ex. 2; Answers to Interrogatories, #5, 9-12, Ex. 3; Exhibit 6.

6. In October 2009, Justin Walters told the plaintiff that he was stupid and said "what the heck is wrong with you?" This comment was unwelcome and offensive. Adams Dep. 39:15-23, 97:5-8, 169:20-169:3, Ex. 1; Adams Affidavit, ¶ 15, Ex. 2; Ex. 6.

After speaking with John Fitch about many of these events, the plaintiff spoke with supervisor Mario Abela in July and August of 2009 about the harassment and discrimination by Walters and was told to give the guy a chance, that he wasn't so bad. Adams Dep. 62:12-18. 63:14-64:18, 168:20-169:7, Ex. 1; Adams Affidavit, ¶ 16, Ex. 2; Answers to Interrogatories, #10, 12, 14, Ex. 3; Exhibit 6.

Plaintiff's supervisors never ended the sexual harassment or discrimination that was created by plaintiff's co-workers. Adams Dep. 90:23-91:7, Ex. 1; Adams Affidavit ¶ 26, Ex. 2. The daily harassment and discrimination caused the plaintiff embarrassment. Adams Dep. 129:2-7, Ex. 1; Adams Affidavit ¶ 27, Ex. 2. The harassment and discrimination also caused the plaintiff to have nightmares and other emotional distress. Adams Dep. 163:16-25, Ex. 1; Adams Affidavit ¶ 28, Ex. 2.

In September 2009, the plaintiff spoke with Jerry Brick, the general manager, about changing positions because he was having trouble in the shop and wanted to be transferred to the paint shop. Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 85:4-13, 86:15-19, 87:16-88:10, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶¶ 17, 21, Ex. 2; Answers to Interrogatories, #10-12, Ex. 3; Exhibit 6. Jerry Brick first told the plaintiff that he could

6

not be moved to the paint shop because the plaintiff did not have painting experience.
Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 85:4-13, 86:15-19, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶ 18, Ex. 2.  After the plaintiff informed Jerry Brick of his painting experience, Jerry Brick then changed his answer and told the plaintiff that there were no open positions in the paint shop.  Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶ 19, Ex. 2.  Plaintiff believes this to be a lie because (1) the paint shop had a lot of work to be done and people from the main shop would often go over to the paint shop to help out and (2) he was told that after he was terminated people from the main shop worked in the paint shop.  Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶ 20, Ex. 2.

At this point, plaintiff simply told Brick that he was having trouble in the shop and may have to leave if he could not be transferred, but plaintiff never gave a verbal or written resignation.  Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 85:4-13, 86:15-19, 87:16-88:10, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶ 21, Ex. 2.; Answers to Interrogatories, #10-12, Ex. 3; Exhibit 6.  John Fitch suggested that the plaintiff take his vacation time.  Adams Dep. 87:16-88:14, Adams Affidavit, ¶ 22, Ex. 2.

When plaintiff returned from taking his vacation time, he had a meeting with his supervisors in which he was told that Jerry Brick had informed corporate that he had resigned.  Adams Dep. 81:4-10, 88:15-89:6, Ex. 1; Adams Affidavit ¶ 23, Ex. 2; Exhibit 5.  The plaintiff told them that he was thinking about it but never did actually resign and could

7

not find another job.  Id.  Jerry Brick then told the plaintiff that there were no positions open and that October 31, 2009 would be the plaintiff's last day, but that he would not contest it if the plaintiff wanted to collect unemployment.  Id.

On October 31, 2009, plaintiff was terminated and forced out of the company. Adams Dep. 90:23-91:7, 91:17-92:3, 92:10-12, Ex. 1; Adams Affidavit ¶ 24, Ex. 2; Exhibit 5.

On November 8, 2009, the plaintiff wrote a letter to corporate explaining that he was sexually harassed at work, had complained of the same and that the supervisors did nothing about it.  Adams Affidavit ¶ 25, Ex. 2; Exhibit 5.  The plaintiff also told corporate that he felt "pushed out the door."  Id.

The plaintiff believes that he "was sexually harassed, discriminated against because of [his] disability and [] gender and the fact that [he] wasn't dating women, and retaliated against for complaining of the harassment and discrimination."  Adams Affidavit ¶ 29, Ex. 2; see also Adams Dep. 93:5-94:5, Ex. 1.

## III.   LAW AND ARGUMENT

### A.      Legal Standard

#### 1.      Summary Judgment

A motion for summary judgment should be granted "where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to

8

JA 219

judgment as a matter of law." D'Amico v. City of New York, 132 F.3d 145, 149 (2d.Cir.1998). It is the moving party's burden to establish that no genuine issue of material fact exist and judgment should enter as a matter of law. Celotex Corp. v. Catreet, 477 U.S. 317, 322-23 (1986). To defeat a motion for summary judgment, the non-moving party must present evidence that could be sufficient to return a jury verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In reviewing the record, the evidence of the party opposing summary judgment is "to be believed, and all justifiable inferences are to be drawn in [that party's] favor." Id. at 255. Summary judgment shall be denied if a dispute is shown "over facts that might affect the outcome of the suit." Id. at 248. Therefore, the plaintiff must demonstrate a genuine issue of material fact as to whether defendant's proffered reason for termination was pretext for discrimination or whether the plaintiff's religion played a motivating factor in defendant's decision to termination the plaintiff.

2.      Discrimination Standard

The plaintiff claims discrimination on the basis of disability in violation of ADA and CFEPA, as well as gender and hostile work environment in violation of the Title VII and CFEPA of the Civil Rights Act. In discrimination claims under the ADA, Title VII, and CFEPA, the three step burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973) is employed. Raytheon Co. v. Hernandez, 540 U.S. 44 (2003) (determining that the burden shifting framework applied in

9

Title VII cases also applies to ADA claims); <u>Zubrow v. Solvay Pharms, Inc.</u>, 207

Fed.Appx. 37, 38 (2d Cir.2006) (*citing* <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 42 (2d

Cir.2000)) (determining that claims of discrimination under CFEPA are governed by the

*McDonnell Douglas* three-part burden shifting framework.).   As such, the claims herein

will be analyzed under the burden-shifting federal standard of <u>McDonnell Douglas</u>, and for

the same reasons the summary judgment must be denied under the ADA (Count One) and

Title VII (Counts Four and Five), summary judgment must also be denied as to the CFEPA

claims (Counts Two, Three, Six and Seven)

 First, claimant must demonstrate a prima facie case.   <u>Quaratino v. Tiffany & Co.</u>,

71 F.3d 58, 64 (2d Cir. 1995).   To allege a prima facie case of discrimination, as originally

required in <u>McDonnell Douglas</u>, plaintiff must show that he: "1) that he belonged to a

protected class; 2) that he was qualified for the position he held; 3) that he suffered an

adverse employment action; and 4) that the adverse employment action occurred under

circumstances giving rise to an inference of discriminatory intent."[1] <u>Feingold v. New</u>

<u>York</u>, 366 F.3d 138, 152 (2d Cir. 2004) (internal citations omitted).   The plaintiff's burden

in establishing this prima facie case in *de minimis* and direct evidence is not required.

---

[1] Specifically with regards to the ADA, the plaintiff must show: "(1) [the] employer is subject to the ADA; (2) [the plaintiff] was disabled within the meaning of the ADA; (3) [the plaintiff] was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) [the plaintiff] suffered adverse employment action because of his disability." <u>Giordano v. City of New York</u>, 274 F.3d 740, 747 (2d Cir. 2001).

10

JA 221

Taylor v. Local 32E Serv. Employees Int'l, Union, 286 F. Supp. 2d 246, 252 (S.D.N.Y.

2003) aff'd sub nom. Taylor v. Local 32E Serv. Employees Int'l Union, 118 F. App'x 526

(2d Cir. 2004); McGuiness v. Lincoln Hall, 263 F.3d 49, 52 (2d Cir.2001); Quaratino, 71

F.3d at 64; see also Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct.

1089, 1094 (1981) ("The burden of establishing a prima facie case of disparate treatment is

not onerous.")  All of the facts must be considered in the light most favorable to the

plaintiff and "a plaintiff may prevail if [he]submits enough believable evidence for a jury

to find that an adverse employment decision resulted because of discrimination."

Quaratino, 71 F.3d at 64.  Establishment of the prima facie case in effect creates a

presumption that the employer unlawfully discriminated against the employee.  Burdine,

450 U.S. at 254; Gallo v. Second Taxing District of City Of Norwalk Operating Under The

Name Of South Norwalk Electric And Water, 507 F.Supp.2d 164, 172 (D.Conn.2007)..

     Once the plaintiff has satisfied his prima facie case for discrimination, the burden

shifts to the defendant to articulate a "legitimate, non-discriminatory reason" for the

adverse employment action at issue. Burdine, 450 U.S. at 254.  The purpose of this step is

"to force the defendant to give an explanation for its conduct, in order to prevent

employers from simply remaining silent while the plaintiff founders on the difficulty of

proving discriminatory intent." Stratton v. Dept. for the Aging for the City of New York,

132 F.3d 869, 879 (2d Cir.1997).  "The employer's legitimate, non-discriminatory reason

11

JA 222

must be both 'clear and specific.'" <u>Gallo</u>, 507 F.Supp.2d at 172  (quoting in part <u>Meiri v. Dacon</u>, 759 F.2d 989, 997 (2d Cir.1985)).

If the employer satisfies this burden of production, the burden shifts back to the claimant to show that the employer's reason "was merely a pretext for discrimination." <u>Gallo v. Prudential Residential Services, Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994). The plaintiff "may attempt to establish that he was a victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." <u>Reeves v. Sansderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."  <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 533, 113 S. Ct. 2742, 2761 (1993).  "[T]he plaintiff is not required to show that the employer's proffered reasons . . . played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors.'" <u>Back v. Hastings On Hudson Union Free School Dist.</u>, 365 F.3d 107, 123 (2d Cir. 2004).[2]

---

[2] A "mixed motives" analysis is also available in ADA claims.  <u>Parker v. Columbia Pictures Industries</u>, 204 F.3d 326, 337 (2d Cir. 2000) (applying the mixed-motive causation standard articulated in the Civil Rights Act of 1991 to claims of discrimination under the ADA).  The Second Circuit has not foreclosed the mixed motives framework under the ADA after the Supreme Court's decision in <u>Gross v. FBL Financial Services, Inc.</u>, 129 S.Ct. 2343 (2009).  <u>See</u> <u>Perry v. NYSARC, Inc.</u>, 424 F. App'x 23, 25-26 (2d Cir. 2011); <u>Bolmer v. Oliveira</u>, 594 F.3d 134, 148-49 (2d Cir. 2010).

The "ultimate issue" in an employment discrimination case is "whether the plaintiff has demonstrated that the adverse employment action was motivated at least in part by an 'impermissible reason, i.e. a discriminatory reason.'" Stratton, 132 F.3d at 879. The plaintiff can satisfy this burden by demonstrating that his disability and/or gender was a motivating or substantial factor in the adverse employment actions he faced. Butts v. NY City Dept of House Pres. & Dev., 307 Fed. Appx 596, 599 (2009). Accordingly, the plaintiff defeats summary judgment when his prima facie case, coupled with evidence that the employer's justification is false or erroneous, supports the inference that the adverse employment action was discriminatory. Reeves, 530 U.S. at 148.

"Unless the defendants' proffered nondiscriminatory reason is 'dispositive and forecloses any issue of material fact', summary judgment is inappropriate." Shain v. Ctr. for Jewish History, Inc., 418 F. Supp. 2d 360, 366 (S.D.N.Y. 2005) (quoting Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000)). Therefore, on a motion for summary judgment, "plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for [the adverse employment action] is false *and* as to whether it is more likely [than not] that a discriminatory reason motivated the employer to make the adverse employment decision." Gallo, 22 F.3d at 1225. The Court further warned to be "cautious about granting summary judgment to an employer when, as here, its intent is at issue." Id. "[T]he McDonnell Douglas analysis is neither "rigid" nor "mechanized" and that the primary focus is always

13

whether an employer treats an employee less favorably than other employees for an impermissible reason." <u>Montana v. First Fed. Sav. & Loan Ass'n of Rochester</u>, 869 F.2d 100, 104 (2d Cir. 1989).

**B.  Plaintiff Can Establish Prima Facie Cases of Disability Discrimination, Sexual Harassment/Hostile-Work Environment, Gender Discrimination and Retaliation.**

**1.  Disability Discrimination under the ADA & CFEPA**

In order to present a prima facie case under the ADA, the plaintiff must show: "(1) [the] employer is subject to the ADA; (2) [the plaintiff] was disabled within the meaning of the ADA; (3) [the plaintiff] was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) [the plaintiff] suffered adverse employment action because of his disability." <u>Giordano v. City of New York</u>, 274 F.3d 740, 747 (2d Cir. 2001).  Of these factors, the defendant contends that the plaintiff cannot establish the first factor (that plaintiff was disabled) or the fourth factor (that the plaintiff suffered an adverse employment action, which did result because of his disability).  Before addressing each factor, it is important to note that Congress intended a "broad scope of protection . . . afforded by the ADA" rather than a narrow definition that excludes people with limiting impairments from protection.  42 U.S.C. § 12101(a)(4).  Thus, as discussed above in Part III.A.2, only minimal evidence is necessary to establish a prima facie case.

Plaintiff is disabled.  Adams Dep. 111:10-12, 112:9-10, Ex. 1; Adams Affidavit ¶ 2, Ex. 2; Exhibit 4.  Under the ADA, "disability" means: "(A) a physical or mental

14

impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or (C) being regarded as having such an impairment."

42 U.S.C. § 12102. The plaintiff has been diagnosed with a mental impairment, and has

presented the minimal evidence necessary to surpass summary judgment. Bates Stamp

P000162 of Exhibit 4 diagnoses the plaintiff with "mild Mental Retardation and/or

Borderline abilities." The defendant contends that the plaintiff cannot rely on his own

conclusory testimony to demonstrate his disability, and the plaintiff does not. Exhibit 4 is

medical evidence from Newington Children's Hospital that substantiates plaintiff's

allegations made in his deposition testimony. Although defendant contends that these

documents are inadmissible because they are unsworn, the defendant itself waived this and

any other objections because the defendant itself submitted these documents as part of

Exhibit B to its Local Rule 56(a)(1) statement and relied upon them in its motion for

summary judgment. Where an employer offers itself such medical letters in support of its

own motion, the employer waives any objection to its admissibility. Capobianco v. City of

New York, 422 F.3d 47, 55 (2d Cir. 2005) (citing 10A Charles Alan Wright et al., *Federal*

*Practice & Procedure* § 2722, at 384-85 (3d ed. 1998)). As such, these documents are

now properly before the court, and can be used by the plaintiff to demonstrate his

disability.[3]

---

[3] The defendant cannot claim that the documents were submitted simply to object to their
admissibility, because an objection to admissibility can be made without submitting them

Not only has the plaintiff provided medical documentation that he is disabled, but he also testified how it has substantially limited a major life activity.  "Major life activities" include learning and working, as well as disabilities that affect the operation of the brain.  42 U.S.C. § 12102(2).  Plaintiff has testified that he is a slow learner and has difficulty learning and remembering many things at once and how to perform new tasks.  Adams Dep. 105:12-14, Ex. 1; Adams Affidavit ¶ 3, Ex. 2.  As this impairment affects the brain, plaintiff has a per se disability under the 2008 ADA Amendments because it affects a major bodily function, as well as one that affects a major life activity.

Even if the Court determines that the plaintiff cannot establish that he had an actual mental impairment, the plaintiff can establish that he was "regarded as" having a disability by the defendant and its agents.  A plaintiff is regarded as having an impairment if the employer perceives and treats the plaintiff as if he has an impairment, regardless of his disability status.  Francis v. City of Meriden, 129 F.3d 281, 284-85 (2d Cir. 1997).  Here, plaintiff testified that he told the employer of an impairment, even if it is not one protected by the ADA.  Adams Dep. 21:16-22:5, 24:16-25:4, Ex. 1; Adams Affidavit ¶ 8, Ex. 2.  Furthermore, defendant's agents would often call him stupid, intimidate him when he called for help over the radio to ask for help with a job, and ask him "what the heck is wrong with you?" as if the plaintiff was impaired and not smart enough to do the job.

---

as an exhibit, and as such the defendant did more than object, and thereby relied on them by submitted them with its Local 56(a)(1) statement.

16

Adams Dep. 39:15-23, 87:21-88:1, 97:5-8, 168:20-169:3, Ex. 1; Adams Affidavit, ¶ 15,

Ex. 2; Ex. 6.  As such, plaintiff was regarded as having a mental impairment that

substantially limited the major life activities of learning and working.

Although plaintiff contends that he meets the first prong of an ADA prima facie

case, that he has a disability under the ADA, whether or not he has a disability must also

be considered under CFEPA, because the definition of disability is broader under the state

statute. Dzubaty v. Milford Bd. of Educ., CV065000824S, 2007 WL 2570413 (Conn.

Super. Ct. Aug. 20, 2007) (citing Beason v. United Technologies Corp., 337 F.3d 271, 275

(2d Cir.2003)).  CFEPA does not include the restrictive language does not include

"substantially limits one or more major life activities."  Therefore, all that is necessary

under CFEPA to be disabled is to have a mental disability, which the plaintiff has

demonstrated through his deposition testimony and medical documents.  Adams Dep.

111:10-12, 112:9-10, Ex. 1; Adams Affidavit ¶ 2, Ex. 2; Exhibit 4.  Specifically, Bates

Stamp P000162 of Exhibit 4 diagnoses the plaintiff with "mild Mental Retardation and/or

Borderline abilities."  As such, this evidence supports plaintiff's allegations that he is

disabled within the meaning of CFEPA.

Now that plaintiff has demonstrated that he is in fact disabled under the ADA and

CFEPA, he can also demonstrate that he suffered adverse employment actions because of

his disability.  Plaintiff can demonstrate that he was constructively discharged and that his

disability was a causal factor in such termination.  "The causal relationship between

disability and decision need not be direct, in that causation may be established if the

disability caused conduct that, in turn, motivated the employer to discharge the employee."

Sedor v. Frank, 42 F.3d 741, 746 (2d Cir. 1994).  Furthermore, the disability only needs to

be a "motivating role" not the only reason.  Parker v. Columbia Pictures Industries, 204

F.3d 326, 337 (2d Cir. 2000).

  The plaintiff was terminated, or at the very least, constructively discharged.  The

plaintiff testified that he felt "forced out" and forced to resign, because, although nobody

told him he was terminated, he did not resign, and the defendant gave him a last date of

employment, despite his denials of resignation, and his supervisors refused to correct or

end the harassment that had reached an intolerable level.  Adams Dep. 81:4-10, Ex. 88:15-

89:6, 90:23-91:7, 91:17-92:3, 92:10-12, Ex. 1; Adams Affidavit ¶¶ 21-24, Ex. 2; Exhibit 5.

The defendant makes a big deal that the plaintiff changed his testimony after conferring

with counsel, but the defendant cannot demonstrate that the plaintiff changed his mind

simply because of something counsel said.  This was not the first time that the plaintiff had

voiced his opinion that he was constructively terminated.  On November 8, 2009, the

plaintiff wrote a letter to the defendant's corporate offices explaining his version of what

happened, and the plaintiff states that "I felt that I was push[ed] out the door."  Exhibit 5.

Therefore, defendant's belittling of plaintiff's feeling that he was constructively discharged

is unfounded.

A constructive discharge occurs "when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily.  Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  <u>Chertkova v. Connecticut General Life Ins. Co.</u>, 92 F.3d 81, 89 (2d Cir. 1996) (internal citations omitted).  Here, the work atmosphere had reached an intolerable level.  Plaintiff testified that the harassment was daily and that it caused him embarrassment, nightmares, and emotional distress.  Adams Dep. 129:2-7, 163:16-25, Ex. 1; Adams Affidavit ¶ 27-28, Ex. 2.  Furthermore, the harassment was intentional because even after the plaintiff informed his supervisors of the treatment, they did nothing to correct the situation, and rather told the plaintiff that he would be subject to harassment in the shop and did not want to hear him complain about it, and that he should toughen up and "be a man."  Adams Dep. 61:4-14, 90:23-91:7, Ex. 1; Adams Affidavit ¶ 26, Ex. 2.  The plaintiff informed the general manager that he wanted to change departments because he was having difficulty in the shop and could not deal with the harassment and being picked on anymore.  Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 85:4-13, 86:15-19, 87:16-88:10, 92:11-12, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶¶ 17, 21, Ex. 2; Answers to Interrogatories, #10-12, Ex. 3; Exhibit 6.  Although plaintiff did say he might begin looking for other work, he never gave a verbal or written resignation.  <u>Id.</u>  Rather, after the plaintiff returned from vacation, he was told that Jerry Brick informed corporate

19

that he was leaving and that October 31, 2009 was chosen for the plaintiff to be his last day.  Adams Dep. 81:4-10, 88:15-89:6, Ex. 1; Adams Affidavit ¶ 23, Ex. 2; Exhibit 5.  The plaintiff felt forced out of the company.  Adams Dep. 90:23-91:7, 91:17-92:3, 92:10-12, Ex. 1; Adams Affidavit ¶ 24, Ex. 2; Exhibit 5.

Therefore, plaintiff has evidenced discriminatory conduct that was so difficult and unpleasant that a reasonable person would have also felt compelled to resign.  The plaintiff was subject to comments about his disability, such as that he was stupid and didn't know what he was doing and was unable to perform his job, in addition to other discriminatory comments based on gender.  The plaintiff has presented evidence that he was emotionally distressed and embarrassed by daily harassment, and even had nightmares about it.  Not only did this occur, but the defendant failed and/or refused to stop the conduct after plaintiff complained of it.  A reasonable person could conclude that they were being constructively discharged.

Even if the court concludes that the disability did not have a direct part in the constructive discharge directly, the disability did have an indirect role in the constructive discharge, which is all that is necessary.  Parker v. Columbia Pictures Industries, 204 F.3d 326, 337 (2d Cir. 2000); Sedor v. Frank, 42 F.3d 741, 746 (2d Cir. 1994).  The harassment plaintiff suffered was based on plaintiff's disability, and this harassment was the reason he complained to his managers and asked to be transferred to the paint department.  This caused the plaintiff to say he would have to start looking for jobs, which the defendant now

20

claims was a resignation, although it clearly was not, and the defendant took it upon itself

to tell corporate that plaintiff was leaving without plaintiff ever giving a resignation.  Had

plaintiff not been harassed based on his disability, this sequence of events would not have

occurred, which caused the defendant to give the plaintiff a final date of employment after

telling corporate he had resigned, when in fact he had not.

Furthermore, the defendant's refusal or denial to transfer the plaintiff also

constitutes an adverse employment action.  "Because there are no bright-line rules as to

which employment actions meet the threshold for "adverse," courts must make this

determination on a case-by-case basis."  Wilburn v. Fleet Financial Group, Inc., 170

F.Supp.2d 219, 237 (D.Conn. 2001).  As such, courts have determined that a "denial of a

transfer request may constitute an adverse employment action where an employee's work

environment prior to the request is objectively unfavorable."  Pimentel v. City of New

York, 2002 WL 977535, *3 (S.D.N.Y. 2002) (citing Mecklenberg v. New York City Off–

Track Betting, 42 F.Supp.2d 359, 378 (S.D.N.Y.1999) (holding that denial of a request to

transfer, from a department where working conditions were objectively unfavorable due to

the measurable shortage in staff, to a department where conditions were more favorable

constituted an adverse employment action)).  Additionally, it is a discriminatory action for

an employer to refuse to accommodate when an employee requests a reasonable

accommodation on account of his disability.  McBride v. BIC Consumer Products Mfg.

Co., Inc., 583 F.3d 92, 100 (2d Cir. 2009).

21

As described in the preceding paragraphs, plaintiff's work environment was so intolerable that he felt constructively discharged, because the daily harassment based on his disability caused him embarrassment, emotional distress and nightmares.  As a result of the harassment, the plaintiff requested to be moved to the paint department.  Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 85:4-13, 86:15-19, 87:16-88:10, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶¶ 17, 21, Ex. 2; Answers to Interrogatories, #10-12, Ex. 3; Exhibit 6.  The defendant first said no assuming the plaintiff did not have experience, and after finding out that the plaintiff had experience, told the plaintiff that there weren't any positions open.  Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 85:4-13, 86:15-19, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶ 18, Ex. 2.  The plaintiff, however, had reason to believe that there were positions open because there was a lot of work to be done for the year in the paint shop, and he subsequently learned that people from the main shop worked in the paint shop after he was terminated.  Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 85:4-13, 86:15-19, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶ 20, Ex. 2.  As such, because the plaintiff's working conditions were so intolerable that he subsequently requested a transfer which was denied, the plaintiff suffered an adverse employment action.  Furthermore, the plaintiff suffered an adverse employment action because his request to be transferred was also a request for an accommodation based on his disability since he was subject to the harassment based on his disability, and therefore, this was a way to continue working without being subjected to such harassment.

22

JA 233

## 2. Sexual Harassment/Hostile Work Environment under Title VII & CFEPA

In order to survive summary judgment on a claim for a hostile work environment, plaintiff must demonstrate a prima facie case showing: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003) (citing Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir.1999)).

First, the defendant contends that the conduct was "sufficiently severe." "Among the factors we consider are the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance. Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004) (internal citations omitted); see also Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S. Ct. 2275, 2283 (1998).

> While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that "[w]hile a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse.*"

Id. (citing Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir.2003) (emphasis in original)). For example, in Feingold, the plaintiff, a Jewish gay male, demonstrated evidence of "hostile"

23

JA 234

and "belligerent" comments made to him at work, such as a co-worker snapping at him saying that "I ain't nobody's teacher," which his non-gay co-workers were not subject to. Id. at 151. The court concluded that a reasonable factfinder could determine that Feingold was subject to a hostile work environment because "Feingold declare[d] in his affidavit that the hostile treatment took a psychological toll on him, causing him to become depressed, to dread going to work, to seek a transfer, and to lose his desire to socialize with people in general." Id.

Likewise, the plaintiff can show that the conduct he was subjected to was sufficiently severe. Plaintiff presented evidence that the harassment was not infrequent, but rather occurred daily. Adams Affidavit ¶¶ 27-28, Ex. 2; Exhibit 6. The plaintiff was also subject to similarly hostile comments relating to his gender and disability, as Feingold was. Supra, pp.4-5. As discussed above, the plaintiff was subjected to comments that he was stupid, "what the heck is wrong with you" and similar comments that made him feel like he could not do his job. Furthermore, the plaintiff presented testimony and an affidavit stating that he was subjected to comments relating to his failure to conform to gender stereotypes of being manly, such as (1) being on his knees is his best position, and that he was stared down while being on his knees, Adams Dep. 40:20-25, 42:2-6, 61:4-14, 97:2-11, Ex. 1; Adams Affidavit, ¶ 10, Ex. 2; Answers to Interrogatories, #5, 9-12, Ex. 3; Exhibit 6; (2) the word "sucks" being written next to his name on his blow torch by co-workers, Adams Dep. 103:21-104:18, 167:21-25, Ex. 1; Adams Affidavit, ¶ 12, Ex. 2;

24

Answers to Interrogatories, #5, 9-12, Ex. 3; Exhibit 6, and (3) that a co-worker stated that he "had" the plaintiff's mother the previous night, Adams Affidavit, ¶ 11, Ex. 2; Answers to Interrogatories, #5, 9-12, Ex. 3. The plaintiff also suffered additional harassment when a co-worker threw nuts and bolts at him and threw an apple on his truck. Adams Dep. 38:4-39:1, 39:6-40:9, 61:4-25, 169:11-170:19 Ex. 1; Adams Affidavit, ¶¶ 13-14, Ex. 2; Answers to Interrogatories, #9-5, 13, Ex. 3; Ex. 6. The plaintiff has testified that he experienced this conduct, while other males at the shop did not experience such comments to this severity because he believes that he was perceived or treated as not manly enough or gay because he was not married and did not date women. Adams Affidavit ¶ 29, Ex. 2; see also Adams Dep. 93:5-94:5, 95:12-15, Ex. 1.

While psychological harm is **not required** to establish a hostile work environment claim "[s]o long as the environment would reasonably be perceived, and is perceived, as hostile or abusive," Harris v. Forklift Sys., Inc., 510 U.S. 17, 22, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993), the plaintiff has still presented testimony and an affidavit, like Feingold, that the conduct took a psychological toll on him, causing him embarrassment and humiliation, as well as emotional distress and nightmares. Adams Dep. 129:2-7, 163:16-25, Ex. 1; Adams Affidavit ¶¶ 27, 28, Ex. 2. Furthermore, these comments and conduct altered the plaintiff's employment for the worse in so far that he asked to be transferred departments and when he couldn't led him to start thinking about looking for other jobs because he could no longer tolerate being picked on. Adams Dep. 92:11-12.

25

JA 236

When considering the factors listed above, coupled with the psychological harm presented, the plaintiff has shown that the harassment was frequent, severe, humiliating, more than a mere utterance and had interfered with and altered the plaintiff's working environment and performance, and therefore, the evidence demonstrates that the harassment was "sufficiently severe" and that a reasonable person would also find this work environment to be hostile.

Furthermore, the plaintiff can also demonstrate the second prong of the prima facie case, that the conduct should be imputed to the employer. The plaintiff told John Fitch, about the knees comment and Fitch said that he informed the plaintiff that while working in the shop the plaintiff would get harassed and picked on and that Fitch didn't want the plaintiff complaining to him and rather "be a man" and be tough. Adams Dep. 40:20-25, 42:2-6, 61:4-14, 97:2-11, Ex. 1; Adams Affidavit, ¶ 10, Ex. 2; Answers to Interrogatories, #5, 9-12, Ex. 3; Exhibit 6. After speaking with John Fitch about many of these events, the plaintiff spoke with supervisor Mario Abela in July and August of 2009 about the harassment and discrimination by Walters and was told to give the guy a chance, that he wasn't so bad. Adams Dep. 62:12-18. 63:14-64:18, 168:20-169:7, Ex. 1; Adams Affidavit, ¶ 16, Ex. 2; Answers to Interrogatories, #10, 12, 14, Ex. 3; Exhibit 6. Plaintiff's supervisors never ended the sexual harassment or discrimination that was created by plaintiff's co-workers. Adams Dep. 90:23-91:7, Ex. 1; Adams Affidavit ¶ 26, Ex. 2.

As such, like in <u>Feingold</u>, plaintiff has presented sufficient evidence of a prima facie case of a hostile work environment based on comments and harassment received daily based on his gender, as well as his disability. This conduct that the plaintiff was subject to was severe and altered the plaintiff's work environment, caused him to ask for a transfer and caused him psychological distress. As such, a reasonable fact finder could find this to be a hostile work environment under both Title VII and CFEPA, and summary judgment should be denied.

### 3. Gender Discrimination under Title VII & CFEPA

To establish a prima facie case of gender discrimination, the plaintiff must prove that he "he (1) is a member of a protected class; (2) was performing his duties satisfactorily; (3) was discharged; and that (4) his discharge occurred under circumstances giving rise to an inference of discrimination on the basis of membership in the protected class." <u>Padilla v. Harris</u>, 285 F. Supp. 2d 263, 269 (D. Conn. 2003) (internal citation omitted). A gender discrimination claim is cognizable under Title VII for discrimination based on failing to conform to gender stereotypes. <u>See</u> <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 250-58 (1989) (finding gender discrimination where plaintiff suffered adverse employment action because she did not act femininely enough); <u>Dawson v. Bumble & Bumble</u>, 398 F.3d 211, 217-18 (2d Cir. 2005). The claim is cognizable when the plaintiff alleges that the employer discriminated against him for failing to conform to gender stereotypes either through behavior or through appearance. <u>Dawson</u>, 398 F.3d at 221.

27

JA 238

In <u>Dawson</u>, the Second Circuit determined that Dawson had not alleged a proper gender discrimination claim because she did not allege that her adverse employment occurred because she did not act feminine enough—"[t]hat is, unlike the plaintiff in <u>Price Waterhouse</u>, she was not told by anyone at Bumble & Bumble that her continued employment depended upon her acting and speaking in a more 'feminine' manner.'" <u>Id.</u> The case at bar, however, is more like <u>Price Waterhouse v. Hopkins</u>, where the plaintiff made an adequate showing of gender discrimination where plaintiff suffered adverse employment action because she did not act femininely enough. 490 U.S. at 250-58. Likewise, plaintiff has presented evidence that he was not seen to be masculine enough. For example, when the plaintiff complained to John Fitch of Walter's comments, Fitch told the plaintiff that he had informed the plaintiff that he would be harassed in this position and therefore the plaintiff needed to "be a man" and "be tough." Adams Dep, 99:9-21, Ex. 1. Additionally, the plaintiff received comments comparing him to feminine sexual stereotypes, such as being on his knees and that he "sucks." Furthermore, the plaintiff believes that he was harassed because he was not married and did not date women, and thus was perceived as not manly enough. Adams Dep. 93:5-94:5, 95:12-15, Ex. 1.

The defendant also contends that the gender discrimination claim must fail because the plaintiff did not suffer an adverse employment action, but for similar reasons as his ADA claim, the plaintiff did suffer an adverse employment action.

28

The plaintiff was terminated, or at the very least, constructively discharged. The plaintiff testified that he felt "forced out" and forced to resign, because, although nobody told him he was terminated, he did not resign, and the defendant gave him a last date of employment, despite his denials of resignation, and his supervisors refused to correct or end the harassment that had reached an intolerable level. Adams Dep. 81:4-10, Ex. 88:15-89:6, 90:23-91:7, 91:17-92:3, 92:10-12, Ex. 1; Adams Affidavit ¶¶ 21-24, Ex. 2; Exhibit 5.

Here, the work atmosphere had reached an intolerable level. Plaintiff testified that the harassment was daily and that it caused him embarrassment, nightmares, and emotional distress. Adams Dep. 129:2-7, 163:16-25, Ex. 1; Adams Affidavit ¶ 27-28, Ex. 2. Furthermore, the harassment was intentional because even after the plaintiff informed his supervisors of the treatment, they did nothing to correct the situation, and rather told the plaintiff that he would be subject to harassment in the shop and did not want to hear him complain about it, and that he should toughen up and "be a man." Adams Dep. 61:4-14, 90:23-91:7, Ex. 1; Adams Affidavit ¶ 26, Ex. 2. The plaintiff informed the general manager that he wanted to change departments because he was having difficulty in the shop and could not deal with the harassment and being picked on anymore. Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 85:4-13, 86:15-19, 87:16-88:10, 92:11-12, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶¶ 17, 21, Ex. 2; Answers to Interrogatories, #10-12, Ex. 3; Exhibit 6. Although plaintiff did say he might begin looking for other work, he never gave a verbal or written resignation. Id. Rather, after the plaintiff returned from

29

JA 240

vacation, he was told that Jerry Brick informed corporate that he was leaving and that

October 31, 2009 was chosen for the plaintiff to be his last day.  Adams Dep. 81:4-10,

88:15-89:6, Ex. 1; Adams Affidavit ¶ 23, Ex. 2; Exhibit 5.  The plaintiff felt forced out of

the company.  Adams Dep. 90:23-91:7, 91:17-92:3, 92:10-12, Ex. 1; Adams Affidavit ¶

24, Ex. 2; Exhibit 5.

Therefore, plaintiff has evidenced discriminatory conduct that was so difficult and

unpleasant, causing him embarrassment, nightmares and emotional distress, that a

reasonable person would have also felt compelled to resign.  The plaintiff was subject to

comments about his gender and not conforming to gender stereotypes, such as that he

should be on his knees because that is his best position, that he sucks, and that he should

"be tough" and "be a man."  The plaintiff has presented evidence that he was emotionally

distressed and embarrassed by daily harassment, and even had nightmares about it.  Not

only did this occur, but the defendant failed and/or refused to stop the conduct after

plaintiff complained of it.  A reasonable person could conclude that they were being

constructively discharged.

The harassment plaintiff suffered was based on plaintiff's failure to conform to

gender stereotypes, and this harassment was the reason he complained to his managers and

asked to be transferred to the paint department.  This caused the plaintiff to say he would

have to start looking for jobs, which the defendant now claims was a resignation, although

it clearly was not, and the defendant took it upon itself to tell corporate that plaintiff was

leaving without plaintiff ever giving a resignation.  Had plaintiff not been harassed based on failing to conform to gender stereotypes, or had the employer stopped the harassment, this sequence of events would not have occurred, which caused the defendant to give the plaintiff a final date of employment after telling corporate he had resigned, when in fact he had not.

Furthermore, the defendant's refusal or denial to transfer the plaintiff also constitutes an adverse employment action.  "Because there are no bright-line rules as to which employment actions meet the threshold for "adverse," courts must make this determination on a case-by-case basis."  Wilburn v. Fleet Financial Group, Inc., 170 F.Supp.2d 219, 237 (D.Conn. 2001).  As such, courts have determined that a "denial of a transfer request may constitute an adverse employment action where an employee's work environment prior to the request is objectively unfavorable."  Pimentel v. City of New York, 2002 WL 977535, *3 (S.D.N.Y. 2002) (citing Mecklenberg v. New York City Off–Track Betting, 42 F.Supp.2d 359, 378 (S.D.N.Y.1999) (holding that denial of a request to transfer, from a department where working conditions were objectively unfavorable due to the measurable shortage in staff, to a department where conditions were more favorable constituted an adverse employment action)).

As described in the preceding paragraphs, plaintiff's work environment was so intolerable that he felt constructively discharged, because the daily harassment based on his failure to conform to gender stereotypes caused him embarrassment, emotional distress

31

and nightmares. Had plaintiff not been harassed based on failing to conform to gender stereotypes, or had the employer stopped the harassment, the plaintiff would not have had to request a transfer. When requesting the transfer, the defendant first said no assuming the plaintiff did not have experience, and after finding out that the plaintiff had experience, told the plaintiff that there weren't any positions open. Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 85:4-13, 86:15-19, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶ 18, Ex. 2. The plaintiff, however, had reason to believe that there were positions open because there was a lot of work to be done for the year in the paint shop, and he subsequently learned that people from the main shop worked in the paint shop after he was terminated. Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 85:4-13, 86:15-19, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶ 20, Ex. 2. As such, because the plaintiff's working conditions were so intolerable and he subsequently requested a transfer which was denied, the plaintiff suffered an adverse employment action.

Therefore, the plaintiff can establish a prima facie case of gender discrimination under both Title VII and CFEPA.

### 4. Retaliation Under Title VII & CFEPA

Despite the defendant's characterization that the retaliation allegation is based on plaintiff's disability, the plaintiff's retaliation claim is based on the plaintiff's termination following the complaints of sexual harassment, as well as because the plaintiff protested

32

JA 243

the discriminatory conduct and treatment he suffered because of his disability. (Complaint, ¶79, Ex. 7).

The McDonnell Douglas burden-shifting framework for Title VII discrimination claims also applies to plaintiff's retaliation claims for complaints of violations of Title VII and the ADA. Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003) (internal citation omitted); Weixel v. Bd. Of Educ. Of the City of N.Y., 287 F.3d 138, 148-49 (2d Cir. 2002); Byra-Grzegorczyk v. Bristol-Myers Squibb Co., 572 F. Supp. 2d 233, 248 (D. Conn. 2008). "To establish a *prima facie* case of retaliation, an employee must show '[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" Terry v. Ashcroft, 336 F.3d at 141 (internal citation omitted). "'Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by' the adverse employment action or by evidence of disparate treatment of fellow similarly situated employees, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant.'" Blanco v. Brogan, 620 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2009) (citing Davis v. State Univ. of New York, 802 F.2d 638, 642 (2d Cir.1986); DeCintio v. Westchester County Med. Center, 821 F.2d 111, 115 (2d Cir.1987)).

The plaintiff made complaints to John Fitch about the "knees" comment made by Justin Walters, the blow-torch incident, and about Justin Walters throwing an apple on

plaintiff's truck. <u>Supra</u>, pp. 4-5. Furthermore, after speaking with John Fitch, the plaintiff

spoke with supervisor Mario Abela in July and August of 2009 about the harassment by

Walters. <u>Supra</u>, pp. 4-5. Finally, the plaintiff complained to Jerry Brick of his troubles in

the shop. <u>Supra</u>, pp. 4-5. Plaintiff's supervisors never ended the sexual harassment or

discrimination that was created by plaintiff's co-workers. Adams Dep. 90:23-91:7, Ex. 1;

Adams Affidavit ¶ 26, Ex. 2.Thus, the plaintiff participated in a protected activity. <u>Kessler</u>

<u>v. Westchester County Dept. of Soc. Services</u>, 461 F.3d 199, 210 (2d Cir. 2006) ("As to

the 'protected activity' element of a Title VII [] retaliation claim, the plaintiff need only

'have had a good faith, reasonable belief that he was opposing an employment practice

made unlawful by Title VII.'") (internal citation omitted); <u>Reed v. A.W. Lawrence & Co.,</u>

<u>Inc.</u>, 95 F.3d 1170, 1178 (2d Cir. 1996) ("[A]n employee 'need not establish that the

conduct [s]he opposed was in fact a violation of Title VII,' but rather, only that she had a

'good faith, reasonable belief' that the underlying employment practice was unlawful.").

 As discussed above in Parts III.B.1 and III.B.3, the plaintiff suffered an adverse

employment action by not being transferred to another department because he had reason

to believe there were open positions and because the harassment based on his disability

and failure to conform to gender stereotypes was the reason he had to request a transfer, in

addition to being constructively discharged because his complaints about the main shop led

him to discuss the situation with his supervisors, which Jerry Brick took as a resignation,

34

although the plaintiff never actually resigned and was given a last day of employment by his supervisors.

The plaintiff can establish a causal connection. Where there is "no meaningful lag time" and the adverse employment action occurs relatively close in time to the protected conduct, a causal connection can be established. Terry v. Ashcroft, 336 F.3d 128, 145 (2d Cir. 2003) (finding a causal connection where the time lapsed between the protected activity and the adverse employment action to be "slightly less than three months"). The plaintiff complained to John Fitch in February, June, July and September 2009, to Mario Abela in the summer of 2009, and Jerry Brick in September 2009. Supra, pp. 4-5. The complaints occurred in the month and several months preceding the termination in October 2009. As such, there is a causal connection between the plaintiff's protected activity and the adverse employment action, and plaintiff's retaliation claims under Title VII and CFEPA must surpass summary judgment.

## C. Defendant's proffered reason for the adverse employment actions were pretext.

As discussed previously, "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 533, 113 S. Ct. 2742, 2761 (1993). "[T]he plaintiff is not required to show that the employer's proffered reasons . . . played no role in the employment decision, but only that they were not the only reasons

35

and that the prohibited factor was at least one of the 'motivating' factors.'" Back v. Hastings On Hudson Union Free School Dist., 365 F.3d 107, 123 (2d Cir. 2004). Accordingly, the plaintiff defeats summary judgment when his prima facie case, coupled with evidence that the employer's justification is false or erroneous, supports the inference that the adverse employment action was discriminatory. Reeves v. Sansderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000).

Here, the defendant proffers that the plaintiff was not terminated, because the plaintiff resigned, and that the failure to transfer is not an adverse employment action because the position did not exist. The plaintiff will take each in turn.

First, claiming that the plaintiff resigned is a pretext for discrimination. As discussed previously, the plaintiff was terminated, or at the very least, constructively discharged. The plaintiff testified that he felt "forced out" and forced to resign, because, although nobody told him he was terminated, he did not resign, and the defendant gave him a last date of employment, despite his denials of resignation, and his supervisors refused to correct or end the harassment that had reached an intolerable level. Adams Dep. 81:4-10, Ex. 88:15-89:6, 90:23-91:7, 91:17-92:3, 92:10-12, Ex. 1; Adams Affidavit ¶¶ 21-24, Ex. 2; Exhibit 5. This is not the first time he has alleged this, but rather the plaintiff wrote a letter to corporate headquarters after his termination stating that he felt that he "was push[ed] out the door." Exhibit 5. This is further supported by plaintiff testimony when the plaintiff returned from vacation, the defendant told the plaintiff that they told

36

JA 247

corporate that he was resigning, which the plaintiff adamantly denied.  Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 85:4-13, 86:15-19, 87:16-88:10, 88:15-89:6, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶¶ 21, 23, Ex. 2.; Answers to Interrogatories, #10-12, Ex. 3; Exhibit 5; Exhibit 6.  The plaintiff told Brick that he had previously simply told Brick that he was having trouble in the shop and may have to leave if he could not be transferred, but that he had never gave a verbal or written resignation.  Id.  It was then that October 31, 2009 was **chosen for him by his managers** as his final date of employment. Adams Dep. 81:4-10, 88:15-89:6, Ex. 1; Adams Affidavit ¶ 23, Ex. 2; Exhibit 5. Furthermore, the only reason that the plaintiff complained and said he was considering finding a new job was because he was being harassed, and had the defendant stopped the harassment, the plaintiff would not have had to have this conversation.  Adams Dep. 81:4-10, 88:15-89:6, 92:11-12, Ex. 1; Adams Affidavit ¶ 23, Ex. 2; Exhibit 5.  The plaintiff denies resigning, because his last date of employment was given to him, rather than chosen by him, despite his denials that he had resigned, and the plaintiff believes he was constructively discharged because the defendant never stopped the harassment that caused an intolerable work environment after multiple complaints by the plaintiff.  The plaintiff was, in numerous ways, forced out.  As such, the defendant's proffered reason for termination is pretext.

   Additionally, the reason that there were no open positions in the paint shop is a false and is a pretext for discrimination.  This is evidenced by the fact that after the

plaintiff requested the transfer, the reasons given that the transfer could not happen were inconsistent. Jerry Brick first told the plaintiff that he could not be moved to the paint shop because the plaintiff did not have painting experience. Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 85:4-13, 86:15-19, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶¶ 18-20, Ex. 2. After the plaintiff informed Jerry Brick of his painting experience, Jerry Brick then changed his answer and told the plaintiff that there were no open positions in the paint shop. Id. Plaintiff believes this to be a lie because the paint shop had a lot of work to be done and people from the main shop would often go over to the paint shop to help out, and he subsequently learned that people from the main shop worked in the paint shop after he was terminated. Id. Because the reasons given for not being able to move the plaintiff to the paint shop were inconsistent and because the plaintiff had reason to believe that there were open positions in the paint shop, the proffered reason by the defendant is unworthy of credence.

The defendant contends that the plaintiff's disability did not cause the plaintiff's adverse employment actions, however, the evidence presented in Part III.B.1 show that plaintiff's disability directly and/or indirectly caused plaintiff's adverse employment actions, and Part III.B.3 shows that plaintiff's failure to conform to gender stereotypes was a basis for the adverse employment actions because the defendant failed to correct the harassment and hostile work environment discussed in Part III.B.2. Furthermore, the defendant's contention that the plaintiff never complained to the defendant about the

38

harassment is incorrect.  The plaintiff complained to John Fitch, Mario Abela, Jerry Brick and to corporate when he wrote his letter.  Supra, pp. 4-5, Exhibit 5.

The plaintiff has presented evidence that the defendant's proffered reasons for the adverse employment actions are false, and this, coupled with the plaintiff's prima facie case, and supporting evidence of discriminatory conduct and the employer failing and/or refusing to stop the discriminatory conduct of its agents supports an inference of discrimination.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, genuine issues of material fact exist and as such, plaintiff's Objection to the Motion for Summary Judgment must be sustained.


THE PLAINTIFF


By____/s/ James V. Sabatini_____
James V. Sabatini, Esquire     CT 19899
Sabatini and Associates, LLC
One Market Square
Newington, CT  06111
Tel. No.:  860-667-0839
Fax No.:  860-667-0867
e-mail:  jsabatini@sabatinilaw.com


39

JA 250

**ELECTRONIC CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2012, a copy of the foregoing Motion For Extension of Time to Respond To Defendant's Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ James V. Sabatini
James V. Sabatini

40

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ANDREW ADAMS,                          :
                                       :
                          Plaintiff,   :        Case No.: 3:11 cv 00427 (JCH)
                                       :
                                       :
          vs.                          :
                                       :
FESTIVAL FUN PARKS, LLC, d/b/a         :
LAKE COMPOUNCE THEME PARK,             :
                                       :
                          Defendant.   :        MAY 4, 2012

## AFFIDAVIT OF JAMES V. SABATINI, ESQ.

I, James V. Sabatini, pursuant to 28 U.S.C. § 1746, being first duly cautioned and sworn, and being more than eighteen years of age and competent to testify about the matters contained herein, hereby state as follows upon personal knowledge and information:

1. I am a member of Sabatini & Associates, LLC, the attorneys for the Plaintiff, Andrew Adams.

2. This Affidavit is made in support of the plaintiff's Objection to Defendant's Motion for Summary Judgment.

3. The following list serves to provide the Court with the Exhibits identified and referred to in the plaintiff's Memorandum of Law and Local Rule 56(a)(2) Statement.

a. Exhibit 1 is a true copy of excerpts from the deposition of Andrew Adams, dated January 20, 2012.

b. Exhibit 2 is a true copy of an Affidavit of Andrew Adams, dated April 27, 2012.

c. Exhibit 3 is a true copy of Andrew Adams's Answers to Defendant's Interrogatories.

d. Exhibit 4 is a true copy of documents produced in discovery in this matter, bates stamped P000161-P000171, which is the plaintiff's Diagnostic Perceptual/Cognitive Assessment, dated December 3, 1990.

e. Exhibit 5 is a true copy of a document produced in discovery in this matter, bates stamped P00020, which is a letter from the plaintiff to Palace Entertainment Corporate Headquarters, dated November 8, 2009.

f. Exhibit 6 is a true copy of a document entitled "Andy's Log of Things That Happen at Lake Compounce Theme Park," which was made Exhibit 10 to plaintiff's deposition.

g. Exhibit 7 is a true copy of the Amended Complaint, dated October 6, 2011.

h. Exhibit 8 is a true copy of each unreported case cited to in the plaintiff's Memorandum of Law.

2

_____
James V. Sabatini


Sworn and subscribed to before me
this  4th day of May 2012.




_____
Notary Public/~~Commissioner of the Superior Court~~
My Notary Commission Expires On: 3|31|17

EMILY J. JESPERSEN
Notary Public, State of Connecticut
My Commission Expires March 31, 2017

3

# EXHIBIT 1

Page 1

## UNITED STATES DISTRICT COURT

### DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| ANDREW ADAMS, | : Case No.: 3:11 cv 00427(JCH) |
| Plaintiff, | : |
| -vs- | : |
| FESTIVAL FUN PARKS, LLC, d/b/a | : |
| LAKE COMPOUNCE THEME PARK, | : |
| Defendant. | : |

DEPOSITION OF: ANDREW ADAMS
DATE: JANUARY 20, 2012
TIME: 10:00 a.m.
HELD AT: HINCKLEY, ALLEN, SNYDER
         20 CHURCH STREET
         HARTFORD, CT 06103

BRANDON SMITH REPORTING SERVICES, LLC
Reporter: Liza Manafort, LSR# 464

44 Capitol Avenue            6 Landmark Square
Hartford, CT 06106           4th Floor
(860) 549-1850               Stamford, CT 06901
(800) 852-4589               (203) 316-8591
                             (800)852-4589

Adams  v. Festival Fun Parks

Page 2

APPEARANCES


FOR THE PLAINTIFF, ANDREW ADAMS:

SABATINI AND ASSOCIATES, LLC
ONE MARKET SQUARE
NEWINGTON, CT 06111
(860) 667-0839

BY:  JAMES SABATINI, ESQ.



FOR THE DEFENDANT, FESTIVAL FUN PARKS, LLC, D/B/A LAKE
COMPOUNCE THEME PARK:

FISHER & PHILLIPS, LLP
RADNOR FINANCIAL CENTER
201 KING OF PRUSSIA ROAD, SUITE 650
(610) 230-2150
RADNOR, PA 19087

BY:  RISA B. BOERNER, ESQ.

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

1   to finish?

2        A    We got hired just for four days in September.

3        Q    So you worked just for four days in 1996 for Lake

4   Compounce?

5        A    Right.

6        Q    I see.  When did you return to Lake Compounce

7   again?

8        A    Back in '97, full-time, like for the summer.

9        Q    How long was that season?  You were employed

10   seasonally in 1997?

11        A    Yes, I was.

12        Q    How long was that season?

13        A    From the month of May, up to the end of September.

14        Q    And what position did you have in 1996 and 1997 at

15   Lake Compounce?

16        A    I was a ride attendant.  And then I turned 18, and

17   then I became a ride operator.

18        Q    And when did you become a ride operator, what year

19   was that?

20        A    '97, on my birthday.

21        Q    Did you continue to hold seasonal employment with

22   Lake Compounce after that?

23        A    Like for the whole year of '97?

24        Q    After your seasonal employment ended in 1997, did

25   you go back to Lake Compounce in 1998?

Adams   v. Festival Fun Parks

Page 13

```
 1      A     Yes, I did.

 2      Q     And again in 1999?

 3      A     Yes.

 4      Q     Was there a break at all between then and 2009,

 5  when you weren't working for Lake Compounce seasonally?

 6      A     I believe 2003 I took a little break, and then

 7  went back in '05.

 8      Q     And when was it that you stopped working

 9  seasonally, and started working full-time for Lake

10  Compounce?

11      A     With benefits and all of that?

12      Q     Yes.

13      A     That started in May 2008, right on Memorial Day

14  weekend.

15      Q     How long were you a ride operator for Lake

16  Compounce, as a seasonal employee?

17      A     It had to be about five years.

18      Q     So from 1997 to 2002?

19      A     Yeah.

20      Q     And then what was your position with Lake

21  Compounce?

22      A     I became a ride trainer.

23      Q     So in 2002 you became a ride trainer?

24      A     Yes.

25      Q     And then how long were you a ride trainer for Lake
```

Adams   v.   Festival Fun Parks

1    Compounce?

2         A    Two years.

3         Q    So 2002 to 2004, on a seasonal basis?

4         A    Yes.

5         Q    And then in 2004 what position did you hold?

6         A    They made me assistant ride supervisor.  They call

7    it coach, but I call it supervisor.

8         Q    And just going back to the last question about

9    being a ride trainer, you were a ride trainer in 2002.  And

10   than I believe you testified that you took a break in 2003?

11        A    Yes.

12        Q    So in 2003 you didn't work for Lake Compounce at

13   all?

14        A    I worked, but I took a break in the middle of the

15   summer.  So by the middle of August I left for a while.

16        Q    Why did you leave?

17        A    I was having some problems with management at the

18   time.

19        Q    What type of problems?

20        A    Being accused of not picking up vomit on a ride,

21   when I called for help and no one came.  And I got written

22   up for that, and I thought it wasn't fair.

23        Q    And so what did you do?

24        A    I just left.  I told them I'm leaving.

25        Q    You quit?

Adams  v. Festival Fun Parks

1/20/2012                                        Andrew Adams

```
                                                    Page 15

  1       A    Yes.

  2       Q    Did you submit a written letter of resignation?

  3       A    No, I did not.

  4       Q    You just verbally quit?

  5       A    Yes.

  6       Q    Or orally?

  7       A    Well, I said I wasn't going to sign the written

  8  document, and they said I had to.  So I did.  And that's

  9  when I quit.

 10       Q    You signed the write-up?

 11       A    Yes, I did.

 12       Q    And then you quit?

 13       A    Yes.

 14       Q    I think you were saying that you were promoted to

 15  assistant ride coach in 2004?

 16       A    Yes.

 17       Q    Is that the same position that you held until you

 18  left in 2009, or did your position change again?

 19       A    It changed again.

 20       Q    When did it change?

 21       A    The beginning of 2007.  I was a housekeeping

 22  supervisor.

 23       Q    And how long did you hold that position with Lake

 24  Compounce?

 25       A    It was until the end of the season, end of
```

Adams   v. Festival Fun Parks

1/20/2012                                    Andrew  Adams

```
                                                      Page 16
  1   October 31st, 2007.
  2        Q    And then what about 2008, what position did you
  3   hold then?
  4        A    That's when I went in to work for the ride
  5   mechanics shop at the park.
  6        Q    And what position did you have?
  7        A    They call them mechanic helper.
  8        Q    Did your position change again, before you left in
  9   2009?
 10        A    No.
 11        Q    What were your responsibilities as a mechanic
 12   helper?
 13        A    Washing parts for the rides; you know, in the off
 14   season they all get taken apart.  Helping the other
 15   mechanics with like taking things apart, they had me clean
 16   the shop up, and helping out in the paint department when it
 17   was needed, and helping out doing ride stuff out in the
 18   park, like helping them fix the roller coaster or
 19   retracking.
 20        Q    While you held that position, did you ever help in
 21   other departments?
 22        A    No.
 23        Q    Who did you primarily work with in that position,
 24   as a mechanic helper?
 25        A    I worked with everyone.  So do you want a special
```

Adams   v. Festival Fun Parks

Andrew  Adams

                                                              Page 17

1   person?

2        Q    I just want to know who you worked with?

3        A    I worked with Wayne Olsen, Bill Cook, Joe, Kyle,

4   sometimes John Fitch, my boss, Danny Pratt, Chris Reeves,

5   Joey Felco, sometimes Lou, I don't know his last name. I'm

6   sorry.

7        Q    That's okay.

8        A    Jim Stevens, the painter at the park, and Richard,

9   they call him Booch, and I don't know how to spell the last

10  name, and those are it.

11       Q    Who was your supervisor, when you were a mechanic

12  helper?

13       A    John Fitch.

14       Q    Did you have any other supervisors?

15       A    The main supervisor was Mario Abela.

16       Q    Anyone else?

17       A    No, those are the only two supervisors.

18       Q    What were your work hours?

19       A    They varied.  Normally from 6:00 in the morning

20  until 3:30 in the afternoon.  Or if the park was open from

21  6:00 in the morning, until sometimes 10:30, eleven o'clock

22  at night.

23       Q    What was your salary at that time, when you left?

24       A    $10.77, I believe.

25       Q    Per hour?

Adams   v. Festival Fun Parks

1/20/2012

Andrew  Adams

Page 20

```
 1      A    Yes.

 2      Q    Even while you weren't working at Lake Compounce?

 3      A    Yes.

 4      Q    Why did you look to come back to Lake Compounce,

 5   after you left in 2003?

 6      A    Well, the theme park thing, it's in my blood, it's

 7   what I like to do.  And I figured maybe things had changed,

 8   if I went back.  And I talked to the boss there to see if I

 9   could come back, and he said sure.

10      Q    Did you fill out an application for a position

11   there?

12      A    No.  They took me back, because they had one on

13   file.

14      Q    Who did you contact about obtaining employment

15   again at Lake Compounce?

16      A    Eric Dezik.

17      Q    How do you spell that, do you know?

18      A    I don't.

19      Q    What was his role at the park?

20      A    He was the director of operations.

21      Q    And what did he say when you approached him?

22      A    He says I have to talk to the general manager, and

23   make sure it's okay with him, and they'll give you a call.

24      Q    And who was the GM?

25      A    Tom Wages.
```

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew Adams

Page 21

1      Q    Did you speak to anybody else about coming back to

2   Lake Compounce at that point?

3      A    No.

4      Q    You didn't speak to anyone, other than Eric Dezik,

5   about coming back?

6      A    Correct.

7      Q    Were you rehired?

8      A    Yes, I was.

9      Q    And who was your supervisor when you came back?

10     A    Brian Nass.

11     Q    And you didn't have to interview, to come back to

12   that position?

13     A    No.  They just brought me in real quick and told

14   me the new rules, and the safety class that I had to take,

15   and that was it.

16     Q    When you were rehired by Lake Compounce, do you

17   believe that they knew anything about your mental disability

18   that you claim that you have in this lawsuit?

19     A    Yes.

20     Q    Why do you believe that?

21     A    Because I've told my bosses, and I have it written

22   on my application for them when I first applied to there.

23     Q    And what did you say to your bosses about it?

24     A    I told them that I took special ed classes,

25   because I have a hard time with remembering a lot of things,

Adams    v. Festival Fun Parks

1/20/2012                                        Andrew  Adams

Page 24

```
1      Q    That was full-time from the start?

2      A    Yes.

3      Q    That was May of 2008, you said?

4      A    Yes.

5      Q    You asked to have full-time employment, and they

6  offered you this full-time position as a mechanic helper,

7  and you accepted it?

8      A    Yes.

9      Q    And that was in May of 2008?

10      A    Yes.

11      Q    Who was your supervisor when you became a mechanic

12  helper?

13      A    John Fitch.

14      Q    And who was the GM at the time?

15      A    Jerry Brick.

16      Q    And do you believe that Jerry knew about your

17  claim of mental disability, at the time that he offered you

18  the full-time position?

19      A    Yes.

20      Q    And what about John Fitch?

21      A    Yes, he did.

22      Q    And what makes you think they knew about it?

23      A    Because I talked to both of them about it.

24      Q    And what had you said to both of them about it?

25      A    I told them I'm willing to learn, but it takes me
```

Page 25

1    time, I can't be like the rest of the guys that can do the

2    job real quick, I have to think about what to do before I

3    jump in there and do it.  And they said don't worry about

4    it, we'll teach you.

5        Q    I had asked you previously about your work

6    experience.  I just want to show you a document that I had

7    premarked as Exhibit 1.  It's an exhibit, it's your resume.

8    Just let me know when you've had a chance to look at it.

9    Ready?

10       A    Yes.  Sorry.

11       Q    That's okay.  When did you prepare this resume?

12       A    That was back when we had to fill out the seasonal

13   management questionnaire, to become a supervisor at the

14   park.  I don't remember what year it was.

15       Q    Do you have any recollection of a time frame, what

16   position, maybe, that you held at the time?

17       A    No, I don't remember.  I'm sorry.

18       Q    Okay.  So you said you prepared this when you were

19   filling out a seasonal management questionnaire, to become a

20   supervisor at the park.

21            So was that the purpose, was it to become a

22   supervisor at the park?  Is that why you filled it out?

23       A    It was asked to.  In the questionnaire, we had to

24   fill in -- they wanted a resume, so I filled one out.

25       Q    Were you applying for a position at the time?

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

Page 38

1   directly that Justin said to you, or did to you?

2        A    He never really saw anything done.  It's after the

3   fact of things.

4        Q    What about Booch, did he ever see or hear anything

5   directly that Justin did to you?

6        A    No, just when I went and complained to him about

7   it.  But Jim Stevens saw -- when Mr. Walters threw the apple

8   at my truck, he saw the apple smashed all over my truck.

9        Q    Did he actually see Mr. Walters throwing the

10  apple, or he just saw it afterwards?

11       A    He saw it afterwards what happened, when he was

12  walking over to the shop.

13       Q    Okay.  So he didn't see Justin Walters throw the

14  apple?

15       A    No.  That was Jordan, Justin at time when they

16  were outside.  Jordan was with him at the time when he threw

17  the apple.

18       Q    Do you know Jordan's last name?

19       A    No, I don't.  I'm sorry.

20       Q    Jordan was with Justin when he threw the apple?

21       A    Yes, he was.

22       Q    Did you see it?

23       A    Yes, I was right outside when he did it.  I was

24  coming out of my truck, to go to the back of my truck to get

25  one of my ride parts, and I heard a bang.  And that's when I

Brandon Smith Reporting & Video
860-549-1850    production@brandonreporting.com   249 Pearl Street

JA 268

Case: 13-1183   Document: 51   Page: 271   08/19/2013   1020229   458

Page 39

1    saw the apple on my truck.

2        Q    I'll ask you a little bit more about that.  But

3    first I want to finish asking you a few questions.  You said

4    that you also spoke to Wayne Olsen about testifying for you?

5        A    Yes.

6        Q    And what would you have Wayne Olsen testify about?

7        A    Stuff that he saw, that Justin did to me.

8        Q    Like what?

9        A    How he was calling me names outside, when we were

10   working together taking rides apart, how he would throw

11   things from in the shop from one side of the shop to where I

12   was.

13       Q    Anything else?

14       A    Not that I can think of right now.

15       Q    And did Wayne Olsen actually see Justin calling

16   you names?

17       A    Yeah, because he was with me outside.

18       Q    On how many occasions?

19       A    Every couple -- well, every couple of days,

20   whenever we were working together outside.

21       Q    Okay.  And what kinds of names?

22       A    Stupid, you know, like what are you doing, you

23   know, what the heck is the matter with you.

24       Q    Okay.  And did Wayne see Justin throw things from

25   one side of the shop to where you were?

Page 40

1     A    Yeah, because he was in the shop with me.  Because

2 Wayne would be like, whoa, what was that.  And that's when I

3 showed him.

4     Q    And what was it is that you showed him?

5     A    Washers, nuts, bolts, they call these things -- I

6 call them hockey pucks; they're circle pieces that go onto a

7 ride.  I guess the right word for them is shock per -- I

8 can't pronounce the names.  They're used on rides and

9 they're rubber, and he used to throw those at me.

10    Q    How often?

11    A    He only did it one time, because he thought he was

12 trying to be funny.

13    Q    So only one time that Justin threw something at

14 you?

15    A    Yeah.

16    Q    Is there anything else that Wayne Olsen would

17 testify to, other than what you already testified about and

18 talked about?

19    A    No.

20    Q    What would you have Joe testify about?

21    A    Joe was with me outside the day we were at Boulder

22 Dash, when Justin made the comment about being on my knees,

23 and so was Tommy J.; I don't know his last name.  I call him

24 Tommy J., because I can't pronounce the last name, and he

25 was there, too, when Justin made that comment.

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew   Adams

Page 42

1        A    No, not that I know of.

2        Q    And what would you have Bill Cook testify to?

3        A    Basically the same thing I said, about how I went

4   to him complaining that, you know, this is what Justin said

5   to me about being on my knees, and constantly picking on me

6   at work, and that I couldn't take it no more.

7        Q    Did Bill Cook ever witness or hear anything that

8   Justin said or did to you?

9        A    No, because he wasn't really with us too much.

10       Q    And then the last name that you mentioned is Kyle.

11  How would you have him testify for you?

12       A    Kyle was with us at Boulder Dash also, when Justin

13  made that remark about me.

14       Q    Which remark was that?

15       A    Being on my knees.

16       Q    Is there anything else that you'd have Kyle

17  testify about?

18       A    No, that was the only time that Kyle was there.

19       Q    Okay.  Did you generally enjoy working at Lake

20  Compounce?

21       A    Yes, I did, up to that point.

22       Q    Until what point?

23       A    Being picked on and bullied every day.

24       Q    When did that start?

25       A    It started when I first went in the maintenance

Page 57

1    believe.

2              ATTORNEY BOERNER:  Off the record.

3

4              (Off the record at 11:31 a.m. for 8 seconds.)

5

6    Q    (By Attorney Boerner) So I premarked this document as

7    Defendant's Exhibit 10.  It's titled "Andy's log of things

8    that happened at Lake Compounce Theme Park."

9              Do you recognize this document?

10   A    Yes, I do.

11   Q    And what is it?

12   A    It's a log I started when I was having problems at

13   the park.  I wrote down things that was happening to me.

14   Q    When did you start preparing this log?

15   A    Well, it was back in 2009, when I just couldn't

16   take it no more, and I wanted to keep a record of what was

17   going on when I went to my bosses to complain about Justin

18   Walters and nothing was getting done.  So I decided to keep

19   a log going.

20   Q    I'm sorry, when did you say that you started

21   keeping the log, in terms of the date?

22   A    Back in 2008, when I started to write things down.

23   Q    This document starts with an incident in February

24   of 2009.  Were you keeping a log prior to that?

25   A    No.

Page 58

```
 1      Q     So does that refresh your memory?  Did you

 2   actually start in February of 2009 keeping this log?

 3      A     Yes.  That's when I started writing about the

 4   first incident that happened with me.

 5      Q     And how did you report what was happening?

 6      A     When I went home from work, I sat down on the

 7   computer and typed it out to the best of my knowledge and

 8   the spelling.

 9      Q     Did you ever revise it after you initially would

10   type out what happened?

11      A     No.  I can't do spell check, I don't know the

12   right spelling of certain things.

13      Q     Did you ever go back to something that you had

14   previously written, and change it in any way?

15      A     No.

16      Q     So the words that are on this page are exactly as

17   you wrote them the first time that you typed them out?

18      A     Yes.

19      Q     Did you tell anyone that you were maintaining this

20   log?

21      A     No.

22      Q     What is it that you recorded in your log?

23      A     Well, the first incident that Justin Walters did

24   to me about being on your knees; that was the first thing

25   that I started with.
```

Page 59

1      Q      And what was the purpose of the log?

2      A      Because I figured, you know, keep it written down,

3    in case I ever did have to testify against that, so they can

4    have proof.

5      Q      Did you have an attorney at that time?

6      A      When I worked at the park?

7      Q      No, when you started keeping this log in February

8    of 2009?

9      A      I had -- yeah, I had it all typed out before I had

10   met with an attorney, yeah.

11     Q      Had you hired an attorney, or talked to an

12   attorney when you started keeping this log?

13     A      I went to a first attorney, but he didn't do

14   nothing for me.  That's when I went to look for a new

15   attorney.

16     Q      I'm asking you in February of 2009, when you

17   started keeping this log, did you have an attorney advising

18   you?

19     A      No.  Because I didn't have an attorney at that

20   time.

21     Q      Okay.  Had you consulted with an attorney prior to

22   that time?

23     A      No.  It was after I left the park in October of

24   '09.

25     Q      That's when you first sought out an attorney?

Adams  v. Festival Fun Parks

1/20/2012                                              Andrew  Adams

Page 60

1      A    Yeah.

2      Q    Okay.  So in terms of keeping this log, getting

3  back to this, did you ever show this log to anyone prior to

4  this litigation?

5      A    Just my mother.

6      Q    Just your mother?

7      A    And my aunt.  That's the only two people.

8      Q    You never showed it to anyone at Lake Compounce?

9      A    No.

10     Q    You never showed it to a manager or director, or

11  supervisor at Lake Compounce?

12     A    No.  No.

13     Q    Did this log just relate to incidents involving

14  Justin Walters?

15     A    Yes.

16     Q    Okay.  Did you ever change or revise anything in

17  this log at any point, after you first wrote it in the log?

18     A    No.

19     Q    And do you still have it on your home computer?

20     A    Yes.

21     Q    Did you ever make a complaint about Justin Walters

22  to any manager, or director at Lake Compounce?

23     A    Yes, I did.

24     Q    When?

25     A    When they were happening.  I went to my first

Brandon Smith Reporting & Video
860-549-1850     production@brandonreporting.com   249 Pearl Street

JA 275

Page 61

1   boss, John Fitch.

2        Q    And when was that?

3        A    It started in 2008.

4        Q    Okay.  So when in 2008 did you first go to John

5   Fitch?

6        A    I can't remember the months.  But I only remember

7   it was around 2008 is when I made my first complaint.

8        Q    What did you complain about at that point?

9        A    That I told Mr. Fitch that, you know, Justin keeps

10  harassing me and picking on me, and bullying me.

11            And that's when Mr. Fitch said I told you before

12  we hired you that, working in the shop, you're going to deal

13  with being picked on and harassed, and I don't want you

14  coming to me and complaining to me every day.

15       Q    Did you say anything specific that Justin had

16  done?

17       A    I told him about the incident with the apple.

18       Q    And this was in 2008?

19       A    Yes.

20       Q    Do you remember when the incident with the apple

21  occurred?

22       A    About September 2009, it was in the off-season.

23       Q    So you didn't tell John Fitch about the apple in

24  2008, because it didn't happen until 2009?

25       A    Correct.

Page 62

1      Q    In 2008, when you spoke with John Fitch, were

2    there any specific incidents that you described?

3      A    No.  Basically the same thing.

4      Q    I'm sorry?

5      A    Just the same thing that I said before, being

6    picked on and bullied by him.

7      Q    You said that you were picked on and bullied?

8      A    Yes.

9      Q    All right.  Did you ever use the words "sexual

10   harassment" at that point?

11     A    No, not to Mr. Fitch I didn't.

12     Q    Okay.  When was the next time that you complained

13   about any conduct, to any of your managers or supervisors,

14   or directors?

15     A    Well, the next one was Mario Abela.

16     Q    When was that?

17     A    That was in 2009, when things started getting

18   really bad.

19     Q    So you didn't make any other comments in 2008,

20   other than the one to John Fitch?

21     A    Yes, that's correct.

22     Q    And when was that one in 2008?

23     A    What month?

24     Q    Yes.

25     A    It was like probably, I want to say June.

Adams   v.   Festival Fun Parks

1/20/2012                                              Andrew  Adams

1        ATTORNEY SABATINI:  Are you guessing, or are you

2    giving an estimate on that?

3        THE WITNESS:  I'd have to say probably an

4    estimate.

5        ATTORNEY SABATINI:  Okay.

6        ATTORNEY BOERNER:  So what's the difference?

7        ATTORNEY SABATINI:  Between, what, a guess and

8    estimate?

9    Q   (By Attorney Boerner) I mean, how sure are you about

10   June?  Would you say it definitely happened in June, or just

11   in the summer?  Can you say what season with certainty?

12       A    Well, it was in the summertime, I don't know what

13   month.

14       Q    So you're certain it was in the summer, you just

15   don't know what month?

16       A    Yes.

17       Q    So the next time that you went and complained to a

18   manager or director, you said was 2009?

19       A    Yes.

20       Q    With Mario Abela?

21       A    Yes.

22       Q    Do you remember when in 2009?

23       A    Was in the summertime when I went to his office.

24       Q    About a year after you had spoken to John Fitch?

25       A    That's correct.

Adams  v. Festival Fun Parks

Page 64

1      Q      What was it that you discussed with the Mario

2  Abela at that time?

3      A      I told Mario basically that he constantly picks on

4  me and bullies me every day, and was putting his stuff in my

5  work area so I can't get into my toolbox.

6            And Mario basically said to me, you know, just try

7  to get along with him, he likes you and he's trying to have

8  fun with you.  And I felt that was unnecessary.

9      Q      You thought what was unnecessary?

10      A      Being treated that way, and to try to get along

11  with him when he's trying to be this way towards me.

12      Q      Did you respond to Mario when he said that?

13      A      Yeah.  That's when I told Mario I don't think this

14  is fair.

15      Q      What did Mario say?

16      A      Well, he said basically he's trying to be your

17  friend.  It's not like you go home with him every night, so

18  try to work with him.

19      Q      Did you have any further discussion with Mario at

20  that point?

21      A      No.  That was my last statement with Mario.

22      Q      Did you make any other complaints to any manager

23  or director of Lake Compounce?

24      A      I went to a girl, her name is Brynn Goldbeck, I

25  want to say, and she was the safety director of the park.

Page 68

```
 1        (A recess was taken from 11:46 a.m. to 11:56 a.m.)

 2

 3   Q    (By Attorney Boerner) Who wrote this letter?

 4        A    I did.

 5        Q    Okay.  And I'm talking about the letter that's

 6   been marked as Defendant's Exhibit 7.  Why did you write it?

 7        A    This letter had to be written for my last

 8   paycheck.  I was told by Mario Abela that corporate wanted

 9   to know what was wrong and why I was leaving the company.

10             And he said that you have to write a letter to the

11   corporation, or you won't receive your last paycheck.  So I

12   did.

13        Q    So did he say why corporate wanted this?

14        A    No.  There was no explanation why.  He just said

15   they wanted a letter from you explaining what happened.

16        Q    How did corporate know that something happened?

17        A    Well, Jerry Brick, the general manager, called

18   them and told them I was leaving the company, said that I

19   resigned.

20             Which I didn't provide them with resignation.  I

21   verbally told Jerry Brick if I can't be moved into a another

22   department, I'm going to have to look for another job.  So

23   he called up Palace and told them.

24        Q    Do you know about anything else that he told them?

25        A    No, not that I know of.  That was all I know.  But
```

Adams  v. Festival Fun Parks

1/20/2012                                    Andrew  Adams

Page 81

1      Q    There were no other times that they egged you into

2   making a statement that you were uncomfortable with?

3      A    No.

4      Q    Tell me how your employment with Lake Compounce

5   ended?

6      A    Well, my last day working there was October 31st.

7      Q    Okay.  Why was that your last day?

8      A    That was the day that Mario Abela gave me for my

9   last day working there.  He wanted me to finish out the

10  season.

11     Q    Did you ever tell anyone at Lake Compounce that

12  you were resigning?

13     A    I told a couple of people that I was looking for

14  another job.

15     Q    Who did you tell?

16     A    I told Rich Booch that I was looking for

17  employment somewhere else, Jim Stevens, the painter.  And

18  then Jerry Brick, the general manager, I told him I was

19  putting applications in.  And that's all I've told.

20     Q    Did you ever tell anyone that you found another

21  job?

22     A    No.  I was just going for job interviews, but did

23  not get hired.

24     Q    Did you tell anybody that you found employment

25  with Coca-Cola?

Adams   v. Festival Fun Parks

Page 83

1       Q     When you said that you spoke to these people about

2    applying for other positions, when did you talk to them

3    about that?

4       A     It was mostly the month of September-ish, about

5    the middle of September.

6       Q     And why did you tell them you were looking for

7    another job?

8       A     I just said I'm having a hard time working here,

9    and dealing with being picked on every day, and being

10   bullied by Justin.  I just had enough.

11      Q     Did you say that to Jerry Brick?

12      A     Yes, I did.

13      Q     When did you say that to him?

14      A     It was October-ish that I had spoken to him, and

15   asked him to go into a different department.

16      Q     Was this before or after your final day was

17   scheduled?

18      A     No, this was before my final day.

19      Q     Was it before that final day was scheduled?

20      A     Yes.

21      Q     When, in October, was it?

22      A     That they scheduled my last day?

23      Q     No, I'm sorry.  When, in October, was it that you

24   asked to go to a different department?

25      A     It had to be, I want to say, the first week of

Case: 13-1183   Document: 51   Page: 285   08/19/2013   1020229   458

Page 84

1   October.

2        Q    Okay.  And what did Jerry Brick say?

3        A    He told me there's no other positions available,

4   he says, you know, there's nothing else for you, unless you

5   work in the maintenance shop.

6        Q    Did you ask to go to any specific other

7   department, or any department?

8        A    I asked to go in the paint department.

9        Q    When Jerry said there were no other positions, you

10  mean he said there were no open positions in the paint

11  department?

12       A    Correct.

13       Q    Had you seen any positions in the paint department

14  posted anywhere?

15       A    No, but I got a call from Jim Stevens telling me

16  what just happened, that they took people from the main shop

17  and sent them over to help him out prepping stuff and

18  sanding stuff, and stuff like that, to get ready for him to

19  paint.

20       Q    How many full-time employees were there in the

21  paint shop at the time?

22       A    There was only two.

23       Q    Who were they?

24       A    Jim Stevens and -- what was his name?  Richie, but

25  I don't know his last name.

1/20/2012                                                    Andrew Adams

Page 85

1       Q    Was anybody else employed in the paint department,

2    that you knew of at that time?

3       A    No.

4       Q    Did you have any experience painting?

5       A    Yes.

6       Q    What experience did you have?

7       A    When I worked with Bill Finkelstein, at the

8    carousel museum.

9       Q    And what experience did you get there painting?

10      A    Taught me how to sand, prep, how to prime pieces.

11      Q    What kind of pieces?

12      A    Carousel horses, sorry.  And taught me how to gold

13   leaf and how to paint horseshoes.

14      Q    And how frequently did you do painting in that

15   position, before you asked Jerry Brick for a position in the

16   painting department?

17      A    When I was working at the museum, I was about 11

18   years old.  So it was a while.

19      Q    He taught you when you were 11?

20      A    Yeah.

21      Q    Did you have any other painting experience?

22      A    No.

23      Q    Do you know anything about Jim Stevens' experience

24   painting, before he started at Lake Compounce?

25      A    He was in charge of -- what's that paint store

Case: 13-1183    Document: 51    Page: 287    08/19/2013    1020229    458

Page 86

1    called -- Sherwin-Williams.

2        Q     What else do you know about his experience?

3        A     He was a supervisor there for a while.  That's all

4    I basically know about him.

5        Q     What about Rich, do you know anything about his

6    experience in painting?

7        A     No, I don't.

8        Q     Did you have any other further discussion with

9    Jerry Brick, about potentially moving to the painting

10   department?

11       A     No.

12       Q     Had anybody told you, before you asked, that there

13   was an open position in that department?

14       A     No.  The only person I talked to was Jerry Brick.

15       Q     Did you have any reason to think that Lake

16   Compounce was hiring anyone, for a full-time position in the

17   paint department at that time?

18       A     I would, because there was a lot of things that

19   had to get done that year.

20       Q     Did you have any knowledge that Lake Compounce was

21   hiring anybody in the paint department at that time?

22       A     No.

23       Q     Okay.  Getting back to the position that you

24   applied for.  In 2008 and 2009, other than applying to Coke,

25   before you left Lake Compounce, did you apply for any other

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

Page 87

1   positions any place other than Lake Compounce?

2       A    No.

3       Q    Did your co-workers at Lake Compounce throw you a

4   fair well party the day before you left?

5       A    Well, no.  It was just our normal breaktime.  It

6   was coffee and doughnuts that I didn't have to pay for his

7   time.  So it wasn't like a party that we normally do for

8   everyone else.

9       Q    So they bought coffee and doughnuts for you?

10      A    Yeah.

11      Q    Who was there?

12      A    Mario Abela, John Fitch, Jordan, Kyle, Joe, Joey,

13  Chris Reeves.  That's it.  That's all I can remember.

14      Q    Was Justin Walters there?

15      A    No.

16      Q    When did you have your first discussion with Lake

17  Compounce about your employment ending at Lake Compounce?

18      A    It was towards the end of September, when I had

19  spoken to John Fitch.

20      Q    And tell me about that discussion?

21      A    Basically went to John saying that I'm giving him

22  notice soon, I'm having a hard time here.  And he asked why.

23  And I said I feel I can't do the job, everybody picks on me,

24  every time I call for help on the radio, I get nothing but a

25  lot of -- what's that word -- intimidation from people

Adams  v. Festival Fun Parks

1/20/2012                                    Andrew  Adams

1   saying, oh, my God, we got to bail Andy out again.

2           And basically he said, you know, keep looking for

3   a job and still work here, you know, we'll find you

4   something else to do in the shop until you find a job.  But

5   he did mention to me if you have any of your holiday time,

6   or any of your vacation time, to use it up, because if you

7   don't you don't get it, you lose it.

8           So I started taking all of my holiday pay, and my

9   vacation time up.  When I came back Jerry Brick had a

10  meeting with me and Mario Abela.

11      Q    How long were you out on your vacation and holiday

12  time?

13      A    I took I believe two weeks, because that's what

14  was owed to me.

15      Q    Who initiated the meeting that you had after that,

16  with Jerry Brick and Mario Abela?

17      A    Who was there?

18      Q    Who initiated it?

19      A    Oh, I don't know.  I went to work that day and

20  Jerry said can we see you upstairs, please.  So I went

21  upstairs to the office.

22      Q    And what did you discuss with them at that point?

23      A    That's when he said to me, you know, I've called

24  corporate up and told corporate you're leaving, so we need

25  to know from you when your last day is.  And Mario said,

Brandon Smith Reporting & Video
860-549-1850     production@brandonreporting.com   249 Pearl Street

JA 287

Page 89

1   well, we're going to give him to October 31st, to the end of

2   the season.

3           And that's when Jerry said to me, okay, and if you

4   can't get a job or find a job, Andy, I'll let you collect

5   unemployment and I won't appeal the case, I'll let you get

6   it.

7       Q    And what did you say to them?

8       A    I said thank you very much.  And then that's how

9   it ended.

10      Q    Was anything discussed, that you haven't described

11  to me, during that meeting?

12      A    Right after my last day I handed him my keys, and

13  they gave me my termination slip.  And then a couple of

14  days, after I couldn't find a job, I called unemployment to

15  put a case in.

16      Q    During that meeting with Jerry Brick and Mario

17  Abela, that you were just describing, was anything else

18  discussed between you, other than what we've already talked

19  about?

20      A    No.

21      Q    Did you have any other discussions with anyone

22  after that, about leaving Lake Compounce?

23      A    Not that I recall.

24      Q    Okay.  Did anybody at Lake Compounce tell you that

25  you were being terminated or fired?

Adams   v. Festival Fun Parks

1/20/2012                                        Andrew Adams

Page 90

```
 1      A    No.

 2      Q    Do you believe that you were fired?

 3      A    No.  I wouldn't say I believe I was, no.

 4      Q    So you resigned from Lake Compounce?

 5      A    Yes.

 6      Q    Okay.  All right.  Are you claiming that Lake

 7    Compounce discriminated against you, based opinion your

 8    gender, being a man?

 9      A    Yes.

10      Q    Okay.  How is that?

11      A    Well, because the way I got treated and picked on,

12    no one else got the same treatment.  So I feel I was being

13    mistreated.

14      Q    Okay.

15           ATTORNEY BOERNER:  Off the record.

16

17     (A lunch recess was taken from 12:32 p.m. to 1:13 p.m.)

18

19    Q    (By Attorney Boerner) I understand that you want to

20    change some of your testimony from earlier, is that right?

21      A    Yes.

22      Q    Why do you want to change your testimony?

23      A    Because I feel the question that you asked about

24    the termination, the do you feel you were terminated or did

25    you quit.  I feel I was terminated because of being -- of
```

Adams   v. Festival Fun Parks

1   them not finding nothing else in the park for me to do, and

2   me being picked on, nobody was doing anything about it.  So

3   I felt like I was being forced out of there.

4       Q    What made you change your testimony from earlier?

5       A    Because I thought about it more.  If the park

6   really wanted me, they would have found another job in the

7   park and they wouldn't have me leave.

8       Q    Did you discuss that with your attorney during the

9   break?

10      A    Yes.

11      Q    And after talking to your attorney, you want to

12  change your testimony?

13      A    Yes.

14      Q    And you understood that earlier you were

15  testifying under oath, correct?

16      A    Yes.

17      Q    And you testified earlier that you resigned,

18  right?

19      A    Yes.  Because I was being forced out of there.

20      Q    Earlier you said you weren't terminated, right?

21      A    Yes.

22      Q    And now you're saying that you were?

23      A    Yes.

24      Q    Okay.  Did anyone ever tell you that you were

25  being terminated?

Adams  v. Festival Fun Parks

1/20/2012                                          Andrew Adams

Page 92

1       A    No.  But working at a place and being picked on

2    and bullied, and your managers aren't doing nothing to stop

3    it...

4       Q    Nobody ever told you you were being terminated, is

5    that right?

6       A    Yes.

7       Q    And nobody ever told you you were being fired,

8    right?

9       A    Correct.

10      Q    Okay.  Sir, you did resign, right?

11      A    Resigned, because I couldn't deal with it no more,

12   being picked on.

13      Q    You resigned because you feel you were being

14   picked on?

15      A    Right.

16      Q    Okay.  But you did resign, correct?

17      A    Yes.

18      Q    Do you think that if you hadn't been a man, you

19   would have been treated differently at Lake Compounce?

20      A    No.

21      Q    Do you think your sex or gender had anything to do

22   with your treatment?

23      A    Yes.

24      Q    How so?

25      A    Because the way Justin said the remark to me, he

Adams   v.   Festival Fun Parks

1/20/2012                                          Andrew   Adams

Page 93

1   doesn't talk that way to anyone else that works there.

2        Q    What remark are you talking about?

3        A    About being on your knees, that's your best

4   position for you.

5        Q    Is there anything, other than that, that you feel

6   is an example of you being treated differently because of

7   your sex or gender?

8        A    Yeah.  Well I don't have a girlfriend, that's one

9   reason why I think he makes that remark, not like the rest

10  of the married guys in there.

11       Q    Anything else that is an example of you being

12  treated differently because of your sex or gender?

13       A    No.

14       Q    You understand that you have a claim for gender

15  discrimination in this lawsuit?

16       A    Yes.

17       Q    Other than the one comment about on your knees

18  that Justin Walters made, are there any other times you felt

19  you were being discriminated against at Lake Compounce?

20       A    No, just that time when he said that to me.

21       Q    Okay.  And how did you feel that that comment was

22  discriminating, based upon on your gender or sex?

23       A    How did it make me feel?

24       Q    Why did you think that that related to your gender

25  or your sex?

Adams  v. Festival Fun Parks

1/20/2012                                              Andrew  Adams

Page 94

1      A    Because I don't date girls, I don't go on dates.

2  And just because I have friends, you know, that I hang out

3  with boys, does he think that that's what I am?

4      Q    Are you a homosexual?

5      A    No.

6      Q    Did you ever hear Justin Walters make similar

7  comments to other employees?

8      A    Not that I know of.

9      Q    Did you ever hear Justin Walters make any other

10 derogatory comments to other employees, other than what

11 you've already described?

12     A    Not if I was around.  I didn't see it, no.

13     Q    Okay.  Did you hear about it?

14     A    No.

15     Q    Did you see any conduct by Justin Walters, where

16 you felt that he was treating any other employee badly,

17 other than what you've already described?

18     A    Well, I seen him one time grab an employee by the

19 shirt, and throw him up against -- well, not throw him up,

20 but pin him up against a fence, because some employee said

21 something to him that he didn't like.

22     Q    What employee was that?

23     A    Jordan.

24     Q    Anything else?

25     A    No.

Adams   v. Festival Fun Parks

1/20/2012                                      Andrew  Adams

Page 95

1      Q     Did you ever hear anybody, other than Justin
2  Walters, make similar comments to you or anyone else?
3      A   No.
4      Q     Did you feel that any female employees were
5  treated differently than you, or received better treatment
6  than you?
7      A    Well, there were no females in the maintenance
8  shop.
9      Q     How about other male employees, do you think they
10  were treated differently or better than you?
11      A    Yeah.
12      Q     In what way?
13      A    Well, they're all married and have girls.  So, of
14  course, he's not going to say anything bad about those
15  people.  I was the only one that got picked on.
16      Q     Is Justin Walters married?
17      A   No.
18      Q     I knew you mentioned earlier that he dated Brynn
19  Goldbeck.  Was that the whole time that you were there, or
20  part of the time?
21      A    For part of the time, and she broke up with him.
22      Q     Was he dating anyone else at the time you were
23  there?
24      A   No.
25      Q     Did you talk to anyone about the comment that

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

Page 97

1        A    Not that I know of, no.

2        Q    How did he sexually harass you?

3        A    The day when he told me get on your knees, that's

4    your best position.

5        Q    Any other instances where he sexually harassed

6    you?

7        A    Just calling me stupid, or what the heck is the

8    matter with you.

9        Q    Okay.  Anything else?

10       A    Just constantly staring me down, when I'm down on

11   my knees working on my rides, just staring at me.

12       Q    Okay.  Anything else?

13       A    And then just throwing things at me.

14       Q    Okay.  Is that all?

15       A    Yes.

16       Q    Did you ever talk to Justin Walters about any of

17   these things, the on your knees comment?

18       A    No, I didn't want to get in a confrontation with

19   him.

20       Q    Did you ever talk to him about the other things

21   you described, calling you stupid, saying what's the matter

22   you, staring at you or throwing things at you?

23       A    No, I just walked away.

24       Q    Were there any witnesses to the calling you stupid

25   or saying what's the matter with you?

Page 99

```
 1      A    No, not that I know of.

 2      Q    Okay.  And did anybody talk to you about any of

 3   these incidents?

 4      A    Jim Stevens, Booch, Wayne says you should report

 5   it.  And I said, why, it's not going to do nothing,

 6   management already told me don't come to them with

 7   complaints, we told you what it would be like when you

 8   worked here.  So I left it alone.

 9      Q    Who told you not to come to them with complaints?

10      A    John Fitch, before I was hired, he told me the

11   rules.

12      Q    Before you got hired?

13      A    Yes, before I switched over to the maintenance

14   shop.

15      Q    What did he say?

16      A    Just I want to let you know that you're going to

17   get picked on and harassed in the shop, that's the nature of

18   working in the shop, don't come to me with complaints every

19   day, because I don't want to hear it, be a man, be tough.

20           So I thought, okay, being picked on, maybe I can

21   deal with it for a while, but not every day.

22      Q    And this was before you started working with

23   Justin Walters?

24      A    Before I even got hired to work in the shop.

25      Q    Did you report any of the conduct that you
```

Adams  v. Festival Fun Parks

1/20/2012                                                Andrew  Adams

Page 103

1    into my drawers to perform my work.

2        Q    And what did you do when that happened?

3        A    I told Mario Abela about it.

4        Q    And what did Mario say?

5        A    He told me he's going to talk to him, to tell him

6    to knock it off.  But, of course, it didn't stop.

7        Q    What didn't stop?

8        A    Justin from doing what he was doing all the time.

9        Q    Did he put the pumps in your spot after that?

10       A    Yes.

11       Q    How many times?

12       A    At least five times.

13       Q    Did you talk to Mario or anybody else about it,

14   after that initial conversation with Mario?

15       A    No.  Mario saw the pumps back there, so Mario

16   moved it and told people to knock it off.

17       Q    He told Justin to knock it off?

18       A    Yes.

19       Q    And did Justin knock it off after that?

20       A    Yes.

21       Q    Is there any other way that you feel Lake

22   Compounce retaliated against you, other than what you've

23   just described?

24       A    Well, I was looking for my blowtorch that I use,

25   and had my name on there, and it was missing and I couldn't

1    find it.  And I asked everybody in the shop have you seen my

2    blowtorch, and they said, no, we haven't seen it.

3           And one person said Wayne was using it at Boulder

4    Dash.  So I walked all the way up from the shop to Boulder

5    Dash, and it wasn't there.  So I came back from Boulder Dash

6    to the shop, and I found it in the black lockbox, they

7    called it.  And that's where I noticed where I had my name

8    on there, someone wrote the word "sucks" in a black

9    permanent marker next to my name.

10           And I showed it to my boss John Fitch.  And all he

11    did was shake his head, and walked away from me.

12    Q    He didn't say anything?

13    A    No.  Just walked away.

14    Q    Did you have any other discussions with anybody

15    about that, any manager or director?

16    A    No.  I told the workers about my blowtorch, you

17    know, who could do something like this.  They all looked at

18    me and go who knows.

19    Q    Did anybody ever admit to doing that?

20    A    No.

21    Q    You don't know who did that?

22    A    No, I don't.

23    Q    Did you have any other discussions with anybody

24    about that?

25    A    No.

Page 105

1       Q     Are there any other ways in which you think Lake

2    Compounce retaliated against you?

3       A     Not that I can think of right now.

4       Q     And what do you think you were being retaliated

5    against for?

6       A     I think just Justin didn't like me, he was trying

7    to find a way to maybe make me mad and leave the company.

8       Q     What conduct did you engage in, that you think

9    caused Lake Compounce to retaliate against you?  Is there

10   anything else, other than what you've described -- that

11   Justin didn't like you?

12      A     I think in my heart, since I'm a slow learner, it

13   takes me time to do things, and I have to constantly go at a

14   slower pace to pick it up.

15      Q     And you think you were retaliated against by Lake

16   Compounce because of that?

17      A     Yeah.

18      Q     And who, specifically, retaliated against you?

19      A     Well, one thing was Justin Walters.   John Fitch --

20   there was one day I was working on a ride, it took me all

21   day, I couldn't figure out how to fix the ride.  And he came

22   back into the shop and goes you're still work on that piece.

23            I'm like I'm having a hard time.  He goes you

24   should remember this by now, you've been with us for a

25   while.  So instead of showing me, all he did was basically

Adams   v. Festival Fun Parks

1/20/2012                                    Andrew  Adams

Page 108

1       A     I feel the hostile work environment for me.

2       Q     I'm just talking about policies.

3       A     Oh, I'm sorry.

4             ATTORNEY SABATINI:  Objection to form.

5             THE WITNESS:  Not that I know of.

6   Q   (By Attorney Boerner) Okay.  Are you aware of any

7   documents that relate to any of these instances of

8   discrimination or sexual harassment, or retaliation that

9   you've described?

10      A     Did I see any documentation?

11      Q     Yeah, any documentation relating to any of these

12  instances that you talked about today?

13      A     Just the stuff that I answered with my attorneys,

14  from the packet that we looked at.

15      Q     Nothing that's been produced in this lawsuit, that

16  you're aware of?

17      A     No.

18      Q     Why do you think you weren't given a position in

19  the paint department?

20      A     Well, Mr. Brick says to me you don't have any

21  experience in painting, and why would I put you in there if

22  you don't have any experience.

23            And I said to him, well, I have painted before,

24  when you guys first put me in there to help him out in the

25  wintertime, so I feel I can do some stuff.  But he says

Adams  v. Festival Fun Parks

1/20/2012                                          Andrew Adams

Page 109

1   there's no positions open.  So that's how it was left from

2   there.

3        Q    Okay.  Why do you think you were told that you

4   couldn't have a position in the paint department?

5        A    Because he said there was no positions open.

6        Q    Do you think that's true?

7        A    No.

8        Q    You think there were positions open?

9        A    Yes.

10        Q    What makes you think there were positions open?

11        A    Because Jim Stevens told me in the wintertime they

12   sent people over from the shop, who were mechanic helpers,

13   over there to help him out with stripping and taping, and

14   sanding and stuff like that.

15        Q    Were those full-time positions?

16        A    Well, they were to the main shop, they just went

17   over there to help out a couple of days a week, to help him

18   out.

19        Q    Were you looking for a full-time position in the

20   paint shop, or just a couple of days a week?

21        A    I wanted to be moved over there, because I didn't

22   want to work in the main shop and deal with that no more,

23   the harassment.

24        Q    You wanted a full-time position in the painting

25   shop?

Page 110

1        A    Yes.

2        Q    Are you aware of anyone that got hired full-time

3    in the paint department, after you asked to be transferred

4    there?

5        A    I have no clue.

6        Q    You don't have any reason to think that somebody

7    was hired full-time after that?

8             ATTORNEY SABATINI:  Objection to form.

9             THE WITNESS:  No.

10   Q    (By Attorney Boerner) I'm sorry?

11       A    No.

12       Q    Is there any other reason that you can think of,

13   that it's not true that you weren't hired for the painting

14   department because there were no positions?

15       A    I feel it was a lie, because then why did you send

16   people over from the shop to go and help him out, if there's

17   no work to be done over there.

18       Q    Other than people working one to two days a week

19   there, is there any other reason that you think there was a

20   position open in the paint department?

21       A    No.  I believe that there could have been a

22   position open, because they needed people to help out; they

23   can't do all the work.

24       Q    You thought that there was enough work for them to

25   hire someone?

Adams  v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

                                                      Page 111

1       A    Yes, I did.

2       Q    But you're not aware of anybody being hired

3    full-time in the paint department, after you asked for a

4    position there?

5            ATTORNEY SABATINI:  Objection to form.

6            THE WITNESS:  No.

7    Q    (By Attorney Boerner) Before you started working for

8    Lake Compounce, did you suffer from any kind of disability?

9       A    Just my slow learning disability.

10      Q    Can you describe that disability for me?

11      A    It's a slight mental retardation.  That's what I

12   was tested for.

13      Q    And who tested you for that?

14      A    We went to a hospital in Newington, and they

15   tested me.

16      Q    And when was that?

17      A    Oh, my goodness, it's when I was kid.  I can't

18   remember exactly what year.

19      Q    Okay.  Did you have any other testing for it,

20   other than that?

21      A    Just a regular school test that they do, what the

22   special ed teachers do.

23      Q    What kind of testing was that?

24      A    All of the stuff, like, you know, like math,

25   reading, how to wash clothes; basic stuff that you need to

Adams   v. Festival Fun Parks

1/20/2012                                               Andrew  Adams

Page 112

1    know in life.

2        Q    Has a doctor ever diagnosed you with having a

3    disability?

4        A    My physical doctor, when I was a kid.

5        Q    Are you talking about the Newington --

6        A    No, it was a regular doctor.

7        Q    What doctor was that?

8        A    Dr. Blumer.

9        Q    And what was his diagnosis?

10       A    It came out as a slight mental retardation.

11       Q    Do you have any medical records that relate to

12   that diagnosis?

13       A    My mom probably has them.  I don't.

14       Q    What are your symptoms?

15       A    As a slow learner?

16       Q    Yes.

17       A    Spelling is number one.  Reading, I can only read,

18   I think, normally third grade reading -- third, fourth grade

19   level of reading.  Remembering a lot of things all at once;

20   I can only remember up to five things, and after that I

21   can't remember.  That's all really I can think of.

22       Q    How does that affect your day-to-day life?

23       A    Well, I can't really get out and go get a really

24   good job because of my disability, I can never be in college

25   because I can't take college courses.

Adams   v. Festival Fun Parks

1/20/2012                                           Andrew  Adams

Page 123

1  out there with you, a first year mechanic is not enough for

2  you to know what to do.  And that was about it.

3      Q    Did there ever come a time that you were working

4  as a mechanic helper, that you felt that you had finally

5  learned how to work the rides, and you were well equipped to

6  be able to handle some of your responsibilities?

7      A    Some of the rides I could do.  Some of the harder

8  rides, I couldn't do.

9      Q    Were you asked to do work on the harder rides?

10     A    They were a part of my rides.  And there were days

11 I called for help.  And some days I regretted calling for

12 help, because two-way radios works where everybody hears

13 when you call for help.  I would try to wait until I seen

14 Wayne.

15     Q    When you called for help, did you get help?

16     A    Yeah, eventually.  It took time, but they came.

17     Q    Do you think other employees were given better

18 opportunities by Lake Compounce, or recognition by Lake

19 Compounce because they weren't disabled?

20     A    I believe so.

21     Q    How?

22     A    Because they don't need to ask for help.  They

23 don't have the special learning disability, like I had.

24     Q    What kind of recognition or opportunities were

25 they given, that you weren't?

Page 124

1      A    Well, they get the bigger rides.  They didn't have

2    the kiddie rides like I was stuck on.  They get to move on

3    to bigger rides and bigger things.  They would send them out

4    to special classes to learn more, and I was supposed to go

5    but they cut it out of the budget for me.  So I felt, yeah,

6    I wasn't getting treated the right way.

7      Q    Okay.  Any other way that you think that other

8    employees were given more opportunities or recognition,

9    because they weren't disabled?

10     A    Well, yeah, because they're getting paid a lot

11   more than I was.  As a helper, I wasn't getting paid doing a

12   mechanic's job.

13     Q    You were a mechanic helper, not a mechanic?

14     A    Exactly.

15     Q    And the mechanics got paid more than a mechanic

16   helper?

17     A    Exactly.

18     Q    Did you apply for the position of a mechanic?

19     A    I applied for the job as a helper, that's what was

20   offered to me, and that's the pay rate that I got -- but

21   doing the helper job, not doing an actual mechanic job.

22          As a helper you're supposed to go with someone and

23   be their right-hand man with them.  That didn't happen with

24   me.

25     Q    Did you ever actually apply for the position of

Adams   v. Festival Fun Parks

1/20/2012                                           Andrew  Adams

Page 126

1      Q     So they were mechanic helpers, just for the water
2  park?
3      A     Yes.
4      Q     What about Joey Felco, was he a mechanic helper
5  for a particular part of the park?
6      A     Joey came in to help me out, and then he started
7  moving on to bigger rides.
8      Q     He came on to help you out?
9      A     In the kiddie ride section.
10     Q     What had he been doing before that?
11     A     He was a ride supervisor for a couple of seasons.
12  And now he's there full-time, as a mechanic.
13     Q     I think you said that you never applied for the
14  position of mechanic.  Did you ever ask to be promoted to
15  that position?
16     A     No, I never asked, because I figured I'm doing
17  mechanics' work already.
18     Q     Did you ever tell anyone that you thought you were
19  not being paid fairly?
20     A     I spoke to Jerry Brick about it, which is the
21  general manager.  And basically I didn't get nothing out of
22  that talk.  He said you should be happy that you got a
23  raise.
24            And then I spoke to Mario, by boss.  And he says
25  the raises went across fair and square across the board,

Adams   v. Festival Fun Parks

1/20/2012                                    Andrew  Adams

Page 129

1       A    Yes.

2       Q    Are you saying that what Lake Compounce did caused

3  you embarrassment?

4       A    I would say that, yes.

5       Q    How did it cause you embarrassment?

6       A    Just from being harassed.  No one else gets that

7  same treatment, why me?

8       Q    Did you ever talk to anybody in Lake Compounce's

9  human resources department about Justin Walters?

10      A    I spoke to Mary Anne Dudek.

11      Q    When did you talk to her?

12      A    I talked to her at the time when it started

13 happening, back in 2009.

14      Q    What did you say to her?

15      A    I told her basically how I get picked on by him

16 constantly and bullied.  And she goes I understand, I know

17 it's hard in the shop.  I knew you were going to have some

18 issues like that in the shop, but I didn't think it would

19 get that bad for you.

20           And she says have you talked to John and Mario

21 about what he said.  I said no, because this is what John

22 said to me, "you're going to work in the shop, you're going

23 to get picked on and harassed."  She basically shook her

24 head at me and basically said I'm sorry.  But she's not

25 there no more either, so...

Case: 13-1183    Document: 51    Page: 311    08/19/2013    1020229    458

Page 163

1    left Lake Compounce?

2         A    No, I did not.

3         Q    You're claiming emotional distress, we just

4    discussed that, correct?

5         A    Yes.

6         Q    What have been the effects of the emotional

7    distress that you've suffered from?

8         A    Number one, losing my job, the place I loved to go

9    to, to work, every day.  Would have been there until the day

10   I retired.  Being picked on, bullied every day, and just

11   felt like after a while I didn't want to be there no more,

12   and I couldn't find a job that I liked doing.

13        Q    What effect has that had on you?

14        A    Made me feel like I'm not good for what I want to

15   do.

16        Q    Any other effects of the emotional distress that

17   you've suffered?

18        A    There's days I can't sleep, there's nights I have

19   the worst nightmares about Justin doing things to me, just

20   been sick over this whole thing.  Basically that's about it.

21        Q    When you say "sick," do you mean physically sick

22   or emotionally?

23        A    Both.  There's days I don't want to eat, there's

24   days that I feel sick to my stomach, I just don't feel like

25   I used to.

Adams   v. Festival Fun Parks

1/20/2012                                    Andrew  Adams

1      A    Yes.

2      Q    -- that you had a discussion in 2008 with him?

3      A    Yes.

4      Q    But it didn't relate to discrimination or

5   harassment with him?

6      A    No.

7      Q    All right.  So the February 2009 discussion you

8   had with John Fitch, this says here "I verbally reported

9   Walters' on your knees comment to John Fitch."  Do you see

10  that?

11     A    Yes.

12     Q    What was John Fitch's response?

13     A    He looked at me and smiled, and then basically

14  just said, well, I told you that if you're going to work in

15  this shop here, you're going to get harassed and picked on,

16  and don't come to me and complain to me about it.  That's

17  when I walked away from John and went home for the day,

18  because I talked to him before it was time to go home.

19     Q    Did you talk to anybody else about that?

20     A    No.

21     Q    What about the June 2009 comment, where you say "I

22  showed my blowtorch with the word "sucks" on it to Fitch."

23  What was his response then?

24     A    He just looked at me and he shook his head, and he

25  says I'll see what I can do about this, and that was it.

Page 168

```
 1      Q    Did you ever talk to him about it again after

 2  that?

 3      A    No, I didn't.

 4      Q    And then July 2009 you said "I verbally reported

 5  to John Fitch and Mario, that Walters was putting things in

 6  my work area."  And what was their response to that?

 7      A    Well, John's response to it was basically nothing;

 8  I got nothing out of that.  Mario finally did something

 9  about it, he told him to knock it off.  And then it stopped

10  after Mario said that to him.

11      Q    And when was it that Mario told him to stop?

12      A    When did he?

13      Q    Right.

14      A    It was like in the summertime when I was there.

15      Q    Do you see August 2009, "I told Mario about

16  Walters throwing some things in my work area"?

17      A    Uh-huh.

18      Q    Was it after that, that he told him to stop?

19      A    Yes.

20      Q    And then July 2009 you say "I told Mario that I

21  was having a problem with Walters picking on me."

22      A    Yes.

23      Q    What was that discussion?

24      A    I sat in his office and told him I was having

25  problems with Mr. Walters constantly picking on me, calling
```

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

Page 169

1   me names, calling me stupid, and I said I'm getting tired of

2   it, Mario.  And I said I've never done nothing wrong to him,

3   why is he always picking on me.

4            And Mario just says, you know, Andy, he comes from

5   a different area, he comes from Kennywood Park, and he has

6   no friends, maybe he's just trying to be your friend, try to

7   get along with him, it's not like you have to go with him.

8       Q    Was that the end of your discussions at that point

9   with Mario about that?

10      A    Basically, because nothing else was getting said.

11      Q    And then in September of 2009 you said "I told

12  Fitch about Walters throwing an apple at my truck."

13      A    Yes.

14      Q    I think you started to describe that incident

15  earlier, but can you give me your recollection of what

16  happened there?

17      A    I was driving my truck from the park to the

18  maintenance shop.  As I pulled into my spot to park my

19  truck, to get out of my truck, and shut the door and walking

20  to get the ride part out of the back of the pick-up, I heard

21  a bang.

22            And I see Justin and Jordan over there, and Justin

23  is laughing, giggling.  And I looked at him, and I said to

24  him what an asshole you are.  And then I walked away from

25  him, and I walked back in the shop.

Adams   v. Festival Fun Parks
1/20/2012                                        Andrew  Adams

Page 170

1          And I told Jordan that, you know, I'm going to
2     tell John about this.  And Jordan said don't make a big deal
3     about it, it's just an apple.  And I said this is my
4     personal truck, how would you like it happening to your
5     vehicle.
6          And the next day I made a complaint to John Fitch
7     about that.  There's a rule, nobody is supposed to touch
8     anybody's personal items here at the park.  What got me mad
9     was that he didn't even volunteer to clean the mess off my
10    truck.
11         Q    Who didn't?
12         A    Justin Walters.  And according to his statement to
13    John was that I drove into the apple, as I was a driving
14    away from the maintenance shop.
15         The speed limit from the maintenance into the park
16    is ten miles per hour.  So if I was going to drive into the
17    apple, I'd have to go about 50 miles an hour to go into the
18    apple.  And there's a garbage can right outside the shop, so
19    why couldn't he throw the apple in the garbage can?
20         Q    Did you talk to Justin directly about this?
21         A    No.  I called him an asshole and walked away from
22    him.
23         Q    How do you know what Justin said happened?
24         A    Well, that's the response that I got from other
25    people, that Justin must have told the witnesses what him

Brandon Smith Reporting & Video
860-549-1850    production@brandonreporting.com   249 Pearl Street

JA 313

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **ANDREW ADAMS,** | : | |
| | : | |
| Plaintiff, | : | **Case No.: 3:11 cv 00427 (JCH)** |
| | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **FESTIVAL FUN PARKS, LLC, d/b/a** | : | |
| **LAKE COMPOUNCE THEME PARK,** | : | |
| | : | |
| Defendant. | : | **APRIL 27, 2012** |

**<u>AFFIDAVIT OF ANDREW ADAMS</u>**

I, Andrew Adams, being first duly cautioned and sworn, and being more than eighteen years of age and competent to testify about the matters contained herein, hereby state as follows upon personal knowledge and information:

1. I am male.

2. I suffer from a slight mental retardation.

3. My disability causes me to be a slow learner, and it takes me longer than average to remember how to perform tasks I am assigned.

4. I began working at Lake Compounce as a seasonal worker in 1997, and continued to be a seasonal worker through 2007.

5. In 2008, I was hired as a full-time employee as a mechanic or maintenance helper.

6. As a mechanic helper, my job was supposed to be assisting mechanics, but I often did jobs on my own, and still received mechanic helper pay. I should have gotten more individualized training or more shadowing experience.

7. During this time, John Fitch was my supervisor, and the main supervisor, the supervisor ahead of him was Mario Abela. Jerry Brick was the general manager.

8. John Fitch and Jerry Brick at Lake Compounce both knew that I was a slow learner and had a slight mental retardation, as I informed them of this when I was originally hired as a seasonal worker in 1997. I told them that I took special education classes and was a slow learner.

9. While a full-time employee, I was harassed and discriminated against by some of my co-workers in the maintenance department.

10. In February & July 2009, Justin Walters, my co-worker, made a comment to me while I was working on my knees stating that I should get down on my knees and being on my knees was my best position because I like men. Co-workers names Tommy J., Kyle and Joey Fecko were with me. I told my supervisor, John Fitch, about this comment and he told me that he informed me when I became full-time that while working in the shop I would get harassed and picked on and that he didn't want me complaining to him. Fitch told me to "be a man" and be tough.

11. In June 2009, Justin Walters told me that he "had" my mother last night and that she was good.

12. On June 2, 2009, my blow torch was missing. My blow torch had my name on it, so I asked people if they had seen it and everybody told me "no." When I found it in the shop, someone had written next to my name on the

2

blow torch in black permanent marker "sucks." I informed John Fitch and Mike Hayes, in HR, of this incident.

13. In July 2009, Justin Walters through nuts and bolts at me. When they landed in the parts washer, the fluid splashed onto me. Dan Pratt, a co-worker named Jordan, Wayne Olsen and Jim Stevens witnessed Walters throwing things at me.

14. In September 2009, I was driving my truck from the park to the shop. When I got out of my truck and walked to the back of it to grab some things, I saw Justin Walters throw his apple on the side of my truck. When it hit my truck, some of the apple remained mashed onto my truck. Justin Walters was laughing about it. A co-worker named Jordan also saw this incident. I told John Fitch about this, and Fitch told me he would talk to Walters, but to my knowledge that never happened.

15. In October 2009, while I was working on a ride, told me that I was stupid and said "what the heck is wrong with you?" This comment was unwelcome and offensive.

16. I spoke with Fitch's supervisor, Mario Abela, in July and August of 2009 about the harassment and discrimination by Walters and was told to give the guy a chance, that he wasn't so bad.

17. In September 2009, I spoke with Jerry Brick, the general manager about changing positions because I was having difficulty in the main shop. I wanted to be moved to the paint shop.

3

18. Jerry Brick first told me that he wouldn't give me a position in the paint shop because I did not have any experience.

19. I informed Jerry Brick that I had past experience in paint work and that I have helped Jim Stevens in the paint shop before, and then Jerry Brick told me there were no open positions in the paint shop.

20. I believe that Jerry Brick lied to me because the paint shop had a lot of work to be done and people from the main shop would often go over to the paint shop to help out. I am also of the information and belief that after I was terminated, some people were taken from the main shop and worked in the paint shop.

21. At this point I had merely told Brick that I was having trouble in my position and was thinking about leaving the company if I could not be transferred to another department. I did not ever give a verbal or written resignation.

22. John Fitch suggested that I take some vacation time and holiday time; therefore, I took two weeks off.

23. When I returned I was told that Jerry Brick had already told corporate that I had resigned from the company. I told Jerry Brick that I did not get another job I had applied for and was only thinking of leaving because I could not be transferred to the paint department, but that I had never resigned. Jerry Brick then told me that he didn't have anything for me at that time and that October 31, 2009 would be my last day. Jerry Brick also informed me that he would allow me to collect unemployment and he would not appeal it.

4

JA 318

24. On October 31, 2009, my employment with the defendant was terminated and I was forced out of the company.

25. On November 8, 2009, I wrote a letter to corporate explaining that I was sexually harassed and discriminated against at work, that I had informed my supervisors about the harassment and that had done nothing about it and that I asked to change departments. I also told them that I felt forced out of the company or "pushed out the door."

26. My supervisors at Lake Compounce never told Justin Walters to stop harassing me and never ended the harassment or discrimination. This allowed my co-workers to create a hostile work environment for me.

27. The daily harassment caused me embarrassment.

28. The daily harassment has also caused me trouble outside of work. I have nightmares of Justin Walters harassing me.

29. I believe that I was sexually harassed, discriminated against because of my disability because I was a slow learner and my gender and the fact that I wasn't dating women, and retaliated against for complaining of the harassment and discrimination.

5

_____

Andrew Adams

Sworn and subscribed to before me
this _4/1_ day of _May_ 2012.

_____

Notary Public Commissioner of the Superior Court
My Notary Commission Expires On:  3/31/17

6

JA 320

**ELECTRONIC CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2012, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ James V. Sabatini
James V. Sabatini

7

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

ANDREW ADAMS,            )
                               )
         Plaintiff,     )
                               )   Case No. 3:11-cv-00427 (JCH)
vs.                     )
                               )
FESTIVAL FUN PARKS, LLC,   )
d/b/a LAKE COMPOUNCE     )
                               )
                               )
         Defendant.   )
                               )

**PLAINTIFF'S RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES**

Defendant, Festival Fun Parks, by and through its undersigned counsel, and pursuant to Federal Rule of Civil Procedure 33, hereby requests that Plaintiff Andrew Adams answer the following Interrogatories, separately and under oath, within thirty (30) days of service in accordance with the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Connecticut, and the instructions and definitions set forth herein.

## INSTRUCTIONS AND DEFINITIONS

Please follow these instructions and use the following definitions in responding to these Interrogatories. Any term or word that is not defined herein has its usual and customary meaning.

A.     In each response to these Interrogatories, provide all information in your possession, custody, or control. If you are able to provide only part of the information sought,

**Error! Unknown document property name.**

provide that partial information and specify the reason for your inability to provide the remainder.

B.    Whenever appropriate to these Interrogatories, the singular shall be interpreted as the plural and vice versa; the present tense shall include the past tense and vice versa; and the neuter shall include both the masculine and feminine.

C.    If any form of privilege or protection from disclosure is claimed as a ground for withholding any document and/or responsive information, the answering party shall set forth (i) the name of the document and/or responsive information, its date, the sender and/or speaker, recipient, persons to whom copies have been furnished, its subject matter, and all other information required for identification of the document and/or responsive information without revealing the information for which the privilege or other protection from disclosure is claimed, and (ii) the basis for the claim of privilege or protection from disclosure.

D.    The terms "and" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Interrogatories any information that might otherwise be construed to be outside their scope.

E.    Pursuant to Federal Rule of Civil Procedure 26(e) and Federal Rule of Civil Procedure 33, these Interrogatories are continuing in nature so as to require you to file a supplementary response and/or provide supplementary documents if you subsequently obtain additional or different information or documents before the trial.

F.    "Plaintiff" or "you," as used herein, refers to Plaintiff Andrew Adams and all servants, representatives, investigators, related persons and entities, attorneys, and all other persons acting on his behalf.

Error! Unknown document property name.

G.    "Defendant," as used herein, refers to Festival Fun Parks and all predecessors, successors, principals, officers, directors, agents, affiliates, employees, servants, representatives, investigators, related persons and entities, attorneys, and all other persons acting on its behalf.

H.    "Document" shall mean and include every writing, record, or graphic matter of every type and description in any form, however produced or reproduced, tangible or retrievable in any way, whether prepared by you, or received by you and wherever located, now or at any time in your possession, custody or control, including, but not limited to, papers, correspondence, memoranda, notes, interoffice communications, charts, proposals, lists, notebooks, circulars, brochures, catalogues, advertisements, plans, handbooks, manuals, letters, minutes, resolutions, statements, contracts, agreements, summaries, messages, diaries, address books, rolodexes, calendars, personal planners, telephone logs, telephone records, books of account, bills, checks and check stubs, receipts, invoices, vouchers, orders, printouts, e-mails, maps, charts, diagrams, blue prints, sketches, models, prototypes, electronically stored information, CD-ROMs, disks or diskettes, audio or video tape, palm pilot, blackberry, or other PDA data, and/or any other such documents or form of written, printed or electronically stored information, data or words.  "Document" also includes any preliminary notes and drafts, and all originals, copies, and any copy that contains any notation or other addition to or modification of the original.  Without limitation of the term "control" as used above, a document is deemed to be in your control if you have the right to secure the document or a copy thereof from another person, of public or private entity which has actual possession thereof.  If a document was, but is no longer in your possession or subject to your control, state what disposition was made of it, by whom and the date or dates, or approximate date or dates, on which such disposition was made, and why.

Error! Unknown document property name.

I.      "Person" means any natural individual in any capacity whatsoever or any entity or organization, including divisions, departments, or other units therein, and shall include, but not be limited to, a public or private corporation, partnership, joint venture, voluntary unincorporated association, organization, proprietorship, trust, state, government agency, commission, bureau, or department.

J.      1.      The term "identify" with respect to a natural person means to:

        (a)      state his or her name; and

        (b)      state his or her current or last known residence, address and telephone number.

    2.      The term "identify" with respect to a document or report means to state its:

        (a)      date;

        (b)      title or content identifier;

        (c)      author; and

        (d)      current location.

    3.      The term "identify" with respect to a communication, means to state its:

        (a)      date;

        (b)      names and titles of persons involved; and

        (c)      the content of the communication.

    4.      The term "identify" with respect to a transaction, event, incident or occurrence means to:

        (a)      state the date thereof;

        (b)      identify each person involved; and

**Error! Unknown document property name.**

(c)    identify the location of the transaction, event, incident or occurrence.

K.    "Reflect(s), relate(s) to, or refer(s) to" means pertains to, refers to, concerns, evidences, embodies, comprises, or has any logical or factual connection with the subject matter of the Interrogatories.

L.    "State in detail the factual basis for your contention," as used in these Interrogatories, means that you should fully and completely describe every act, event, occurrence, omission, document or communication of which you know that supports your contention, as well as identify any witnesses whose testimony you expect will support your position.

M.    "Action" means the civil litigation pending between Plaintiff Andrew Adams and Defendant Festival Fun Parks in the United States District Court for the District of Connecticut, No. 3:11- cv-00427 (JCH).

N.    "Complaint" means the document Plaintiff filed in the United States District Court for the District of Connecticut on March 18, 2011.

O.    "Health Care Provider" means any doctor or other practitioner or institution of medical science or healing art, including but not limited to, counselors, nurses, chiropractors, psychologists, psychiatrists, podiatrists, dentists, optometrists, social workers, therapists, obstetricians, and physical/occupational therapists, as well as hospitals, clinics, hospices, and other institutions providing health care.

## INTERROGATORIES

1.      Identify any person from whom you have obtained or will obtain a written or oral report, statement, memorandum, affidavit, declaration, or testimony regarding any of the allegations in your Complaint and describe the general subject matter of the report, statement, memorandum, affidavit, declaration, or testimony.

**ANSWER:**

Subject to and without waiving the Objection: one or more of the following individuals will be deposed.

1.      Justin Walters (employed by defendant): Walters will likely have discoverable information on plaintiff's employment with the defendant, his conduct directed towards the plaintiff, and the allegations set forth in plaintiff's Complaint.

2.      Bill Cook (employed by defendant): Cook will likely have discoverable information on plaintiff's employment, plaintiff's job performance and the allegations set forth in plaintiff's Complaint.

3.      Joseph Fecko (employed by defendant): Fecko will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

4.      Tommy Juskevicious (employed by defendant) Juskevicious will likely have discoverable information on plaintiff's employment and the allegations set forth in plaintiff's Complaint.

5.      Wayne Olsen (employed by the defendant) Olsen will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

Error! Unknown document property name.

6.      Jim Stevens (employed by defendant) Stevens will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

7.      Jerry Brick (employed by the defendant) Brick will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

8.      Michael Hayes (employed by defendant) Hayes will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

9.      John Fitch (employed by defendant) Fitch will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

10.      Richard Aylward (former employee of the defendant, current address unknown) Aylward will likely have discoverable information on plaintiff's employment, plaintiff's job performance, the allegations set forth in plaintiff's Complaint.

11.      Bryn Goldbeck (employee of the defendant) Goldbeck will likely have discoverable information on plaintiff's employment, plaintiff's job performance, the allegations set forth in plaintiff's Complaint.

12.      Holly Byrnes (former employee of defendant, current address unknown) Byrnes will likely have discoverable information on plaintiff's employment, plaintiff's job performance, the allegations set forth in plaintiff's Complaint.

13.      `Jim Lenois (former employee of defendant, current address unknown) Lenois will likely have discoverable information on plaintiff's employment, plaintiff's job performance,

the allegations set forth in plaintiff's Complaint.

  14. Rich Booch (employee of defendant) Booch will likely have discoverable information on plaintiff's employment, plaintiff's job performance, the allegations set forth in plaintiff's Complaint.

  15. Marianne Dudac (former employee of defendant, current address unknown) Dudac will likely have discoverable information on plaintiff's employment, plaintiff's job performance, the allegations set forth in plaintiff's Complaint.

  16. Cynthia K. Niedbala, M.S., Educational Diagnostician (formerly with Newington Children's Hospital, Newington, Connecticut, current address unknown) Niedbala will likely have discoverable information concerning plaintiff's mental disability.

  2. Describe in detail the amount of damages that you are claiming in this Action for Festival Fun Park's alleged violations of the Americans with Disabilities Act, the Connecticut Fair Employment Practices Act, and Title VII of the Civil Rights Act.  Include in your description the basis of each calculation of damages by item, including each and every factor used in making said calculation, and identify any documents that record or relate to your damages or that record the basis of your calculation of damages.

**ANSWER:**

1. Back Pay: 10/31/09 through present date of December 1, 2011, at $10.66 per hour, 40 hours per week equals $46,051.20  (subject to offset from wages and income earned post termination)(further subject to any overtime worked)

2. Front Pay: Two years - $44,345.60(subject to additional overtime pay and to any offset

from current wages and/or income)

3.      Emotional Distress - $50,000.00

4.      Consequential Damages: will be supplied

5.      Attorneys' Fees & Court Costs: will be supplied

6.      Punitive Damages: To be determined by trier of fact

    3.      Identify each and every Health Care Provider who has examined, diagnosed, and/or treated the diagnosis of your alleged "mental retardation," including, but not limited to, any Health Care Provider who made any recommendation in regards to your employment or any accommodation related thereto. For each such Health Care Provider, state the dates you were examined, diagnosed, or received treatment, and describe the diagnosis and/or treatment.

**ANSWER:**

    Subject to and without waiving the objection, plaintiff identifies the following

1.   Newington Children's Hospital

     Clinician: Cynthia K. Niedbala, M.S. Educational Diagnostician

     Date of Testing: 1990

     The Newington Children's Hospital moved or became a part of the Connecticut

Children's Medical Center, 282 Washington Street, Hartford, Connecticut 06016 in 1996.

    4.      Identify each person not already identified whom you know or believe has any knowledge or information related to any and all facts, circumstances, or issues raised in the

Complaint, and for each such person, describe in detail the nature of his or her information or knowledge.

**ANSWER:**

See individuals identified in response to Interrogatory No. 1

5.      Identify each and every statement, whether written or oral, made at any time by Defendant, or any of its current or former agents or representatives, that you contend or believe constitutes an admission or declaration against interest on the part of Defendant or any of its current or former agents or representatives with regard to the subject matter of your Complaint.

**ANSWER:**

Subject to and without waiving the Objection, plaintiff identifies the following:

1.      Justin Walters stated: Andy get down on your knees that is the best spot for you.

2.      I went looking for my blow torch that had my name on it. When I found it the word "SUCKS" was written on it.

3.      Mario Abela, my other boss in the shop, told me that Justin Walters liked to play jokes on me.

4.      Walters, told the me that he "had" my mother last night and that she was good.

5.      Mario Abela told me to give Walters a chance and that he was not so bad.

6.      Fitch told me that I would have to deal with it (Walter's harassment) if I wanted to work in the department.

7.      Walters told me that being on my knees was my best position and that I liked being on my knees because I liked guys so much.

8.      Walters threw and smashed an apple on my truck.

Error! Unknown document property name.

Additional admissions may be discovered during the course of discovery.

6.      Identify each expert witness you have reason to believe you will engage, use, or ask to provide testimony in connection with this matter and, as to each such person, describe in detail his or her profession or occupation and the field in which he or she allegedly is an expert, the subject matter about which he or she is expected to testify, the substance of the opinion to which he or she is expected to testify, give a summary of the grounds upon which he or she bases that opinion, and identify all documents upon which he or she is expected to rely in support of his or her testimony.

**ANSWER:**

Subject to and without waiving the objection, plaintiff identifies the following:

Newington Children's Hospital – now a part of CT Children's Medical Center

Clinician: Cynthia K. Niedbala, M.S. Educational Diagnosticia

It is anticipated that Niedbala will offer testimony regarding her clinical records pertaining to the plaintiff. As for the substance of her opinions, see attached documents Plaintiff's Bates Nos. Nos. 161-171

7.      Identify each employee of Festival Fun Parks (if any) that you notified, informed, or otherwise apprised of your alleged "mental retardation," and for each such person identify the date and substance of the communication related to your "mental retardation," and whether the notification was made in writing.

**ANSWER:**

Error! Unknown document property name.

I identified in my job application with the defendant that I was a slow learner. I also informed my bosses and my general manager about my learning disability.

8.    Describe in detail your professional qualifications and experience that would qualify you to work in the paint department at Lake Compounce.

**ANSWER:**

See attached copy of my resume and May 24, 2009 memo from Jerry Brick. Plaintiff's Bates Nos. 6; 172

9.    Identify each instance of harassment you experienced while employed by Festival Fun Parks, and for each such instance identify the representative of Festival Fun Parks that allegedly harassed you, the date on which the alleged harassment occurred, the location in which the alleged harassment occurred; and describe the substance of the alleged harassment.

**ANSWER:**

Feb. 2009 and July 2009:Walters, told me that being on my knees was my best position and that I liked being on my knees because I liked guys so much.

June 2009: Walters said that he "had" my mother last night and that she was good.

June 2, 2009: I went looking for my blow torch that had my name on it. When I found it the word "SUCKS" was written on it.

July 2009 – Walters threw nuts and bolts towards me and they landed into the parts washer and the fluid splashed onto me.

August 2009 – Walters put his palette of 2 Water Park Pumps in my work area.

September 2009 - Walters threw and smashed an apple on my truck.

Error! Unknown document property name.

October 2009 – I was working on the sky ride at the park.  Walters questioned the work that I performed on the ride.

10.    Identify each complaint you made to a representative of Festival Fun Parks of any alleged harassment, and for each such complaint identify the representative of Festival Fun Parks to whom you reported the alleged harassment, identify the date on which you reported the alleged harassment, describe the substance of the complaint, and state whether the complaint was made in writing.

**ANSWER:**

February 2009 – I verbally reported Walters "on you knees" comment to John Fitch.

June 2009 – I showed my blow torch with the word "sucks" on it to Fitch

July 2009 – I verbally reported to John Fitch and Mario that Walters was putting things in my work area

July 2009, I told Mario that I was having a problem with Walters picking on me.

August 2009 – I told Mario about Walters putting things in my work area

September 2009 – I told Fitch about Walters throwing an apple at my truck

October 2009 – I told Jerry Brick about the problems I was having at the shop and asked to work in the paint shop.

11/8/09 email – see attached plaintiff's Bates No. 20

11.    Identify each instance of discrimination you experienced while employed by Festival Fun Parks, and for each such instance identify the representative of Festival Fun Parks that allegedly discriminated against you, the date on which the alleged discrimination occurred,

Error! Unknown document property name.

the location in which the alleged discrimination occurred; and describe the substance of the alleged discrimination.

**ANSWER:**

Justin Walters called me stupid on multiple occasions.

In October 2009, Walters said that I did not know what I was doing.

In June 2009, someone wrote the word "sucks" next to my name located on my blow torch.

In September 2009, Walters threw and smashed an apple on my truck.

In February and July 2009 Walters, told me that being on my knees was my best position and that I liked being on my knees because I liked guys so much.

In June 2009 Walters, told the plaintiff that he "had" plaintiff's mother last night and that she was good.

In October 2009 I spoke to Jerry Brick, and asked if he could find a new position to work because of the problems I was having and I was told that there were no open positions in the painting department.

12.    Identify each complaint you made to a representative of Festival Fun Parks of any alleged discrimination, and for each such complaint identify the representative of Festival Fun Parks to whom you reported the alleged discrimination, identify the date on which you reported the alleged discrimination, describe the substance of the complaint, and state whether the complaint was made in writing.

**RESPONSE:**

Error! Unknown document property name.

February 2009 – I verbally reported Walters "on you knees" comment to John Fitch.

June 2009 – I showed my blow torch with the word "sucks" on it to Fitch

July 2009 – I verbally reported to John Fitch and Mario that Walters was putting things in my work area

July 2009, I told Mario that I was having a problem with Walters picking on me.

August 2009 – I told Mario about Walters putting things in my work area

September 2009 – I told Fitch about Walters throwing an apple at my truck

October 2009 – I told Jerry Brick about the problems I was having at the shop and asked to work in the paint shop.

11/8/09 email – see attached plaintiff's Bates No. 20

 

13.     State in detail the factual basis for your contention that "defendant treated the plaintiff adversely different from similarly situated non-male employees."

**ANSWER:**

See amended complaint as the amended complaint eliminated the allegation

 

14.     Identify the discriminatory employment practice(s), if any, that you opposed during your employment with Festival Fun Parks.   For each discriminatory practice that you identify as having opposed, identify the statement, writing, or other communication you made to a representative of Festival Fun Park in which you opposed the allegedly discriminatory employment practice(s), and identify the representative of Festival Fun Parks with whom you so communicated.

**ANSWER:**

February 2009 – I verbally reported Walters "on you knees" comment to John Fitch.

June 2009 – I showed my blow torch with the word "sucks" on it to Fitch

July 2009 – I verbally reported to John Fitch and Mario that Walters was putting things in my work area

July 2009, I told Mario that I was having a problem with Walters picking on me.

August 2009 – I told Mario about Walters putting things in my work area

September 2009 – I told Fitch about Walters throwing an apple at my truck

October 2009 – I told Jerry Brick about the problems I was having at the shop and asked to work in the paint shop.

11/8/09 email – see attached plaintiff's Bates No. 20


15.     Identify any and all conduct by Festival Fun Parks that constituted discharging, expelling, or otherwise discriminating against you as a result of any opposition to a discriminatory employment practice identified above.

**ANSWER:**

    I complained to the defendant that Walters was harassing me. Defendant did not end the harassment. I asked the defendant for a job transfer. Defendant did not transfer me. Defendant terminated my employment.


16.     Identify by case or docket number any complaint or charge you have filed, or any proceeding with which you have testified or assisted, and for each such complaint, charge or

proceeding describe in detail the subject of the complaint, charge, or proceeding, and the state the current status of the litigation, charge, or proceeding.

**ANSWER:**

    Objection pending

17.    Describe in detail all your efforts to secure employment with any person between your separation from Festival Fun Parks through the present.  Your response should include an identification of any and all applications or interviews for employment and any and all attempts to establish or to buy a business operation or establish self-employment.   If an offer of employment was extended to you, please describe each offer, indicating by whom and when made and the full terms of the offer (salary, fringe benefits, bonuses, conditions of employment, etc.), whether you accepted or refused any offer of employment, and the identity of any documents which record or reflect any of the above.

**ANSWER:**

1.    M&M Market and Deli, LLC, 1277 Stafford Avenue, Bristol, CT 06010. See attached plaintiff's Bates Nos. 129-160

2.    Illusions, 1639 Wolcott Road, Wolcott, CT 06717. See attached plaintiff's Bates Nos. 18-19

3.    Andrew Adams d/b/a Gold Leaf Galleries, home address. See attached plaintiff's Bates Nos. 107-128

**Error! Unknown document property name.**

18.     Identify each document or other fact that you believe will support or refute any of the allegations in your Complaint to the extent such document or other fact is not otherwise identified in any other answer to these Interrogatories

**ANSWER:**

Objection pending

Error! Unknown document property name.

Date:  August 11, 2011

FISHER & PHILLIPS LLP

_____
Risa B. Boerner, Esquire
Fisher & Phillips LLP
Radnor Financial Center
201 King of Prussia Road,
Radnor, Pennsylvania  19087
(610) 230-2132
(610) 230-2151 (facsimile)
rboerner@laborlawyers.com

*Counsel for Defendant Festival Fun Parks LLC*

**Error! Unknown document property name.**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2011, a copy of the foregoing First Set of Interrogatories of Defendant Festival Fun Parks Directed to Plaintiff Andrew Adams were served by first-class U.S. Mail on counsel for Plaintiff Andrew Adams, as follows:

James V. Sabatini, Esquire
Sabatini & Associates, LLC
One Market Square
Newington, Connecticut 06111

*Counsel for Plaintiff*

_____
Risa B. Boerner

**Error! Unknown document property name.**

# EXHIBIT 4



**NEWINGTON
CHILDREN'S HOSPITAL**

<u>EDUCATIONAL EVALUATION & CONSULTING SERVICES</u>
<u>(203) 667-5315</u>

DATE: December 3, 1990
RE: Andrew Adams
Medical Record: 132576

Mr. & Mrs. Lawrence Adams
1272 Stafford Avenue
Bristol, Connecticut 06010

Dear Mr. & Mrs. Adams:

Enclosed please find Andrew's Diagnostic Perceptual/Cognitive
Assessment.  Copies of this evaluation have been sent only
to those who have been indicated on the signed release.

Should you have questions or concerns regarding specific test
results or recommendations, please contact Educational Evaluation
and Consulting Services at 667-5315 for assistance.

Sincerely,

Barbara E. Brown, M.S.
Director

Enclosure

BEB/dw

P000161

JA 344

# NEWINGTON CHILDREN'S HOSPITAL

## DIAGNOSTIC PERCEPTUAL/COGNITIVE ASSESSMENT

## EDUCATIONAL EVALUATION AND CONSULTING SERVICES

Andrew Adams
BD: 8/15/79
CA: 11+3
Grade: 5.2 Special
Education (1990-91)
Stafford Elementary School
Bristol, Connecticut

Medical #: 132576
Date of Testing: 10/30/79
Referral: Parents -
  Mr. and Mrs. Lawrence Adams
Clinician: Cynthia K. Niedbala, M.S.
  Educational Diagnostician

## Background Information and Reason for Referral

Per parental report, Andy has been involved in specialized
services, initially for speech and language needs, since
preschool.  Specific educational data regarding his performance
throughout the primary grades was not available for review prior
to this assessment.  However, per parental report, Andy has
participated within the Aim program, Stafford Elementary School,
Bristol, Connecticut, since kindergarten age.

The results of a triennial psychological review, completed within
his school system, (January, 1990), revealed substantial
deficiencies in verbal and non-verbal spheres, which resulted in
a composite score which was marginally within the Borderline
range.  Visual motor integrative skills were displayed three
years below his chronological age.  An educational assessment
(April, 1990) revealed reading, spelling and mathematics skills
to be within a second to third grade skill range.  A speech and
language assessment indicated continued deficiencies in receptive
and expressive vocabulary, while selected language processing
skills requiring categorization and determination of differences
were displayed as above average.

Andy currently continues to participate in a self-contained
special educational program, designed to meet his needs as a
student with mild Mental Retardation, and/or Borderline
abilities.  He is currently mainstreamed with fifth grade
students for art, music, physical education,  and homeroom,
following a similar program model to what was initiated in fourth
grade.

Andy was referred for this Diagnostic Perceptual/Cognitive
Assessment by his parents, Mr. and Mrs. Lawrence Adams, to
determine current processing and academic achievement levels with
recommendations for programming.

## Individualized Educational Program/Transition Services

Student: *Andrew Adams*

### Long Term Goal: INDEPENDENT LIVING

( ) No special skills training needed
( ) Independent (House or Apartment)    ( ) Supervised Living    ( ) Group Home    ( ) Family
( ) Other
(✓) Specialized skills training in:
    (✓) Activities of Daily Living  (✓) Social Skills    (✓) Self-Advocacy    (✓) Financial Planning
    (✓) Money Management    (✓) Legal    ( ) Other: _____

Goal Statement: _____
Evaluation Schedule Code:   0 - Not Addressed    1 - Partial    2 - Half    3 - Most    4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule 1st MP | 2nd MP | 3rd MP | 4th MP |
|---|---|---|---|---|---|---|---|
| Andy will complete all of the needed steps to open a checking account and to maintain it on a daily basis independently. | Student/staff | Unit Tests in Banking and teacher made activities | 6/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will plan menu for a day, including the correct number of foods from each of the pyramid groups to make it nutritionally sound. | Student/staff | Teacher - Made Evaluation | 6/96 | 2 | | | |
| End of Year Summary: | | | | | | | |

Justification Statement:  Did the PPT conclude a need in this area?  Yes _____.    No _____
If no, please provide a justification statement indicating the reasons:

P000163

JA 346

**Long Term Goal: INDEPENDENT LIVING**

pg. ~~~~

Evaluation Schedule Code:   0 - Not Addressed     1 - Partial     2 - Half    3 - Most    4 = Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule 1st MP | 2nd MP | 3rd MP | 4th MP |
|---|---|---|---|---|---|---|---|
| Andy will independently sort, launder and iron as needed his laundry. | Staff | Teacher- Made Checklists and Student Self-Evaluation | 3/96 | 3 | | | |
| End of Year Summary: | | | | | | | |
| Andy will maintain acceptable personal hygiene, e.g. clean hair, hands and nails and acceptable clothing. | Staff/ student/ parents | Student Self-Evaluation | 3/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will identify the time in 1 minute intervals and will state the time in 15 minute intervals before or after that time. | Staff | Teacher- Made Evaluation and situational assessment. | 2/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will complete a unit on basic First Aid and will state/display behavior needed in an emergency situation. | Staff/ parents | Basic First Aid, scoring at least 90% on each unit test. | 1/96 | 2 | | | |
| End of Year Summary: | | | | | | | |

P000164

JA 347

**Long Term Goal: INDEPENDENT LIVING**

pg. 3

Evaluation Schedule Code:   0 - Not Addressed     1 - Partial     2 - Half     3 - Most     4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will set an alarm clock and a clock radio, digital and standard, to the correct time and set the alarm using the correct buttons. | student/staff parents | Teacher-Made Checklists | 10/95 | — | | | |
| End of Year Summary: | | | | | | | |
| Andy will state and write the sizes he needs for his personal clothing. | student/staff | Self-Evaluation | 1/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will complete unit on ordering from a catalog, scoring at least 95% on each unit | student/staff | Ordering from a Catalog | 11/96 | — | | | |
| End of Year Summary: | | | | | | | |
| Andy will use a sales tax chart to compute tax and then add it to a price to get total. | student, staff | Teacher-Made Activities | 12/96 | — | | | |
| End of Year Summary: | | | | | | | |

P000165

JA 348

Long Term Goal: INDEPENDENT LIVING

pg. ~~~~~

Evaluation Schedule Code:   0 - Not Addressed    1 - Partial    2 - Half    3 - Most    4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will state under what conditions and the method to use a portable fire extinguisher. | staff/parents | Information Checklist and Situational Assessment | 2/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| Andy will state and demonstrate 2 methods of clearing a clogged toilet or drain. | staff/parents | Teacher-Made Checklists | 2/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will complete Everyday Living Skills, Lessons 4-10 scoring at least 90% on each unit test. | student/staff | Everyday Living Skills | 2/96 | 3 | | | |
| End of Year Summary: | | | | | | | |
| | | | | | | | |
| End of Year Summary: | | | | | | | |

P000166

JA 349

Individualized Educational Program/Transition Services

Student: _Andy Adams_____

Long Term Goal: EMPLOYMENT/POSTSECONDARY EDUCATION

( ) 4 Year College ( ) 2 Year College (✓) Postsecondary vocational training ( ) Ind.Competitive Employme
(✓) 1 Time-limited assistance for Employment  ( ) Supported Employment  ( ) Apprenticeship/Training
( ) Military  ( ) Other: _____

Goal Statement:_____

Evaluation Schedule Code:  0 - Not Addressed  1 - Partial  2 - Half  3 - Most  4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule 1st MP | 2nd MP | 3rd MP | 4th MP |
|---|---|---|---|---|---|---|---|
| Andy will work in a community Job-site two days a week. | student/job coach | work-site and supervisor evaluations | 4/96 | 3 | | | |
| End of Year Summary: | | | | | | | |
| Andy will read the want ads, and evaluate the qualifications needed, and the benefits and drawbacks of each opening, stating which he is qualified for and which he would like. | student/staff | Teacher-made activities and evaluations. | 4/96 | 2 | | | |
| End of Year Summary: | | | | | | | |

P000167    JA 350

_Andy Adams_

**Long Term Goal: EMPLOYMENT/POSTSECONDARY EDUCATION**

Evaluation Schedule Code:    0 - Not Addressed    1 - Partial    2 - Half    3 - Most    4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule 1st MP | 2nd MP | 3rd MP | 4th MP |
|---|---|---|---|---|---|---|---|
| Andy will prepare a resume of his education and employment experiences. | student/staff | Evaluation of Resume | 4/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| When a supervisor or co-worker is speaking to him, Andy will establish eye contact with the person. | student/staff | Self-evaluation | 4/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| During a performance review, Andy will describe his work in a positive manner. | student/staff | self-evaluation and staff evaluation | 3/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| Andy will discuss a complaint about work situation with his supervisor. | student/staff | self evaluation and staff evaluation | 4/96 | 1 | | | |
| End of Year Summary: | | | | | | | |

P000168

JA 351

## Long Term Goal: EMPLOYMENT/POSTSECONDARY EDUCATION

Evaluation Schedule Code:   0 - Not Addressed    1 - Partial    2 - Half    3 - Most    4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule 1st MP | 2nd MP | 3rd MP | 4th MP |
|---|---|---|---|---|---|---|---|
| Andy will identify and state the meanings for all food prep. terms in Brigance Essential Skills. | Staff | Evaluation Checklist | 12/95 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will identify and carry out in sequential steps for the recipe directions in Brigance Essential Skills. | Staff | Evaluation Checklist | 4/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| Andy will explore Technical School opportunities in the culinary area | Staff/Student/ parents | Evaluation by Array of each visitation | 4/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will be referred to B.R.S. | Staff/Student/ parents | Referal proc. begun | 4/96 | 4 | | | |
| End of Year Summary: | | | | | | | |

P000169    JA 352

Individualized Educational Program/Transition Services

Student: _Andy Adams_____

Long Term Goal: COMMUNITY PARTICIPATION

( ) No special skills training needed
( ) Specialized skills training in:

   ( ) Transportation   ( ) Recreation/Leisure   ( ) Consumerism
   ( ) Medical       ( ) Other

Goal Statement: _____

Evaluation Schedule Code: 0 - Not Addressed    1 - Partial    2 - Half    3 - Most    4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives | Person/Program/Agency Responsible | Evaluation Criteria | Projected Date of Completion | Evaluation Schedule 1st MP | 2nd MP | 3rd MP | 4th MP |
|---|---|---|---|---|---|---|---|
| Andy will plan the route and take a public bus to a local destination. | student/staff | Checklist Evaluation | 2/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| Andy will identify local agencies that may offer support after graduation. | student/staff/parents | Agency Response Checklist | 4/96 | 1 | | | |
| End of Year Summary: | | | | | | | |

P000170

JA 353

Justification Statement: Did the PPT conclude a need in this area?  Yes ____    No ____
If no, please provide a justification statement indicating the reasons:

Student: Andy Adams

pg. 2

**Long Term Goal: COMMUNITY PARTICIPATION**

Evaluation Schedule Code:   0 - Not Addressed    1 - Partial    2 - Half    3 - Most    4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/Agency Responsible | Evaluation Procedure | Projected Date of Completion | 1st MP | 2nd MP | 3rd MP | 4th MP |
|---|---|---|---|---|---|---|---|
| Andy will identify community clubs and organizations that may be of interest and will make an initial contact. | student/staff | Results from Telephone Poll/Contact Poll | 4/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| Andy will identify places in the community where he can spend leisure/recreation time, and will plan an activity that he and a friend can attend. | student/staff/parents | evaluations of student/staff/parents | 2/96 | 4 | | | |
| End of Year Summary: | | | | | | | |
| Andy will locate name in white pages of the phone book independently. | student/staff | Teacher-made checklists | 1/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will locate a phone number in the yellow pages of a needed service. | staff | Teacher-made checklists | 4/96 | 2 | | | |
| End of Year Summary: | | | | | | | |

P000171    JA 354

# EXHIBIT 5

TO: Palace Entertainme    Corporate Headquarters
4590 MacArthur Blvd., Suite 400
Newport Beach, CA 92660

From: Andy Adams

This is my letter to you telling you what happen to me. I have been working at Lake Compounce since 1996 With the Kenneywood Theme Park. Back in 2007 I work in the rides Maintenance Dept. I have learned how to do things under Mario Abela and John Fitch my two managers. I been having problem with someone in the shop. He always pick on me from the time I punch in the morning time and till I punch out. I had to go to a Clinic for my neck and back pain because of all the problems I was dealing with at work. Since I had been going to the clinic it's been helping my neck and back problem. So I went to Jerry Brick the GM at Lake Compounce and I have said to him that I am thinking of leaving. And he said why? And I told him that I am having some problem here at work and he told me to talk to Mario and John too. Which I did talk to John about. When I have ask Jerry can I go to the paint shop to work he said to me that Palace is not going to open up any new jobs. they are cutting back on things and Jerry total agreed with them to save money. The paint shop has a lot of things to do this winter. There is only one guy that is working in the paint shop. I ask Jerry if I could work in the paint shop to help Jim. Jerry call palace up on the phone and told them that I have someone leaving that is a full time team member. I never gave my notice or put it in writing I said I was thinking of leaving because I had a hard time in the Maintenance Dept. and I ask him if I can go into the paint shop. Jerry, Mario, and I had a meeting about this and Jerry said to me what's the plan and I said to him that I was looking but did not get the job I wanted. So at this time I was only looking around and then jerry said well you gave your notice but I never did. I only said I am thinking of it because he wouldn't offer me to work in the paint shop. So then he said to me well if you can't do the job then I don't have anything here for you at this time. So I felt I was push out the door. Then Jerry said to me that if you have to file for unemployment I will not fight it at all. I will let you have it. Mario was there when Jerry telling me this. This one guy name Justin Walters has always picking on me every day at work. He always made me do all his work for him things that were his job at the park to do. Making me clean out the water park filters. He takes credit for it all the time. Also saying things to me like what the hell is wrong with you if I mess something up or did not know what I was doing. Or you stupid what the heck is wrong with you. He never has anything nice to say to no one at work. Then one day I was using my own pickup truck at work and I had it park where the shop was. We were on our break and Justin thought it was funny to throw his apple at my truck, and the apple went all over my truck he never clean it up at all. He started to laugh about it and I told him that you are a big ass for what you did. But this is the kind of guy you have working for you at this park. And that's why I was having problems with sleeping, eating, and my Nervous System. I have told my boss about the apple thing that he did to my truck. And I don't think anything happen with that at all.

This is my story and its truth of it all.

Thank you
Andy Adams
11/08/2009

# EXHIBIT 6

12/26/2010   13:22   8608458333   GOLDLEAFGALLERIES   PAGE 02

## ANDY'S LOG OF THINGS THAT HAPPEN AT LAKE COMPOUNCE THEME PARK

**Feb. 2009** I and Tommy J, Justin Walters, Joe, & Kyle where at the Boulder Dash Roller Coaster. Down by the South end of the park, Justin Walters and Tommy J came down to drop off some Steel. Tommy J did not have his keys with him to open the gate up and told me to get down on my knees and I will step on your back to get over the fence. That's when Justin Walters have then said yeah Andy get down on your knees that's your best Spot for you. You like to look up at the guys chock area all the time. At that time I gave Justin Walters a dirty look back at him I was Very mad at him for saying that kind of thing. Tommy J told me to not take that from him and get back at him for that. But I did not want to do any thing I went to my boss about it. Which was John Fich and John just gave me a smile and a look and told me I told you before I hire you that you will get pick on and harssed. And that is the nature of working in the shop and that I did not want you to come to me every day that someone picks on you. So I feel John did not want to do any thing about this at all. But I have told this to everyone that I work with in the shop what Justin said to me and they did not think it was funny at all.

**June 2, 2009** I have been looking for my Blow touch Gun that I use at the park. It was on my bench all the time when it was missing I have ask people have they seen it. And everyone has told me NO. But when I went looking for it in the shop I have found it in this black lock box that we keep all of our straps for picking up big things in the shop. I had my name on it so people would know it is my. Right next to my name in big black bold letters it said the word SUCKS right next to it. I have shown John Fich my boss this and he told me he will talk to people about it. Which I know he did not do any thing about it.

**Also from June 2009 Till Aug 2009** Justin Walters had put this palt of 2 Water Park Pumps right in my work area. Right close up to my tool box so I can't even open up my box at all. I have move this once in the shop so I can work on my things. Then as soon as I come back to the shop the pumps will be right back in my work area and right near my toll box. Joarden that works in the shop there got the fork lift and move them pumps from my side of the work area to his area of the shop and put them at Justin Walters area. Then me and Joarden went park into the park to work on our rides. Then Justin Walters calls me on my 2 way radio Maint 5 to Maint 18 Andy. Joarden and I stop working so I can answer my radio. Justin Walters said over the radio did you move my pumps in the shop. I said NO I did not someone else did put he just wanted everone in the park to hear him talk to me over the 2 way radio. But this is the things that he does to me there just because he NEVER like me form day one.

12/26/2010  13:22     8608458339                    GOLDLEAFGALLERIES                        PAGE   03

**July 8, 2009** I went to Mario my other boss in the shop and have told him things that I am having troblem with Justin Walters. He told me that Justin comes from Kennywood and he does not have any friends at all. He likes you a lot Andy. He just likes to play jokes on you and just try to get alog with him ok. But just try to be nice to him at work it's not like he goes home with you and you have to deal with him there. But I am sorry I said to Mario I should not have to deal with this at all. But then Mario said to me that he is trying to make friends here so just try to talk with him ok. So I was not happy with Mario and I just got up and walk out of his office and went back to work.

**September 2009** I was driving my pick up truck from the park back to the shop I have park my truck over by the ADMI bulding. I got out of my truck and walk to the back of it to grab some things out of it. When I saw Justin Walters throw his apple on the side of my truck on the right side. It hit my truck and made a bag on it and the apple mash on to my truck. Then I saw Justin Walters laugh at it and never walk over there to clean it off. I told him that you are a big ass hole for what you did. I don't know why he threw his apple at my truck when there is a big green dumpers outside the shop where he was. I have told John Finch about this and John told me he was going to talk to him about it. And tell him that is not nice of you to do at all. But I know notting got done about it at all. Because the bosses are good friends with him and they don't want to be the bad guys at all. There was even people that saw him threw the apple at my truck.

**Oct 2009** I was working on the sky ride at the park. I was working on it with a other guy at the park. I forgot to do one thing on the ride and I have call John my boss to come down to see me. Then when we came down there to see me and took care of the thing. Then the next day Justin Walters had to say things to me wow what the heck is wrong with you. Then he said to Vic the other worker you better check your ride out real good. They had Andy and this other guy working on your ride. Then Justin Walters stated to laugh about it. It made me mad that he was treaing me this way. Then after this has happen I just got tired of being treaded this way. So that's when I started to look for a new job and put in applications to find a new job. But it did not go so good. I have told Jerry that I am going to be leaving because I was having problems in the shop. But he never ask me what kind at all.

And this is how Justin Walters has been to me for the past 2 years I have work in the shop. He NEVER like me from day one. And I just don't know why I have always been nice to him and talk to him, I even got lunch for him when I went out. Even when he was short cash I put it in for me. But never got one THANK YOU from him at all.

This is my log that I have kept from the time I work in the shop. I never went by the day because it will be a 25 to 30 page log so I just kept it brief for you to have.

Andy Adams

# EXHIBIT 7

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ANDREW ADAMS,                          :
                                       :
                    Plaintiff,         :        Case No.:  3:11 cv 00427 (JCH)
                                       :
                                       :
            vs.                        :
                                       :
FESTIVAL FUN PARKS, LLC, d/b/a         :
LAKE COMPOUNCE THEME PARK,             :
                                       :
                    Defendant.         :        October 6, 2011

                                                **Jury Trial Demanded**

### FIRST AMENDED COMPLAINT

Plaintiff, Andrew Adams, by and through his attorneys, Sabatini and Associates,

LLC, complaining of the defendant, respectfully alleges:

### PARTIES

1.  Plaintiff Andrew Adams is a Connecticut citizen residing in the City of Bristol.

2.  Defendant, Festival Fun Parks, LLC d/b/a Lake Compounce Theme Park. is a

limited liability company organized and existing under the laws of the State of Delaware.

Defendant's principal place of business is 4590 Macarthur Blvd., Newport Beach,

California.

3.  At all times material, plaintiff is an employee within the meaning of the

Americans With Disabilities Act of 1990 (ADA), Title VII and the Connecticut Fair

Employment Practices Act 46a-60(a)(1) *et seq.*

4.  At all times material, defendant is an employer within the meaning of the

ADA, Title VII and the Connecticut Fair Employment Practices Act 46a-60(a)(1) *et seq.*

## JURISDICTION AND VENUE

5.  The Court has jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343 and this action is brought pursuant to: the American With Disabilities Act of 1990, cited as 42 U.S.C. §12101 and Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991.

6.  This Court has personal jurisdiction over the Parties and venue is proper under 28 U.S.C. §1391(b) in that a substantial part of the events or omissions giving rise to the claim occurred in the State of Connecticut.

## GENERAL ALLEGATIONS

7.  Plaintiff is suffers from mental retardation.

8.  Plaintiff is male.

9.  At all times material, Defendant employs fifteen (15) or more individuals.

10.  In May 2008, defendant hired the plaintiff as a full time employee with the job title of Maintenance Helper.

11.  Plaintiff worked at defendant's Lake Compounce Theme Park located in Bristol, Connecticut.

12.  Plaintiff was subjected to sexual harassment by his co-employees including Justin Walters.

13.  Defendant, by and through its employees, called the plaintiff stupid.

14.  Defendant, by and through its employees, told the plaintiff that he did not know what he was doing.

15.  Defendant, by and through its employees, wrote the word "sucks" next to plaintiff's name located on plaintiff's blow torch.

16.  Defendant, by and through its employees, threw and smashed an apple on plaintiff's truck.

17.  Defendant, by and through its employee, Walters, told the plaintiff that being on his knees was his best position and that he liked being on his knees because he liked guys so much.

18.  Walters would repeatedly make the above-referenced comment when plaintiff was required to get on his knees to perform his job duties.

19.  Defendant, by and through its employees Walters, told the plaintiff that he "had" plaintiff's mother last night and that she was good.

20.  Plaintiff complained to his immediate supervisor, John Fitch, about the harassment.

21.  Fitch told the plaintiff that he would have to deal with it if he wanted to work in the department.

22.  Fitch failed to end the harassment.

23.  Upon information and belief, Fitch failed to make any effort to end the harassment.

24.  Plaintiff spoke to Fitch's supervisor, Mario Abela about the harassment by Walters and was told to give Walters a chance and that he was not so bad.

25.  Plaintiff spoke to defendant's general manager, Jerry Brick, and asked if he could find a new position to work because of the problems he was having.

26.  Plaintiff asked if he could work in the painting department.

27.  Defendant told the plaintiff that there were no open positions in the painting department.

28. On October 31, 2009, defendant terminated plaintiff's employment.

29. At all times material, defendant was aware of plaintiff's mental disability.

30. Defendant sexually harassed the plaintiff and harassed the plaintiff on the basis of his disability.

31. At all times material, plaintiff's disability does not prevent him from performing the essential functions of his job with or without a reasonable accommodation.

32. Any excuse to be given by the defendant regarding plaintiff's termination would be a pretext for the termination.

33. Plaintiff filed charges on the following date: February 22, 2010 with the Equal Employment Opportunity Commission (EEOC).

34. Plaintiff's receipt of the right to sue letter is pending.

35. Plaintiff filed charges on the following date: February 22, 2010, with the Commission on Human Rights and Opportunities (CHRO).

36. Plaintiff received a release of jurisdiction (copy attached as Exhibit 1) on the following date: December 29, 2010.

## FIRST COUNT
### (Disability Discrimination In Violation Of The ADA)

1. Plaintiff repeats the allegations in paragraphs 1 through 41 above as if fully incorporated herein.

37. Defendant's actions violate the Americans With Disabilities Act of 1990 as amended, which prohibits discrimination on the basis of disability.

38. Defendant, by and through its agents and/or employees, violated the Americans With Disabilities Act, in one or more of the following ways:

(a)    In that defendant interfered with plaintiff's privilege of employment on the basis of plaintiff's disability;

(b)    In that defendant discriminated against the plaintiff in such a way that it adversely affected his status as an employee including termination;

(c)    In that defendant terminated plaintiff's employment; and

(d)    In that defendant treated the plaintiff adversely different from similarly situated non-disabled employees;

39.  As a direct and proximate result of defendant's unequal treatment and discrimination, plaintiff has been deprived of his employment and equal employment opportunities because of her disability.

40.  As a further direct and proximate result of defendant's discrimination of the plaintiff, plaintiff has been deprived of income, wages, and benefits.

41.  As a further result of defendant's termination and discrimination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment, emotional distress, and harm to professional reputation.

42.  Plaintiff has suffered and will continue to suffer injuries and losses as a result of defendant's wrongful and discriminatory acts.

43.  Defendant's conduct towards the plaintiff was arbitrary and discriminatory all in violation of the ADA.  The defendant exhibited ill will, malice, improper motive and indifference to the plaintiff's civil rights by terminating his employment on the basis of his disability.

## SECOND COUNT
### (Disability Discrimination in Violation of C.G.S. §46a-60(a)(1))

1. Plaintiff repeats the allegations in paragraphs 1 through 43 above as if fully incorporated herein.

44. Defendant, by and through its agents, servants, and/or employees, violated the Connecticut Fair Employment Practices Act C.G.S. §46a-60a *et seq.* in one or more of the following ways.

    a.      In that defendant interfered with plaintiff's privilege of employment on the basis of plaintiff's disability;

    b.      In that defendant limited and classified the plaintiff by his disability in such a way that deprived him of opportunities and recognition given to other similarly situated coworkers;

    c.      In that defendant discriminated against the plaintiff in such a way that adversely affected his status as an employee;

    d.      In that defendant treated the plaintiff adversely different from similarly situated non-disabled employees;

    e.      In that defendant terminated plaintiff's employment on account of his disability; and

    f.      In that defendant intentionally discriminated against the plaintiff;

45. As a direct and proximate result of defendant's unequal treatment and discrimination, plaintiff has been deprived of his employment and equal employment opportunities because of his disability.

46. As a further direct and proximate result of defendant's discrimination of the plaintiff, plaintiff has been deprived of income, wages, and benefits.

47. As a further result of defendant's termination and discrimination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment, emotional distress, and harm to professional reputation.

48. Plaintiff has suffered and will continue to suffer injuries and losses as a result of defendant's wrongful and discriminatory acts.

49. Defendant's conduct towards the plaintiff was arbitrary and discriminatory all in violation of the C.G.S. Section 46a-60(a)(1). The defendant exhibited ill will, malice, improper motive and indifference to the plaintiff's civil rights by terminating him employment on the basis of his disability.

### THIRD COUNT
**(Gender Discrimination in Violation of C.G.S. §46a-60(a)(1))**

1. Plaintiff repeats the foregoing allegations as if the same were repeated herein.

50. Defendant's actions violated Connecticut Fair Employment Practices Act, C.G.S. §46a-60(a)(1) as amended, which prohibit discrimination on the basis of gender in one or more of the following ways:

(a)   In that defendant terminated plaintiff's employment because of his gender;

(b)   In that defendant interfered with plaintiff's privilege of employment on the basis of plaintiff's gender;

(c)   In that defendant limited and classified the plaintiff by his gender in such a way that deprived herein of opportunities and recognition given to other similarly situated coworkers;

(d)   In that defendant discriminated against the plaintiff in such a way that adversely affected his status as an employee;

(e)    In that defendant treated the plaintiff adversely different from similarly situated non-male employees; and

(f)    In that defendant discriminated against the plaintiff because the plaintiff did not act more masculine thus did not fit a stereotype of his gender.

51.  As a direct and proximate result of defendant's discrimination and wrongful termination, plaintiff has been deprived of his employment and equal employment opportunities because of his gender.

52.  As a further direct and proximate result of defendant's discrimination of the plaintiff, plaintiff has been deprived of income, wages and benefits.

53.  As a further result of defendant's termination and discrimination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment and emotional distress.

54.  Plaintiff has suffered and will continue to suffer injuries as a result of defendant's wrongful and discriminatory acts.

55.  Defendant's termination and unequal treatment of the plaintiff was arbitrary, unreasonably discriminatory and retaliatory all in violation of Connecticut's Fair Employment Practices Act. The defendant exhibited ill will, malice, improper motive, and indifference to the plaintiff's civil rights by terminating him on the basis of his gender.

## FOURTH COUNT
### (Gender Discrimination in Violation of Title VII)

1.  Plaintiff repeats the foregoing allegations as if the same were repeated herein.

56. Defendant's actions violated Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991 in one or more of the following ways.

(a)    In that defendant terminated plaintiff's employment because of his gender;

(b)    In that defendant interfered with plaintiff's privilege of employment on the basis of plaintiff's gender;

(c)    In that defendant limited and classified the plaintiff by his gender in such a way that deprived herein of opportunities and recognition given to other similarly situated coworkers;

(d)    In that defendant discriminated against the plaintiff in such a way that adversely affected his status as an employee;

(e)    In that defendant treated the plaintiff adversely different from similarly situated non-male employees; and

(f)    In that defendant discriminated against the plaintiff because the plaintiff did not act more masculine thus did not fit a stereotype of his gender.

57.  As a direct and proximate result of defendant's discrimination and wrongful termination, plaintiff has been deprived of his employment and equal employment opportunities because of his gender.

58.  As a further direct and proximate result of defendant's discrimination of the plaintiff, plaintiff has been deprived of income, wages and benefits.

59.  As a further result of defendant's termination and discrimination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment and emotional distress.

60.  Plaintiff has suffered and will continue to suffer injuries as a result of defendant's wrongful and discriminatory acts.

61.  Defendant's termination and unequal treatment of the plaintiff was arbitrary, and unreasonably discriminatory all in violation of Title VII. The defendant exhibited ill will, malice, improper motive, and indifference to the plaintiff's civil rights by

terminating him on the basis of his gender.

## FIFTH COUNT
### (Hostile Work Environment Sexual Harassment In Violation of Title VII)

1. Plaintiff repeats the foregoing allegations as if the same were repeated herein.

62. Plaintiff was repeatedly subjected to sexual harassment by his co-worker. The harassment was repetitious and continuous.

63. The harassment was unwelcome.

64. The harassment was based upon his gender and was sexual in nature.

65. Plaintiff subjectively, reasonably and objectively perceived his work environment to be hostile.

66. Defendant knew or should have known that the plaintiff was being sexually harassed and unreasonably failed to stop the sexual harassment.

67. As a direct and proximate result of the hostile work environment sexual harassment, plaintiff suffered damages.

## SIXTH COUNT
### (Hostile Work Environment Sexual Harassment In Violation of C.G.S. §46a-60(a)(1)))

1. Plaintiff repeats the foregoing allegations as if the same were repeated herein.

68. Plaintiff was repeatedly subjected to sexual harassment by his co-worker. The harassment was repetitious and continuous.

69. The harassment was unwelcome.

70. The harassment was based upon his gender and was sexual in nature.

71. Plaintiff subjectively, reasonably and objectively perceived his work environment to be hostile.

72. Defendant knew or should have known that the plaintiff was being sexually

harassed and unreasonably failed to stop the sexual harassment.

73. As a direct and proximate result of the hostile work environment sexual harassment, plaintiff suffered damages.

## SEVENTH COUNT
**(Retaliation In Violation of Connecticut Fair Employment Practices Act C.G.S. §46a-60(a)(4))**

1. Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein.

74. Defendant, by and through its agents, servants, and/or employees, violated the Connecticut Fair Employment Practices Act C.G.S. §46a-609(a)(4) *et seq.* in one or more of the following ways.

a.      In that defendant retaliated against the plaintiff in response to his complaint that he was being sexually harassed;

b.      In that defendant retaliated against the plaintiff for his protesting of discriminatory conduct and treatment directed towards him on the basis of his disability.

75. As a result of defendant's violation of Connecticut Fair Employment Practices Act C.G.S. §46a-60(a)(4), plaintiff suffered damages including: loss of employment, loss of income and wages and benefits, and harm to his professional reputation.

76. As a further result of defendant's retaliatory termination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment, and emotional distress.

77. Plaintiff has suffered and will continue to suffer injuries as a result of defendant's wrongful and retaliatory acts.

78. Defendant's retaliatory conducted toward the plaintiff was arbitrary,

unreasonably discriminatory and retaliatory all in violation of Connecticut Fair Employment Practices Act C.G.S. §46a-609(a)(4) *et seq*. The defendant exhibited ill will, malice, improper motive, and indifference to the plaintiff's civil rights by retaliating against him.

## EIGHTH COUNT
### (Retaliation In Violation of Title VII)

1. Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein.

79. Defendant, by and through its agents, servants, and/or employees, violated Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991. in one or more of the following ways.

   a.    In that defendant retaliated against the plaintiff in response to his complaint that he was being sexually harassed;

   b.    In that defendant retaliated against the plaintiff for his protesting of discriminatory conduct and treatment directed towards him on the basis of his disability.

80. As a result of defendant's violation of Title VII, plaintiff suffered damages including: loss of employment, loss of income and wages and benefits, and harm to his professional reputation.

81. As a further result of defendant's retaliatory termination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment, and emotional distress.

82. Plaintiff has suffered and will continue to suffer injuries as a result of defendant's wrongful and retaliatory acts.

83. Defendant's retaliatory conducted toward the plaintiff was arbitrary, unreasonably discriminatory and retaliatory all in violation of Title VII. The defendant

exhibited ill will, malice, improper motive, and indifference to the plaintiff's civil rights by retaliating against him.

## DEMAND FOR RELIEF

WHEREFORE, plaintiff prays for appropriate compensatory damages including: compensatory damages; damages for back pay, front pay, bonuses, personal days, lost pension benefits, emotional distress; consequential damages; punitive damages; reasonable attorneys' fees; costs; interest; job reinstatement; prejudgment interest; for an injunction requiring the removal of any and all adverse information contained in plaintiff's personnel file; for a trial by jury; and for all other just and proper relief.

DATE:    October 6, 2011

        /s/ James Sabatini

James V. Sabatini, Esq.
Fed. No.: CT 19899
SABATINI AND ASSOCIATES, LLC
1 Market Square
Newington, CT 06111
Tel. No.: (860) 667-0839
Fax No.: (860) 667-0867
Email: jsabatini@sabatinilaw.com

ATTORNEY FOR PLAINTIFF

## ELECTRONIC CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2011 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


_____/s/ James V. Sabatini
James V. Sabatini

**EXHIBIT 1**

## STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

**Andrew Adams**
COMPLAINANT

vs.                                                    **DATE: December 29, 2010**

**Palace Entertainment d/b/a Lake Compounce Theme Park**
RESPONDENT

CHRO Case No. 1030252

## RELEASE OF JURISDICTION

Pursuant to the request for a release of jurisdiction, the Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint in accordance with CONN. GEN. STAT. § 46a-101. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred or in which the Respondent transacts business. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

**A copy of any civil action brought pursuant to this release must be served on the Commission at 25 Sigourney Street, Hartford, CT 06106 at the same time all other parties are served. THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION    BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

In granting this release, the Commission expressly finds in accordance with CONN. GEN. STAT. §§ 46a-100 and 46a-101(b) that all conditions precedent to the issuance of the release have been met. The complaint was timely filed under CONN. GEN. STAT. § 46a-82 and the complaint has been pending for a period of not less than 210 days. The complaint is not currently scheduled for public hearing nor is there reason to believe that the complaint will be resolved within a period of 30 days from the date the Commission received the request.

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

With the granting of this release of jurisdiction, the Commission administratively dismisses this complaint in accordance with CONN. GEN. STAT. § 46a-101(d) without cost or penalty to any party.

Very truly yours,

Robert J. Brothers, Jr.
Executive Director

cc:  Complainant:'s counsel James V. Sabatini by e-mail to: jsabatini@sabatinilaw.com
Respondent's Attorney: Christopher H. Mills by e-mail to: cmills@laborlawyers.com

# EXHIBIT 8

Westlaw.

Not Reported in F.Supp.2d, 2002 WL 977535 (S.D.N.Y.)
**(Cite as: 2002 WL 977535 (S.D.N.Y.))**

H
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Sylvia PIMENTEL, Plaintiff,
v.
CITY OF NEW YORK, Defendant.

No. 00 CIV.326(SAS).
May 14, 2002.

Sylvia Pimentel, Brooklyn, for Plaintiff (Pro Se).

Donald C. Sullivan, Esq., Assistant Corporation
Counsel of the City of New York, New York, for
Defendant.

### OPINION AND ORDER
SCHEINDLIN, D.J.

*1 Sylvia Pimentel has sued the City of New
York ("City"), alleging that it has "discriminated
against her in employment on the basis of her race,
national origin, and her disability" in violation of
various federal laws. *Pimentel v. City of New York,
No. 00 Civ. 326, 2001 WL 1579553, at *1 (S.D.N.Y.
Dec. 11, 2001).* Pimentel also sued the City for re-
taliation based on its denial of her requests to be
transferred from Manhattan to Brooklyn for medical
reasons. On December 11, 2001, this Court granted
summary judgement to the City on all of the claims
except one: With respect to the retaliation claim, this
Court held that Pimentel had proffered "sufficient
circumstantial evidence to permit a rational factfinder
to infer that defendant would have granted plaintiff a
transfer had it not been for her various administrative
complaints." *Id.* at *19.

The City now moves for reconsideration of the
denial of summary judgement with respect to the
retaliation claim. *See* Defendant's Memorandum of
Law in Support of its Motion for Summary Judgment
on plaintiff's Claim of Retaliation. The City does not
challenge this Court's holding that plaintiff has pro-
duced sufficient evidence to raise a material issue of
fact as to whether it denied her transfer in retaliation
for her complaints of discrimination. Rather, the City
argues that plaintiff "did not suffer an adverse em-

ployment action when her transfer request was de-
nied," an issue that was not previously addressed. *Id.*
at 1; *see also* 12/19/01 Letter from Donald C. Sulli-
van, Assistant Corporation Counsel to the City of
New York at 4.

For the reasons set forth below, the motion for
summary judgement on Pimentel's retaliation claim is
now granted.

### II. LEGAL STANDARD

A motion for summary judgment may be granted
only when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with
the affidavits, if any, show that there is no genuine
issue as to any material fact and that the moving
party is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(c). "[G]enuineness runs to whether
disputed factual issues can reasonably be resolved in
favor of either party, [while] materiality runs to
whether the dispute matters, *i.e.,* whether it concerns
facts that can affect the outcome under the applicable
substantive law. A reasonably disputed, legally es-
sential issue is both genuine and material and must be
resolved at trial." *Mitchell v. Washingtonville Cent.
Sch. Dist.,* 190 F.3d 1, 5 (2d Cir.1999) (quotation
marks and citations omitted).

In determining whether genuine issues of mate-
rial fact are in dispute, courts must resolve all ambi-
guities and draw all reasonable factual inferences in
favor of the non-moving party. *See Nora Beverages,
Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742
(2d Cir.1998). The moving party bears the initial
burden of demonstrating an absence of genuine issues
of material fact. *See Schwapp v. Town of Avon,* 118
F.3d 106, 110 (2d Cir.1997). If the moving party
meets its initial burden, the non-moving party may
not rely on conclusory allegations or speculation to
create factual disputes. Instead, the non-moving party
"must produce specific facts indicating that a genuine
issue of fact exists. If the evidence [presented by the
non-moving party] is merely colorable, or is not sig-
nificantly probative, summary judgment may be
granted." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d
Cir.1998) (quotation marks and citations omitted)
(alteration in original).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 977535 (S.D.N.Y.)
(Cite as: 2002 WL 977535 (S.D.N.Y.))

III. FACTS

**\*2** In 1988, Pimentel began working for the City in the Bureau of Child Welfare.[FN1] *See Pimentel,* 2001 WL 1579553, at \*1. Two years later, she became a permanent Civil Service employee holding the position of caseworker. *See id.* In January 1997, Pimentel was promoted on a probationary basis to a supervisory position in the City's Administration for Children's Services Office of Child Support Enforcement ("OCSE"). *See id.* Over the next seven months, Pimentel received numerous memoranda that criticized her performance as a supervisor and, in August 1997, she was demoted to her previous position as a caseworker. *See id.* In January 1998, Pimentel filed a charge of discrimination with the New York City Commission on Human Rights that alleged that the City demoted her because of her race and national origin. *See id.*

> FN1. Familiarity with this Court's previous decision is presumed; only those facts that relate to Pimentel's claim of retaliation are presented here.

Seven months later, in August 1998, Pimentel was diagnosed with Hepatitis C. *See id.* One week later, Pimentel requested a transfer to OCSE in Brooklyn claiming that stress caused by harassment in the Manhattan OCSE office would worsen her medical condition. *See* 8/13/98 Letter from Sylvia Pimentel attached to Notice of Motion for Summary Judgment in Favor of Defendant. A few weeks later, on September 1, 1998, Pimentel filed a charge of retaliation with the New York State Division on Human Rights in which she claimed that the City had retaliated against her by giving her poor job assignments, disciplinary memoranda, and performance evaluations for previously filing a charge of discrimination. *See Pimentel,* 2001 WL 1579553, at \*1.

On two occasions during the following year, Pimentel requested that the City transfer her out of OCSE altogether—on March 25, 1999, and September 8, 1999. *See id.* In the first request, she cited management's alleged harassment. *See* 3/25/99 Letter from Sylvia Pimentel attached to Notice of Motion for Summary Judgment in Favor of Defendant ("Def.Not.Mot."). In the second request, sent a few weeks after Pimentel began a treatment regime for Hepatitis C,[FN2] she claimed that the harassment had caused her medical condition to worsen and again

requested a transfer out of OCSE. *See* 9/8/99 Letter from Sylvia Pimentel attached to Def. Not. Mot. None of Pimentel's transfer requests were granted. *See Pimentel,* 2001 WL 1579553, at \*1. Three weeks after her last transfer request, on September 22, 1999, Pimentel filed another complaint of discrimination that alleged she was being discriminated against on the basis of her disability (Hepatitis C), race and national origin. *See id.* Among other things, Pimentel alleged that the City was wrongfully refusing to transfer her. *See id.*

> FN2. Pimentel began Rebetron injection therapy on August 13, 1999. *See* 10/13/99 Letter from Dr. Jane Geders to Dr. Carmen Co attached to Notice of Motion for Summary Judgment in Favor of Defendant.

On January 18, 2000, Pimentel filed the instant Complaint. The sole remaining issue is whether the denial of Pimentel's transfer requests constituted an adverse employment action.

IV. TRANSFERS AND DENIALS OF TRANSFER REQUESTS AS ADVERSE EMPLOYMENT ACTIONS

Title VII prohibits an employer from retaliating against an employee who has complained of discrimination. *See* 42 U.S.C. § 2000e–3a(1994). To make out a prima facie case of discriminatory retaliation a plaintiff must demonstrate that: (i) she engaged in an activity protected under Title VII; (ii) the employer was aware of her participation in the protected activity; (iii) the employer took an adverse employment action against the employee; and (iv) a causal connection existed between the employee's protected activity and the adverse employment action taken by the employer. *See Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir.2000).

**\*3** Title VII prohibits discriminatory acts that affect the "terms and conditions" of employment. *See* 42 U.S.C. § 2000e–3(a); *Gregory v. Daly,* 243 F.3d 687, 695 (2d Cir.2001). Examples of adverse employment actions are "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999). The Second Circuit has also held that lesser actions may meet the adversity threshold, but it has not explicitly defined what quantum of lesser actions constitutes an adverse employment action. *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 977535 (S.D.N.Y.)
**(Cite as: 2002 WL 977535 (S.D.N.Y.))**

"Because there are no bright line rules as to which employment actions meet the threshold for 'adverse,' courts must make this determination on a case-by-case basis." *Wilburn v. Fleet Fin. Group, Inc.,* 170 F.Supp.2d 219, 237 (D.Conn.2001), (quoting *Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 446 (2d Cir.1999)).

To sustain an adverse employment action, a plaintiff must "endure[ ] a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2001) (quoting *Richardson,* 180 F.3d at 446). In order for the action(s) to be " 'materially adverse', a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (quoting *Crady v. Liberty Nat'l Bank and Trust Co. of Indiana,* 993 F.2d 132, 136 (7th Cir.1993)). A " 'material adverse change' is one that 'has an attendant negative result, a deprivation of a position or an opportunity." ' *Campbell v. Grayline Air Shuttle, Inc.,* 930 F.Supp. 794, 802 (E.D.N.Y.1996) (citations omitted). While adverse employment actions extend beyond readily quantifiable losses, "not everything that makes an employee unhappy is an actionable adverse action." *Phillips v. Bowen,* 278 F.3d 103, 117 (2d Cir.2002). *See also Bennett v. Watson Wyatt & Co.,* 136 F.Supp.2d 236 (S.D.N.Y.2001).

A. When a Transfer or Denial of a Transfer Request Is an Adverse Employment Action

Denial of a transfer request may constitute an adverse employment action in certain circumstances. For example, a transfer has an adverse impact on the terms and conditions of employment if the employee: (i) has the same job responsibilities and compensation but an increase in workload and location-specific stress [FN3]; (ii) has different job responsibilities [FN4]; (iii) is no longer eligible for promotion opportunities [FN5]; or (iv) experiences a net loss in salary [FN6]. An adverse employment action may also occur when an employee is transferred "from an 'elite' division ... which provided prestige and opportunity for advancement, to a less prestigious unit with little opportunity for professional growth." *de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Serv.,* 82 F.3d 16, 21 (2d Cir.1996). Finally, denial of a transfer request may constitute an adverse employment action where an employee's work environment prior to the request is objectively unfavorable.[FN7]

FN3. *See Patrolmen's Benevolent Ass'n of the City of New York, Inc. v. City of New York,* 74 F.Supp.2d 321, 335–36 (S.D.N.Y.1999) (holding that involuntary transfer of police officers was an adverse employment action because of reduced status and an increased workload and stress).

FN4. *See Richardson,* 180 F.3d at 444 ("There was sufficient evidence to conclude that the transfer and reassignment—which involved different job responsibilities and a move to a position involving contact with a prisoner population—constituted an adverse employment action.").

FN5. *See Stembridge v. City of New York,* 88 F.Supp.2d 276, 283 (S.D.N.Y.2000) (finding that transfer of employee together with ineligibility for promotion opportunities pending resolution of dispute with supervisor was an adverse employment action).

FN6. *See Bampoe v. Coach Stores, Inc.,* 93 F.Supp.2d 360, 373 (S.D.N.Y.2000).

FN7. *See Mecklenberg v. New York City Off–Track Betting,* 42 F.Supp.2d 359, 378 (S.D.N.Y.1999) (holding that denial of a request to transfer, from a department where working conditions were objectively unfavorable due to the measurable shortage in staff, to a department where conditions were more favorable constituted an adverse employment action).

B. When a Transfer or Denial of a Transfer Request Is Not an Adverse Employment Action

**\*4** A "pure lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Adeniji v. Admin. for Children Serv., NYC,* 43 F.Supp.2d 407, 426 (S.D.N.Y.1999) (internal citations omitted). "[T]he mere fact that an employee has been transferred or that his job responsibilities have changed is not in itself sufficient to show an adverse change in working conditions." *Cooper v. New York State Dep't of Human Rights,* 986 F.Supp. 825, 828 (S.D.N.Y.1997). Thus, denial

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 977535 (S.D.N.Y.)
**(Cite as: 2002 WL 977535 (S.D.N.Y.))**

of a request to transfer to an office of the same agency or department in a location more convenient to the employee's home, where there will no significant change in duties or opportunities for advancement, does not constitute an adverse employment action.[FN8]

> FN8. *See Nonnenmann v. City of New York,* 174 F.Supp.2d 121, 133 (S.D.N.Y.2001) (holding that denial of officer's request to transfer to a more convenient precinct was not an adverse employment action because the transfer would not have involved a material change in working conditions and because Nonnenmann did not allege that the salaries, benefits and opportunities for advancement in the two locations were different); *see also Duncan v. Shalala,* No. 97 CV 3607, 2000 WL 1772655, at *4 (E.D.N.Y. Nov. 29, 2000) (holding that denial of a transfer request so that an employee could live near his wife was not an adverse employment action).

An "adverse employment action affects the terms, privileges, duration, or conditions of the plaintiff's employment" and, for that reason, "subjective feelings ... are not enough to transform the denial [of a transfer request] into an adverse employment action within the meaning of Title VII." *Bunis v. Runyon,* No. 94 Civ.2063, 1997 WL 639241, at *3 (S.D.N.Y. Oct. 16, 1997). If an employee "earns the same salary, has the same benefits, works the same hours ... and has the same opportunities for promotion" following a transfer then there is no adverse employment action, even if the employee is "extremely unhappy about it." *Garber v. New York City Police Dept.,* No. 95 Civ. 2516, 1997 WL 525396, at *4 (S.D.N.Y. Aug. 22, 1997) (holding that "purely subjective feelings about a transfer which, by objective standards, did not negatively alter the terms and conditions of his employment in any respect" have no bearing on whether an adverse employment action occurred).[FN9] Interference with "sleeping, therapy, eating and medication schedules are purely subjective matters that Title VII does not address." *Armfield v. Jacobson,* No. 95–CV–4820, 1998 WL 427560, at *6 (E.D.N.Y. Jan. 21, 1998).

> FN9. *See also Morris,* 196 F.3d at 113 ("Morris does not allege that the transfer

here involved any change in job description, days and hours, duties, benefits, or opportunity for promotion. It follows that the transfer was not an adverse employment action.").

Denial of "requested transfers [that] did not involve an upgrade in position or increase in wages" is not an adverse employment action. *Gonzalez v. FedEx Co.,* No. 95 Civ. 3529, 1998 WL 289722, at *4 n. 7 (S.D.N.Y. June 3, 1998). In such a case, an employee is not seeking a better position or enhanced conditions and is not harmed by denial of a transfer request.

## V. PIMENTEL'S CLAIMS

### A. Denial of Pimentel's Request for a Lateral Transfer Was Not an Adverse Employment Action

On August 13, 1998, Pimentel made her first request for a transfer—a pure lateral transfer to the OCSE office in Brooklyn. The denial of this request fails to constitute an adverse employment action for four reasons. *First,* there would have been no discernible difference in job responsibilities. She would have served the public in Brooklyn—the same public—just as she did in the Manhattan office. There is no objective evidence that the workload and associated levels of stress were different. *See supra* Parts IV.A. and B.[FN10] *Second,* where there is no loss of salary, benefits, seniority, tenure or promotion opportunities, there is no adverse employment action. In this case, Pimentel does present any evidence, or even claim, that the requested transfer would have improved the terms and conditions of her employment. *See supra* Parts IV.A. and B.[FN11] *Third,* a transfer, or denial of a transfer, to a more or less convenient location does not, by itself, constitute an adverse employment action.[FN12] *See supra* Part IV.B.[FN13] *Fourth,* Pimentel's claim that she would have been happier or more at ease in the Brooklyn office of the OCSE cannot elevate the denial of her request to an adverse employment action because it is based only on her subjective feelings. *See supra* Part IV.B.[FN14]

> FN10. *See also Richardson,* 180 F.3d at 446; *Patrolmen's Benevolent Ass'n,* 74 F.Supp.2d at 335–36; *Adeniji,* 43 F.Supp.2d at 426; *Cooper,* 986 F.Supp. at 828.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 977535 (S.D.N.Y.)
**(Cite as: 2002 WL 977535 (S.D.N.Y.))**

FN11. *See also Galabya,* 202 F.3d at 641; *de la Cruz,* 83 F.3d at 21; *Bampoe,* 93 F.Supp.2d at 373; *Stembridge,* 88 F.Supp.2d at 283.

FN12. Pimentel had not yet started medical treatment when she requested a transfer to the Brooklyn office. Denial of this request therefore had no impact on her ability to seek ongoing medical treatment.

FN13. *See also Nonnenmann,* 174 F.Supp.2d at 133; *Duncan,* 2000 WL 1772655, at *4.

FN14. *See also Morris,* 196 F.3d at 113; *Armfield,* 1998 WL 427560, at *6; *Bunis,* 1997 WL 639241, at *3; *Garber,* 1997 WL 525396, at *4.

B. Denial of Pimentel's Request for a Transfer Out of OCSE Was Not an Adverse Employment Action

**\*5** Pimentel's second and third request, if granted, would not have constituted a pure lateral transfer because she asked to be transferred out of OCSE altogether. Nonetheless, her claim of an adverse employment action based on the denials of these transfers fails for two reasons.

*First,* while Pimentel claims that the Manhattan office of OCSE is a particularly stressful place for her, she has not offered any evidence that conditions in this office are *objectively* worse than conditions at other City agencies where employees interact with the public on a regular basis. *See supra* Part IV.A [FN15]. *Second,* when Pimentel requested a transfer out of OCSE, she did not request assignment to any particular agency. As a result, there is no way to evaluate whether the denials involved "an upgrade in position or increase in wages." Accordingly, I cannot conclude that plaintiff suffered an adverse employment action. *See supra* Part IV.B.[FN16]

FN15. *See also Mecklenberg,* 42 F.Supp.2d at 378.

FN16. *See also Gonzalez,* 1998 WL 289722, at *4 n. 7.

VI. CONCLUSION

Because Pimentel has failed to establish that denial of her transfer requests constituted an adverse employment action, the defendant's motion for summary judgment is granted. The Clerk of the Court is directed to close this case.

SO ORDERED:

S.D.N.Y.,2002.
Pimentel v. City of New York
Not Reported in F.Supp.2d, 2002 WL 977535 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in A.2d, 2007 WL 2570413 (Conn.Super.), 44 Conn. L. Rptr. 62
**(Cite as: 2007 WL 2570413 (Conn.Super.))**

**C**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Ansonia-Milford.
Michael DZUBATY
v.
MILFORD BOARD OF EDUCATION.

No. CV065000824S.
Aug. 20, 2007.

John R. Williams, New Haven, for Michael Dzubaty.

Halloran & Sage, Westport, CT, for Milford Board of
Education.

RICHARD A. ROBINSON, J.
*Facts*
**\*1** The plaintiff brings this action pursuant to the
provisions of the Connecticut Fair Employment Prac-
tices Act, Conn. Gen Stat. §§ 46a-60, et seq. (herein-
after CFEPA).

He alleges in his complaint that he was em-
ployed as a school teacher by the defendant Milford
Board of Education from 1999 until his termination
from employment in June 2004.

He alleges that in 2003 he was diagnosed with
severe hypertension. He further alleges that his
hypertension is so severe that it substantially affects
his major life activities, including living and breath-
ing.

The plaintiff alleges that he notified the defen-
dant of his condition after he was diagnosed.

Before he gave notice of his condition to the de-
fendant, the plaintiff had received satisfactory or bet-
ter employment performance ratings.

After the defendant learned of the plaintiff's con-
dition the defendant became highly critical of the

plaintiff's job performance and began a pattern of bad
evaluations for the purpose of terminating the plain-
tiff's employment.

In June 2004 the defendant gave the plaintiff a
"nonrenewal hearing" and subsequently terminated
the plaintiff's employment.

The defendant's stated reason for terminating the
plaintiff was inadequate job performance. The plain-
tiff alleges that the stated reason is false and was de-
signed to cover up the fact that the defendant did not
want the plaintiff on its payroll because it might incur
substantial medical expenses and may need to give
the plaintiff a medical leave of absence.

The plaintiff alleges that he was able to perform
the essential functions of his job either with or with-
out a reasonable accommodation.

The plaintiff alleges that the defendant has dis-
criminated again him because of his disability in vio-
lation of § 46a-60(a)(1) C.G.S.

On March 23, 2007 the defendant filed a motion
for summary judgment. The defendant argues that the
plaintiff's condition does not constitute a recognized
disability under the Connecticut Employment Prac-
tice Act. The defendant further argues that the "un-
disputed facts demonstrate that the plaintiff was ter-
minated because of performance deficits and not be-
cause of his physical condition."

*Standards*
Before addressing the merits of the defendant's
motion, a brief review of the standards for the grant-
ing of a motion for summary judgment is warranted:
"Summary judgment shall be rendered forthwith if
the pleadings, affidavits and any other proof submit-
ted show that there is no genuine issue as to any ma-
terial fact and that the moving party is entitled to
judgment as a matter of law. In deciding a motion for
summary judgment, the trial court must view the evi-
dence in the light most favorable to the nonmoving
party." (Internal quotation marks omitted.) *Orkney v.*
*Hanover Ins. Co.,* 248 Conn. 195, 201, 727 A.2d 700
(1999).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2007 WL 2570413 (Conn.Super.), 44 Conn. L. Rptr. 62
**(Cite as: 2007 WL 2570413 (Conn.Super.))**

Section 17-45 of the Connecticut Practice Book concerns the proceedings for motions for summary judgment. It provides that: "A motion for summary judgment shall be supported by such documents as may be appropriate, including but not limited to affidavits, certified transcripts of testimony under oath, disclosures, written admissions and the like. The motion shall be placed on the short calendar to be held not less than fifteen days following the filing of the motion and the supporting materials, unless the judicial authority otherwise directs. The adverse party [prior to the day the case is set down for short calendar] shall at least five days before the date the motion is to be considered on the short calendar file opposing affidavits and other available documentary evidence. Affidavits, and other documentary proof not already a part of the file, shall be filed and served as are pleadings."

**\*2** "[T]he party opposing a motion for summary judgment] must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact ..." (Citations omitted.) _Appleton v. Board of Education,_ 254 Conn. 205, 209, 757 A.2d 1059 (2000). It "must be demonstrated by counteraffidavits and concrete evidence." (Citations omitted.) _Pion v. Southern New England Telephone,_ 44 Conn.App. 657, 663, 691 A.2d 1107 (1997). "A material fact ... [is] a fact which will make a difference in the result of the case." (Citations omitted.) _H.O.R.S.E. of Connecticut, Inc. v. Washington,_ 258 Conn. 553, 560, 783 A.2d 993 (2001). "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Citations omitted.) _Barry v. Quality Steel Products, Inc.,_ 263 Conn. 424, 450, 820 A.2d 258 (2003). "The test is whether a party would be entitled to a directed verdict on the same facts." (Citations omitted; Internal quotation marks omitted.) _Cummings & Lockwood v. Gray,_ 26 Conn.App. 293, 296-97, 600 A.2d 1040 (1991). "In ruling on a motion for summary judgment, the court's function is not to decide issues of material fact, but rather to determine whether any such issues exist." (Citations omitted.) _Nolan v. Borkowski,_ 206 Conn. 495, 500, 538 A.2d 1031 (1988). A conclusory assertion [in an affidavit] does not constitute evidence sufficient to establish the existence of a disputed material fact for purposes of summary judgment. See _Hoskins v. Titan Value Equities Group, Inc.,_ 252 Conn. 789, 793-94,

749 A.2d 1144 (2000).

*Discussion*

Section 46a-60 of the Connecticut General Statutes concerns discriminatory employment practices. This statute provides in pertinent part that: "(a) It shall be a discriminatory practice in violation of this section: (1) For an employer, by the employer or the employer's agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or *physical disability,* including, but not limited to blindness." (Emphasis added.)

*The Plaintiff's Physical Condition Does Not Constitute a Recognized Disability Under CFEPA*

The defendant argues that it is entitled to summary judgment because the plaintiff is not "disabled" as that term is defined in CFEPA.

To establish a prima facie case of discrimination, a plaintiff must show (1) that he is an individual who has a disability within the meaning of the law, (2) that a covered employee had notice of the disability, (3) that with reasonable accommodation, he could perform the essential functions of the position in question, and (4) the employer refused to make such accommodations. _Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,_ 263 F.3d 208 (2d Cir.2001).

**\*3** Once the plaintiff has met his/her burden of proof of establishing a prima facie case, Connecticut courts employ the burden shifting framework of _McDonnell Douglass Corp. v. Green,_ 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); see _Levy,_ 936 Conn. at 103-04. To establish a prima facie case, the plaintiff must prove that: (1) he is in a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination. _Board of Education of City of Norwalk v. Comm'n on Human Rights and Opportunities,_ 266 Conn. 492, 505, 832 A.2d 660 (2003). If a plaintiff meets this initial burden of establishing a prima facie case of discrimina-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2007 WL 2570413 (Conn.Super.), 44 Conn. L. Rptr. 62
(Cite as: 2007 WL 2570413 (Conn.Super.))

tion, the defendant must then offer a legitimate reason for its decision, and if it does so, the burden shifts back to plaintiff who must demonstrate pretext. See *Ford v. Blue Cross & Blue Shield of Connecticut, Inc.*, 216 Conn. 40, 53, 578 A.2d 1054 (1990); see also *Ann Howard's Apricots Restaurant, Inc. v. Comm'n on Human Rights & Opportunities*, 237 Conn. 209, 224, 676 A.2d 844 (1996).

The defendant argues that the plaintiff stated at his deposition of December 1, 2006 that his high blood pressure is controlled when he takes his medication. It appears to this court that the defendant is urging this court to use what appears to be an ADA analysis to determine that the plaintiff does not have a disability. It essentially asserts that this Court must consider the effect of high blood pressure medications prescribed to the plaintiff. See *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (mitigating or corrective measures must be taken into account in judging whether an individual suffers a disability); *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) (a truck driver with high blood pressure did not suffer a "disability" under the ADA where the medication for the condition allowed him to perform major life activities without substantial limitation).

The Americans with Disabilities Action ("ADA") and CFEPA define "disability" differently. The ADA's definition is more restrictive than CFEPA's. The United States District Court has held that "the disability discrimination provisions of CFEPA do not mirror the federal ADA." *Hill v. Pfizer, Inc.*, 266 F.Sup.2d 352, 364 (D.Conn.2003). Specifically, the court stated that "[t]o be disabled under Connecticut law is different than being disabled under the ADA." (Internal quotation marks omitted.) *Id.* "Physically disabled is defined under the CFEPA ... as any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device." (Citation omitted; internal quotation marks omitted.) *Id.*

"The Second Circuit has held that the ADA has an additional requirement that is absent from the CFEPA definition. *Beason v. United Technologies Corp.*, 337 F.3d 271, 275 (2d Cir.2003). 'The CFEPA defines the term [p]hysically disabled as refer[ring] to any individual who has any chronic physical handicap, infirmity, or impairment ... The ADA also prohibits disability-based discrimination and similarly defines disability as a physical or mental impairment. But, significantly, it adds a requirement that the impairment substantially limit[s] one or more of the major life activities of [the] individual,' (Citation omitted; internal quotation marks omitted.) *Id., at 277.* 'Absent similar language in the CFEPA, [the Second Circuit] believe[s] the Connecticut Supreme Court would decline to find the CFEPA possesses the same restrictive threshold.' *Id.* Furthermore, '[g]iven that the definition of disability used by the ADA essentially predates the definition of physical disability promulgated by the Connecticut General Assembly, had it wished to do so, could have adopted the ADA definition. The fact that the General Assembly chose not to adopt that language readily supports an inference that the Connecticut legislature appreciated the scope of the ADA definition and intended the CFEPA definition to be different.' " *Curry v. Goodman,* Judicial District of Hartford, at Hartford, D.N. CV 02-0817767S (Nov. 18, 2004, Stengel, J.)

**\*4** The court notes that although the plaintiff did state that his blood pressure is largely controlled by medication, he also stated that his blood pressure becomes uncontrolled when he gets very upset. He also stated that there were some incidents while working for the defendant that his blood pressure became uncontrolled.[FN1]

> FN1. See defendant's Exhibit A in support of the motion for summary judgment at page 256.

Even if this court were to accept the defendant's argument and apply the American Disability Act's standards to determine whether or not the defendant is disabled under CFEPA, there are genuine issues of fact as to whether the plaintiff's blood pressure was sufficiently under control to a point where it cannot be considered a disability.

The defendant argues in the alternative that "[t]o the extent that the plaintiff may argue that the existence of a recognized disability is established by the five episodes in which his hypertension caused him

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2007 WL 2570413 (Conn.Super.), 44 Conn. L. Rptr. 62
**(Cite as: 2007 WL 2570413 (Conn.Super.))**

to leave work and be hospitalized; he would then not be a 'qualified individual with a disability' under the ADA and CFEPA because his <u>hypertension</u> rendered him completely unable to work and thus unable to perform the essential takes of the job." [FN2] However, there are genuine issues of material fact in existence as to whether the plaintiff's <u>high blood pressure</u> rendered him "completely unable to work."

> FN2. See defendant's memorandum in support of the motion for summary judgment at page 17.

*The Defendant was Terminated Because of Performance Deficits and not Because of His Physical Condition*

The main issue before this court concerns the intent of the defendant employer in terminating the plaintiff's employment. It is well settled law that "[s]ummary judgment is inappropriate where the inferences that the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions." *<u>Tryon v. North Branford,</u>* <u>58 Conn.App. 702, 707, 755 A.2d 317 (2000)</u>. "A question of intent raises an issue of material fact, which cannot be decided on a motion for summary judgment." *<u>Picataggio v. Romeo,</u>* <u>36 Conn.App. 791, 794, 654 A.2d 382 (1995)</u>. "[E]ven with respect to questions of motive, intent and good faith [however], the party opposing summary judgment must present a factual predicate for [her] argument in order to raise a genuine issue of material fact." *<u>Wadia Enterprises, Inc. v. Hirschfeld,</u>* <u>224 Conn. 240, 250, 618 A.2d 506 (1992)</u>. Upon completing its review of the Exhibits filed in support of the objection to the motion of summary judgment this court finds that the plaintiff has met his burden of proof to show that there are genuine issues of material fact in existence as to the motive of the defendant in terminating the employment of the plaintiff.

*Conclusion*

For all of the foregoing reasons, the defendant's motion for summary judgment is denied.

Conn.Super.,2007.
Dzubaty v. Milford Bd. of Educ.
Not Reported in A.2d, 2007 WL 2570413 (Conn.Super.), 44 Conn. L. Rptr. 62

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ANDREW ADAMS,                          :
                                       :
                        Plaintiff,     :        Case No.:  3:11 cv 00427 (JCH)
                                       :
                                       :
            vs.                        :
                                       :
FESTIVAL FUN PARKS, LLC, d/b/a         :
LAKE COMPOUNCE THEME PARK,             :
                                       :
                        Defendant.     :        MAY 4, 2012


## PLAINTIFFS' LOCAL RULE 56(a)(2) STATEMENT

**Responses to Defendant's Local Rule 56(a)(1) Statement**

1. Admitted.

2. Admitted.

3. Admitted.

4. Admitted

5. Admitted.

6. Admitted.

7. Admitted.

8. Admitted.

9. Deny that the plaintiff "reapplied" to Lake Compounce, because he testified that he

   did not have to fill out another application or interview again, but rather he

   contacted the Director of Operations about returning, and the Director of

   Operations then spoke with the General Manager.  Adams Dep. 20:10-23, 21:7-

   8,11-15, Ex. 1.  Admit that Adams did return as a seasonal employee in 2004.

10. Admitted.

11. Admitted.

12. Admitted.

13. Deny that the plaintiff resigned.  October 31, 2009 was the date given to the plaintiff as his last day, and it was not chosen by him.  Adams Dep. 81:4-10, Ex. 88:15-89:6, Ex. 1; Adams Affidavit, ¶ 23, Ex. 2. The plaintiff testified that although nobody told him he was terminated, he felt "forced out of there," and as such believes he was terminated.  Adams Dep. 90:23-91:7, 91:17-92:3, 92:10-12, Ex. 1; Adams Affidavit, ¶¶ 23-25, Ex. 2.  Deny that there were no open positions in the paint shop.  The paint shop needed extra help and often mechanic helpers would be sent over to the paint shop to help out, and therefore the plaintiff believes that there could have been an open position.  Adams Dep. 86:15-19, 108:3-23, 110:18-111:1, Ex. 1.

14. Admitted.

15. Denied.  The plaintiff informed John Fitch of Walters' comment that the plaintiff should be on his knees because this is his best position because he likes guys so much.  Adams Affidavit, ¶ 10, Ex. 2; Answers to Interrogatories, #10, 12, Ex. 3; Exhibit 6.    The plaintiff informed John Fitch and Mike Hayes, an HR representative, when the word "sucks" was written next to the plaintiff's name on his blow torch.  Adams Dep. 103:21-104:18, Ex. 1; Adams Affidavit, ¶ 12, Ex. 2; Answers to Interrogatories, #10, 12, Ex. 3; Exhibit 6.  The plaintiff also told John Fitch about Walters throwing an apple on his truck.  Adams Affidavit, ¶ 14, Ex. 2; Answers to Interrogatories, #10, 12, Ex. 3; Exhibit 6.  The plaintiff also complained

2  .

to Mario Abela in the summer of 2009 about the harassment and discrimination. Adams Dep. 63:17-64:18, Ex. 1; Adams Affidavit, ¶ 16, Ex. 2; Answers to Interrogatories, #10, 12, Ex. 3; Exhibit 6. Finally, the plaintiff wrote a letter to corporate in November 2009 after his termination stating that he was harassed. Adams Affidavit, ¶ 25, Ex. 2; Answers to Interrogatories, #10, 12, Ex. 3; Exhibit 5.

16. Denied. The plaintiff informed John Fitch of Walters' comment that the plaintiff should be on his knees because this is his best position because he likes guys so much. Adams Affidavit, ¶ 10, Ex. 2; Answers to Interrogatories, #10, 12, Ex. 3; Exhibit 6. The plaintiff informed John Fitch and Mike Hayes, an HR representative, when the word "sucks" was written next to the plaintiff's name on his blow torch. Adams Dep. 103:21-104:18, Ex. 1; Adams Affidavit, ¶ 12, Ex. 2; Answers to Interrogatories, #10, 12, Ex. 3; Exhibit 6. The plaintiff also told John Fitch about Walters throwing an apple on his truck. Adams Affidavit, ¶ 14, Ex. 2; Answers to Interrogatories, #10, 12, Ex. 3; Exhibit 6. The plaintiff also complained to Mario Abela in the summer of 2009 about the harassment and discrimination. Adams Dep. 63:17-64:18, Ex. 1; Adams Affidavit, ¶ 16, Ex. 2; Answers to Interrogatories, #10, 12, Ex. 3; Exhibit 6. Finally, the plaintiff wrote a letter to corporate in November 2009 after his termination stating that he was harassed. Adams Affidavit, ¶ 25, Ex. 2; Answers to Interrogatories, #10, 12, Ex. 3; Exhibit 5.

17. Deny that there were no open positions in the paint shop. The paint shop needed extra help and often mechanic helpers would be sent over to the paint shop to help out, and therefore the plaintiff believes that there could have been an open position.

3

Adams Dep. 84:13-19, 86:15-19, 109:3-23, 110:12-111:1, Ex. 1; see also Adams

Affidavit, ¶¶ 18-20 , Ex. 2.

18. Denied.  The plaintiff was told that the defendant "sent people over from the shop,

who were mechanic helpers, over there to help [] out with stripping and taping, and

sanding."  Adams Dep. 109:10-14, Ex. 1.

19. No knowledge.

20. No knowledge.

21. Denied.  The plaintiff believes that he was discriminated against, retaliated against

and terminated because he has a disability and is a slow learner due to that

disability, as well as experiencing gender discrimination and sexual harassment,

and retaliation.  Adams Dep. 105:8-17, Ex. 1; Adams Affidavit, ¶ 29, Ex. 2.

22. Admitted.

23. Agree that plaintiff's supervisor notified him about comments but disagree with the

characterization of the testimony.  The testimony (Adams Dep, 99:9-21, Ex. 1) is as

follows:

99

9   Q    Who told you not to come to them with complaints?

10      A    John Fitch, before I was hired, he told me the

11   rules.

12      Q    Before you got hired?

13      A    Yes, before I switched over to the maintenance

14   shop.

15      Q    What did he say?

4

16    A    Just I want to let you know that you're going to

17    get picked on and harassed in the shop, that's the nature of

18    working in the shop, don't come to me with complaints every

19    day, because I don't want to hear it, be a man, be tough.

20        So I thought, okay, being picked on, maybe I can

21    deal with it for a while, but not every day.

24. Admitted.


**Disputed Issues of Material Fact**

1. Plaintiff suffers from a slight mental retardation.  Adams Dep. 111:10-12, 112:9-10, Ex. 1; Adams Affidavit ¶ 2, Ex. 2; Exhibit 4.

2. Plaintiff's disability causes him to be a slow learner and to have difficulty remembering many things.  Adams Dep. 105:12-14, Ex. 1; Adams Affidavit ¶ 3, Ex. 2; Exhibit 4.

3. Plaintiff commenced working at Lake Compounce as a seasonal worker in 1997, and continued to be a seasonal worker through 2007.  Adams Dep. 12:6-14:15, 15:14-16:10, Ex. 1; Adams Affidavit ¶ 4, Ex. 2.

4. In 2008, the plaintiff was hired as a full-time employee as a mechanic or maintenance helper.  Adams Dep. 16:2-7, Ex. 1; Adams Affidavit ¶ 5, Ex. 2.

5. As a mechanic helper, the plaintiff's job was supposed to be assisting mechanics, but he often did jobs on his own, and still received mechanic helper pay.  The plaintiff believes that he should have gotten more individualized training or done more shadowing.  Adams Dep. 123:2-124:24, 126:13-23, Ex. 1; Adams Affidavit ¶ 6, Ex. 2.

5

6.  John Fitch was plaintiff's supervisor, and Mario Abela was also a supervisor ahead of Fitch.  Jerry Brick was the general manager.  Adams Dep. 17:11-17, 24:14-15, Ex. 1; Adams Affidavit ¶ 7, Ex. 2.

7.  John Fitch and Jerry Brick at Lake Compounce both knew of plaintiff's disability as a slow learner because plaintiff informed them of the same.  Adams Dep. 21:16-22:5, 24:16-25:4, Ex. 1; Adams Affidavit ¶ 8, Ex. 2.

8.  While a full-time employee, the plaintiff was subject to sexual harassment and discrimination at work.  Adams Affidavit ¶ 9, Ex. 2.

9.  Beginning in February 2009, the plaintiff began to keep a typed log of discriminatory events and harassment that he was subject to.  Adams Dep. 57:6-60:20, Ex. 1; Exhibit 6.

10. In February & July 2009, Justin Walters, told the plaintiff, while working on his knees, that the plaintiff should get down on his knees because being on my knees was my best position because he liked men.  Walters also stared the plaintiff down while he worked on his knees.  The plaintiff told John Fitch, about this comment.  Fitch said that he informed the plaintiff that while working in the shop the plaintiff would get harassed and picked on and that Fitch didn't want the plaintiff complaining to him.  Fitch told the plaintiff to "be a man" and be tough.  Adams Dep. 40:20-25, 42:2-6, 61:4-14, 97:2-11, Ex. 1; Adams Affidavit, ¶ 10, Ex. 2; Answers to Interrogatories, #5, 9-12, Ex. 3; Exhibit 6.

11. In June 2009, Justin Walters told the plaintiff that he "had" the plaintiff's mother last night and that she was good.  Adams Affidavit, ¶ 11, Ex. 2; Answers to Interrogatories, #5, 9-12, Ex. 3.

6

12. On June 2, 2009, plaintiff could not find his blowtorch. When plaintiff found it in the shop, someone had written next to his name "sucks" in black permanent marker. The plaintiff informed John Fitch and Mike Hayes, in HR, of this incident. Adams Dep. 103:21-104:18, 167:21-25, Ex. 1; Adams Affidavit, ¶ 12, Ex. 2; Answers to Interrogatories, #5, 9-12, Ex. 3; Exhibit 6.

13. In July 2009, Justin Walters through nuts and bolts at the plaintiff. When they landed in the parts washer, the fluid splashed onto the plaintiff. Adams Dep. 39:6-40:9, Ex. 1; Adams Affidavit, ¶ 13, Ex. 2; Answers to Interrogatories, #13, Ex. 3.

14. In September 2009, Justin Walters threw an apple at plaintiff's truck. The plaintiff told John Fitch about this, but Fitch did not reprimand Walters or do anything about it. Adams Dep. 38:4-39:1, 61:4-25, 169:11-170:19; Adams Affidavit, ¶ 14, Ex. 2; Answers to Interrogatories, #5, 9-12, Ex. 3; Exhibit 6.

15. In October 2009, Justin Walters told the plaintiff that he was stupid and said "what the heck is wrong with you?" This comment was unwelcome and offensive. Adams Dep. 39:15-23, 97:5-8, 168:20-169:3, Ex. 1; Adams Affidavit, ¶ 15, Ex. 2; Ex. 6.

16. The plaintiff spoke with supervisor Mario Abela in July and August of 2009 about the harassment and discrimination by Walters and was told to give the guy a chance, that he wasn't so bad. Adams Dep. 62:12-18. 63:14-64:18, 168:20-169:7, Ex. 1; Adams Affidavit, ¶ 16, Ex. 2; Answers to Interrogatories, #10, 12, 14, Ex. 3; Exhibit 6.

17. In September 2009, the plaintiff spoke with Jerry Brick, the general manager about changing positions because he was having trouble in the shop and wanted to

7

be transferred to the paint shop because he was having difficulty in the main shop. Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 85:4-13, 86:15-19, 87:16-88:10, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶¶ 17, 21, Ex. 2; Answers to Interrogatories, #10-12, Ex. 3; Exhibit 6.

18. Jerry Brick first told the plaintiff that he could not be moved to the paint shop because the plaintiff did not have painting experience. Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 85:4-13, 86:15-19, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶ 18, Ex. 2.

19. After the plaintiff informed Jerry Brick of his painting experience, Jerry Brick then changed his answer and told the plaintiff that there were no open positions in the paint shop. Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 85:4-13, 86:15-19, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶ 19, Ex. 2.

20. Plaintiff believes this to be a lie because the paint shop had a lot of work to be done and people from the main shop would often go over to the paint shop to help out. Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 85:4-13, 86:15-19, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶ 20, Ex. 2.

21. At this point, plaintiff simply told Brick that he was having trouble in the shop and may have to leave if he could not be transferred, but plaintiff never gave a verbal or written resignation. Adams Dep. 68:16-23, 81:11-23, 83:1-94:19, 85:4-13, 86:15-19, 87:16-88:10, 108:18-109:23, 110:12-111:1, Ex. 1; Adams Affidavit ¶ 21, Ex. 2.; Answers to Interrogatories, #10-12, Ex. 3; Exhibit 6.

22. John Fitch suggested that the plaintiff take his vacation time. Adams Dep. 87:16-88:14, Adams Affidavit, ¶ 22, Ex. 2.

8

23. When plaintiff returned he had a meeting with his supervisors in which he was told that Jerry Brick told corporate that he had resigned. The plaintiff told them that he was thinking about it but never did actually resign and could not find another job. Jerry Brick then told the plaintiff that there were no positions open and that October 31, 2009 would be the plaintiff's last day, but that he would not contest it if the plaintiff wanted to collect unemployment. Adams Dep. 81:4-10, 88:15-89:6, Ex. 1; Adams Affidavit ¶ 23, Ex. 2; Exhibit 5.

24. On October 31, 2009, plaintiff was terminated and forced out of the company. Adams Dep. 81:4-10, Ex. 88:15-89:6, 90:23-91:7, 91:17-92:3, 92:10-12, Ex. 1; Adams Affidavit ¶ 24, Ex. 2; Exhibit 5.

25. On November 8, 2009, the plaintiff wrote a letter to corporate explaining that he was sexually harassed and discriminated against at work, had complained of the same and that the supervisors did nothing about it. The plaintiff told corporate that he felt "pushed out the door." Adams Affidavit ¶ 25, Ex. 2; Exhibit 5.

26. Plaintiff's supervisors never ended the sexual harassment or discrimination that was created by plaintiff's co-workers. Adams Dep. 90:23-91:7, Ex. 1; Adams Affidavit ¶ 26, Ex. 2.

27. The daily harassment and discrimination caused the plaintiff embarrassment. Adams Dep. 129:2-7, Ex. 1; Adams Affidavit ¶ 27, Ex. 2.

28. The harassment and discrimination caused the plaintiff to have nightmares and other emotional distress. Adams Dep. 163:16-25; Adams Affidavit ¶ 28, Ex. 2.

29. The plaintiff believes that he "was sexually harassed, discriminated against because of [his] disability and [] gender and the fact that [he] wasn't dating

9

women or married, and retaliated against for complaining of the harassment and discrimination."  Adams Affidavit ¶ 29, Ex. 2; see also Adams Dep. 93:5-94:5, 95:12-15, Ex. 1.


                    THE PLAINTIFF

                    By_____/s/ James V. Sabatini_____
                            James V. Sabatini, Esquire   (CT 19899)
                            Sabatini and Associates, LLC
                            One Market Square
                            Newington, CT  06111
                            Tel. No.:  860-667-0839
                            Fax No.:  860-667-0867
                            e-mail:  jsabatini@sabatinilaw.com

10

**ELECTRONIC CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2012, a copy of the foregoing Motion For Extension of Time to Respond To Defendant's Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ James V. Sabatini_____
James V. Sabatini

11

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ANDREW ADAMS,                          :
                                       :
              Plaintiff,               :
                                       :
      v.                               :      CASE NO.:  3:11-cv-00427-JCH
                                       :
FESTIVAL FUN PARKS, LLC,               :
D/B/A LAKE COMPOUNCE,                  :
                                       :      JUNE 1, 2012
              Defendant.               :

REPLY BRIEF IN SUPPORT OF THE MOTION OF DEFENDANT
FESTIVAL FUN PARKS, LLC FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Defendant Festival Fun Parks LLC ("Festival Fun Parks") respectfully submits this Reply

Brief in Support of its Motion for Summary Judgment and in response to Plaintiff's

Memorandum in Opposition to Defendants' Motion for Summary Judgment (the "Opposition").

## II. ARGUMENT

### A. Plaintiff Cannot Establish That He Is Disabled Within the Meaning of the ADA or CFEPA.

Plaintiff cannot establish that he is disabled for purposes of the ADA or CFEPA, and he

has put forth no evidence to corroborate his claim that Festival Fun Parks regarded him as

disabled.  For these reasons, Festival Fun Parks is entitled to summary judgment on Plaintiff's

disability discrimination claims.

#### i. Festival Fun Parks' Reference to the Inadmissible Medical Report Does Not Transform It Into Admissible Evidence.

Plaintiff's reliance on Capobianco v. City of New York, 422 F.3d 47 (2d Cir. 2005), in

support of his argument that Festival Fun Parks has "waived" any objection to the admissibility

of the unsworn medical records is misplaced.  First, Festival Fun Parks did not "rely upon them

1

in its motion for summary judgment," as Plaintiff contends. Opposition at p. 15. To the contrary,
Festival Fun Parks clearly stated that the records were "inadmissible hearsay," and cited to them
only to address Plaintiff's reliance on them to establish that he was disabled. Memorandum of
Law in Support of Motion for Summary Judgment ("Def.'s Mem.") at p. 11. Festival Fun Parks'
reference to the unsworn medical reports is factually and legally distinguishable from the Second
Circuit's ruling in the Capobianco case.

In Capobianco, both parties cited to *and relied on* medical reports in their summary
judgment briefs. See Capobianco, 422 F.3d at 55 ("Defendants cited both letters and relied on
them in seeking summary judgment."). Festival Fun Parks in no way "relied on" the reports in
support of its Motion; rather, it addressed the evidence that Plaintiff had produced in discovery to
support his contention that he is disabled.[1] A reference to inadmissible evidence produced by the
Plaintiff, for the purpose of disputing the admissibility of that evidence, does not transform it
into admissible evidence. Further, the Second Circuit in Capobianco found the objection to
admissibility waived because the Capobianco defendants "had submitted the reports initially, [so
plaintiff] reasonably believed that he could rely on them even though they were unsworn letters."
Capobianco, 422 F.3d at 55. The detrimental reliance component present in Capobianco is not
present here; the reports were produced by Plaintiff and identified as documents he relies on to
support his contention that he is disabled. Id. at 56. Nor can Plaintiff be laboring under any
misapprehension that Festival Fun Parks is relying on the unsworn report. On the same date
Festival Fun Parks filed its Motion for Summary Judgment, it filed a Motion to Preclude the
Testimony of Dr. Cynthia K. Neidbala, the physician who purportedly authored the report,

---

[1]    Plaintiff produced the report in response to a document request seeking "[a]ny and all
Documents and/or Communications that reflect, relate to, or refer to Plaintiff's alleged
"mental retardation." See Exhibit "A" hereto, Plaintiff's response to Festival Fun Parks'
21st Request for Production; see also Exhibit D-9 to Exhibit "B" to Def's Mem.

partially on the ground that the report was unsworn and therefore inadmissible. Notably, Plaintiff did not oppose the Motion to Preclude, which the court has granted. Finally, Capobianco is inapposite because the Second Circuit in Capobianco also found that the doctors' report at issue was actually admissible evidence.

### ii. Plaintiff Cannot Establish That His Alleged Disability Prevented Him From Performing a Major Life Activity.

Plaintiff cannot show that his alleged disabilities prevented him from performing a "major life activity," which is required to establish he was disabled under the ADA. To defeat a summary judgment motion, the disability discrimination plaintiff must "offer[] evidence that the extent of the limitation in terms of [his] own experience . . . is substantial." Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 567 (1999). Summary judgment will be granted if a plaintiff fails to adduce specific facts demonstrating such a limitation. Id.; see also Chandler v. AMR Am. Eagle Airline, 251 F. Supp. 2d 1173, 1182 (E.D.N.Y. 2003) (granting summary judgment to defendant on ADA claim because "plaintiff has produced no evidence, other than conclusory statements, that he was substantially limited in his ability to engage in a major life activity").

Plaintiff's generalized statements that he is a "slow learner" and "has difficulty learning and remembering many things at once and how to perform new tasks" are simply too conclusory to support a finding that he is substantially limited in a major life activity. Exhibit "B" at 105:12-14. See, e.g., Littleton v. Wal-Mart Stores, Inc., 231 Fed. Appx. 874, 877 (11th Cir. 2007) (upholding grant of summary judgment on ADA claim where "[Plaintiff] pointed to no evidence which would create a genuine issue of material fact regarding whether he is substantially limited in the major activity of learning because of his mental retardation."); Huizenga v. Elkay Mfg., 2001 U.S. Dist. LEXIS 10151, 2001 WL 640973, at *6 (N.D. Ill. 2001) (finding that plaintiff's description of his mental process as "slow" and that he "get[s] confused

3

easily, that he cannot express himself to others and that his "speech is sometimes not coherent" were "simply too generic for a reasonable jury to conclude [the plaintiff] was significantly restricted in his ability to perform a major life activity as compared to the average person.").[2]

### iii. Plaintiff Presents No Objective Evidence That Festival Fun Parks Regarded Him as Disabled.

Plaintiff cannot establish that Festival Fun Parks regarded him as disabled because he cannot support this allegation with any record evidence other than his own deposition testimony. Whether an employer regards an employee disabled turns on the employer's perception of the employee, which is "a question of intent," rather than a question of whether the employee is in fact disabled. See Brown v. City of Waterbury Bd. of Educ., 722 F. Supp. 2d 218, 225 (D. Conn. 2010), citing Francis v. City of Meriden, 129 F.3d 281, 284 (2d Cir. 1997). In the absence of objective evidence that speaks to defendant's perception of whether a plaintiff was substantially limited in major life activities, it is not reasonable to infer that a defendant perceived that a plaintiff was disabled. See Winsley v. Cook County, 553 F. Supp. 2d 967, 972 (N.D. Ill. 2009) (granting summary judgment on regarded as disability claim where "Plaintiff fail[ed] to point to any facts in the record, aside from her own deposition testimony, establishing she was regarded as disabled within the meaning of the ADA.")

Here, Plaintiff cannot identify any evidence that suggests Festival Fun Parks regarded him as disabled. Plaintiff simply cannot make out a regarded as claim when he presents no

---

[2]    Similarly, Plaintiff cannot establish that he is "disabled" under the less stringent definition of disability contained in the CFEPA, because he has presented no admissible evidence that he is disabled.  As Festival Fun Parks noted in its initial brief, the District of Connecticut has held that the CFEPA's comparatively relaxed disability standard does not modify the modicum of evidence the disability plaintiff must put forth to survive summary judgment.  See Def's Mem. at fn 4, citing Buotote v Illinois Tool Works, Inc., 2011 U.S. Dist. LEXIS 97850, *20, No. 3:09-cv-2144 (JBA) (D. Conn. Aug. 30, 2011), finding that "the need for corroborating evidence of disability under the ADA is also required under the CFEPA."

evidence of Festival Fun Parks' perception of his disability.  Plaintiff's failure to offer any evidence as to what Festival Fun Parks' employees knew or believed about Plaintiff's alleged disability is fatal to his "regarded as" claim.

### B. Plaintiff Did Not Engage in Protected Activity Sufficient to Establish a Claim for Retaliation.

Plaintiff has offered no evidence in his Opposition sufficient to establish a prima facie case of retaliation under Title VII or the CFEPA.  To state a prima facie claim for retaliation, the protected activity must "involve some sort of complaint about a type of discrimination that Title VII forbids." Santucci v. Veneman, , 2002 U.S. Dist. LEXIS 19032, *3, No. 01-CIV-6644(CBM) (S.D.N.Y. Oct. 8, 2002).  To survive summary judgment on a retaliation claim, a plaintiff must establish that he engaged in protected activity by explicitly complaining about discrimination. See, e.g., McDowell v. T-Mobile USA, Inc., 307 F. App'x 531, 534 (2d Cir. 2009) (summary judgment upheld where there was no evidence other than Plaintiff's testimony from which jury could conclude that supervisors could have understood complaints were about a protected class).

While a plaintiff need not specifically cite to statutory language in making his or her allegations, he must make the employer aware in his complaints that his "opposition [is] directed at conduct prohibited by Title VII." Galdieri-Ambrosini v. National Realty and Development Corporation, 136 F.3d 276, 292 (2d Cir. 1998), see also Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F.Supp.2d 345. 357 (S.D.N.Y. 2007) ("ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute a protected activity."); Aiello v. Stamford Hosp., 2011 U.S. Dist. LEXIS 87121, *66, No. 09-cv-1161 (VLB) (D. Conn. August 8, 2011) ("[t]o succeed on retaliation claim, the plaintiff must show that the employer could reasonably have understood that the plaintiff's opposition was

directed at conduct prohibited by Title VII"), (citing McDowell, 307 Fed.Appx. at 534 (2d Cir. 2009)).

The complaints Plaintiff identifies – notifying Festival Fun Parks that a co-worker wrote "sucks" on his blow torch, a co-worker threw an apple at his truck, and a co-worker made a comment about Plaintiff being on his knees -- are not complaints *of discrimination*; they are simply complaints.  Plaintiff never alleged that these comments were made because he was disabled, or that these comments were sexually harassing, or were directed at his gender conformity.  Plaintiff simply complained.  These statements did not communicate to Festival Fun Parks a belief that unlawful discrimination was occurring, and therefore do not "constitute action to protect or oppose statutorily prohibited discrimination" that is required to state a claim for retaliation.  Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000), reversed on other grounds, Swierkiewicz v. Sorema, 534 U.S. 506 (2002).

### C.  Plaintiff Cannot Establish His Gender Discrimination Claim.

Plaintiff's gender discrimination claim is factually and legally analogous to the issues raised in Dawson v. Bumble & Bumble, 398 F.3d 211 (2d Cir. 2005), not Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  In Price Waterhouse, the plaintiff was a female accountant who had been denied promotion to partnership based on employment evaluations that criticized her for having a tendency to act in what was seen as a masculine manner. The Supreme Court in Price Waterhouse, in recognizing the existence of the failure to conform to gender norms claim for the first time, found that a triable claim existed when "it was suggested that [the plaintiff] overcompensated for being a woman" by acting in a "macho" fashion, and that she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." Price Waterhouse, 490 U.S. at 235.

6

JA 404

The facts Plaintiff presents to support his failure to conform to gender stereotypes claim are thoroughly distinguishable from the facts in <u>Price Waterhouse</u>. Plaintiff's only allegations that might relate to this claim are statements by Festival Fun Parks employees that Plaintiff "liked being on his knees" and that he "sucks." These statements simply do not suggest a failure to conform to gender stereotypes; if anything, they may have been directed to Plaintiff's sexual orientation, which is not a protected category.[3]  Like the plaintiff in <u>Dawson</u>, Plaintiff "was not told by anyone at [Festival Fun Parks] that [his] continued employment depended upon [him] acting and speaking in a more [masculine] manner. <u>Dawson</u>, 398 F.3d at 221.

### D.   Plaintiff Did Not Suffer Any Adverse Employment Action.

Plaintiff's employment with Festival Fun Parks was not terminated.  In support of his Opposition, Plaintiff submits an affidavit in which he directly contradicts his deposition testimony by stating that he never gave a written or verbal resignation to Jerry Brick, and that his employment with Festival Fun Parks was terminated. Affidavit of Andrew Adams at ¶¶ 21, 27. These statements should be disregarded because they contradict his prior sworn deposition testimony.  In opposing Festival Fun Parks' Motion, Plaintiff, having "testified to a given fact in his deposition[,] cannot create a triable issue merely by submitting his affidavit denying the fact." <u>Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.</u>, 925 F.2d 566, 572 (2d Cir. 1991).  This concept, known as the "sham affidavit doctrine," prevents a party from submitting an affidavit that contradicts the party's prior deposition testimony in order to raise an issue of fact sufficient to preclude summary judgment. See <u>Perma Research & Dev. Co. v. Singer</u>

---

[3]   See <u>Dawson</u>, 398 F.3d at 219 ("[D]istrict courts in this Circuit have repeatedly rejected attempts by homosexual plaintiffs to assert employment discrimination claims based upon allegations involving sexual orientation by crafting the claim as arising from discrimination based upon gender stereotypes); <u>see also</u> <u>Martin v. New York State Dep't of Corr. Servs.</u>, 224 F. Supp. 2d 434, 447 (N.D.N.Y. 2002) ("The torment endured by Martin . . . the name-calling, the lewd conduct and the posting of profane pictures and graffiti are all of a sexual, not gender, nature.")

Co., 410 F.2d 572, 578 (2d Cir. 1969). Any issue of fact created by the contradiction is not

genuine, and therefore cannot serve as a basis on which to deny summary judgment. See Palazzo

ex rel Delmage v. Corio, 232 F.3d 38, 43 (2d Cir. 2000).

Plaintiff's affidavit is a sham affidavit.  At his deposition, Plaintiff repeatedly testified

under oath that he resigned his employment, and that no one at Festival Fun Parks had told him

he was being fired or his employment was being terminated.  See Exhibit"**C**" at 88:20-22, 89:24-

90:5, 90:19-92:17.  While he later modified his deposition testimony to suggest that he had been

forced to resign, he never stated at his deposition that his employment was terminated.  Because

Plaintiff in his affidavit directly contradicts his deposition testimony, it is appropriate for the

Court to disregard the factual dispute raised in the affidavit as a sham, and find that Plaintiff's

employment was not terminated.[4]

### E.    Festival Fun Parks  Has Fulfilled Its Burden Of Showing A Nondiscriminatory Reason For Its Actions.

The second prong of the McDonnell Douglas framework requires that Defendant

"articulate some legitimate, nondiscriminatory reason for the employee's [treatment]."

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Festival Fun Parks has fulfilled

its burden under the second prong of McDonnell Douglas by demonstrating that Plaintiff was not

transferred to the paint shop because no open position existed.   There can be no legitimate

factual dispute on this point. Plaintiff has submitted no evidence other than his unsubstantiated

belief that there may have been a need for more help in the paint shop; Festival Fun Parks has

---

[4]    Nor can Plaintiff survive summary judgment by attempting to post-facto transform his resignation into a constructive discharge. The allegedly intolerable workplace conduct Plaintiff complains of, and which he has not substantiated with any testimony or other evidence from the individuals who allegedly harassed him, are not the " deliberately created working conditions…so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Stetson v. Nynex Service Co., 995 F.2d 355, 361 (2d Cir. 1993).

submitted the sworn statement of the park's general manager that there were no open positions in the paint shop when Plaintiff resigned, and no new employees have been hired in the paint shop since.  See Declaration of Gerard Brick, Exhibit "D" to Def.'s Mem., at ¶ 4-6.

### F.    Plaintiff Has Failed To Demonstrate That Festival Fun Parks' Legitimate Reasons For Refusing to Transfer Him Were Pretextual.

In light of Festival Fun Parks' presentation of evidence regarding its refusal to transfer Plaintiff to the paint shop, Plaintiff must produce evidence sufficient to demonstrate that Festival Fun Parks' proferred reason for this refusal was pretextual. Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001);  see also McDonnell Douglas, 411 U.S. at 804.  When challenging an employer's legitimate, non-discriminatory reasons for the employment action, a plaintiff cannot simply argue "that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." O'Hazo v. Bristol-Burlington Health Dist., 599 F. Supp. 2d 242, 260 (D. Conn. 2009).  The motion "will not be defeated merely . . . on the basis of conjecture or surmise." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, L & L Started Pullets, Inc. v. Gourdine, 762 F.2d 1, 3-4 (2d Cir. 1985). Plaintiff has failed to offer evidence sufficient to demonstrate that the stated reason for Festival Fun Parks' refusal to transfer him to the paint department was pretext for discrimination or retaliation.

Plaintiff's only evidence of discriminatory intent is his conclusory allegation that he was denied a transfer to the paint shop because he was disabled. However, he has adduced no evidence that any protected activity was taken into account. In fact, Plaintiff essentially admits as much in his Opposition, stating that he "believes" that there was a need for additional help in

the paint shop at the time he was terminated or since. Plaintiff's "belief," uncorroborated by any other evidence, is exactly the type of "mere suspicion" that the Second Circuit has repeatedly found to be insufficient to establish discriminatory intent.

Because Plaintiff has offered no evidence of pretext sufficient to demonstrate that Festival Fun Parks' explanation for the decision not to transfer him to the paint shop was pretextual or motivated by discriminatory animus, as is required, he cannot carry his "difficult burden" under the third prong of the McDonnell Douglas analysis. See, e.g., Lane v. Carpinello, 2009 U.S. Dist. LEXIS 88345 , *51 No. 07-CV-0751 (GLS/DEP) (N.D.N.Y. September 24, 2009). As a result, Defendant is entitled to summary judgment in its favor as to Plaintiff's disability and gender discrimination, sexual harassment, and retaliation claims.

## III. CONCLUSION

For the reasons set forth herein, Defendant's Motion for Summary Judgment should be granted.

Respectfully Submitted,

Dated: June 1, 2012                    FISHER & PHILLIPS LLP

/s/ Risa B. Boerner
Risa B. Boerner
Attorney I.D. No. ct28341
James P. McLaughlin
Attorney I.D. No. phv05264
Fisher & Phillips LLP
201 King of Prussia Rd., Suite 650
Radnor, PA  19087
Telephone: (610) 230-2150
Facsimile: (610) 230-2151
E-Mail: rboerner@laborlawyers.com
        jmclaughlin@laborlawyers.com

*Attorneys for Defendant Festival Fun Parks,
LLC d/b/a Lake Compounce*

10

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2012, a copy of the foregoing was filed electronically and served electronically on all attorneys and pro se parties of record as listed below. Notice of this filing will be sent be e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

James V. Sabatini, Esquire
Sabatini and Associates, LLC
1 Market Square
Newington, CT 06111

Attorney for Plaintiff


/s/ James P. McLaughlin
James P. McLaughlin

11

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

ANDREW ADAMS,                          )
                                       )
                    Plaintiff,         )
                                       )        Case No. 3:11-cv-00427 (JCH)
vs.                                    )
                                       )
FESTIVAL FUN PARKS, LLC,               )
d/b/a LAKE COMPOUNCE                   )
                                       )
                                       )
                    Defendant.         )
                                       )

**DEFENDANT'S FIRST SET OF REQUESTS FOR THE PRODUCTION OF
DOCUMENTS DIRECTED TO PLAINTIFF ANDREW ADAMS**

  Defendant, Festival Fun Park, LLC, by and through its undersigned counsel, and pursuant to Federal Rule of Civil Procedure 34, hereby requests that Plaintiff Andrew Adams answer the following Requests for Production of Documents and produce documents responsive thereto, within thirty (30) days of service hereof, in accordance with the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Connecticut, and the instructions and definitions set forth herein.

**INSTRUCTIONS AND DEFINITIONS**

  Please follow these instructions and use the following definitions in responding to these Requests for Production of Documents. Any term or word that is not defined herein has its usual and customary meaning.

  A.  In each response to these Requests for Production of Documents, provide all information in your possession, custody, or control. If you are able to provide only part of the

Error! Unknown document property name.

21. Any and all Documents and/or Communications that reflect, relate to, or refer to Plaintiff's alleged "mental retardation."

**RESPONSE:**

Objection pending. Subject to and without waiving the objection, see attached plaintiff's Bates Nos. 161-171

22. Any and all Documents and/or Communications between Plaintiff and Defendant that reference Plaintiff's "mental retardation" in any way whatsoever.

**RESPONSE:**

Unaware of any responsive documents at this time

23. Any and all documents which relate to or support your claim for damages related to any medical care, psychological care, health care, or related services to you, if any, for any injuries, problems, or conditions that you assert were the result of the actions taken by Defendant that are the subjects of your Complaint.

**RESPONSE:**

None

24. All Documents that refer, reflect, or relate to any claim of employment discrimination, harassment, retaliation, wrongful discharge, or any other employment-related claim that Plaintiff has ever made, whether internally, to a government agency, in a lawsuit, or in any other manner, with respect to any entity other than Defendant.

**RESPONSE:**

10

**Error! Unknown document property name.**

# EXHIBIT B

1/20/2012                                      Andrew Adams

# COPY                          Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

```
_____
                         :
ANDREW ADAMS,            : Case No.: 3:11 cv 00427(JCH)
                         :
         Plaintiff,      :
                         :
                         :
    -vs-                 :
                         :
FESTIVAL FUN PARKS, LLC, d/b/a:
LAKE COMPOUNCE THEME PARK,    :
                         :
         Defendant.      :
                         :
_____:
```

DEPOSITION OF:  ANDREW ADAMS
DATE:  JANUARY 20, 2012
TIME:  10:00 a.m.
HELD AT:  HINCKLEY, ALLEN, SNYDER
          20 CHURCH STREET
          HARTFORD, CT 06103

BRANDON SMITH REPORTING SERVICES, LLC
Reporter:  Liza Manafort, LSR# 464

44 Capitol Avenue              6 Landmark Square
Hartford, CT 06106             4th Floor
(860) 549-1850                 Stamford, CT 06901
(800) 852-4589                 (203) 316-8591
                               (800) 852-4589

1/20/2012                                                    Andrew  Adams



Page 2

APPEARANCES


FOR THE PLAINTIFF, ANDREW ADAMS:

SABATINI AND ASSOCIATES, LLC
ONE MARKET SQUARE
NEWINGTON, CT 06111
(860) 667-0839

BY:  JAMES SABATINI, ESQ.



FOR THE DEFENDANT, FESTIVAL FUN PARKS, LLC, D/B/A LAKE
COMPOUNCE THEME PARK:

FISHER & PHILLIPS, LLP
RADNOR FINANCIAL CENTER
201 KING OF PRUSSIA ROAD, SUITE 650
(610) 230-2150
RADNOR, PA 19087

BY:  RISA B. BOERNER, ESQ.

1/20/2012                                      Andrew  Adams

                                                    Page 105

1       Q     Are there any other ways in which you think Lake

2    Compounce retaliated against you?

3       A     Not that I can think of right now.

4       Q     And what do you think you were being retaliated

5    against for?

6       A     I think just Justin didn't like me, he was trying

7    to find a way to maybe make me mad and leave the company.

8       Q     What conduct did you engage in, that you think

9    caused Lake Compounce to retaliate against you?  Is there

10   anything else, other than what you've described -- that

11   Justin didn't like you?

12      A     I think in my heart, since I'm a slow learner, it

13   takes me time to do things, and I have to constantly go at a

14   slower pace to pick it up.

15      Q     And you think you were retaliated against by Lake

16   Compounce because of that?

17      A     Yeah.

18      Q     And who, specifically, retaliated against you?

19      A     Well, one thing was Justin Walters.  John Fitch --

20   there was one day I was working on a ride, it took me all

21   day, I couldn't figure out how to fix the ride.  And he came

22   back into the shop and goes you're still work on that piece.

23            I'm like I'm having a hard time.  He goes you

24   should remember this by now, you've been with us for a

25   while.  So instead of showing me, all he did was basically

# EXHIBIT C

Adams v. Festival Fun Parks

1/20/2012                                                    Andrew Adams

# COPY                    Page 1

## UNITED STATES DISTRICT COURT

### DISTRICT OF CONNECTICUT

----

ANDREW ADAMS,                    :  Case No.: 3:11 cv 00427(JCH)
                                 :
                Plaintiff,       :
                                 :
                                 :
        -vs-                     :
                                 :
FESTIVAL FUN PARKS, LLC, d/b/a   :
LAKE COMPOUNCE THEME PARK,       :
                                 :
                Defendant.       :
                                 :
----

               DEPOSITION OF:  ANDREW ADAMS
               DATE:   JANUARY 20, 2012
               TIME:   10:00 a.m.
               HELD AT:  HINCKLEY, ALLEN, SNYDER
                         20 CHURCH STREET
                         HARTFORD, CT 06103


          BRANDON SMITH REPORTING SERVICES, LLC
          Reporter:  Liza Manafort, LSR# 464

   44 Capitol Avenue                6 Landmark Square
   Hartford, CT 06106               4th Floor
   (860) 549-1850                   Stamford, CT 06901
   (800) 852-4589                   (203) 316-8591
                                    (800)852-4589

Adams   v. Festival Fun Parks

1/20/2012                                                Andrew  Adams

Page 2

APPEARANCES


FOR THE PLAINTIFF, ANDREW ADAMS:

SABATINI AND ASSOCIATES, LLC
ONE MARKET SQUARE
NEWINGTON, CT 06111
(860) 667-0839

BY:  JAMES SABATINI, ESQ.



FOR THE DEFENDANT, FESTIVAL FUN PARKS, LLC, D/B/A LAKE
COMPOUNCE THEME PARK:

FISHER & PHILLIPS, LLP
RADNOR FINANCIAL CENTER
201 KING OF PRUSSIA ROAD, SUITE 650
(610) 230-2150
RADNOR, PA 19087

BY:  RISA B. BOERNER, ESQ.

1/20/2012                                          Andrew  Adams

Page 88

1    saying, oh, my God, we got to bail Andy out again.

2         And basically he said, you know, keep looking for

3    a job and still work here, you know, we'll find you

4    something else to do in the shop until you find a job.  But

5    he did mention to me if you have any of your holiday time,

6    or any of your vacation time, to use it up, because if you

7    don't you don't get it, you lose it.

8         So I started taking all of my holiday pay, and my

9    vacation time up.  When I came back Jerry Brick had a

10   meeting with me and Mario Abela.

11   Q    How long were you out on your vacation and holiday

12   time?

13   A    I took I believe two weeks, because that's what

14   was owed to me.

15   Q    Who initiated the meeting that you had after that,

16   with Jerry Brick and Mario Abela?

17   A    Who was there?

18   Q    Who initiated it?

19   A    Oh, I don't know.  I went to work that day and

20   Jerry said can we see you upstairs, please.  So I went

21   upstairs to the office.

22   Q    And what did you discuss with them at that point?

23   A    That's when he said to me, you know, I've called

24   corporate up and told corporate you're leaving, so we need

25   to know from you when your last day is.  And Mario said,

1/20/2012                                        Andrew  Adams

Page 89

1   well, we're going to give him to October 31st, to the end of

2   the season.

3          And that's when Jerry said to me, okay, and if you

4   can't get a job or find a job, Andy, I'll let you collect

5   unemployment and I won't appeal the case, I'll let you get

6   it.

7      Q    And what did you say to them?

8      A    I said thank you very much.  And then that's how

9   it ended.

10     Q    Was anything discussed, that you haven't described

11  to me, during that meeting?

12     A    Right after my last day I handed him my keys, and

13  they gave me my termination slip.  And then a couple of

14  days, after I couldn't find a job, I called unemployment to

15  put a case in.

16     Q    During that meeting with Jerry Brick and Mario

17  Abela, that you were just describing, was anything else

18  discussed between you, other than what we've already talked

19  about?

20     A    No.

21     Q    Did you have any other discussions with anyone

22  after that, about leaving Lake Compounce?

23     A    Not that I recall.

24     Q    Okay.  Did anybody at Lake Compounce tell you that

25  you were being terminated or fired?

1/20/2012                                              Andrew  Adams

Page 90

1     A    No.

2     Q    Do you believe that you were fired?

3     A    No.  I wouldn't say I believe I was, no.

4     Q    So you resigned from Lake Compounce?

5     A    Yes.

6     Q    Okay.  All right.  Are you claiming that Lake

7    Compounce discriminated against you, based opinion your

8    gender, being a man?

9     A    Yes.

10     Q    Okay.  How is that?

11     A    Well, because the way I got treated and picked on,

12    no one else got the same treatment.  So I feel I was being

13    mistreated.

14     Q    Okay.

15          ATTORNEY BOERNER:  Off the record.

16

17    (A lunch recess was taken from 12:32 p.m. to 1:13 p.m.)

18

19    Q    (By Attorney Boerner) I understand that you want to

20    change some of your testimony from earlier, is that right?

21     A    Yes.

22     Q    Why do you want to change your testimony?

23     A    Because I feel the question that you asked about

24    the termination, the do you feel you were terminated or did

25    you quit.  I feel I was terminated because of being -- of

Adams  v.  Festival Fun Parks

1/20/2012                                          Andrew  Adams

                                                        Page 91

1    them not finding nothing else in the park for me to do, and

2    me being picked on, nobody was doing anything about it.  So

3    I felt like I was being forced out of there.

4         Q     What made you change your testimony from earlier?

5         A     Because I thought about it more.  If the park

6    really wanted me, they would have found another job in the

7    park and they wouldn't have me leave.

8         Q     Did you discuss that with your attorney during the

9    break?

10        A     Yes.

11        Q     And after talking to your attorney, you want to

12   change your testimony?

13        A     Yes.

14        Q     And you understood that earlier you were

15   testifying under oath, correct?

16        A     Yes.

17        Q     And you testified earlier that you resigned,

18   right?

19        A     Yes.  Because I was being forced out of there.

20        Q     Earlier you said you weren't terminated, right?

21        A     Yes.

22        Q     And now you're saying that you were?

23        A     Yes.

24        Q     Okay.  Did anyone ever tell you that you were

25   being terminated?

1/20/2012                                    Andrew   Adams

                                                      Page 92

1       A     No.  But working at a place and being picked on

2    and bullied, and your managers aren't doing nothing to stop

3    it...

4       Q     Nobody ever told you you were being terminated, is

5    that right?

6       A     Yes.

7       Q     And nobody ever told you you were being fired,

8    right?

9       A     Correct.

10      Q     Okay.  Sir, you did resign, right?

11      A     Resigned, because I couldn't deal with it no more,

12   being picked on.

13      Q     You resigned because you feel you were being

14   picked on?

15      A     Right.

16      Q     Okay.  But you did resign, correct?

17      A     Yes.

18      Q     Do you think that if you hadn't been a man, you

19   would have been treated differently at Lake Compounce?

20      A     No.

21      Q     Do you think your sex or gender had anything to do

22   with your treatment?

23      A     Yes.

24      Q     How so?

25      A     Because the way Justin said the remark to me, he

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANDREW ADAMS, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:11-cv-427 (JCH) |
| | : | |
| v. | : | |
| | : | |
| FESTIVAL FUN PARKS, LLC, d/b/a/ | : | MARCH 12, 2013 |
| LAKE COMPOUNCE THEME PARK, | : | |
| Defendant. | : | |

**RULING RE: MOTION FOR SUMMARY JUDGMENT (Doc. No. 30)**

## I.     INTRODUCTION

Plaintiff Andrew Adams ("Adams") commenced this action against defendant

Festival Fun Parks, LLC, d/b/a Lake Compounce Theme Park ("Festival Fun Parks"),

his former employer.  The Complaint alleges eight counts.  Counts 1 and 2 claim that

Festival Fun Parks discriminated against Adams on the basis of his disability in violation

of the Americans With Disabilities Act, 42 U.S.C. § 12101, et seq. (the "ADA")  and the

Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a–60(a), et seq. (the

"CFEPA").  Counts 3 and 4 claim that Festival Fun Parks discriminated against Adams

on the basis of his gender in violation of the ADA and Title VII of the Civil Rights Act of

1964, as amended ("Title VII").  Counts 5 and 6 claim that Adams was subjected to

sexual harassment and a hostile work environment in violation of Title VII and the

CFEPA.  Finally, Counts 7 and 8 claim that Festival Fun Parks retaliated against Adams

in response to his complaints of harassment and discrimination in violation of the

CFEPA and Title VII.  Festival Fun Parks has filed a Motion for Summary Judgment

(Doc. No. 30) on all counts.

1

## II.    STATEMENT OF FACTS

Festival Fun Parks owns and operates Lake Compounce, a theme park located in Bristol, Connecticut.  Def.'s Local Rule 56(a)1 Statement ¶ 1.  Each summer from 1997 through 2007, with the exception of part of the summer of 2003, Adams worked at Lake Compounce as a seasonal employee of Festival Fun Parks.  Id. ¶¶ 5, 7.  As a seasonal employee, he held various positions at Lake Compounce, including ride operator, ride trainer, assistant ride supervisor, assistant ride coach, and housekeeping supervisor.  Id. ¶¶ 6, 10.  Sometime in 2008, Adams was hired as a full-time employee at Lake Compounce.  He worked there as a Mechanical Helper until his employment ended in October 2009.  Id. ¶¶ 12–13.

Adams alleges that he was subjected to sexual harassment and gender and disability discrimination while he was a full-time employee of Festival Fun Parks.  Pl.'s Local Rule 56(a)(2) Statement ¶ 8.  Adams alleges that he suffers from a "slight mental retardation," which causes him to be a slow learner and have difficulty remembering things.  Id. ¶¶ 1–2.  Adams claims that he kept a log of incidents of workplace harassment that occurred between February 2009 and October 2009.  This log identifies approximately six such incidents, most of which identify a co-worker, Justin Walters ("Walters"), as the source of the harassment.  Id. ¶¶ 10–15 & Ex. 6 ("Adams Log").  Adams alleges that he told John Fitch ("Fitch") and Mario Abela ("Abela"), two of his supervisors, as well as Mike Hayes, who worked in HR, about his being harassed, but that they failed to do anything about the situation.  Id. ¶¶ 10, 12, 14, 16.

Adams further alleges that in September 2009, he asked Jerry Brick ("Brick"), the general manager, if he could be transferred to the paint shop.  Id. ¶ 17.  According to

2

Adams, Brick told Adams he could not transfer him because he lacked painting experience.  Brick later told him that there were no open positions in the paint shop.  Id. ¶¶ 18–19.  In October 2009, Adams resigned.[1]  L.R. 56(a)(1) ¶ 13.

## III.   STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  Id.  In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. Cnty. of Nassau, 524

---

[1] Adams testified that he resigned from Festival Fun Parks.  Deposition Transcript of Andrew Adams, Jan. 20, 2012, Ex. 2 to Def.'s Mot. Summ. J. (Doc. No. 30-2) ("Adams Tr.") at 90:2–5, 92:4–15.  However, Adams also claims that he was constructively terminated.  See L.R. 56(a)(2) ¶¶ 21–24.  Adams' claim of constructive discharge is addressed, infra, at Part IV.B.2.i.

F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir.

2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008)

(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that a

non-moving party must point to more than a mere "scintilla" of evidence in order to

defeat a motion for summary judgment).

## IV.    DISCUSSION

Festival Fun Parks argues that it is entitled to summary judgment regarding all of

Adams' claims because Adams has failed to establish a prima facie case of disability

discrimination, sexual harassment, gender discrimination, or retaliation; or alternatively,

because Adams cannot show that Festival Fun Parks' constructive discharge, or failure

to transfer him to another shop, was pretextual or done with discriminatory intent.

### A.  Disability Discrimination Claims

Counts 1 and 2 claim that Festival Fun Parks discriminated against Adams on

the basis of his disability in violation of the ADA and the CFEPA.

### 1.  Americans With Disabilities Act

The ADA provides that, "[n]o covered entity shall discriminate against a qualified

individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and

other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  "Claims

alleging disability discrimination in violation of the ADA are subject to the burden-shifting

analysis originally established by the Supreme Court in McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."  McBride v. BIC

Consumer Products Mfg. Co., Inc., 583 F.3d 92, 96 (2d Cir. 2009).  Under such

analysis, the "plaintiff must establish a prima facie case [of discrimination]; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." Sista v. CDC Ixix N.A., Inc., 445 F.3d 161, 169 (2d Cir. 2006) (citing Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, 198 F.3d 68, 72 (2d Cir.1999)).

Festival Fun Parks argues that Adams has failed to establish a prima facie case of disability discrimination. To establish such a case, Adams must show four elements: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001). Festival Fun Parks contests only the second and fourth elements.

       i.     Whether Adams was disabled within the meaning of the ADA. Adams may show that he is disabled in one of three ways: (1) he suffers a physical or mental impairment that "substantially limits" one or more of his "major life activities"; (2) he shows a record of such impairment; or (3) he is "regarded" as having such an impairment.[2] See 42 U.S.C. § 12102.

Adams claims that he suffers from mental retardation. See Compl. (Doc. No. 1) ¶ 7. He testified in his deposition that he is a "slow learner" and has to "constantly go at a slower pace" to pick things up. Deposition Transcript of Andrew Adams, Jan. 20,

---

[2] Adams does not appear to allege that he has a record of a disability. See generally Am. Compl. (Doc. No. 16).

2012, Ex. 2 to Def.'s Mot. Summ. J. (Doc. No. 30-2) ("Adams Tr.") at 105:12–14.[3] He

also testified that he was diagnosed as having "slight mental retardation," although he

does not have any medical records of this diagnosis. Id. at 112:2–13. He also testified

that, when he was in fifth grade, he was assessed to be at a "third, fourth grade level of

reading." Id. at 112:17–113:25. As a basis for this testimony, Adams relies on an

unsworn summary of a diagnostic assessment conducted by Dr. Cynthis K. Niedbala in

January 1990. This summary states that, at the time, Adams participated in a program

"designed to meet his needs as a student with mild Mental Retardation, and/or

Borderline abilities." Ex. 4 to Pl.'s Obj. to Def.'s Mot. Summ. J. ("Niedbala Summary"),

at Bates No. P000162.

     The parties disagree as to whether the court may consider the Niedbala

Summary. Generally, unsworn summary reports are inadmissible as hearsay and may

not be considered on summary judgment. See, e.g., Fall v. New York State United

Teachers, 289 Fed. Appx. 419, 421 n.3 (2d Cir. 2008) (finding that unsworn audiologist

reports "constitute inadmissible hearsay"); Weltz v. City of New York, No. 99 Civ. 3932,

2004 WL 1907309, *5 (S.D.N.Y. Aug. 25, 2004) (finding that unsworn doctor's letters

were inadmissible as hearsay and could not properly be considered at summary

judgment). However, Adams argues that the Niedbala Summary is admissible because

Festival Fun Parks waived any objections to its admissibility when it submitted the

document as an exhibit to its Local Rule 56(a)(1) Statement and "relied upon" the

document in its Motion for Summary Judgment. Pl.'s Opp. Def.'s Mot. Summ. J. ("Pl.'s

Opp.") at 15 (citing Capobianco v. City of New York, 422 F.3d 47, 55 (2d Cir. 2005)).

---

[3] Exhibit 2 contains only excerpts of Adams' deposition. Other portions of the same deposition
transcript are excerpted in Adams' papers. See Pl.'s Opp., Ex. 2 (Doc. No. 36-4). This court will not
differentiate between the two excerpts, but will cite to "Adams Tr." whenever it cites to either exhibit.

6

The Capobianco case is inapposite. There, the Second Circuit held that the district court improperly decided sua sponte to exclude, at summary judgment, two unsworn letters written by the plaintiff's doctor. First, the Capobianco court noted that the defendants submitted both letters as exhibits to their Rule 56.1 Statement and then "cited . . . and relied on them in seeking summary judgment," and that "[n]either side objected to the admissibility of the reports." Capobianco, 422 F.3d at 55. Here, although Festival Fun Parks attached the Niedbala Summary to its Rule 56.1(a) Statement, see Ex. D-9 to Adams Tr., it did so to note that Adams produced the document in discovery, "[i]n support of his claim that he is disabled," and that Adams did not produce the actual assessment referenced in the Niedbala Summary. L.R. 56(a)(1) ¶ 24. Then, in its Motion for Summary Judgment, Festival Fun Parks argued that the summary was inadmissible hearsay. Def.'s Mem. Mot. Summ. J. (Doc. No. 30-1) at 10–11. Accordingly, Festival Fun Parks attached the Niedbala Summary to its Local Rule 56(a)(1) Statement to argue why it should not be relied upon, and then, unlike in Capobianco, explicitly argued that the document was inadmissible. Compare Capobianco, 422 F.3d at 55 (noting that "[n]either side objected to the admissibility of the reports"), with Def.'s Mem. Mot. Summ. J. at 10–11 (referencing Niedbala Summary, and arguing that it is hearsay that "cannot be considered for purposes of summary judgment").

Second, the Capobianco court held that the district court's sua sponte decision to exclude the unsworn letters prejudiced the plaintiff, because he "reasonably believed that he could rely" on documents initially submitted by and relied on by the defendants. Again, because Festival Fun Parks did not rely on the Niedbala Summary, and in fact

7

argued against its inadmissibility, there is no similar concern here of detrimental reliance by Adams.  Further, on the same date it filed its Motion for Summary Judgment, Festival Fun Parks filed a Motion to Preclude the Testimony of Dr. Cynthia K. Niedbala, the purported author of the report underlying the Niedbala Summary.  See Doc. No. 29 (filed on March 15, 2012, the same date as the Motion for Summary Judgment).  In papers supporting that motion, Festival Fun Parks argued, among other things, that the assessment report was inadmissible because it was unsigned, and "a review of the report suggests that it was not even prepared by Dr. Niedbala."  Doc. No. 29-1, at 5.  This court subsequently granted Festival Fun Park's Motion to Preclude, noting that Adams had failed to object.  See Doc. No. 39 (granting Doc. No. 29 "absent objection").

Finally, in Capobianco, the court noted that excluding the reports prejudiced the plaintiff because, had he known they would be excluded, he could have "obtained an affidavit easily" from someone who had "already been designated as an expert" and whose "expert report had previously been produced."  Capobianco, 422 F.3d at 55.  Here, Adams is not similarly prejudiced, particularly considering that Festival Fun Parks made a Motion to Preclude Niedbala's testimony.  Given all of the above, the court will not consider the Niedbala Summary on summary judgment.

Absent consideration of the summary, the remainder of Adams' evidence consists of his own testimony.  However, such self-serving testimony, without more, is insufficient to create a material issue of fact as to whether Adams is disabled within the meaning of the ADA.  See, e.g., Buotote v. Ill. Tool Works, Inc., 815 F. Supp. 2d 549, 558 (D. Conn. 2011) (granting summary judgment on plaintiff's disability claim under the ADA where he "provide[d] no evidence of his disability beyond his own testimony and a

disability rating"); Baerga v. Hosp. For Special Surgery, No. 97 Civ. 0230, 2003 WL

22251294, at *6 (S.D.N.Y. Sept. 30, 2003) ("Courts in the Second Circuit have

consistently held that when a plaintiff fails to offer any medical evidence substantiating

the specific limitations to which he claims he is subject due to his condition, he cannot

established that he is disabled within the meaning of the ADA." (citations and internal

quotation marks omitted)).

Moreover, even if this court were to credit Adams' testimony that he is a "slow

learner" and must go at a "slower pace," such statements would not be sufficient to

establish a prima facie case as to his being disabled under the ADA, because they

constitute conclusory statements that do not show that Adams is substantially limited in

his ability to perform a class or broad range of jobs.  See Littleton v. Wal-Mart Stores,

Inc., 231 Fed. Appx. 874, 877 (11th Cir. 2007) ("The term substantially limits means

significantly restricted in the ability to perform either a class of jobs or a broad range of

jobs in various classes . . . .  The inability to perform a single, particular job does not

constitute a substantial limitation in the major life activity of working." (quotation marks

and citations omitted)).  Adams has not testified, or come forward with other evidence,

that he is substantially limited in his ability to perform a wide variety of tasks or jobs.

Thus, there is no material issue of fact as to whether he is disabled within the meaning

of the ADA.

     ii.    Whether Adams was regarded as disabled within the meaning of the ADA.

Adams can also show that he is "disabled" under the meaning of the ADA by showing

that Festival Fun Parks "regarded" him as suffering a mental impairment that

substantially limits one or more of his major life activities.[4]  See 42 U.S.C. § 12102.  To

succeed on the "regarded as" prong under the ADA, Adams cannot merely show that

Festival Fun Parks regarded him as "somehow disabled"; he must show that Festival

Fun Parks regarded him as disabled within the meaning of the ADA, i.e., as "having an

impairment that substantially limits a major life activity."  Capobianco, 422 F.3d at 57

(internal quotation marks and citations omitted); Piascyk v. City of New Haven, 64 F.

Supp. 2d 19, 32 (D. Conn. 1999) (noting that an employer's mere awareness that an

employee is impaired is insufficient to meet the "regarded as" standard, as the

employee "must show that defendants perceived his impairment as substantially limiting

the exercise of a major life activity" (internal quotation marks and citations omitted)).

Adams has not provided evidence from which a reasonable jury could find that

Festival Fun Parks regarded him as disabled within the meaning of the ADA.  Adams

did testify that he told his supervisors that he had taken special education classes and

that he had a "hard time with remembering a lot of things."  Adams Tr. at 21:23–25.

However, even viewing this evidence in a light most favorable to Adams, it does not

show that his supervisors' awareness of his comments resulted in their perceiving him

as being disabled, much less substantially limited in his exercise of a major life activity.

Adams did not show them any medical reports assessing him as mentally disabled, and

there is no evidence that his soon-to-be supervisors responded to Adams' comments in

a way that evinced that they perceived him to be disabled.  In fact, after this

_____

[4] As a preliminary matter, Festival Fun Parks argues that Adams failed to plead that he was
regarded as disabled, and thus is precluded from relying on the "regarded as" prong to show he is
disabled.  Def.'s Mem. Mot. Summ. J. at 11.  Because Adams has not presented evidence creating a
material factual dispute as to whether Festival Fun Parks regarded him as being disabled, this court does
not need to reach that issue.

conversation occurred, Festival Fun Parks hired him as a full-time employee, and nothing in the record shows any reservations or restrictions related to this decision.

Nor does the evidence reasonably support a finding that anyone else at Festival Fun Parks was aware of Adams' alleged mental disability. Adams argues that his testimony that his co-workers would "call him stupid," and ask him what was wrong with him, evince a belief that he was "impaired and not smart enough to do the job." Pl.'s Opp. at 16. However, a reasonable jury could not find that calling someone "stupid," without anything more, was evidence that the speaker perceived that person to be mentally impaired so as to substantially limit that person's exercise of a major life activity. Moreover, there is no evidence in the record that Adams told his co-workers that he suffered from a mental disability, or that they somehow knew this fact.

Because the record does not create a material factual dispute as to whether Adams was disabled under the ADA, this court does not need to determine whether Adams was terminated because of his alleged disability. Adams has failed to establish a prima facie case of disability discrimination under the ADA, and the court grants summary judgment as to Count 1.[5]

2. Connecticut Fair Employment Practices Act

Discrimination claims brought under the CFEPA are construed similarly to claims brought under the ADA. See Worster v. Carlson Wagon Lit Travel, Inc., 353 F. Supp. 2d 257, 267 (D. Conn. 2005) ("Connecticut courts review[ ] federal precedent concerning employment discrimination for guidance in enforcing the CFEPA."). Indeed,

---

[5] Even assuming arguendo that Adams were disabled under the meaning of the ADA, summary judgment would still be appropriate, because Adams failed to show that he suffered an adverse employment action because of his alleged disability. See infra, Part IV.C.2 (ruling that Adams failed to prove adverse employment action regarding gender discrimination claim).

11

JA 435

"Connecticut courts generally analyze ADA and CFEPA claims under the same

standard." Buck v. AT&T Servs., Inc., No. 08 Civ. 1619, 2010 WL 2640045, *1 n.1 (D.

Conn. June 28, 2010).  Notably, the definition of "disability" is broader under the CFEPA

than it is under the ADA, as the CFEPA does not require that a disability "substantially

limit a major life activity."  Buotote, 815 F. Supp. 2d at 556.  However, "[a]lthough the

CFEPA applies more broadly than the ADA, the evidentiary standards for the two

statutes are the same, and they are therefore often examined in conjunction.  Thus,

although the CFEPA has no 'substantial limitation' requirement, the need for

corroborating evidence of disability under the ADA is also required under the CFEPA."

Id. at 557 n.10 (internal citations omitted).

This court has determined that Adams presented insufficient evidence to

corroborate his claims that he was mentally disabled.  See supra, Part IV.A.1.i; see also

Buotote, 815 F. Supp. 2d at 558 (granting summary judgment on CFEPA claim where

plaintiff's evidence consisted only of "his own testimony and a disability rating that lacks

context or other helpful guidance").  Accordingly, this court also grants summary

judgment as to Adams' claim of disability discrimination under the CFEPA.

B.  Sexual Harassment/Hostile Work Environment Claims

In Counts 5 and 6, Adams brings hostile work environment sexual harassment

claims in violation of Title VII and the CFEPA.  "Title VII prohibits discrimination against

any individual with respect to his or her compensation, terms, conditions, or privileges of

employment, because of, inter alia, such individual's sex." Kaytor v. Electric Boat Corp.,

609 F.3d 537, 546 (2d Cir. 2010) (internal quotation marks and alterations omitted)

(quoting 42 U.S.C. § 2000-2(a)(1)).  Additionally, under the CFEPA, an employer may

not "discriminate against [any] individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . sex . . . ."  Conn. Gen. Stat. § 46a-60(a)(1).  As with Adams' disability discrimination claims, these claims are both analyzed under the burden-shifting analysis found in McDonnell Douglas.  See Jamilik v. Yale Univ., 362 Fed. Appx. 148, 150, 151 n.3 (2d Cir. 2009) (applying McDonnell Douglas analysis to Title VII sex discrimination claim, and noting that "CFEPA claims are governed by the same standards applicable to Title VII claims"); Hall v. Family Care Home Visiting Nurse and Home Care Agency, LLC, 696 F. Supp. 2d 190, 198 (D. Conn. 2010) (analyzing Title VII and CFEPA sex discrimination claims under McDonnell Douglas analysis).

    1.  Sufficiently Severe Discrimination

    To establish a prima facie hostile work environment claim under Title VII and CFEPA, Adams must show the following:  "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [Adams'] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to [Festival Fun Parks]." Carter v. New Venture Gear, Inc., 310 Fed. Appx. 454, 457–58 (2d Cir. 2009) (quoting Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003)); Lamphear v. Potter, No. 09-1640, 2012 WL 3043108, *7 (D. Conn. July 25, 2012) (citing Carter).  When determining whether an employer's conduct was "sufficiently severe," courts must consider the "totality of the circumstances" and examine "the nature of the workplace environment as a whole," including the following factors:  the frequency and severity of the alleged discriminatory conduct; whether the conduct is physically threatening or

13

humiliating as opposed to a mere offensive utterance; and whether the conduct unreasonably interferes with an employee's work performance. Kaytor v. Electric Boat Corp., 609 F.3d 537, 547 (2d Cir. 2010) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993), and Cruz v. Coach Stores, Inc., 202 F.3d 560, 567 (2d Cir. 2000)). Moreover, courts must use "both an objective and a subjective standard . . . to prove the existence of a hostile work environment violative of Title VII." Id.

Adams must also establish that the abuse in question was based on his gender. Id. (citing Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir. 2001)). However, the court may consider "facially neutral incidents . . . so long as a reasonable fact-finder could conclude that they were, in fact, based on sex." Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002)). For example, "[c]ircumstantial evidence that facially sex-neutral incidents were part of a pattern of discrimination on the basis of gender may consist of evidence that the same individual engaged in multiple acts of harassment, some overtly sexual and some not." Kaytor, 609 F.3d at 547–48 (quoting Alfano, 294 F.3d at 375).

The Amended Complaint alleges that Adams was "repeatedly subjected to sexual harassment by his co-worker," and that such harassment was "repetitious and continuous" and "based upon his gender and was sexual in nature." Am. Compl. ¶¶ 62. 64, 68, 70. Adams also claims in his Affidavit that he was subjected to constant harassment by his co-worker Justin Walters, which caused him embarrassment and nightmares. Aff. of Andrew Adams, Ex. 2 to Opp. Mot. Summ. J. (Doc. No. 36-4) ("Adams Aff.") ¶¶ 27–28; Adams Tr. at 129:15–16 (claiming he was "picked on . . .

14

constantly and bullied").  Adams identifies the following specific incidents of
harassment:[6]

> (1) February 2009:  co-worker Walters told Adams to "get down on your knees[;]
> that's your best [s]pot for you."

> (2) June 2, 2009:  someone wrote on Adams' lock box, next to his name,
> "SUCKS."

> (3) June 2009 and August 2009:  Walters asked Adams, on the company's two-
> way radio, whether Adams had moved Walters' equipment.  Adams alleges that
> this statement constituted harassment because Walters "just wanted ever[y]one
> in the park to hear [Walters] talk to [him] over the 2 way radio."

> (4) July 8, 2009:  Adams complained to Abela about Walters' behavior.  Abela
> told Adams that Walters just liked to play jokes on him, and that Adams should
> try to get along with him.[7]

> (5) September 2009:  While Adams was outside his truck, Walters threw an apple
> on the side of Adams' truck.

> (6) October 2009:  Fitch spoke to Adams about forgetting to do something while
> checking one of the rides.  The next day, Walters asked Adams, "[W]hat the heck
> is wrong with you[?]," told another worker, "[Y]ou better check your ride out real
> good," and laughed.

---

[6] In his log, Adams indicates that other instances of harassment occurred.  See Adams Log ("I never went by the day because it will be a 25 to 30 page log so I just kept it brief for you to have."). However, there is no indication in the record that these other incidents constituted sexual harassment. For example, Adams testified that some of these incidents involved Walters calling him names like "Stupid," Adams Tr. at 39:15–23, which no reasonable factfinder would consider to be sexual in nature.

[7] This does not appear to constitute an independent incident of alleged harassment.

See Adams Log.  In his deposition, Adams identified three possibly additional incidents:
(1) Walters calling him "stupid, or what the heck is the matter with you";[8] (2) "[Walters]
constantly staring me down, when I'm down on my knees working on my rides"; and (3)
"just throwing things at me."[9]  Adams Tr. at 97:2–15.[10]  Additionally, in Adams' Affidavit,
he adds that, when Walters told Adams to get down on his knees in 2009, he also said
that this was because Adams likes men.  Adams Aff. ¶ 10.[11]

Adams has failed to meet the prima facie case to establish that a hostile work
environment existed under Title VII.  First, a reasonable factfinder could not conclude
that the work environment was objectively hostile under Title VII/CFEPA.  Only two of
the specific incidents could reasonably be construed to be sexual in nature:  Walters'
February 2009 comment about Adams being "on his knees," and Adams' testimony that

---

[8] It is unclear whether this is the same incident as the October 2009 incident referenced in
Adams' Log, but a reasonable juror could conclude that this was a separate incident.

[9] Despite this testimony, Adams testified elsewhere in his deposition that Walters only threw
something at him once.  Adams Tr. at 40:13–15 ("Q:  So [there was] only one time that [Walters] threw
something at you?  A:  Yeah.").  However, a reasonable juror could conclude that this throwing incident
was a different one than the September 2009 incident referenced in Adams' Log.

[10] In his Affidavit, Adams also testifies that Walters told him that he had "had [Adams'] mother last
night and that she was good."  Adams Aff. ¶ 19.  However, Adams did not mention this incident during his
deposition.  Further, he testified that the incidents he did mention were the only examples of gender
discrimination against him.  See Adams Tr. at 93:11–13 ("Q:  Is there anything, other than [Walters'
comment about Adams being on his knees], that you feel is an example of you being treated differently
because of your sex or gender?  A:  No."), 17–20 ("Q:  Other than the one comment about on your knees
that Justin Walters made, are there any other times you felt you were being discriminated against at Lake
Compounce?  A:  No, just that time when he said that to me.").  This court does not credit the portions of
Adams' subsequent Affidavit that discuss additional incidents and contradict his prior sworn testimony.
See Trans-Orient Marine Corp. v. Star Trad. & Marine, Inc., 925 F.2d 566, 572–73  (2d Cir. 1991) ("The
rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion,
create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony.") (citing
cases).

[11] Adams also states in his Affidavit that he told Fitch about Walters' comment.  Adams Aff. ¶ 10.
However, this testimony contradicts Adams' earlier deposition testimony, where he testified that when he
spoke to Fitch, he only discussed the general issue of being picked on and did not cite any specific
incidents.  Adams Tr. at 62:1–11; see supra, n.10.

16

Walters would stare him down while he worked on his knees.[12]  Even assuming the
sexual nature of those incidents, they cannot reasonably be construed to constitute
circumstantial evidence that the other "facially sex-neutral incidents were a pattern of
discrimination on the basis of gender."  Kaytor, 609 F.3d at 547–48 (quoting Alfano, 294
F.3d at 375); see also Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004) ("Simple
teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely
serious) will not support a claim of discriminatory harassment.").  Even if Adams
subjectively felt that his work environment was hostile, a reasonable person in his
position would not find that these isolated incidents created a workplace "permeated"
with discriminatory intimidation that was based on his gender and so "sufficiently severe
or pervasive" so as to alter the conditions of his working environment.

Second, the evidence in the record does not support Adams' contention that any
discrimination, even if it occurred, was based on his gender.  In other words, even if it
were established that Walter mistreated Adams, it would not necessarily follow that the
mistreatment was based on sex.  Adams testified that he believed that Walters
discriminated against him because "I don't have a girlfriend" and "[b]ecause I don't date
girls, I don't go on dates."  Adams Tr. at 93:8–10, 95:13–16.  However, Adams does not
provide evidence that Walters was aware of the dating habits of Adams or their other
co-workers.  Nor is there evidence that Walters knew that Adams did not have a
girlfriend.  Consequently, a reasonable juror could not conclude that Walters
discriminated against Adams for the reasons Adams proffers if there is no evidence that
Walters was aware of those facts.

---

[12] In fact, those comments are the only ones that Adams himself identified as being based on his sex or gender.  See supra, n.10.

17

2.  Imputing Conduct to Employer

Even if the incidents in the record were sufficient to create a material issue of fact as to whether a hostile work environment existed, summary judgment would still be appropriate because the evidence before the court cannot support a finding that "a specific basis exists for imputing the conduct that created the hostile work environment" to Festival Fun Parks.  Murray v. N.Y. Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir. 1995) (citations omitted); Martinsky v. City of Bridgeport, 814 F. Supp. 2d 130, 151 (D. Conn. 2011) (citing Murray).  Here, Walter, Adams' coworker, is the one alleged to have engaged in discrimination against Adams.  However, there is no indication in the record that Walters is Adams' supervisor.  Nor is there any indication that Walters wielded supervisory authority delegated to him by Festival Fun Parks.  See Murray, 57 F.3d at 249.  Accordingly, Walters' conduct can be imputed to Festival Fun Parks only if Festival Fun Parks "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it."  Id. (quoting Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 63 (2d Cir. 1992).  The record does not support either conclusion.

Adams testified that, sometime in 2008, he complained once to Fitch about the fact that Walters was picking on him, and that Fitch told him that he had told him before hiring him that others would pick on him and that he did not want Adams to complain to him every day.  Adams Tr. at 61:3–62:21 (describing incident, and testifying that he "didn't make any other comments [to his supervisors] in 2008, other than the one to John Fitch").  However, Adams also testified that he did not state specifically to Fitch

18

JA 442

that he thought he was being sexually harassed.[13]  Adams Tr. at 62:7–11 (testifying that

he told Fitch he was "being picked on and bullied" by Walters, but that he never used

the words "sexual harassment" or suggested the bullying was based on gender).  In

fact, Adams testified that, when he complained to Fitch, he did not cite any specific

incidents with Walters.[14]  Id. at 62:1–3.  In Rojas v. Roman Catholic Diocese of

Rochester, 660 F.3d 98 (2d Cir. 2011), a plaintiff brought a hostile work environment

claim against the Diocese of Rochester.  The evidence the district court considered

showed that she complained to the Diocese about a pastor "making my life miserable."

Id. at 103.  In affirming the district court's finding of summary judgment for the

defendants, the Second Circuit noted that the plaintiff's complaints to her supervisor

"related to the general friction between the two [employees] and made no reference to

sexual harassment," and that there was no evidence that the Diocese "knew or should

have known about the alleged sexual harassment."  Id. at 107.  Likewise, the fact that

Adams complained generally about being "picked on" by a co-worker is not evidence

that his supervisors were aware that he was claiming that he was being discriminatorily

treated based on his sex.[15]  See Andersen v. Rochester City Sch. Dist., 481 Fed. Appx.

628, 632 (2d Cir. 2012) (finding that a vague complaint to supervisors, which did not

request employer school district to "take any responsive action," could not have "put the

---

[13] Adams also testified that he never asked Walters to stop engaging in any of the alleged discrimination.  Adams Tr. at 97:16–23.

[14] Adams originally testified that, when he complained to Fitch in 2008, he complained specifically about Walters throwing an apple at his truck.  However, when he was notified that the alleged incident with the apple did not occur until 2009, he altered his testimony and stated that he did not discuss the incident regarding the apple.  Adams Tr. at 61:15–25.

[15] Adams appears to describe a separate incident in which someone had written "sucks" on his blowtorch.  According to Adams, he showed the blowtorch to Fitch, who shook his head and walked away.  Adams Tr. at 103:24–104:18.  However, as with the 2008 incident, there is no indication that Adams identified this to Fitch as an instance of sexual harassment.  In fact, there is no indication that Adams said or did anything at all, other than to show Fitch the blowtorch.  See id.

19

district on reasonable notice that [the plaintiff] was complaining of sex discrimination by co-workers in violation of Title VII" and provided "no basis . . . for concluding that . . . the district intentionally created an intolerable work atmosphere").

Adams also testified that the next time he complained to a supervisor was in the summer of 2009, when he complained to Abela, the "main supervisor," about Walter picking on him. Adams Tr. at 17:14–15. Abela told Adams that he would talk to Walters and "tell him to knock it off." Id. at 103:3–6. Adams further testifies that Abela went to Walters and asked him to stop, which he did. Id. at 103:17–20 ("Q: He [Abela] told [Walters] to knock it off? A: Yes. Q: And did [Walters] knock it off after that? A: Yes."), 168:4–10. Adams In other words, not only was there an opportunity for Adams to raise complaints with his supervisors, and not only did his supervisor responded by taking action and telling Walters to stop, but Walters did in fact stop harassing Adams after being reprimanded. Thus, far from creating a hostile work environment, at least one of Adams' supervisors acted to prevent one.

The record does not reasonably support the conclusion that Walters' conduct should be imputed to Festival Fun Parks. According to Adams' own testimony, he complained once in 2008, but did not identify any specific incidents or state that he was complaining about sexual harassment. Then, after complaining about an incident in 2009, his main supervisor acted on Adams' complaint. Based on the evidence in the record, this court grants summary judgment as to Adams' hostile work environment claims.

C.  Gender Discrimination Claims

1.  Prima Facie Case

Counts 3 and 4 claim that Festival Fun Parks discriminated against Adams on the basis of his gender in violation of the ADA and Title VII of the Civil Rights Act of 1964, as amended ("Title VII").  As with the previous four counts, these claims are subject to the McDonnell Douglas burden-shifting analysis.  See Dawson v. Bumble & Bumble, 398 F.3d 211, 217 (2d Cir. 2005) (applying McDonnell Douglas analysis to gender stereotyping claim under Title VII).  Thus, Adams must make the prima facie case that (1) he is a member of a protected class; (2) he was competent to perform the job or performed his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) that adverse decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class.  See id.

Adams argues that he has a claim for gender discrimination under Title VII because Festival Fun Parks discriminated against him for failing to conform to gender stereotypes.  Gender stereotyping claims are cognizable under Title VII.  See Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989).  "Generally speaking, one can fail to conform to gender stereotypes in two ways:  (1) through behavior or (2) through appearance."  Dawson, 398 F.3d at 221.  It is clear from the record that Adams' claim is based on behavior, not appearance.

In support of his gender stereotyping claim, Adams argues that he was "not seen to be masculine enough," and references the following incidents, which have already been discussed supra:  (1) when Adams was first hired in the machine shop, Fitch told

21

JA 445

him that he might get picked on, but that he should "be a man" and "be tough";[16] (2) co-workers' comments about his being "on his knees" and that he "sucks" constituted "comments comparing him to feminine sexual stereotypes"; and (3) Adams believed he was harassed because he was unmarried and did not have a girlfriend, and "thus was perceived as not manly enough." See Pl.'s Opp. at 28.

In Price Waterhouse, the court found that a female plaintiff had a viable gender stereotyping claim where she was denied promotion based on her perceived tendency to act in a "masculine" manner and "overcompensate[ ] for being a woman" by acting in a "macho" fashion, and where it was suggested that she "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." Price Waterhouse, 490 U.S. at 235.

This court does not decide whether the record in this case supports a similar finding. Even assuming arguendo that a reasonable juror could find that Adams was subject to gender stereotyping under Title VII, his claim would still fail. A reasonable factfinder could not conclude that Adams suffered an adverse employment action; nor could a reasonable factfinder conclude that such adverse action, if it occurred, was taken because Festival Fun Parks perceived that Adams failed to conform to gender stereotypes.

2. Adverse Employment Action

Adams claims that Festival Fun Parks took two adverse employment actions against him: first, that Festival Fun Parks constructively discharged him by forcing him

---

[16] Adams suggests that Fitch's comment came in response to Adams' complaint about Walters harassing him, but in the portion of the deposition testimony he cites to, he testified that Fitch made the comment before Adams started working with Walters. Adams Tr. at 99:10–24 ("Q: And this [comment] was [made] before you started working with Justin Walters?  A:  Before I even got hired to work in the shop.").

22

JA 446

to resign based on the allegedly discriminatory conduct; and second, that Adams'
supervisor refused to transfer him to the paint shop.[17]

       i.     <u>Whether Adams was constructively discharged</u>.  Constructive discharge
occurs when "an employer, rather than directly discharging an individual, intentionally
creates an intolerable work atmosphere that forces an employee to quit voluntarily."
<u>Chertkova v. Conn. Gen. Life Ins. Co.</u>, 92 F.3d 81, 89 (2d Cir. 1996); <u>see</u> <u>Brittel v. Dep't
of Corr.</u>, 247 Conn. 148, 178 (1998) (using same definition).  "Case law generally
focuses on two parts of this standard:  the employer's intentional conduct and the
intolerable level of the work conditions."  <u>Petrosino</u>, 385 F.3d at 229.  The Second
Circuit has not determined definitively whether an employer must have acted with
<u>specific</u> intent to cause the plaintiff to resign.  <u>Id.</u> ("[T]his court has not expressly insisted
on proof of specific intent.").  However, a plaintiff must at least show that the employer's
actions were "deliberate and not merely negligent or ineffective."  <u>Id.</u> at 229–30
(quotation marks and alterations omitted) (quoting <u>Whidbee v. Garzarelli Food
Specialties, Inc.</u>, 223 F.3d 62, 74 (2d Cir. 2000)).  Regarding the second prong, the
question is whether working conditions were so intolerable that a reasonable person in
the employee's position felt compelled to resign.  <u>Id.</u> (internal citations omitted).

       Adams has failed to provide evidence sufficient to show there is a material issue
of fact as to whether was constructively discharged.  First, a reasonable juror could not
find that the working conditions at Festival Fun Parks were "so difficult or unpleasant

---

[17] Adams appears to argue, at times, that he did not resign, but was terminated.  <u>See, e.g.</u>, Pl.'s
Opp. at 8; Adams Aff. ¶¶ 21, 23 (claiming that "I did not ever give a verbal or written resignation" and "I
had never resigned").  However, these statements contradict his sworn deposition testimony.  <u>See, e.g.</u>,
Adams Tr. at 15:4–13 (testifying to written and oral resignation), 89:24–90:5 (testifying that he resigned
and that no one told him he was terminated), 91:11–92:17 (changing testimony, but reiterating that he
resigned and that no one told him he was terminated).  Thus, this court does not credit the portions of
Adams' subsequent Affidavit that contradict his prior sworn testimony.  <u>See</u> <u>Trans-Orient Marine Corp.</u>,
925 F.2d at 572–73 .

that a reasonable person in the employee's shoes would have felt compelled to resign."

Chertkova, 92 F.3d at 89.  This court has reviewed Adams' evidence of incidents of

harassment and discrimination, which consist of name-calling, instances where a co-

worker mentioned Adams being "on his knees" and stared at him, and instances where

that same co-worker threw things at Adams or at his truck.  See supra, at Part IV.B.2.

Adams' testimony, at most, supports a finding that Adams subjectively felt compelled to

resign.  But that is not enough.  See Petrosino, 385 F.3d at 230 (noting that the issue of

whether working conditions were intolerable "is assessed objectively by reference to a

reasonable person in the employee's position.").  No reasonable factfinder could

conclude that these incidents were "so difficult or unpleasant" that a reasonable person

would have felt compelled to quit.  Id.

Second, even if the evidence were sufficient for a reasonable juror to find the

existence of an intolerable work environment, the record cannot reasonably support a

finding that Festival Fun Parks engaged in a "*deliberate* attempt to make [Adams']

working conditions intolerable."  Wilburn v. Fleet Fin. Grp., Inc., 170 F. Supp. 2d 219,

238–39 (D. Conn. 2001) (emphasis in original).  "[M]erely ineffective or even

incompetent handling of complaints does not rise to the level of deliberate action

required by Second Circuit precedent."  Id. at 238 (internal quotation marks and

alterations omitted) (quoting Whidbee, 233 F.3d at 74).  Here, Adams testified that he

told his supervisors that his co-worker was picking on him, but did not state that he

thought he was being subject to discrimination.  Adams Tr. at 62:7–11 (testifying that he

told Fitch he was "being picked on and bullied" by Walters, but that he never used the

words "sexual harassment" or suggest that it was harassment based on gender).

24

JA 448

Moreover, as this court has already noted, after Adams complained to a supervisor about Walters, that supervisor went to Walters and asked him to stop, which he did.  Id. at 103:17–20 ("Q:  He [supervisor] told [Walters] to knock it off?  A:  Yes.  Q:  And did [Walters] knock it off after that?  A:  Yes.").  Far from attempting to create an intolerable work environment, at least one of Adams' supervisors attempted to handle Adams' complaints; and Adams concedes that this attempt was successful.  Even if those attempts were ultimately "ineffective or even incompetent," this would not be enough to show intent.  Wilburn, 170 F. Supp. 2d at 238.  Thus, a reasonable factfinder could not conclude that Festival Fun Parks acted intentionally to render Adams' working conditions intolerable.

     ii.    <u>Whether the refusal to transfer Adams was an "adverse employment action."</u>  Adams alleges that he requested to be transferred to the paint shop, but that Brick, the general manager, refused to transfer him.  A failure to transfer may constitute an adverse employment action if "the change in position would have resulted in a significant change in duties and could potentially lead to increased opportunities for advancement."  Belch v. Jefferson County, 108 F. Supp. 2d 143, 154 (N.D.N.Y. 2000).

     Here, the record cannot support a finding that Festival Fun Park's failure to transfer him to the paint shop constituted an adverse employment action, because the evidence does not create a material issue of fact as to whether an open position existed.  Adams did testify that an employee at the paint shop told him that the company would send people to the paint department to help with "prepping stuff," and that he believed there were open positions because "there was a lot of things that had to get done that year."  Adams Tr. at 84:15–19, 86:15–19.  However, even if this out-of-court

statement were admissible, it would serve as evidence that workers, who were presumably employed in another part of the shop, helped out at the paint shop. It would not be evidence that a full-time, or even part-time, opening existed when Adams requested a transfer. Moreover, Adams' belief is not corroborated by the evidence. Adams testified that, when he requested the transfer, he was unaware of any open positions in that department, no one had told him that any open positions existed, and he was told that no open positions existed. See Adams Tr. at 84:13–15 (testifying that he had not "seen any positions in the paint department posted anywhere"), 86:12–14 (testifying that no one told him that "there was an open position" in the paint department), 84:3–12 (testifying that Brick told him that there were no open positions in the paint department). Brick also provided an Affidavit stating that no open positions existed in the paint shop when Adams left the company and that no positions were subsequently opened or created since then. Aff. of Gerard Brick, dated March 13, 2012, Ex. 3 to Def.'s Mem. Mot. Summ. J. (Doc. No. 34–1) at ¶¶ 4–6; L.R. 56(a)1 at 17–19. Festival Fun Parks was under no obligation to create a position for Adams simply because he requested a transfer. For these reasons, a factfinder could not reasonably find that the failure to transfer him to the paint department constituted an "adverse employment action" under Title VII.

D. Retaliation Claims

Finally, Counts 7 and 8 claim that Festival Fun Parks retaliated against Adams in response to his complaints of harassment and discrimination, in violation of the CFEPA and Title VII. "In adjudicating retaliation claims, courts follow the familiar burden-shifting approach of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S.Ct. 1817,

26

JA 450

36 L.Ed.2d 668 (1973)." Kaytor, 609 F.3d at 552 (citing Jute v. Hamilton Sundstrand
Corp., 420 F.3d 166, 173 (2d Cir. 2005)).

Under the CFEPA and Title VII, a plaintiff must establish a prima facie retaliation
claim by showing: (1) the plaintiff was engaged in protected activity; (2) the alleged
retaliator knew that the plaintiff was involved in such activity; (3) an adverse decision or
action was taken against the plaintiff; and (4) a causal connection exists between the
protected activity and the adverse action. See Weixel v. Board of Educ. of the City of
N.Y., 287 F.3d 138, 148–49 (2d Cir. 2002) (ADA); Treglia v. Town of Manlius, 313 F.3d
713, 719 (2d Cir. 2002) (Title VII).

Festival Fun Parks does not contest either of the first two prongs. Indeed, a
reasonable factfinder could conclude that Adams had a "good faith, reasonable belief
that he was opposing an employment practice made unlawful by Title VII or the ADEA."
Kessler v. Westchester County Dept. of Social Servs., 461 F.3d 199, 210 (2d Cir. 2006)
(quotation marks and alterations omitted) (citing McMenemy v. City of Rochester, 241
F.3d 279, 285 (2d Cir. 2001)). However, for the reasons described supra, the record
cannot reasonably support a conclusion that any adverse employment action was taken
against Adams. See supra, at Part IV.C.2.i (Adams testified that he did not tell his
supervisors that he was subjected to sexual harassment), IV.A.1.ii (evidence does not
support a finding that Festival Fun Parks regarded Adams as disabled).

Even if Adams were able to show that Festival Fun Parks took an adverse
employment action against him, he "has not proved that defendant's conduct with
respect to such alleged adverse action was pretextual for retaliation." Mirabillo v.
Regional Sch. Dist. 16, No. 10-cv-1117, 2012 WL 4754689, *5 (D. Conn. Oct. 4, 2012).

Adams claims in his Affidavit that Brick lied about the lack of open positions in the paint shop.  Adams Aff. ¶ 20 (stating that "the paint shop had a lot of work to be done," that people would sometimes "go over to the paint shop to help out," and that he believes that after his termination, "some people" from the main shop worked in the paint shop). However, these assertions are belied by Adams' prior deposition testimony, in which he testified that he was unaware of any openings in the paint shop and that no one told him that any such openings existed.  See Adams Tr. at 84:13–15 (testifying that he had not "seen any positions in the paint department posted anywhere"), 86:12–14 (testifying that no one told him that "there was an open position" in the paint department), 84:3–12 (testifying that Brick told him that there were no open positions in the paint department). Thus, no material issue of fact has been created concerning Brick's reason for not transferring Adams to the paint department—that no such open positions existed at the time of the request.  Nor is there any evidence in the record "that discrimination was the real reason" for the failure to transfer him.  St. Mary's Honor Ctr. V. Hicks, 509 U.S. 502, 533 (1993).  The court concludes that Adams has failed to show a material issue of fact concerning Adams' retaliation claims.

28

JA 452

**V.    CONCLUSION**

For the foregoing reasons, Festival Fun Parks' Motion for Summary Judgment

(Doc. No. 30) is **GRANTED**.  Summary judgment is entered in favor of Festival Fun

Parks on all Counts.

**SO ORDERED.**

Dated at New Haven, Connecticut this 12th day of March, 2013.

/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge

29

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ANDREW ADAMS

v.                                            3:11cv427(JCH)

FESTIVAL FUN PARKS, LLC
d/b/a Lake Compounce Theme Park

J U D G M E N T

This matter came on before the Honorable Janet C. Hall, United States District

Judge, as a result of defendants' Motion for Summary Judgment.

The Court has reviewed all of the papers filed in conjunction with the Motion and

on March 12, 2013, entered a Ruling granting the defendant's Motion with respect to all

claims.

Therefore, it is ORDERED and ADJUDGED that judgment is entered for the

defendant, Festival Fun Parks, against the plaintiff, Andrew Adams, and the case is

closed.

Dated at New Haven, Connecticut, this 12th Day of March, 2013.

                                    Robin D. Tabora, Clerk


                                    By /s/ Diahann Lewis
Entered on Docket  3/12/2013                Deputy Clerk

JA 454

**Federal Rules of Appellate Procedure Form 1.   Notice of Appeal to a Court of Appeals From a Judgment or Order of a District Court.**

United States District Court for the District of
Connecticut
_____

File Number 3:11-cv-00427 (JCH)
_____

Andrew Adams                         )
      *Plaintiff,*              )
   v.                              )       Notice of Appeal

                  )
Festival Fun Parks, LLC              )
      *Defendant.*              )

Notice is hereby given that Andrew Adams _____, (plaintiffs) (defendants) in the above-named case*, hereby appeal to the United States Court of Appeals for the Second Circuit (from the final judgment) (from an order (describing it)) entered in this action on the 12th day of March , No 2013 .

             /s/ *Cindy Miller*
             Cindy A. Miller, Esq./Sabatini & Associates, LLC
             Attorney for
             Plaintiff, Andrew Adams
             Address:
             One Market Square, Newington, CT 06111

*See Rule 3(c) for permissible ways of identifying appellants