# 13-1183

## United States Court of Appeals
### for the
## Second Circuit

Andrew Adams,

*Appellant,*

-v.-

Festival Fun Parks, LLC

*Defendant – Appellee.*

On Appeal from the United States District Court
for the District of Connecticut

## PLAINTIFF – APPELLANT'S BRIEF

Attorney for the Plaintiff:
Sabatini and Associates, LLC
One Market Square
Newington, CT  06111
860-667-0839

## I.     <u>TABLE OF CONTENTS</u>

I.     TABLE OF CONTENTS…………………………………………………i

II.    TABLE OF AUTHORITIES……………………………………………..ii

III.   JURISDICTIONAL STATEMENT…………………………………….1

IV.    STATEMENT OF ISSUES PRESENTED FOR REVIEW………………1

V.     STATEMETN OF THE CASE………………………………………….4

VI.    STATEMENT OF THE FACTS……………………………………….5

VII.   SUMMARY OF THE ARGUMENT…………………………………..8

VIII.  ARGUMENT…………………………………………………………..10

        1.   Genuine Issue of Material Fact As to Whether
             Plaintiff is Disabled………………………………………..10
        2.   Genuine Issue of Martial Fact As to Whether
             Plaintiff was Regarded as Disabled…………………………15
        3.   Genuine Issue of Material Fact as to Whether
             Harassment was Sufficiently Sever and Based on Gender…..17
        4.   Genuine Issue of Material Fact As to Whether
             Conduct Can be Imputed on to Employer…………………….21
        5.   Genuine Issue of Material Fact as to Whether
             Plaintiff was Discriminated Based on Gender………………..23
        6.   Genuine Issue of Material Fact as to Whether
             Plaintiff Suffered an Adverse Employment Action………….24
        7.   Genuine Issue of Material Fact As to Whether
             Plaintiff was Retaliated Against……………………..………29

IX.    CONCLUSION………………………………………………………..30

X.     CERTIFICATE OF COMPLIANCE…………………………………32

XI.    ADDENDUM A………………………………………………………A

## <u>TABLE OF AUTHORITIES</u>

**PAGE**

<u>FEDERAL CASES</u>

<u>Anderson v. Liberty Lobby, Inc.</u>,
477 U.S. 242, (1986)……………………………………………..…………3, 4, 25, 29

<u>Blanco v. Brogan</u>,
620 F. Supp. 2d 546, (S.D.N.Y. 2009)…………………………………………30

<u>Buotote v. Illinois Tool Works, Inc.</u>,
815 F. Supp. 2d 549, (D.Conn.2011)…………………………………………..13

<u>Capobianco v. City of New York</u>,
422 F.3d 47, (2d Cir. 2005)……………………………………………………3, 11

<u>Cellular Telephone Co. v. Town of Oyster Bay</u>,
166 F.3d 490, (2d Cir.1999)………………………………………………………3

<u>Celotex Corp. v. Catreet</u>,
 477 U.S. 317, (1986)………………………………………………………………3

<u>Chertkova. Conn. Gen. Life Ins. Co.</u>,
92 F.3d 81, (2d Cir. 1996)……………………………………………………..26

<u>Coleman v. Keebler Co.</u>,
997 F.Supp. 1102, (N.D. Ind. 1998)…………………………………………16

<u>D'Amico v. City of New York</u>,
132 F.3d 145, (2d.Cir.1998)………………………………………………………3

<u>Davis v. State Univ. of New York</u>,
802 F.2d 638, 642 (2d Cir.1986)………………………………………………30

<u>Dawson v. Bumble & Bumble</u>,
398 F.3d 211, (2d Cir. 2005)…………………………………………..…21, 23

<u>DeCintio v. Westchester County Med. Center</u>,
821 F.2d 111, (2d Cir.1987)……………………………………………………30

<u>Distasio v. Perkin Elmer Corp.</u>,
157 F.3d 55, (2d Cir. 1998)……………………………………………………3, 4

<u>Faragher v. City of Boca Raton</u>,
524 U.S. 775, 118 S. Ct. 2275, (1998)………………………………………..18

ii

Feingold v. New York,
366 F.3d 138, 2d Cir. 2004)……………………………………………………..18

Francis v. City of Meriden,
129 F.3d 281, (2d Cir. 1997)……………………………………………………16

Graham v. Henderson,
89 F.3d 75, (2d Cir.1996)…………………………………………………………3

Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.
957 F.2d 59, (2d Cir. 1992)……………………………………………………22

Lenz v. Dewey,
64 F.3d 547, (10th Cir. 1995)…………………………………………………27

Littleton v. Wal-Mart Stores, Inc.
 231 Fed. Appx. 874, (11th Cir. 2007)…………………………………………12, 13

Mack v. Otis Elevator Co.,
326 F.3d 116, 122 (2d Cir. 2003)………………………………………………17

Mechlenberg v. New York Off-Track Betting,
42 F. Supp.2d 359, (S.D.N.Y 1999)………………………………..…………28

Murray v. N.Y. Univ. College of Dentistry,
57 F.3d 243, (2d Cir. 1995)………………………………………….…………22

Petrosino v. Bell Atlantic,
385 F.3d 210, (2d Cir. 2004)……………………………………………………27

Pimentel v. City of New York,
2002 WL 977535, (S.D.N.Y 2002)……………………………………………28

Price Waterhouse v. Hopkins,
490 U.S. 228, (1989)…………………………………………………………21, 23

Raniola v. Bratton,
243 F.3d 610, 621 (2d Cir. 2001)……………………………………….………17

Rhoads v. Board of Educ. Of Mad River Local School Dist.,
103 Fed. Appx. 888 (6th Cir. 2004)……………………………………………..27

Richardson v. New York State Dep't of Corr. Serv.,
180 F.3d 426, (2d Cir.1999)……………………………………………………..17

Rule v. Brine, Inc.,
85 F.3d 1002, 1011 (2d Cir. 1996)……………………………………..10, 14, 19, 20

Samuels v. Mockry,
77 F.3d 34, (2d Cir.1996)……………………………………………………….4

Sista v.CDC Ixis North America, Inc.,
445 F.3d 161, (2d Cir. 2006)……………………………………….....3, 4

Taylor v. Pathmark Stores, Inc.,
177 F.3d 180, 188 (3rd Cir. 1999)…………………………………………16

Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.
925 F.2d 566, (2d Cir. 1991)………………………………………………...19

Villante v. Department of Corrections,
786 F.2d 516, (2d Cir. 1986)………………………………………………19

**FEDERAL RULES**

Fed. R. Evid. Rule 803(6)………………………………………………...11

**STATE STATUTES**

C.G.S. § 46a-51(20)………………………………………………………...15

C.G.S. § 46a-60(a)(1)……………………………………………1, 2, 4, 9, 17

C.G.S. § 46a-60(a)(4)……………………………………………………… 5

**FEDERAL STATUTES**

28 U.S.C. § 1331…………………………………………………………….1

28 U.S.C. § 1343…………………………………………………………….1

42 U.S.C. § 12101……………………………………...…………1, 4, 8, 9, 10, 13

42 U.S.C. § 12102…………………………………………………….12, 14, 15

42 U.S.C. § 2000e-2………………………………………....…………2, 4, 9, 17

## II.    <u>JURISDICTIONAL STATEMENT</u>

Plaintiff filed a Complaint in the U.S. District Court for the District of Connecticut which states that jurisdiction is based upon 28 U.S.C. §1331 and 28 U.S.C. §1343 and the action was brought pursuant to: the American With Disabilities Act of 1990, cited as 42 U.S.C. §12101 and Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991. (Joint Appendix ["JA] 9).

The District Court, Judge Hall, granted Defendant's Motion for Summary Judgment and entered Judgment in favor of the Defendant on March 12, 2013. (JA 453, 454). On April 1, 2013 the Plaintiff filed a timely Notice of Appeal. (JA 455).

The U.S. Court of Appeals for the Second Circuit has jurisdiction to hear the Plaintiff's appeal based upon the District Court's order being a final decision.

## III.    <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

1.     Whether the U.S. District Court abused its discretion in refusing to consider a medical repot submitted by the Plaintiff and erred in determining that there was no genuine issue of material fact as to whether the Plaintiff was disabled as defined by the Americans with Disabilities Act as the 2008 Amendments apply, 42 U.S.C. § 12101 *et seq*. (ADA) and/or as defined by the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. Sec. 46a-60(a)(1) et seq. (CFEPA).

2.      Whether the U.S. District Court erred in determining that there was no genuine issue of material fact as to whether Plaintiff was regarded as disabled under the ADA as the 2008 Amendments apply.

3.      Whether the U.S. District Court erred in determining that there was no genuine issue of material fact as to whether the harassment Plaintiff was subject to was sufficiently severe and/or hostile and/or was not based on his gender in order to provide a prima facie case of a hostile work environment under of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2 (Title VII) or CFEPA.

4.      Whether the U.S. District Court erred in determining that there was insufficient evidence to impute the conduct to the employer.

5.      Whether the U.S. District Court erred in finding that there was no genuine issue of material fact as to whether plaintiff was discriminated against based on his gender in violation of Title VII and/or CFEPA.

6.      Whether the U.S. District Court erred in determining that there was no genuine issue of material fact as to whether plaintiff suffered an adverse employment action.

7.      Whether the Court erred in determining that there was no genuine issue of material fact as to plaintiff's retaliation claims.

## STANDARD OF REVIEW

2

This Court's review of the District Court's decision to exclude the medial report submitted by the Plaintiff is reviewed under the abuse of discretion standard. Capobianco v. City of New York, 422 F.3d 47, 54 (2d Cir. 2005).

A grant of summary judgment by a district court is reviewed de novo. Sista v.CDC Ixis North America, Inc., 445 F.3d 161, 168-69 (2d Cir. 2006) (citing Cellular Telephone Co. v. Town of Oyster Bay, 166 F.3d 490, 492 (2d Cir.1999); Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61 (2d Cir. 1998) (citing Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996). The legal standard with regard to summary judgment is the same as the standard used by the district court. Sista, 445 F.3d at 169. A motion for summary judgment should be granted "where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." D'Amico v. City of New York, 132 F.3d 145, 149 (2d.Cir.1998). "A material fact is one that would 'affect the outcome of the suit under the governing law.'" Sista, 445 F.3d at 169 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). It is the moving party's burden to establish that no genuine issue of material fact exists and judgment should enter as a matter of law. Celotex Corp. v. Catreet, 477 U.S. 317, 322-23 (1986). To defeat a motion for summary judgment, the non-moving party must present evidence that could be sufficient to return a jury verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49

(1986). In determining a motion for summary judgment "the non-movant will have his allegations taken as true." Distasio, 157 F.3d at 61 (citing Samuels v. Mockry, 77 F.3d 34, 36 (2d Cir.1996) (per curiam). In reviewing the record, the evidence of the party opposing summary judgment is "to be believed, and all justifiable inferences are to be drawn in [that party's] favor." Anderson, 477 U.S. at 255. All ambiguities should be resolved in favor of the non-moving party. Sista, 445 F.3d at 169 (internal citations omitted). Summary judgment shall be denied if a dispute is shown "over facts that might affect the outcome of the suit." Anderson, 477 U.S. at 248.

## IV.   STATEMENT OF THE CASE

Insofar as relevant to this appeal, the Plaintiff alleges that while employed by the Defendant, at Lake Compounce Theme Park, the Defendant discriminated against him on the basis of his disability and/or gender, Plaintiff was sexually harassed, retaliated against and wrongfully terminated on the basis of his disability and/or gender. (JA8-20). On or about March 18, 2011, the Plaintiff filed suit in the U.S. District Court for the District of Connecticut.(JA1-2). The Plaintiff alleged eight counts. Count's 1 and 2 allege Disability Discrimination in Violation of the ADA, and C.G.S. § 46a-60(a)(1), Count's 3 and 4 allege Gender Discrimination in Violation of C.G.S. § 46a-60(a)(1) and Title VII. Count's 5 and 5 allege Hostile Work Environment Sexual Harassment in Violation of Title VII and C.G.S. § 46a-

60(a)(1), Count's 7 and 8 allege Retaliation in Violation of C.G.S. § 46a-60(a)(4), and Title VII. (JA8-20). On March 15, 2012 the Defendant file a Motion for Summary Judgment on all counts. (JA 107-202). On March 12, 2013, the Honorable Judge Janet C. Hall granted the Motion for Summary Judgment and entered Judgment in favor of the Defendant. (JA453-454). This appeal ensued.

## V.    <u>STATEMENT OF THE FACTS</u>

The Plaintiff suffers from a slight mental retardation causing him to be a slow learner and have difficulty remembering things. (JA303-304, 315, 344-345).

The Plaintiff commenced working at Lake Compounce in 1997 and worked as a seasonal worker through 2007. (JA258-262, 315). In 2008 Plaintiff was hired as a full-time employee as a mechanic or maintenance helper. (JA262, 315). The Plaintiff informed John Fitch, plaintiff's supervisor, and Jerry Brick, plaintiff's general manager, of his disability when he was hired and being trained. (JA, 265-267,316).

While employed as a full-time employee, the plaintiff was subject to sexual harassment and discrimination at work. (JA316). The following is a summary of events:

1. In February & July 2009, Justin Walters, a co-worker, told the plaintiff that the plaintiff should get down on his knees because being on his knees was his best position because he liked to look up at guy's crotch area all the time.  Walters

also stared the plaintiff down while the plaintiff worked on his knees. The plaintiff told John Fitch, about this comment. Fitch said that he informed the plaintiff that while working in the shop the plaintiff would get harassed and picked on and that Fitch didn't want the plaintiff complaining to him. Fitch told the plaintiff to "be a man" and be tough. (JA276, 295, 310, 316, 332, 358).

2. In June 2009, Justin Walters told the plaintiff that he "had" the plaintiff's mother last night and that she was good. (JA316, 332).

3. On June 2, 2009, plaintiff could not find his blowtorch. When plaintiff found it in the shop, someone had written next to his name "sucks" in black permanent marker. The plaintiff informed John Fitch and Mike Hayes, in HR, of this incident. (JA297-298, 310, 316-317, 332, 310, 358).

4. In July 2009, Justin Walters through nuts and bolts at the plaintiff. When they landed in the parts washer, the fluid splashed onto the plaintiff. (JA270, 317, 334).

5. In September 2009, Justin Walters threw an apple at plaintiff's truck. The plaintiff told John Fitch about this, but Fitch did not reprimand Walters or do anything about it. (JA268-269, 276, 317, 332, 335, 359).

6. In October 2009, Justin Walters told the plaintiff that he was stupid and said "what the heck is wrong with you?" This comment was unwelcome and offensive.(JA269, 295, 311-312, 317, 356, 359).

The Plaintiff informed Fitch and the Brick about many of these events. (JA310-313, 316-317, 335, 358-359). The Plaintiff's supervisors never ended the sexual harassment or discrimination. (JA319, 338). The Plaintiff informed HR of the harassment. (JA308). The harassment and discrimination caused the Plaintiff to have nightmares and other emotional distress. (JA309, 319).

In September of 2009, the Plaintiff inquired with Brick about changing positions because he was having trouble in the shop and could not deal with the harassment and discrimination anymore. (JA317-318, 335, 336). Plaintiff asked to be transferred to the paint shop. (JA317-318, 335, 336). At first, Plaintiff was told he could not be transferred to the paint shop because he did not have experience. (JA300, 318). After Plaintiff told Brick that he did have painting experience Plaintiff was told he could not be transferred because there were no open positions. (JA301, 318). Plaintiff believes this to be a lie because (1) the paint shop had a lot of work to be done and people from the main shop would often go over to the paint shop to help out and (2) after he was terminated plaintiff was told that people from the main shop worked in the paint shop. (JA285, 301-302, 318).In response to not being transferred to the paint shop Plaintiff did state he may have to look for a new job because he could not take the harassment anymore. (JA280, 281, 286-287, 318). Plaintiff, however, did not intend that to mean that he quit or resigned from his current position, this simply meant he was looking for other jobs. In response,

Fitch suggested the Plaintiff take his vacation time. (JA286-287, 318). After

Plaintiff's return from vacation plaintiff was told that the Brick had informed

corporate that Plaintiff had resigned. (JA287, 318). The Plaintiff told the Brick that

he had not resigned. (JA318). At that time Plaintiff was informed that there were

no positions open except in maintenance and that October 31, 2009 would be the

Plaintiff's last day. (JA281, 283, 288, 318). Further, Brick said he would consent to

Plaintiff collecting unemployment. (JA288, 318).

On November 8, 2009, the plaintiff wrote a letter to corporate explaining

that he was sexually harassed at work, had complained of the same and that the

supervisors did nothing about it. (JA356).The Plaintiff further told corporate that

he felt "pushed out the door." (JA356)

## VI.   <u>SUMMARY OF ARUGMENT</u>

1. The District Court erred in a number of ways when it ruled that there is no

issue of material fact as to whether the Plaintiff is disabled as defined by the ADA

as amended. First, the District Court abused its discretion in refusing to consider a

medical report submitted by the Plaintiff as support of his diagnosis. Second, the

District Court applied the incorrect standard when assessing whether the evidence

supported a finding that Plaintiff's mental impairment substantially limited one or

more of his major life activities. Third, the District Court erred in discrediting

evidence submitted by the Plaintiff and failing to make all reasonable inferences in favor of the plaintiff.

2. The U.S. District Court erred in determining that there was no genuine issue of material fact as to whether Plaintiff was regarded as disabled under the ADA as the 2008 Amendments apply. The District Court erred in discrediting evidence submitted by the Plaintiff and failing to make all reasonable inferences in favor of the plaintiff.

3. The U.S. District Court erred in determining that there was no genuine issue of material fact as to whether the harassment Plaintiff was subject to was sufficiently severe and/or hostile and/or was not based on his gender in order to provide a prima facie case of a hostile work environment under of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2 (Title VII) or CFEPA. The District Court improperly discredited evidence submitted by the Plaintiff.

4. The U.S. District Court erred in determining that there was insufficient evidence to impute the co-workers harassment of the plaintiff to the employer, because, the Court failed to make all reasonable inferences in favor of the Plaintiff.

5. The U.S. District Court erred in finding that there was no genuine issue of material fact as to whether the Plaintiff was discriminated against based on his gender in violation of Title VII and/or CFEPA. The District Court failed to make all reasonable inferences in favor of the Plaintiff.

6. The U.S. District Court erred in determining that there was no genuine issue of material fact as to whether Plaintiff suffered an adverse employment action. The District Court failed to make all reasonable inferences in favor of the Plaintiff.

7. The U.S. District Court erred in determining that there was no causal connection between any adverse employment action and Plaintiff's termination and therefore, no genuine issue of material fact as to plaintiff's retaliation claims. The District Court failed to make all reasonable inferences in favor of the Plaintiff.

## VII.  <u>ARGUMENT</u>

The U.S. District Court erred in granting summary judgment in favor of the Defendant's on all counts. The U.S. District Court applied outdated case law that is in conflict with the congressional intent of the ADA as amended in 2008. In addition, the U.S. District Court erred in discrediting evidence provided by the Plaintiff based on the courts judgment of credibility which is inappropriate at the summary judgment stage. Further, the U.S. District Court failed to "draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment" as is required. <u>Rule v. Brine, Inc.,</u> 85 F.3d 1002, 1011 (2d Cir. 1996). The Plaintiff addresses each material factual dispute below.

## <u>1.</u>    <u>Genuine Issue of Material Fact as to whether the Plaintiff is "Disabled" Exists</u>

The District Court erred in a number of ways when it ruled that there is no issue of material fact as to whether the Plaintiff is disabled as defined by the ADA as amended. First, the District Court abused its discretion in refusing to consider a medical report submitted by the Plaintiff as support of his diagnosis. Second, the District Court applied the incorrect standard when assessing whether the evidence supported a finding that Plaintiff's mental impairment substantially limited one or more of his major life activities. Third, the District Court erred in discrediting evidence submitted by the Plaintiff and failing to make all reasonable inferences in favor of the plaintiff.

The District Court abused its discretion in refusing to consider the medical documentation presented by the Plaintiff. The District Court's rationale for refusing to consider the report was because the report was unsworn and therefore inadmissible hearsay. (JA432). This Court's review of the District Court's decision to exclude the medial report is under the abuse of discretion standard. <u>Capobianco v. City of New </u>York, 422 F.3d 47, 54 (2d Cir. 2005). The report submitted by the Plaintiff would be admissible at trial as a business record pursuant to the Federal Rules of Evidence Rule 803(6)[1]. Rule 803(6) of the Federal Rules of Evidence provides a hearsay exception for a record of a diagnosis. The plaintiff does not

---

[1] Text of Federal Rules of Evidence, Rule 803(6) is provided in the attached Addendum A

need an expert and can simply call a records keeper from Newington Children's Hospital to testify that making the record was a regular practice and the record was kept in the regular course of business. Therefore, the District Court abused its discretion in refusing to consider the medical records and then granting Summary Judgment on the basis that there was no medical support for Plaintiff's statement that he is disabled. (JA433).

The District Court applied the incorrect standard when assessing whether the evidence presented created an issue of fact as to whether the Plaintiff is disabled. Under the ADA, "disability" means; "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarding as having such an impairment." 42 U.S.C. § 12102(1)[2]. Major life activities include; learning and also includes operation of a major bodily function such as the brain. 42 U.S.C. § 12102(2)[3]. Plaintiff has provided evidence to support a finding under subsection (A). The District Court; however, applied the incorrect standard in determining there was no material issue of fact at to whether Plaintiff's impairment substantially limits one or more major life activity. The District Court cites to, Littleton v. Wal-Mart Stores, Inc. 231 Fed. Appx. 874, 877 (11th Cir. 2007), to support its position that "substantially limits" means the Plaintiff must present

---

[2] Text of the ADA, 42 U.S.C. § 12102(1) is provided in the attached Addendum A
[3] Text of the ADA, 42 U.S.C. § 12102(2) is provided in the attached Addendum A

evidence he is significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes. (JA433). The <u>Littleton</u> case is from 2007. The ADA was amended in 2008. One reason for the 2008 amendment was because Congress found that current "regulations defining the term "substantially limits" as "significantly restricted" are inconsistent with congressional intent, by expressing too high a standard." 42 U.S.C. § 12101(a)(8)[4]. Therefore, the standard applied by the District Court was inconsistent with the congressional intent behind the ADA and is too high of a standard. Under the amendment to the ADA the "factors considered in determining whether an individual is substantially limited in a major life activity include: '(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." <u>Buotote v. Illinois Tool Works, Inc.</u>, 815 F. Supp. 2d 549, 556 (D.Conn.2011). The Plaintiff has presented evidence that he was diagnosed with "mild mental retardation, and/or Borderline abilities" in 1990. (JA344-345, 303-304). The 1990 assessment reflects that the Plaintiff has been involved in specialized services since preschool. (JA345). The Plaintiff testified that to the present day he is a slow learner and has a hard time remembering things. (JA303-304, 315). Further, the Plaintiff testified that; he can only read at a third or fourth

---

[4] Text of the ADA, 42 U.S.C. § 12101(a)(8) is provided in the attached Addendum A

grade level, he has difficulty remembering things, difficulty with spelling and could never go to college because of his disability. (JA303-304). Therefore, Plaintiff has presented sufficient evidence, to at least create a material issue in dispute, that he has a severe permanent mental impairment that impacts his brain function and his ability to learn, both of which are considered major life activities under the ADA. 42 U.S.C. § 12102(2).

Lastly, the District Court improperly discredited Plaintiff's testimony that he is a slow learner and must go at a slower pace. (JA433). Credibility is not an issue to be decided at the summary judgment stage. This Court has held that, "assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996). Further, "in ruling on a motion for summary judgment, the district court is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment." Id. The Plaintiff's testimony that he is a slow learner, must go at a slower pace, and that he was diagnosed with slight mental retardation as a child are factual assertions from which inferences favorable to the Plaintiff should be drawn. (JA303). From those facts a reasonable inference can be drawn that the Plaintiff is disabled. Therefore, it was improper for the court to discredit those facts at the summary judgment stage.

14

Under CFEPA the definition of disability is broader and does not include the restrictive language "substantially limits one or more major life activities." See C.G.S. § 46a-51(20)[5]. Therefore, all that is necessary under CFEPA to be disabled is to have a mental disability, which the plaintiff has demonstrated through his deposition testimony and medical documents. (JA303-304, 315, 344-345).

Therefore, the District Court abused its discretion in failing to consider the medical records provided by the Plaintiff, erred in discrediting Plaintiff's testimony and applying the wrong standard which lead to the District Court's erroneous ruling that there was no genuine issue of material fact as to whether the Plaintiff was disabled under the ADA and CFEPA.

**2.** **Genuine Issue of Material Fact as to whether the Plaintiff was Regarded as "Disabled" Exists**

Even if the District Court was correct in finding there was no material issue in dispute as to whether Plaintiff suffered a mental impairment that interfered with a major life activity the Plaintiff has produced evidence that he was regarded as having such impairment. Under the ADA an individual can prove disability discrimination if he is regarded has having an impairment that substantially limits one or more major life activity regardless of whether that individual is actually disabled or not. 42 U.S.C. § 12102(1).

---

[5] Text of C.G.S. § 46a-51(20) is provided in the attached Addendum

A Plaintiff is regarded as having an impairment if the employer perceives and treats the plaintiff as if he has an impairment, regardless of his disability status. Francis v. City of Meriden, 129 F.3d 281, 284-85 (2d Cir. 1997). The Plaintiff presented evidence that he told his bosses when he first applied that he took special ed classes. (JA265, 316). Plaintiff testified that he told his supervisor he was slower than the other guys. (JA265-267).  Plaintiff testified that he was called stupid and intimidated when he asked for help, asked "what the heck is wrong with you." (JA269, 286-287, 295, 311-312, 317). Further, Plaintiff testified one time, after working on a ride all day, Fitch came to him and commented "your still work[ing] on that piece" "you should remember this by now". (JA299).  When Plaintiff requested a transfer to the paint department Brick assumed plaintiff had no experience and concluded plaintiff could not perform any jobs in the paint department. (JA300).  "In Coleman v. Keebler Co., 997 F.Supp. 1102, 1114 (N.D. Ind. 1998), the court held that evidence that the defendant concluded that the plaintiff could not perform any available jobs in a production plan created a material issue of fact on a "regarded as" claim." Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 188 (3rd Cir. 1999). As such, Plaintiff was regarded as having a mental impairment that substantially limited the major life activities of learning, working and brain function.

16

If the plaintiff's allegations are taken as true and all reasonably inferences are drawn in his favor then a reasonable jury could find that Plaintiff was regarded as disabled.  Therefore, the District Court erred in ruling there was no material factual dispute as to whether the Plaintiff was regarded as disabled.

**<u>3.</u>**    **<u>Genuine Issue of Material Fact as to Whether the Harassment Plaintiff was Subject to was Sufficiently Severe and Based on Gender Exists</u>**

When addressing the Plaintiff's allegations of sexual harassment and hostile work environment in violation of Title VII and CFEPA, the District Court erred in ruling that there was no material factual dispute as to whether a sufficiently severe work environment existed. Further, this District Court erred in ruling that there was no material factual dispute as to whether the harassment was based on gender.

In order to survive summary judgment on a claim for a hostile work environment, plaintiff must demonstrate a prima facie case showing: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." <u>Mack v. Otis Elevator Co.</u>, 326 F.3d 116, 122 (2d Cir. 2003) (citing <u>Richardson v. New York State Dep't of Corr. Serv.</u>, 180 F.3d 426, 436 (2d Cir.1999)). Further, the Plaintiff must prove that the abuse in question was based on his gender. <u>Raniola v. Bratton,</u> 243 F.3d 610, 621 (2d Cir. 2001).

In determining whether the actions were sufficiently severe the courts consider the "totality of the circumstances," including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance. Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004) (internal citations omitted); see also Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S. Ct. 2275, 2283 (1998). The Plaintiff has submitted evidence that the harassment he endured was not infrequent but occurred daily. (JA269, 271, 319). The plaintiff has presented testimony and an affidavit, that the conduct took a psychological toll on him, causing him embarrassment and humiliation, as well as emotional distress and nightmares. (JA308-309, 319). The facts reflect that; Walters, a co-worker, told Plaintiff to get on his knees, that's a good sport for him because he likes to look at men's crotch area.(JA270-271, 295, 310, 316, 332, 358). Walters said to Plaintiff that he "had" Plaintiff's mother last night and she was good. (JA316, 332). Further, Plaintiff found his blowtorch one day with the word "SUCKS" written after his name. (JA297-298, 310, 316-317, 332, 358).

Sufficient evidence has been provided to create a material issue of fact as to whether the defendant's conduct was sufficiently severe so as to create a hostile work environment. A reasonable jury in the Plaintiff's position could find being

told "get down on your knees that's the best spot for you," having "sucks" written after their name on their tools, and being stared down while working on their knees creates a hostile work environment. A reasonable jury could find that the actions were severe and physically humiliating. Further, a reasonable jury could find that the actions unreasonably interfered with Plaintiff's work performance, as a result of the harassment Plaintiff requested a move to the paint shop.

This District Court discredited evidence submitted by the Plaintiff asserting Plaintiff's affidavit contradicted his deposition testimony. Specifically, the District Court only credits the event where Walters told Plaintiff to get on his knees and that Walters would stare Plaintiff down while on his knees. (JA440-441). The District Court discredits the other incidents stating they contradict Plaintiff's testimony. (JA440, fn.10). The District Court cites to, Trans-Orient Marine Corp. v. Star Trading & Marine, Inc. 925 F.2d 566, 572-73 (2d Cir. 1991), for the position that "The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." (JA440). However, this Court has also held that "a material issue of fact may be revealed by his subsequent sworn testimony that amplifies or explains, but does not merely contradict his prior testimony, see, e.g. Villante v. Department of Corrections, 786 F.2d 516, 522 (2d Cir. 1986)." Rule v. Brine, Inc. 85 F.2d 1002, 1011 (2d Cir. 1996). The Plaintiff

did testify at his deposition about the event with the blowtorch and someone writing the word "SUCKS" after his name. (JA297-298, 310). Further, in Plaintiff's response to interrogatories, answered prior to his deposition, Plaintiff discussed the comment about his mother. Both of these instances were sworn to either during the deposition or prior.  Therefore, the Court again erred in refusing to credit Plaintiff's evidence. This Court has held that, "assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).  In this case the affidavit submitted by the Plaintiff contains more detail about the exact incidents that occurred during his employment. Plaintiff's affidavit does not dispute or flat out contradict his prior sworn testimony regarding these events.

The District Court further held that regardless of whether the conduct was sufficiently severe there is a lack of evidence that the discrimination was based on Plaintiff's gender. (JA441). The Court specifically states;

> "Adams testified that he believed that Walters discriminated against him because 'I don't have a girlfriend' and '[b]ecause I don't date girls, I don't go on dates.' Adams Tr. At 93:8-10, 95:13-16. However, Adams does not provide evidence that Walters was aware of the dating habits of Adams or their other co-workers" (JA441).

However, the Plaintiff testified that he was treated differently from the other male employees because "they're all married and have girls. So, of course he's not going

to say anything bad about those people. I was the only one that got picked on."

(JA294). A gender discrimination claim is cognizable under Title VII for

discrimination based on failing to conform to gender stereotypes.  See Price

Waterhouse v. Hopkins, 490 U.S. 228, 250-58 (1989) (finding gender

discrimination where plaintiff suffered adverse employment action because she did

not act femininely enough); Dawson v. Bumble & Bumble, 398 F.3d 211, 217-18

(2d Cir. 2005).  The facts in the record are that Plaintiff did not date girls, all the

other men were married or had girls and Plaintiff was treated differently because of

this. (JA292, 294). Taking the Plaintiff's allegations as true and drawing all

reasonable inferences in plaintiff's favor  a material issue of fact exists as to

whether the conduct of Walters was based on Plaintiff's gender or failure to

conform to gender stereotypes and the District Court erred in granting Summary

Judgment.

**4.    Genuine Issue of Material Fact as to Whether Conduct of the
       Defendant's Employees Should Be Imputed to the Employer Exists.**

The District Court erred in finding that the evidence did not support a

finding that a basis exists for imputing the conduct that created the hostile work

environment onto the Defendant.

The hostile work environment was created mostly by Plaintiff's co-worker

Walters. However, Walters conduct can be imputed to the Defendant if the

Defendant "either provided no reasonable avenue for complaint or knew of the

21

harassment but did nothing about it. Murray v. N.Y. Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir. 1995); quoting Kotcher v. Rosa & Sullivan Appliance Ctr., Inc. 957 F.2d 59, 63 (2d Cir. 1992).

The plaintiff has demonstrated enough evidence, to create a disputed material issue of fact, that the conduct of the defendant's employees should be imputed to the employer.  The plaintiff informed Fitch about many of these events, including the knees comment, and the plaintiff spoke with Fitch's supervisor, Mario Abela, in July and August of 2009 about the harassment and discrimination by Walters, a co-worker, and was told to give the guy a chance, that he wasn't so bad.  (JA276-279, 310-312, 316-317, 335, 358-359). Plaintiff's supervisors never ended the sexual harassment or discrimination that was created by plaintiff's co-workers.  (JA319, 338). Further, Plaintiff testified he was told by Fitch if he is going to work in the shop he has to deal with being picked on and harassed and can't complain everyday. (JA296, 308, 358). Therefore, plaintiff was neither given an avenue to complain nor was anything done about the complaints he did make.

Part of the District Court's rationale for finding no genuine issue of material fact as to whether the conduct should be imputed on the employer includes the court's belief that the Plaintiff's complaints to his employers were only general and there is no evidence the employer was aware Plaintiff was being harassed based on his sex. (JA443). However, the Plaintiff presented evidence that he did inform his

supervisor of specific incidents such as the "knees" incident. (JA276-279, 310-312, 316-317, 335, 358-359). The Plaintiff testified that he informed Fitch about someone writing the word "SUCKS" after his name on his blowtorch and Fitch just shook his head. (JA297-298, 358). Therefore, drawing all inferences in favor of the plaintiff the evidence supports that his supervisors knew about the harassment but did nothing to stop it or provide him with a reasonable avenue for complaint.

**5.**    **Genuine Issue of Material Fact as to Whether Plaintiff was Discriminated Against Based on Gender Exists.**

The District Court erred when it held that no reasonable jury could conclude that an adverse employment action occurred based on the Defendant's perception that the Plaintiff failed to conform to gender stereotypes.

A gender discrimination claim is cognizable under Title VII for discrimination based on failing to conform to gender stereotypes. See Price Waterhouse v. Hopkins, 490 U.S. 228, 250-58 (1989) (finding gender discrimination where plaintiff suffered adverse employment action because she did not act femininely enough); Dawson v. Bumble & Bumble, 398 F.3d 211, 217-18 (2d Cir. 2005). The claim is cognizable when the plaintiff alleges that the employer discriminated against him for failing to conform to gender stereotypes either through behavior or through appearance. Dawson, 398 F.3d at 221.

Plaintiff has presented evidence that he was not seen to be masculine enough. (JA292-294). The plaintiff received comments comparing him to feminine

23

sexual stereotypes, such as being on his knees and that he "sucks." Furthermore, the plaintiff believes that he was harassed because he was not married and did not date women, and thus was perceived as not manly enough. (JA292-294.). Plaintiff sworn in his affidavit that he was told by Fitch at times to "be a man" and "be tough." (316). Therefore, when drawing all reasonable inferences in favor of the plaintiff there is enough evidence for a reasonable jury to find that the Defendant perceived Plaintiff as failing to conform to gender stereotypes and discriminated against him on that basis.

The District Court further held that Plaintiff's gender discrimination counts failed because Plaintiff has failed to establish he suffered an adverse employment action (that argument is discussed below).

**6.** **Genuine Issue of Material Fact as to Whether Plaintiff Suffered and Adverse Employment Action Exists.**

The issue of whether the Plaintiff suffered an adverse employment action is material to every count brought in his complaint. The Plaintiff presented evidence of two adverse employment actions; (1) that Plaintiff was terminated or constructively discharged, and (2) that he was denied a transfer to the paint shop. The District Court erred in ruling that a reasonable jury could not conclude that the Plaintiff suffered either of the adverse employment actions alleged. The District Court failed to believe the evidence submitted by the plaintiff and draw all

reasonable inferences in his favor, as is required. <u>Anderson v. Liberty Lobby, Inc.</u>, 447 U.S. 242, 248-49 (1986).

First, there is sufficient evidence to create a material factual dispute as to whether the Plaintiff was terminated or resigned. The Plaintiff informed Brick that he wanted to change departments because he was having difficulty in the shop and could not deal with the harassment and being picked on anymore. (JA280-287, 301, 317, 335, 356). After being denied a transfer plaintiff said he might begin looking for other work; however, he never gave a verbal or written resignation. <u>Id</u>. While the Plaintiff did in fact start looking for other work he had not yet obtained a new position and did not intend to resign until he had found a new job. (JA282, 356). The Defendant clearly interpreted Plaintiff's comment that he would have to start looking for another job as a resignation. Plaintiff took his vacation time as suggested by Fitch and upon return was told that Brick had already informed corporate that Plaintiff was leaving and that October 31, 2009 would be his last day. (JA281, 287-288, 318). The circumstances are more consistent with a termination than a resignation. Defendant, not the Plaintiff, determined Plaintiff's last day would be October 31, 2009. Therefore, whether Plaintiff resigned or was terminated is a material issue in dispute and summary judgment should not have been granted based on that.

Second, at the very least the evidence supports a constructive discharge. Plaintiff testified he loved working at Lake Compounce and he never would have thought about looking for jobs elsewhere; however, the atmosphere was so intolerable the Plaintiff had no other choice but to leave. (JA271,309). Constructive discharge takes place when "an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily.  Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign" Chertkova. Conn. Gen. Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996).  In the present case the work atmosphere had reached an intolerable level. Plaintiff testified a number of times that he could not take the harassment anymore, he didn't want to be there anymore. (JA291, 309) Plaintiff testified that the harassment was daily and that it caused him embarrassment, nightmares, and emotional distress. (JA308-309, 319). The Plaintiff was subject to comments about his disability, such as that he was stupid and didn't know what he was doing and was unable to perform his job, in addition to other discriminatory comments based on gender. Further, the Plaintiff made his supervisors aware of the harassment, they did nothing to stop it, and rather told the plaintiff that he would be subject to harassment in the shop and they did not want to hear him complaint about it, and that he should toughen up and "be a man." (JA276, 296, 316). The

District Court held that plaintiff had not presented enough evidence, that when assessed objectively, it could be determined that a reasonable person in plaintiff's position would be compelled to quit. (JA448). The District Court cites to <u>Petrosino v. Bell Atlantic</u>, 385 F.3d 210, 230 (2nd Cir. 2004), in that case the Court found that although a reasonable jury could find that the work environment was deliberately hostile to women, the Plaintiff had endured this environment for eight years and therefore a reasonable jury could not conclude that the conduct compelled her resignation. The present case is distinguishable; the Plaintiff had worked for Lake Compounce for over ten years seasonally; however, Plaintiff had only worked as a mechanic helper, where he endured the harassment, for about a year. A reasonable person in the Plaintiff's position would have felt compelled to resign after being denied a transfer and told to "be a man" and deal with daily harassment including lewd comments, things being thrown at them and being picked on because of their disability. Further, if it is concluded that the Plaintiff resigned it was certainly an involuntarily resignation. "Relevant to this inquiry [is] (1) whether the employee was given an alternative to resignation, (2) whether the employee understood the nature of the choice [he] was given, (3) whether the employee was given a reasonable time in which to choose, and (4) whether the employee could select the effective date of resignation." <u>Rhoads v. Board of Educ. Of Mad River Local School Dist.</u>, 103 Fed. Appx. 888 (6th Cir. 2004); citing <u>Lenz v. Dewey</u>, 64 F.3d

547, 552 (10th Cir. 1995).  As addressed above, the Plaintiff was not provided an alternative to resignation as he was denied transfer to the paint shop and Plaintiff did not select the effective resignation date. Further, the Plaintiff presented evidence that he wrote to corporate, shortly after he left, complaining of the harassment and that he felt pushed out, supporting the fact that his resignation was involuntary. (JA356).

Lastly, Plaintiff suffered an adverse employment action when he was denied a transfer to the paint shop. Courts have held that a "denial of a transfer request may constitute an adverse employment action where an employee's work environment prior to the request is objectively unfavorable" Pimentel v. City of New York, 2002 WL 977535, *3 (S.D.N.Y 2002)(Citing Mechlenberg v. New York Off-Track Betting, 42 F. Supp.2d 359, 378 (S.D.N.Y 1999)(holding that denial of a request to transfer, from a department where working conditions were objectively unfavorable due to the measurable shortage in staff, to a department where conditions were more favorable constituted an adverse employment action). As mentioned above, due to the Plaintiff's intolerable work environment he requested a transfer to another department, the paint department. (JA280-287, 301, 317, 335, 356). The Defendant, assuming Plaintiff had no experience, first denied Plaintiff's request based on lack of experience. (JA300). After finding out the Plaintiff did have experience the Defendant denied the request stating there were

no open positions. (JA301, 318). There is no evidence that the Defendant informed Plaintiff if there were open positions in any other department. The Plaintiff has reason to believe there were open positions in the paint shop because there was a lot of work to be done and he subsequently learned that people from the main shop worked in the paint shop after he left. (JA285, 301-302, 318). Therefore, because the plaintiff's working conditions were so intolerable that he subsequently requested a transfer which was denied, the plaintiff suffered an adverse employment action.

## 7.    Genuine Issue of Material Fact as to Whether Plaintiff was Retaliated Against Exists.

The District Court erred when it held that Plaintiff's Title VII and CFEPA retaliation claims fail because there was no adverse employment action. [6](Addressed above). (JA451).  The District Court further erred with he held that even if an adverse employment action had occurred there was no causal connection between plaintiff's protected activity and the adverse employment action. (JA-451).  The District Court again failed to draw all reasonable inferences in plaintiff's favor, as is required. Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 248-49 (1986).

_____

[6] The Text of Title VII and CFEPA's Retaliation Statutes are provided in the attached Addendum

The plaintiff's retaliation claim is based on the plaintiff's termination following the complaints of sexual harassment, as well as because the plaintiff protested the discriminatory conduct and treatment he suffered because of his disability. (JA19). "'Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by' the adverse employment action or by evidence of disparate treatment of fellow similarly situated employees, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant.'" Blanco v. Brogan, 620 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2009) (citing Davis v. State Univ. of New York, 802 F.2d 638, 642 (2d Cir.1986); DeCintio v. Westchester County Med. Center, 821 F.2d 111, 115 (2d Cir.1987)). The plaintiff complained to John Fitch in February, June, July and September of 2009, to Mario Abela in the summer of 2009, and Jerry Brick in September 2009. (JA310-313, 316-319, 335). The complaints occurred in the month and several months preceding the termination in October 2009. Further, the Plaintiff has a long positive work history with the Defendant up until the harassment and discrimination began. (JA271). As such, there is a causal connection between the plaintiff's protected activity and the adverse employment action, and plaintiff's retaliation claims under Title VII and CFEPA should have surpassed summary judgment.

## VIII.  CONCLUSION

For all reasons set forth above, the Defendant should not have been granted summary judgment on all counts of Plaintiff's Complaint. Therefore, the decision of the U.S. District Court for the District of Connecticut should be reversed insofar as it erred in entering judgment for all claims in favor of the Defendant.

Respectfully Submitted,

Megan L Piltz, Esq.    CT 28813
James V. Sabatini, Esq.   CT 19899
SABATINI & ASSOCIATES, LLC
One Market Square
Newington, CT 06111
Tel. No: 860-667-0839
Fax No: 860-667-0867
e-mail: jsabatini@sabatinilaw.com
        mpiltz@sabatinilaw.com

## IX.    <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) because this brief contains 7248 words, excluding the parts of the
brief exempted by Fed. R. App. P. 32(A)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because
this brief has been prepared in a proportionally spaced typeface using Microsoft
Word 2003 in 14 point Times New Roman font.

MEGAN L. PILTZ
Attorney For Appellant
August 16, 2013

## <u>ADDEMDUM A – INDEX</u>

Relevant Text of the Americans with Disabilities Act…………………..….. B

Relevant Text of the Connecticut Fair Employment Practices Act………..…...I

Relevant Text of Title VII of the Civil Rights Act………….…..……….….…J

Relevant Text of the Federal Rules of Evidence………………………………K

**Relevant Text of the Americans with Disabilities Act of 1990,as Amended 42 U.S.C. §12101**

TITLE 42 - THE PUBLIC HEALTH AND WELFARE

CHAPTER 126 - EQUAL OPPORTUNITY FOR INDIVIDUALS WITH DISABILITIES

Sec. 12101. Findings and purpose

(a) Findings

The Congress finds that

(1) physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination;

(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

(4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;

(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the

B

discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;

(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;

(7) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and

(8) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.

(b) Purpose

It is the purpose of this chapter

(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

(2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

(3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and

(4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

C

Sec. 12101 note: Findings and Purposes of ADA Amendments Act of 2008, Pub. L. 110-325, Â§ 2, Sept. 25, 2008, 122 Stat. 3553, provided that:

(a) Findings

Congress finds that-

(1) in enacting the Americans with Disabilities Act of 1990 (ADA), Congress intended that the Act "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and provide broad coverage;

(2) in enacting the ADA, Congress recognized that physical and mental disabilities in no way diminish a person's right to fully participate in all aspects of society, but that people with physical or mental disabilities are frequently precluded from doing so because of prejudice, antiquated attitudes, or the failure to remove societal and institutional barriers;

(3) while Congress expected that the definition of disability under the ADA would be interpreted consistently with how courts had applied the definition of a handicapped individual under the Rehabilitation Act of 1973, that expectation has not been fulfilled;

(4) the holdings of the Supreme Court in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) and its companion cases have narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect;

(5) the holding of the Supreme Court in Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002) further narrowed the broad scope of protection intended to be afforded by the ADA;

(6) as a result of these Supreme Court cases, lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities;

(7) in particular, the Supreme Court, in the case of Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002),

D

interpreted the term "substantially limits" to require a greater degree of limitation than was intended by Congress; and

(8) Congress finds that the current Equal Employment Opportunity Commission ADA regulations defining the term "substantially limits" as "significantly restricted" are inconsistent with congressional intent, by expressing too high a standard.

(b) Purposes

The purposes of this Act are-

(1) to carry out the ADA's objectives of providing "a clear and comprehensive national mandate for the elimination of discrimination" and "clear, strong, consistent, enforceable standards addressing discrimination" by reinstating a broad scope of protection to be available under the ADA;

(2) to reject the requirement enunciated by the Supreme Court in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures;

(3) to reject the Supreme Court's reasoning in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) with regard to coverage under the third prong of the definition of disability and to reinstate the reasoning of the Supreme Court in School Board of Nassau County v. Arline, 480 U.S. 273 (1987) which set forth a broad view of the third prong of the definition of handicap under the Rehabilitation Act of 1973;

(4) to reject the standards enunciated by the Supreme Court in Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), that the terms "substantially" and "major" in the definition of disability under the ADA "need to be interpreted strictly to create a demanding standard for qualifying as disabled," and that to be substantially limited in performing a major life activity under the ADA "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives";

E

(5) to convey congressional intent that the standard created by the Supreme Court in the case of Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002) for "substantially limits", and applied by lower courts in numerous decisions, has created an inappropriately high level of limitation necessary to obtain coverage under the ADA, to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis; and

(6) to express Congress' expectation that the Equal Employment Opportunity Commission will revise that portion of its current regulations that defines the term "substantially limits" as "significantly restricted" to be consistent with this Act, including the amendments made by this Act.

Sec. 12102. Definition of disability

As used in this chapter:

(1) Disability

The term "disability" means, with respect to an individual

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment (as described in paragraph (3)).

(2) Major Life Activities

(A) In general

For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting,

bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

(B) Major bodily functions

For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

(3) Regarded as having such an impairment

For purposes of paragraph (1)(C):

(A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

(B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

(4) Rules of construction regarding the definition of disability

The definition of "disability" in paragraph (1) shall be construed in accordance with the following:

(A) The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.

(B) The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

G

(C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

(D) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(E)

> (i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as
>
> > (I) medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;
> >
> > (II) use of assistive technology;
> >
> > (III) reasonable accommodations or auxiliary aids or services; or
> >
> > (IV) learned behavioral or adaptive neurological modifications.
>
> (ii) The ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.
>
> (iii) As used in this subparagraph
>
> > (I) the term "ordinary eyeglasses or contact lenses" means lenses that are intended to fully correct visual acuity or eliminate refractive error; and
> >
> > (II) the term "low-vision devices" means devices that magnify, enhance, or otherwise augment a visual image.

H

## <u>Relevant Text of the Connecticut Fair Employment Practices Act</u>
## <u>Conn. Gen. Stat. Sec. 46a-60</u>

C.G.S. Sec. 46a-60. (Formerly Sec. 31-126). Discriminatory employment practices prohibited. (a) It shall be a discriminatory practice in violation of this section:

(1) For an employer, by the employer or the employer's agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or physical disability, including, but not limited to, blindness;

(2) For any employment agency, except in the case of a bona fide occupational qualification or need, to fail or refuse to classify properly or refer for employment or otherwise to discriminate against any individual because of such individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or physical disability, including, but not limited to, blindness;

(3) For a labor organization, because of the race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or physical disability, including, but not limited to, blindness of any individual to exclude from full membership rights or to expel from its membership such individual or to discriminate in any way against any of its members or against any employer or any individual employed by an employer, unless such action is based on a bona fide occupational qualification;

(4) For any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint or testified or assisted in any proceeding under section 46a-82, 46a-83 or 46a-84;

C.G.S. Sec. 46a-51. (Formerly Sec. 31-122). Definitions. As used in section 4a-60a and this chapter

(20) "Mental disability" refers to an individual who has a record of, or is regarded as having one or more mental disorders, as defined in the most recent edition of the American Psychiatric Association's "Diagnostic and Statistical Manual of Mental Disorders"

## Relevant Text of Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991

SEC. 2000e-2 *[Section 703]*

(a) Employer Practices

It shall be an unlawful employment practice for an employer-

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

> (2) to limit, segregate, or classify his employees or applicants for employment in      any way which would deprive or tend to deprive any individual of employment      opportunities or otherwise adversely affect his status as an employee, because of      such individual's race, color, religion, sex, or national origin.

SEC. 2000e-3 *[Section 704]*
(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applications for employment, for an employment agency, or a joint labor-management committee controlling apprenticeship or other training or retraining, including on the job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

J

**Relevant Text from the Federal Rules of Evidence**

**Rule 803**
The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

**(6) Records of a Regularly Conducted Activity.** A record of an act, event, condition, opinion, or diagnosis if:
>    (A) the record was made at or near the time by – or from information transmitted by – someone with knowledge;
>    (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>    (C) making the record was a regular practice of that activity;
>    (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitted certification; and
>    (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.